UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

ROXANNE DAWSON

      Plaintiff,

vs.

STUDENT LOAN SOLUTIONS, LLC
ROACH & MURTHA ATTORNEYS AT LAW, P.C.

      Defendants.

_____

Case No.: 1:23-cv-09690

**PLAINTIFF'S LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
PURSUANT TO LOCAL CIVIL RULE 56.1**

In accordance with Local Civil Rule 56.1 and the Court's Individual Rule 5.C.ii, Plaintiff

in the above-captioned action respectfully submits this Local Rule 56.1 Statement of Undisputed

Facts.

**Plaintiff's Statements of Material Fact:**

**A.      Origination**

1.      On November 29, 2007, Plaintiff Roxanne Dawson ("Plaintiff") and her father, Isaiah Dawson, signed a "Loan Request/Credit Agreement" with Bank of America, N.A. for a student loan for Plaintiff ("Plaintiff's Loan").  Ex. E to the January 14, 2025 Declaration of Jessica Ranucci ("Ranucci Decl")[1] (SLS065-66).

2.      Ms. Dawson's loan was a "Education Maximizer" loan guaranteed by The Education Resources Institute, Inc. ("TERI"). Ex. E (SLS065).

3.      TERI was a guaranty agency for securitized student loans that went bankrupt in 2008. *See generally In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145 (D. Mass. 2009).

4.      Ms. Dawson's father was a co-signer for Plaintiff's Loan. Ex. E (SLS065).

5.      Ms. Dawson had an agreement with her father that he would make the payments on Plaintiff's Loan. Declaration of Roxanne Dawson ("Dawson Decl.") ¶ 3.

6.      In connection with Plaintiff's Loan, Bank of America, N.A. ("Bank of America") disbursed to Plaintiff and/or her father $30,000 on or about December 10, 2007.  Ex. E (SLS074).

7.      A loan origination fee of $3,519.55 was assessed on Plaintiff's Loan. Ex. E (SLS074).

8.      Plaintiff's Loan had a variable interest rate of 7.25% above the LIBOR index. Ex. E (SLS065); Ex. E (SLS067, ¶ D.2).

9.      The Credit Agreement ("Loan Note") between Plaintiff and Bank of America, Ex. E (SLS067-71), states:

---

[1] All documents cited here are exhibits to the January 14, 2025 Declaration of Jessica Ranucci unless otherwise noted.

a. "To the extent permitted by applicable law, I will be in default and you have the right to give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under the terms of this Credit Agreement, are due and payable at once (subject to any applicable law which may give me a right to cure my default) if: (1) I fail to make any monthly payment to you when due. . . ." Ex. E (SLS068, ¶ I).

b. "You will not be obligated to make any demand upon me, send me any notice, present this Credit Agreement to me for payment or make protest of non-payment to me before suing to collect on this Credit Agreement if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions." Ex. E (SLS069, ¶ L.3).

c. "My Monthly Payment Amount will be calculated as of the day the Repayment Period begins ("Repayment Date"). It will be recalculated (a) once each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the Monthly Payment Amount would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date"). As of any Repayment Date, my Monthly Payment Amount will be recalculated. My new Monthly Payment Amount will be disclosed to me by the servicer. The new Monthly Payment Amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation. I understand that this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period (and, if I have elected the "interest Only" repayment option, during the period of interest payments) the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer." Ex. E (SLS068, ¶ E.3)

d. "Beginning on the Disbursement Date, interest will be calculated at the Variable Rate (Paragraph D.2) and charged on the Principal Sum, and on any unpaid interest later added to the Principal Sum according to Paragraph D.3. During the Repayment Period, interest will be calculated at the Variable Rate and charged on the outstanding balance of this Credit Agreement until all amounts are paid in full. Interest will be calculated on a daily simple interest basis. The daily interest rate will be equal to the annual interest rate in effect on that day, divided by the number of days in that calendar year." Ex. E (SLS067, ¶ D.1)

e. "The "Variable Rate" is equal to the Current Index plus a Margin. The Margins for both the Deferment Period and the Repayment Period are shown on the first

3

page of this Credit Agreement. In no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the State of California. The Variable Rate will change monthly on the first day of each calendar month (the "Change Date(s)") if the Current Index changes. The "Current Index" for any calendar month (or for any shorter period beginning on the Disbursement Date and ending on the last day of a calendar month) is based on the one-month London Interbank Offered Rate ("LIBOR") as published in the "Money Rates" section of *The Wall Street Journal* (Eastern Edition). The index for each calendar month (or for any shorter period beginning on a Disbursement Date and ending on the last day of a calendar month) will equal the LIBOR rate published on the first business day of the immediately preceding calendar month, rounded to the nearest one-hundredth of one percent (0.01%). If *The Wall Street Journal* (Eastern Edition) is not published or the Current Index is not given on that date, then the Current Index will be determined by using the immediately preceding published Current Index for such date. If the Current Index is no longer available, you will choose a comparable index." Ex. E (SLS067, ¶ D.2)

f.  "If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), I am not obligated to make any payments until the loan enters the Repayment Period and you will add unpaid accrued interest to the principal loan balance as of the last day of each calendar quarter (the last day of December, March, June and September) during the Deferment Period and as of the last day of my Deferment Period. Interest that is added to principal is called "Capitalized" interest. Capitalized interest will be treated as principal. In addition, if I am in default (see Paragraph I) and the loan has been sold to TERI (see Paragraph L.12), TERI may capitalize accrued and unpaid interest as of the date it purchases my loan. I understand that you will also add all accrued and unpaid interest to the principal balance of my loan at the end of any forbearance period (see Paragraph H)." Ex. E (SLS067-68, ¶ D.3)

g.  "Payments will be applied first to late fees, other fees and charges, accrued interest and the remainder to principal." Ex. E (SLS067-68, ¶ E.5)

10.  The note disclosure statement for Plaintiff's Loan, Ex. E (SLS074), provides:

a.  Plaintiff's Loan would be repaid in 240 monthly payments beginning in December 2010, Ex. E (SLS074);

b.  A monthly payment amount of $519.51, Ex. E (SLS074);

c.  "All numerical disclosures except the late payment disclosure are estimates." Ex. E (SLS074).

4

11.     From April 1, 2008 to March 1, 2012, interest accrued on Ms. Dawson's loan and capitalized quarterly. Ex. E (SLS076-77).

12.     Each Class Member had a private student loan with Bank of America ("Class Members' Loans"). Ex. A (SLS Tr. 46:14-19); ECF 75-1 (SLS407); *see also* Mem. of Law (defining Class as individuals with private student loan purchased from Bank of America).

13.     Most Class Members' Loans were originated by Bank of America itself, but a small minority of Class Members had their loans originated by Fleet Bank and then those loans became owned by Bank of America when Bank of America acquired Fleet Bank in 2004. Ex. A (SLS Tr. 46:14-19).

14.     ██ Class Members obtained their loans in 2007 and ██ obtained them prior to 2008. Ex. A (SLS Tr. 46:20-22); Ex. AA (Loan Tape).[2]

15.     Class Members' loans have variable interest rates of LIBOR plus margin. *Supra* ¶ 9.

16.     SLS did not "choose a comparable index" when LIBOR became defunct. Ex. A (SLS Tr. 130:10-18).

17.     Each Class Member entered into a Credit Agreement ("Class Member Loan Note") that had terms identical to one of eight template loan notes. Ex. A (SLS Tr. 123:24-126:8); Ex. B (W&F Tr. 75:18-76:17).

18.     The eight template loan notes are identified by the following, Ex. F (SLS625-683):

    a.  BK.05-06.CSX1.10SC.0105 (SLS625-631)

    b.  BA.06-07.UNGT.10.0306 (SLS632-635 and SLS679-683)

    c.  BK.07-08.CRRD.10MED.0207 (SLS636-641)

---

[2] Certain information is redacted from the public version of this 56.1 statement pursuant to the Court's order, ECF No. 79, provisionally requiring this information to be filed under seal and the Confidentiality Order, ECF No. 27.

    d.  BK.07-08.CRWO.10SC.1106 (SLS642-648)

    e.  BK.07-08.CSX1.10DC.0107 (SLS649-655 and SLS672-678)

    f.  PF.02-03.CRWO.10ISLP.0502 (SLS656-660)

    g.  PF.03-04.CSX1.10.0303 (SLS661-665)

    h.  BK.07-08.CRWO.10DC.0107 (SLS667-671)

19.    Seven of the eight template loan notes have terms identical to each of the terms in Plaintiff's Loan Note reproduced above in ¶ 9, Ex. F (SLS625-631 and SLS636-678).

    a.  BK.05-06.CSX1.10SC.0105 (SLS625-631)

    b.  BK.07-08.CRRD.10MED.0207 (SLS636-641)

    c.  BK.07-08.CRWO.10SC.1106 (SLS642-648)

    d.  BK.07-08.CSX1.10DC.0107 (SLS649-655 and SLS672-678)

    e.  PF.02-03.CRWO.10ISLP.0502 (SLS656-660)

    f.  PF.03-04.CSX1.10.0303 (SLS661-665)

    g.  BK.07-08.CRWO.10DC.0107 (SLS667-671)

20.    The eighth template loan note, Ex. F (SLS632-635 and SLS679-683), has the following terms:

    a.  "The entire outstanding balance and any interest accrued hereon shall become immediately due and payable at the option of Lender, without notice or demand, together with all costs of collection and reasonable attorneys' fees, if Borrower and Cosigner shall be in default." (SLS633, ¶6)

    b.  "I will also pay all late charges, reasonable attorneys' fees and other costs necessary for collection of any amount not paid when due, including without limitation reasonable collection agency costs." (SLS632, ¶1.A)

    c.  "Payments of principal and interest shall become due monthly, starting eight months following the date I cease to be Enrolled at an Eligible Institution (see Section 2(f)) as reported by the National Clearing House of the Eligible Institution, but no longer than five (5) years plus eight (8) calendar months after the first disbursement date (the "First Payment Due Date")." (SLS632, ¶2.A)

    d.  "Interest on this Note shall accrue from the date of each disbursement and shall be added to the Principal Sum when repayment begins, and such capitalized interest shall be repaid with other principal balances." (SLS632, ¶2.C)

    e.  "Payments received on this Note shall be allocated in the following order: (i) to accrued interest, (ii) to late charges and expenses of Lender in connection with collecting past due amounts, if any, and (iii) to outstanding principal provided however, that no otherwise timely payments shall be deemed late solely because Borrower owes a late fee with respect to a past payment." (SLS633, ¶ 2.E)

**B.**    **Bank of America Collection and Charge Off**

21.    The first payment on Ms. Dawson's loan was due December 9, 2010. Ex. E (SLS074).

22.    Bank of America's records show that the balance on Ms. Dawson's loan in December 2010 was $43,514.84. Ex. E (SLS076-77).

23.    Neither Ms. Dawson nor her father made a payment on or before December 9, 2010. Ex. E (SLS076-77).

24.    On or before July 23, 2012, Plaintiff and/or Plaintiff's father failed to pay the loan as agreed. Ex. E (SLS076-79).

25.    On or before July 23, 2012, Plaintiff's Loan was in default. Ex. E (SLS076-79).

26.    On July 23, 2012, Bank of America charged off Ms. Dawson's loan for $48,840.17 (the "charge off balance"), inclusive of $47,441.33 in principal and $1,398.84 in interest. Ex. E (SLS077).

27.    No interest accrued on Ms. Dawson's loan after the charge off date. Ex. G (SLS217).

28.    Bank of America charged off each Class Member's Loan. ECF No. 75-1 (SLS414 ¶1(f)); Ex. A (SLS Tr. 46:23-24).

29.    ██████ Class Members' Loans were charged off by Bank of America between 2009 and 2014. Ex. AA (Loan Tape).

30. Each of the Class Members' Loans was in default. ECF No. 75-1 (SLS414 ¶1(f)); Ex. A (SLS Tr. 46:25-47:1).

31. Each Class Member failed to pay their Loan as agreed. ECF No. 75-1 (SLS414 ¶1(f)); Ex. A (SLS Tr. 46:25-47:1).

32. Once Class Members' Loans were charged off by Bank of America, they were sent to collections. Ex. B (W&F Tr. 28:9-12).

33. Once Class Members' Loans were charged off by Bank of America, they did not accrue interest. Ex. A (SLS Tr. 138:10-13).

34. Once Class Members' Loans were charged off by Bank of America and sent to collections, borrowers were not sent monthly bills. Ex. A (SLS Tr. 174:12-16).

35. Bank of America does not currently have any records regarding Plaintiff's Loan. Ex. W (PLAINTIFF000764).

36. Bank of America's website states that it "keep[s] copies of [] statements for up to 7 years." *Account Statement FAQs*, BANK OF AMERICA, https://www.bankofamerica.com/deposits/account-statements-faqs/ (last visited Jan. 13, 2025)

37. Williams & Fudge, Inc. ("W&F") is a debt collector. Ex. B (W&F Tr. 20:13-16).

38. W&F collects debt on behalf of over 1,500 clients. Ex. B (W&F Tr. 164:13-18).

39. W&F specializes in student loans. Ex. B (W&F Tr. 188:22-189:9).

40. Bank of America hired W&F to collect on Class Members' Loans beginning in 2010. Ex. B (W&F Tr. 26:1-11).

41. Bank of America hired W&F to collect the full charge-off balance from Class Members. Ex. B (W&F Tr. 104:14-105:5).

8

42. On October 10, 2012, W&F began collecting on Plaintiff's Loan on behalf of Bank of America. Ex. G (SLS217); Ex. A (SLS Tr. 171:15-18).

43. W&F attempted to collect on Plaintiff's Loan on behalf of Bank of America from approximately October 10, 2012 until the loan was sold to SLS on October 31, 2017. Ex. G (SLS217).

44. Prior to March 10, 2014, W&F attempted to collect the charge-off balance from Ms. Dawson. Ex. A (SLS Tr. 176:4-8).

45. A series of payments totaling a net $488.40 were made on Ms. Dawson's account in March and April 2013. Ex. E (SLS079).

46. The last payment on Ms. Dawson's account was made on April 11, 2013. Ex. E (SLS079).

47. As of April 12, 2013, the balance on Ms. Dawson's account was $48,351.77 ($48,840.17 less the $488.40 in payments). Ex. G (SLS217-221).

48. On April 15, 2015, W&F, as Bank of America's collector, sent an email to Ms. Dawson stating she has "a loan balance in my office that is due." Ex. H (SLS403); Ex. G (SLS262).

49. On or about April 16, 2015, W&F sent a letter to Ms. Dawson's father stating that W&F "represent[s] the above creditor(s) to collect the total amount from you in connection with a delinquent debt" and listed an "Amount Due." Ex. I (SLS559); Ex. A (SLS Tr. 177:18-178:11); Ex. G (SLS262).

50. On or about June 22, 2015, W&F sent a letter to Ms. Dawson stating that W&F was "retained" by Bank of America "to collect the total amount from you in connection with a delinquent account(s). We want to find a way to work with you in order to clear this outstanding

balance" and listed an "Amount Owed." Ex. I (SLS550); Ex. A (SLS Tr. 180:1-21); Ex. G (SLS261).

51.    On May 30, 2016, W&F sent an email to Ms. Dawson stating: "We are contacting you and Isaiah Dawson on behalf of Bank of America regarding your educational loan SL732493850 in the amount of $48,351.77. Roxanne, your balance listed is due . . . ." Ex. J (Document produced by SLS on July 8, 2024 without Bates number); Ex. G (SLS256).

52.    W&F attempted to collect on all Class Members' Loans on behalf of Bank of America. Ex. A (SLS Tr. 43:13-16, 44:14-19, 47:2-5).

53.    W&F's template collection notices sought the full charge-off balance from Class Members. Ex. A (SLS Tr. 182:19-183:4); Ex. B (W&F Tr. 106:24-109:1); Ex. I (SLS547-560).

54.    All W&F collection letters are made from templates. Ex. B (W&F Tr. 58:5-59:16, 102:12-20); Ex. K (W&F Settlement and Payment Policies, SLS194).

55.    Mr. Ruh, on behalf of SLS, testified that that the collection letter templates "don't change much. Collection letters are collection letters." Ex. A (SLS Tr. 179:23-25).

56.    W&F's policy from at least 2017 to the present is that its collectors request that the consumer pay the full balance due and disclose the total balance on the account in every call to a consumer. Ex. K (SLS194); Ex. B (W&F Tr. 107:18-109:1).

57.    W&F had a contract with Bank of America to attempt to collect on the charged-off balance from Class Members. Ex. B (W&F Tr. 104:14-105:7).

58.    W&F's account notes show all collection actions taken by W&F on an account. Ex. B (W&F Tr. 70:2-6, 61:8-15).

59.    All of W&F's account notes from before 2014 were destroyed in 2015. Ex. B (W&F Tr. 63:21-64:6, 79:10-21, 86:12-87:2, 186:11-19) Ex. A (SLS Tr. 172:1-15).

### C. Creation of SLS

60.    In 2008, Student Loan Solutions, LLC was formed. Ex. A (SLS Tr. 21:7-9).

61.    SLS was headquartered at the home of Christopher Ruh. Ex. A (SLS Tr. 21:12-25).

62.    Christopher Ruh is the managing member and general manager of SLS. Ex. A (SLS Tr. 17:4-10).

63.    Mr. Ruh is responsible for the day-to-day operations of SLS. Ex. A (SLS Tr. 17:20-22).

64.    Mr. Ruh is the President of W&F. Ex. A (SLS Tr. 17:11-13).

65.    Prior to becoming President of W&F, Mr. Ruh was a Vice President of W&F. Ex. B (W&F Tr. 12:19-13:18).

66.    There are five other members of SLS: Bob Perrin, Clay Goodyear, David Williams, Gary Williams, and Chad Echols. Ex. A (SLS Tr. 19:7-11).

67.    All six members of SLS are current or former employees or owners of W&F. Ex. A (SLS Tr. 19:1-11, 39:19-23, 39:24-40:3); Ex. B (W&F Tr. 17:23-18:4, 18:7-18, 23:24-24:12).

68.    All six members of SLS have an equal one-sixth ownership share. Ex. A (SLS Tr. 195:9-18).

69.    Each of SLS's members draws a salary from SLS, and at times have been paid bonuses. Ex. A (SLS Tr. 20:19-21, 37:10-18).

70.    SLS describes itself as a "passive debt buyer." Ex. A (SLS Tr. 18:2-3, 24:17).

71.    SLS's sole business is purchasing defaulted student loans. Ex. A (SLS Tr. 24:16-20).

72.    SLS hires W&F to collect on the defaulted student loans it purchases. Ex. A (SLS Tr. 26:3-14); Ex. L (SLS141-146).

73.     SLS's only source of revenue is money that is remitted to SLS from debt collectors who collect that money from borrowers on SLS's behalf. Ex. A (SLS Tr. 36:9-23).

74.     SLS does not have any employees. Ex. A (SLS Tr. 31:16-18).

75.     SLS has no administrative or support staff. Ex. A (SLS Tr. 31:16-18).

76.     SLS does not have a website. Ex. A (SLS Tr. 31:22-32:2).

77.     SLS does not have a phone number. Ex. B (W&F Tr. 33:8-10).

78.     Most of SLS's communications go through Mr. Ruh's and other employees' W&F email addresses and phone numbers. Ex. A (SLS Tr. 32:3-15); Ex. B (W&F Tr. 32:21-34:2).

79.     SLS does not have any database or computer server. Ex. A (SLS Tr. 32:19-20).

80.     SLS does not maintain records for the loans it purchases separate from W&F's records. Ex. A (SLS Tr. 32:21-33:18, 40:10-41:3, 74:10-18).

81.     SLS does not have any formal policies. Ex. A (SLS Tr. 32:16-18).

82.     Mr. Ruh does not keep track of when he is working for SLS or W&F. Ex. B (W&F Tr. 36:20-37:18).

83.     Mr. Ruh testified that he does not communicate with W&F employees in his SLS role because "the person [he] would communicate with is [him]self." Ex. B (W&F Tr. 40:7-16).

**D.     SLS Purchase of Class Members' Loans**

84.     On October 31, 2017, SLS purchased ▮▮▮▮ private student loans from Bank of America, including Plaintiff's Loan and all Class Members' Loans in a single transaction. ECF No. 75-2 (SLS216).

85.     The total aggregate loan balance of the loans SLS purchased in the transaction was ▮▮▮▮▮▮▮▮. ECF No. 75-2 (SLS216).

86.     Bank of America and SLS entered into a Loan Sale Agreement governing the transaction, ECF No. 75-1 (SLS 407-440), which states:



87.    Bank of America sold the Loans for ███ of their balance. ECF No. 75-1 (SLS410, ¶ i); ECF No. 75-3 (SLS Tr. 52:14-21).

88.    SLS paid approximately ████ for loans with a face value of ████████. ECF No. 75-3 (SLS Tr. 51:23-24); ECF No. 75-2 (SLS216).

89.    Mr. Ruh negotiated the purchase from Bank of America. Ex. A (SLS Tr. 45:20-21).

90.    Mr. Ruh and a colleague analyzed the projected return from the purchase based on data from W&F's prior collection efforts on the portfolio of loans that was to be purchased. Ex. A (SLS Tr. 48:5-20,49:14-50:1).

91.    Mr. Ruh, on behalf of SLS, testified that he did these calculations without writing them down except possibly "on a scratch sheet of paper." Ex. A (SLS Tr. 48:21-22, 50:7-11).

92.    At the time of the purchase, SLS expected to collect ███ of the loan balance— about ██ times what it paid for the loans. Ex. A (SLS Tr. 50:12-14); ECF No. 75-3 (SLS Tr. 51:1-53:1).

93.    Mr. Ruh orally recommended to SLS's other members that the portfolio be purchased. Ex. A (SLS Tr. 48:23-49:7).

94.    SLS did not review Bank of America's underwriting standards when negotiating the purchase. Ex. A (SLS Tr. 56:2-4).

95.    SLS obtained the funds it needed for the purchase as follows: ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ Ex. C (Ruh Tr. 16:18-17:14); Ex. A (SLS Tr. 195:21-196:1); ECF No. 75-4 (62:7-23, 63:3-8, 197:1-10).

14

96.     At the time of the purchase, SLS intended to file lawsuits on the loans. Ex. A (SLS Tr. 60:14-16).

97.     Chad Echols, one of the members of SLS and former inside counsel to W&F ███ ███████████████████████ ECF No. 75-4 (SLS Tr. 199:4-15); Ex. B (W&F Tr. 54:9-11).

98.     The Echols Firm ████████████████████████████████ ECF No. 75-4 (SLS Tr. 65:21-24).

99.     The Echols Firm—including Chad Echols— ████████████████████████ ████████████████████ ECF No. 75-4 (SLS Tr. 200:8-16).

100.    The Echols Firm later created a state-by-state analysis of statute of limitations law for SLS's use in litigation against Class Members. Ex. A (SLS Tr. 159:14-21); Ex. BB (SLS763-807).

101.    The Echols Firm was ████████████████████████ Ex. B (W&F Tr. 54:9-11).

102.    Upon purchase, Bank of America transferred to SLS each Class Member's Loan Note, accompanying note disclosure statement, and payment history, as well as an excel file with data about the Class called the Loan Tape. Ex. A (SLS Tr. 72:18-74:9).

103.    These records were maintained solely in W&F's database. Ex. A (SLS Tr. 74:10-18).

104.    Other than the Loan Notes, note disclosure statements, payment histories, and Loan Tape, SLS did not ever obtain or review any records from Bank of America, such as bills, monthly statements, collection letters or charge off statements. Ex. A (SLS Tr. 76:10-24).

105.    Mr. Ruh, on behalf of SLS, testified that he "ha[s] no idea" whether Bank of America hired any third parties other than W&F to collect Ms. Dawson's loan prior to 2014. Ex. A (SLS Tr. 175:1-6).

106.    Mr. Ruh, on behalf of SLS, testified that he "ha[s] no idea" whether Bank of America sent a charge-off notice to Ms. Dawson or Class Members prior to March 10, 2014. Ex. A (SLS Tr. 175:10-17).

107.    SLS does not have any records from which it could determine if Bank of America sent a charge-off notice to Ms. Dawson or Class Members prior to 2014. Ex. A (SLS Tr. 175:10-17).

108.    SLS does not have any records from which it could determine if Bank of America sent bills to Ms. Dawson or Class Members prior to 2014. Ex. A (SLS Tr. 173:14-174:25).

109.    SLS does not have any records from which it could determine if any third-party collector besides W&F attempted to collect on Ms. Dawson and Class Members' Loans prior to March 10, 2014. Ex. A (SLS Tr. 175:1-9).

## E.    Collection of Loans by W&F on behalf of SLS

110.    After the October 31, 2017 purchase, SLS hired W&F to collect on Ms. Dawson's and Class Members' loans. Ex. A (SLS Tr. 26:3-8).

111.    SLS's contract with W&F required it to "achieve a maximum recovery of debts" Ex. L (SLS143, ¶ 11).

112.    W&F uses the mail to collect debt on behalf of SLS. Ex. B (W&F Tr. 21:19-24).

113.    Mr. Ruh, on behalf of W&F, testified that before SLS litigated on Class Members' Loans, W&F attempted to collect the full charge-off balance from Class Members. Ex. B (W&F Tr. 105:8-106:2).

16

114.    W&F's policy and practice was to only send collection letters to Class Members from pre-approved templates. Ex. B (W&F Tr. 58:5-59:16, 101:12-20); Ex. M (SLS182).

115.    On or about November 10, 2017, W&F sent Ms. Dawson a letter stating: "We were hired by Student Loan Solutions, LLC to collect the amount owed" and listed an "Amount Due." Ex. G (SLS253); Ex. A (SLS Tr. 187:3-188:16); Ex. T (PLAINTIFF000762-763).

116.    On or about November 10, 2017, SLS sent a nearly identical letter to each Class Member created from a template. Ex. A (SLS Tr. 187:3-188:16); Ex. T (PLAINTIFF000762-763).

117.    On March 26, 2018, W&F called Ms. Dawson's father to attempt to collect the $48,351.77 balance. Ex. G (SLS249); Ex. N (transcript).

118.    On August 18, 2018, W&F called Ms. Dawson's father to attempt to collect the $48,351.77 balance. Ex. G (SLS246); Ex. N (transcript).

119.    On January 24, 2019, W&F called Ms. Dawson's father to attempt to collect the $48,351.77 balance. Ex. G (SLS239); Ex. N (transcript).

120.    All collections letters sent by W&F prior to 2018 have been destroyed. Ex. A (SLS Tr. 176:24-177:12); Ex. B (W&F Tr. 95:18-96:23, 100:1-6).

**F.    W&F's Statute of Limitations System**

121.    W&F's Debt Manager software performs a daily scan to identify any account that is beyond the statute of limitations. Ex. P (SLS539); Ex. O (SLS197); Ex. B (W&F Tr. 122:17-124:3, 112:10-114:24).

122.    W&F's daily scan is designed to prevent statute of limitations violations. Ex. P (SLS539); Ex. O (SLS197).

123.    W&F's Debt Manager software automatically scans accounts and marks them as "closed" and "statute of limitations expired" when the time since the "delinquency date" on the

account exceeds the statute of limitations of the state where the consumer resides. Ex. B (W&F Tr. 112:15-113:12); Ex. P (SLS539); Ex. O (SLS197).

124.    This statute of limitations scan is part of the core function of Debt Manager. Ex. B (W&F Tr. 122:17-124:3).

125.    W&F has been using Debt Manager since 2015. Ex. B (W&F Tr. 61:5-7).

126.    Debt Manager set the "delinquency date" on Ms. Dawson's and Class Members' Loans as the charge off date by Bank of America or the date of the Class Member's last payment. Ex. B (W&F Tr. 113:13-114:12, 140:25-141:4).

127.    When W&F's automated scan flagged a Class Member's account as "statute of limitations expired," that "trigger[ed]" a manual review to begin the litigation process because "collection efforts have ceased at that point." Ex. B (W&F Tr. 112:10-113:12).

128.    Once an account was flagged as "statute of limitations expired," SLS authorized W&F to have the account proceed to litigation as long as the balance was over $2,000. Ex. B (W&F Tr. 112:10-116:9, 132:22-133:19).

129.    W&F's collection software determined that the delinquency date on Ms. Dawson's account was April 11, 2013, the date of her father's last payment. Ex. B (W&F Tr. 140:22-24).

130.    W&F's collection software measured the limitations period on Ms. Dawson's account from April 11, 2013. Ex. B (W&F Tr. 140:13-21).

131.    At approximately 1 a.m. on April 11, 2019, W&F's collection software automatically assigned Consumer Account Tag "WU" to the account and moved it to workgroup "80." Ex. G (SLS236).

132.    "80" is a "workgroup" in the Debt Manager software that means "closed returned." Ex. B (W&F Tr. 153:5); Ex. Z (SLS376).

133.    "WU" is a tag in the Debt Manager software that means statute of limitations expired. Ex. B (W&F Tr. 153:5); Ex. Z (SLS361).

134.    W&F did not attempt to collect on Ms. Dawson's loan from April 11, 2019 to November 8, 2021. Ex. B (W&F Tr. 159:19-161:4).

135.    W&F did not allow collectors to make collection efforts on accounts in the "80" workgroup. Ex. B (W&F Tr. 160:10-161:4).

136.    W&F did not allow its collectors to collect on Ms. Dawson's loan while it had the "WU" tag and/or was in the "80" workgroup. Ex. B (W&F Tr. 160:16-20).

### G.    Accelerated Balance

137.    Once W&F's system flags an account as out-of-statute, the account is sent to the legal admin department to create amortization tables to calculate its accelerated balance. Ex. B (W&F Tr. 112:10-116:1).

138.    W&F calculated an "accelerated balance" for each Class Member by creating amortization tables for each Class Member's loan. Ex. E (SLS048-62); Ex. A (SLS Tr. 103:9-104:19); Ex. B (W&F Tr. 125:13-126:9).

139.     SLS's amortization tables showed two sets of monthly payments (one with both principal and interest, and one with only the principal portion). Ex. E (SLS048-62); Ex. A (SLS Tr. 92:3-9, 59:9-60:9).

140.    To calculate the "accelerated balance," SLS added up the monthly payments from the principal-only version of the chart for the months that SLS claimed to be suing for. Ex. A (SLS Tr. 103:9-25, 67:6-14,115:6-116:1); Ex. Q (SLS441).

141.    Mr. Ruh, on behalf of SLS, testified that it included only the purported principal portion of each monthly payment in its accelerated balance "for the benefit" of Class Members

and because it was "not worth the hassle" of calculating the interest portion, and that the figures in the amortization tables were "hypotheticals." Ex. A (SLS Tr. 130:10-19, 121:3-9).

142.    Mr. Ruh testified that SLS did not include interest in its calculation of the accelerated balances because "these are variable rate based on LIBOR and a margin and going back and calculating based -- I mean, LIBOR, I'm sure you understand, changes periodically." Ex. A (SLS Tr. 130:10-18).

143.    The monthly payment amount that W&F used for the principal-and-interest amortization table was taken from the payment information table of each Class Member's note disclosure statement. Ex. A (SLS Tr. 95:9-18, 109:13-25).

144.    The W&F template used by SLS to summarize the accelerated balance calculation did not credit any payments made by borrowers. Ex. A (SLS Tr. 88:3-89:11); Ex Q (SLS441).

145.    The amortization tables did not credit any payments made by borrowers. Ex. E (SLS048-62).

146.    W&F does not create amortization tables for any of its other clients. Ex. B (W&F Tr. 188:9-11); Ex. C (Ruh Tr. 7:19-9:18).

147.    So long as the total accelerated balance exceeded $2,000, the account was referred to litigation. Ex. A (SLS Tr. 150:1-7).

148.    SLS sued Ms. Dawson on an accelerated balance of $18,574.78, which it calculated by multiplying a $139.66 monthly principal-portion payment by 133 months. Ex. R (PLAINTIFF000002); Ex. E (SLS048-62); Ex. Q (SLS441); Ex. B (W&F Tr. 127:23-128:20, 115:6-22).

149.    SLS's amortization tables for Ms. Dawson's account showed that Ms. Dawson's total principal-plus-interest monthly payments were $519.51 (as listed in her note disclosure statement) and principal-only payments were $139.66. Ex. E (SLS049-62, 074); Ex. Q (SLS441).

150.    SLS's amortization tables for Ms. Dawson's account show that the principal-and-interest balance on Ms. Dawson's loan in December 2010 was $124,682.40 Ex. E (SLS049).

### H.    Acceleration

151.    SLS gave W&F a blanket directive to send "acceleration notice[s]" on Ms. Dawson's and all Class Members' accounts. Ex. A (SLS Tr. 101:20-102:20).

152.    On December 1, 2021, W&F sent Ms. Dawson an acceleration notice on behalf of SLS that stated: "Pursuant to the Agreement, SLS hereby accelerates the loan and demands all payments due." Ex. E (SLS089-90).

153.    SLS sent a nearly identical letter to all Class Members created from a template letter. Ex. A (SLS Tr. 101:10-14, 102:21-103:8); Ex. B (W&F Tr. 111:22-112:3, 166:6-15).

154.    SLS holds out the provision of the Loan Note reprinted *supra* at ¶ 9(a) as the basis of its acceleration. Ex. A (SLS Tr. 113:25-114:25); Ex. E (SLS046-47).

155.    SLS asserts that neither Ms. Dawson's nor any Class Member's Loan had been accelerated prior to SLS's acceleration notice being sent for that Loan. Ex. A (SLS Tr. 115:10-116:1); SLS's Answer to the Amended Complaint, ECF No. 20 ¶ 99-100.

156.    Mr. Ruh testified that it was "correct" that SLS's Acceleration Notice to Ms. Dawson meant that the loan had not been previously accelerated. Ex. A (SLS Tr. 115:10-116:1).

157.    Mr. Ruh testified that he cannot recall any other student loan creditor that sends acceleration notices. Ex. C (Ruh Tr. 14:3-16,7:19-9:18).

### I.    Litigation

158.    After W&F sent Class Members an acceleration notice, W&F recommended litigation on each Class Member's account. Ex. A (SLS Tr. 98:20-100:5).

159.    SLS would authorize litigation unless the Class Member paid upon receiving the acceleration notice. Ex. B (W&F Tr. 117:25-118:24).

160.    Mr. Ruh executed a standard form sworn "Affidavit in Support of Accelerated Balance Due" on each Class Member's account. Ex. A (SLS Tr. 110:25-111:3, 113:19-24); Ex. E (SLS046-47).

161.    Mr. Ruh testified that the "Affidavit in Support of Accelerated Balance Due" was used when each account was "accelerated for the purpose of litigation." Ex. A (SLS Tr. 110:16-111:3).

162.    Mr. Ruh transmitted the "Affidavit in Support of Accelerated Balance Due" as an enclosure to a standard form letter to W&F titled "approval to initiate litigation."  Ex. A (SLS Tr. 105:14-106:11); Ex. E (SLS046-47); Ex. U (SLS044).

163.    SLS approved litigation on each Class Member's account. Ex. A (SLS Tr. 105:15-106:11).

164.    Following SLS's approval to initiate litigation, W&F retained a debt collection law firm to sue to each Borrower on SLS's behalf. Ex. B (W&F Tr. 119:24-120:24).

165.    W&F sent the "Affidavit in Support of Accelerated Balance Due" and "Approval to Initiate Litigation" letter for each Class Member's account to the debt collection law firm it retained on SLS's behalf to litigate on that Class Member's account. Ex. A (SLS Tr. 91:4-92:23); Ex. E (SLS046-47); Ex. U (SLS044).

166.    SLS filed a debt collection lawsuit against each Class Member. Ex. A (SLS Tr. 98:20-100:5); Ex. B (W&F Tr. 105:8-20); *see also* Mem. of Law (defining Class as individuals sued by SLS).

167.    Each lawsuit against a Class Member was preceded by acceleration. Ex. A (SLS Tr. 144:11-145:19, 98:20-100:5); *see also* Mem. of Law (defining Class as individuals with loans which SLS purported to accelerate).

168.    Mr. Ruh, on behalf of SLS, testified that the "vast majority or all" of SLS's lawsuits against Class Members were preceded by acceleration; that he could not remember any "specific accounts" where SLS brought a lawsuit against a Class Member that was not preceded by acceleration; that he could not "think of a circumstance" where a lawsuit would not have been preceded by acceleration; that SLS "approve[d] the litigation after" an acceleration notice had been sent; that "[o]ne of the steps made prior to litigation is the acceleration"; and that SLS files a lawsuit "at some point after" the acceleration notice is sent. Ex. A (SLS Tr. 144:11-145:19, 98:20-100:5).

169.    Each lawsuit against a Class Member sought the accelerated balance. Ex. A (SLS Tr. 113:7-24, 144:1-4, 88:3-89:6, 91:4-92:23, 110:16-111:3).

170.    On November 3, 2022, SLS filed a state court collection lawsuit against Ms. Dawson to collect $18,574.78. Ex. R (PLAINTIFF002-005).

171.    Mr. Ruh testified that a three-year statute of limitations applies to Ms. Dawson's Loan because New York's statute of limitations applies; New York has a borrowing statute that borrows the statute of limitations of the original creditor's home state (here, North Carolina; and North Carolina's statute of limitations is three years. Ex. B (W&F Tr. 162:18-163:7).

**J.    Harm to Ms. Dawson and Class Members**

23

172.  In December 2022, Ms. Dawson found out that Student Loan Solutions had filed a collection lawsuit filed against her. Ex. D (Dawson Tr. 27:25-28:25).

173.  In December 2022, Ms. Dawson lived in Georgia. Ex. D (Dawson Tr. 7:14-8:4).

174.  On December 19, 2022, Ms. Dawson flew back to New York City in order to read the summons and complaint and file an answer in the collection lawsuit. Ex. D (Dawson Tr. 121:17-23).

175.  On January 18, 2023, Ms. Dawson returned to Atlanta, Georgia after filing her answer. Ex. D (Dawson Tr. 124:13-23).

176.  Ms. Dawson would not have come to New York in December 2022 or January 2023 if not for the collection lawsuit. Dawson Decl. ¶ 6.

177.  On January 17, 2023, Ms. Dawson filed a *pro se* answer at the Bronx Civil Court courthouse. Ex. D (Dawson Tr. 102:5-17, 103:15-104:8).

178.  Ms. Dawson's *pro se* answer asserted defenses of statute of limitations and laches. Dawson Tr. 105:6-14; Ex. S (PLAINTIFF008).

179.  Around March 2023, Ms. Dawson moved back to New York from Atlanta, Georgia in order to face the collection lawsuit. Ex. D (Dawson Tr. 122:22-124:11); Dawson Decl. ¶ 20.

180.  Ms. Dawson would not have moved to New York in March 2023 if not for the collection lawsuit. Dawson Decl. ¶ 20.

181.  On July 11, 2023, Ms. Dawson appeared in person at the Bronx Civil Court for the first court date of the collection lawsuit. Ex. D (Dawson Tr. 130:7-9).

182.  At that court appearance, Ms. Dawson was represented by a volunteer attorney from the New York Legal Assistance Group (NYLAG) through the court's Volunteer Lawyer for a Day program. Dawson Decl. ¶ 26.

24

183.  Ms. Dawson paid the following costs out of pocket in connection with the collection lawsuit, totaling $729.58:

a.  Ms. Dawson paid $109.57 for her December 19, 2022 flight from Atlanta to New York. Ex. D (Dawson Tr. 121:13-125:7, 142:22-143:19); Dawson Decl. Ex. 1 (PLAINTIFF000748).

b.  Ms. Dawson paid $29.87 for a December 19, 2022 rideshare to the Atlanta airport. Ex. D (Dawson Tr.  125:8-126:25, 142:11-21); Dawson Decl. Ex. 2 (PLAINTIFF000746).

c.  Ms. Dawson paid $38.23 for a December 19, 2022 rideshare from La Guardia airport to her father's house. Ex. D (Dawson Tr. 125:8-126:25); Dawson Decl. Ex. 3 (PLAINTIFF000749).

d.  To file her answer, Ms. Dawson took a taxi to the courthouse from her father's house, and to her father's house back from the courthouse. She paid approximately $40 for these taxis, $20 each way. Dawson Decl. ¶ 12; Ex. D (Dawson Tr. 150:13-151:14).

e.  Ms. Dawson's paid approximately $175 for her January 18, 2023 flight back to Atlanta from New York. Dawson Decl. ¶ 13; Ex. D (Dawson Tr. 122:8-14).

f.  Ms. Dawson paid $43.46 for a January 18, 2023 rideshare to LaGuardia airport. Dawson Decl. Ex. 4 (PLAINTIFF000750); Ex. D (Dawson Tr. 125:8-126:25, 145:6-12).

g.  Ms. Dawson paid $32.84 for a January 18, 2023 rideshare from the Atlanta airport. Dawson Decl. Ex. 5 (PLAINTIFF000752); Ex. D (Dawson Tr. 125:8-126:25).

h.  Ms. Dawson paid $135.26 for her March 6, 2023 flight from Atlanta back to New York. Dawson Decl. Ex. 6 (PLAINTIFF000767); Ex. D (Dawson Tr. 122:17-123:8).

i.  Ms. Dawson paid $37.01 for a March 6, 2023 rideshare to the Atlanta airport. Dawson Decl. Ex. 7 (PLAINTIFF000766); Ex. D (Dawson Tr. 125:8-126:25).

j.  Ms. Dawson paid $48.34 for a March 6, 2023 rideshare from the LaGuardia airport. Dawson Decl. Ex. 8 (PLAINTIFF000765); Ex. D (Dawson Tr. 125:8-126:25).

k.  To appear at her July 11, 2023 court appearance, Ms. Dawson took a taxi to the courthouse from her father's house, and to her father's house back from the courthouse. She paid approximately $40 for these taxis, $20 each way. Dawson Decl. ¶ 27; Ex. D (Dawson Tr. 150:13-151:14).

184. Ms. Dawson missed work to fly to New York, read the summons and complaint in the collection action, file her answer, and fly home to Georgia. Dawson Decl. ¶¶ 5, 7, 11, 18; Ex. D (Dawson Tr. 129:3-130:16).

185. Ms. Dawson was unable to work while in New York from December 19, 2022 to January 18, 2023 and unable to take paid time off. Dawson Decl. ¶ 16; Ex. D (Dawson Tr. 129:7-131:5).

186. In December 2022 and January 2023, Ms. Dawson was working full time as a nurse in Atlanta, Georgia. She was paid $35/hour and worked 12 hours a day, 4 days per week, typically on Mondays, Tuesdays, Fridays, and Saturdays. Dawson Decl. ¶ 17; Ex. D (Dawson Tr. 131:16-132:3).

187. Ms. Dawson flew to New York for the collection lawsuit on Monday, December 2022. This led to Ms. Dawson missing 2 days of work on Monday and Tuesday of that week, December 19 and December 20. Dawson Decl. ¶ 18.

188. After filing an answer in the collection lawsuit, Ms. Dawson flew back to Atlanta, Geogia on Wednesday January 18, 2023. This led to Ms. Dawson missing 2 days of work on Monday and Tuesday of that week, January 16 and January 17. Dawson Decl. ¶ 18.

189. Ms. Dawson was charged $5,915.78 to break her lease when she moved back to New York. Dawson Decl. Ex. 9 (PLAINTIFF000753); Dawson Decl. ¶ 22; Ex. D (Dawson Tr. 123:20-124:12, 127:3-24, 149:7-13).

190. As a result of the collection lawsuit, Ms. Dawson experienced stress. Dawson Decl. ¶ 28-32; Ex. D (Dawson Tr. 136:12-20).

191. As a result of the collection lawsuit, Ms. Dawson experienced uncertainty and fear about what to do. Dawson Decl. ¶ 28-29; Ex. D (Dawson Tr. 135:20-136:4).

192.    As a result of the collection lawsuit, Ms. Dawson was scared about the possibility of a judgment being entered against her, including the impact on her finances. Dawson Decl. ¶ 28; Ex. D (Dawson Tr. 135:20-136:4).

193.    As a result of the collection lawsuit, Ms. Dawson experienced stress and difficulty while going to court to file an answer. Dawson Decl. ¶ 29; Ex. D (Dawson Tr. 135:20-136:4).

194.    As a result of the collection lawsuit, Ms. Dawson's thoughts were constantly occupied by the lawsuit. Dawson Decl. ¶ 30; Ex. D (Dawson Tr. 134:13-22).

195.    As a result of the collection lawsuit, Ms. Dawson experienced insomnia and nightmares. Dawson Decl. ¶ 30; Ex. D (Dawson Tr. 134:13-135:4).

196.    As a result of the collection lawsuit, Ms. Dawson experienced isolation and loss of interest in activities. Dawson Decl. ¶ 30.

197.    As a result of the collection lawsuit, Ms. Dawson experienced mood changes and depression. Dawson Decl. ¶ 30; Ex. D (Dawson Tr. 134:25-135:4).

198.    As a result of the collection lawsuit, Ms. Dawson had issues with eczema. Dawson Decl. ¶ 31; Ex. D (Dawson Tr. 134:8-136:20).

199.    As a result of the collection lawsuit, Ms. Dawson gained at least forty pounds. Dawson Decl. ¶ 31; Ex. D (Dawson Tr. 134:13-22).

200.    As a result of the collection lawsuit, Ms. Dawson experienced stomach pain and nausea. Dawson Decl. ¶ 31.

201.    As a result of the collection lawsuit, Ms. Dawson experienced headaches. Dawson Decl. ¶ 31.

202.    As a result of the collection lawsuit, Ms. Dawson remains worried that SLS could try to sue her again and still experiences stress. Dawson Decl. ¶ 32; Ex. D (Dawson Tr. 134:8-136:20).

203.    On October 6, 2023, NYLAG, on behalf of Ms. Dawson, sent a letter to SLS, alerting the company that it had filed the lawsuits against Ms. Dawson and other borrowers long after the statute of limitations expired. Ranucci Decl. ¶ 33.

204.    On October 25, 2023, Roach & Murtha Attorneys at Law PLLC ("Roach & Murtha"), the debt collection law firm representing SLS, agreed to discontinue the collection lawsuit against Ms. Dawson without prejudice. ECF No. 20 ¶ 65; SLS Tr. 161:11-12.

205.    SLS asserts that Ms. Dawson's loan is still outstanding. Ex. A (SLS Tr. 161:15-18).

206.    There are ███ individuals whose loans SLS purchased on October 31, 2017 and were referred by SLS to litigation. ECF No. 75-5 (interrogatory response ¶ 8(c)).

207.    SLS sent an acceleration notice to all or virtually all individuals whose loans SLS purchased on October 31, 2017 and were referred by SLS to litigation. Ex. A (SLS Tr. 144:11-145:19, 98:20-100:5).

208.    SLS sent an acceleration notice to ███ individuals whose loans SLS purchased on October 31, 2017 and were referred by SLS to litigation. ECF No. 75-5 (interrogatory response ¶ 8(c)); Ex. A (SLS Tr. 144:11-145:19, 98:20-100:5).

209.    SLS has collected ███████ in total on all loans it purchased on October 31, 2017. ECF No. 75-5 (interrogatory response ¶ 10(a)).

210.    SLS collected ███████ on all loans it purchased on October 31, 2017 that were referred to litigation. ECF No. 75-5 (interrogatory response ¶ 10(c)).

211. There are ▮ individuals in New York whose loans SLS purchased on October 31, 2017 and were referred by SLS to litigation. ECF No. 75-5 (interrogatory response ¶ 8(d)).

212. SLS collected ▮ from individuals in New York whose loans SLS purchased on October 31, 2017 and were referred by SLS to litigation. ECF No. 75-5 (interrogatory response ¶ 10(d)).

213. SLS states that its net worth is ▮. ECF No. 75-5 (interrogatory response ¶ 11).

214. The identity of each individual whose loan SLS purchased on October 31, 2017, accelerated, and sued on is contained in SLS's records. Ex. B (W&F Tr. 62:5-63:1, 74:6-15).

### K. Additional Facts

215. Ms. Dawson testified the following:

   a. "Q: What was wrong about the prior collection action? A: The timeframe in which that lawsuit should have been file[d], from my understanding, has passed." Ex. D (Dawson Tr. 25:20-25).

   b. "Q: And what was the factual basis as to why you believe that the collection action was untimely? A: . . . [T]he timeframe for being sued for a debt is . . . between three and six years and I know that timeframe has passed." Ex. D (Dawson Tr. 32:13-20).

   c. "Q: What is your understanding of the Class representative? . . . A: That there are other people that are filing on their behalf as well, but I'm the one that is essentially taking the lead." Ex. D (Dawson Tr. 38:9-16).

   d. "Q: Okay. And what group of people do you purportedly want to represent? A: Other people that were sued by Student Loan Solutions." Ex. D (Dawson Tr. 38:17-22).

216. Ms. Dawson is aware that as a Class Representative, it is her responsibility to make decisions that benefit the Class as a whole, not just herself. Dawson Decl. ¶ 37.

217. Ms. Dawson is aware that as a Class Representative, it is her responsibility to remain knowledgeable about the case. Dawson Decl. ¶ 38.

29

218.    Ms. Dawson is aware that as a Class Representative, it is her responsibility to use her judgment and speak up if she disagrees with any decisions being made about the case. Dawson Decl. ¶ 39.

219.    Ms. Dawson is willing to represent the Class for the duration of the case. Dawson Decl. ¶ 40.

220.    Ms. Dawson participated in two meetings, including a 2-hour-in-person meeting, to prepare for her deposition. Dawson Decl. ¶ 35

221.    Ms. Dawson prepared for her deposition, including reviewing several documents. Dawson Decl. ¶ 35, 43.

222.    Ms. Dawson testified at her three-hour deposition. Dawson Decl. ¶ 1, 154.

223.    Ms. Dawson spent significant time searching her records to respond to discovery requests from defendants Student Loan Solutions and Roach & Murtha. Dawson Decl. ¶ 41.

224.    Ms. Dawson has reviewed and signed documents in this lawsuit. Dawson Decl. ¶ 42.

225.    Ms. Dawson has made key decisions in the lawsuit. Dawson Decl. ¶ 35, 37.

226.    Ms. Dawson has no interest conflicting with those of any Class Member. Ranucci Decl. ¶ 32.

227.    NYLAG is a nonprofit organization that provides free civil legal services to low-income New Yorkers in many fields, including consumer protection. Ranucci Decl. ¶ 34.

228.    NYLAG has performed significant work in this case, conducting document discovery, taking and defending depositions, and preparing this summary judgment and class certification briefing. Ranucci Decl. ¶ 36.

229.    NYLAG's attorneys representing Ms. Dawson in this case are highly qualified. Ranucci Decl. ¶ 38-41.

230.    NYLAG's Special Litigation Unit specializes in class actions and has been appointed class counsel in cases affecting low-income student loan borrowers and other consumers sued in New York City Civil Court. Ranucci Decl. ¶ 35.

231.    NYLAG's Special Litigation Unit has been described as "one of the highest caliber impact litigation practices in New York City." Declaration of Matthew Brinckerhoff ¶ 15, *Burkett v. Houslanger & Assocs. et al.*, No 19 Civ. 2285 (E.D.N.Y. Nov. 7, 2019), ECF No. 43-3.

Dated:  January 15, 2024

> Lisa Rivera, Esq.
> NEW YORK LEGAL ASSISTANCE GROUP
> 100 Pearl St., 19th Floor
> New York, NY 10004
> (212) 613-5000
>
> By:
>
> _____
>
> Jessica Ranucci, of counsel
> Danielle Tarantolo, of counsel
> (212) 613-7578
> jranucci@nylag.org
> dtarantolo@nylag.org

31