# EXHIBIT A

In the Matter of:

DAWSON

**-against-**

STUDENT LOAN SOLUTIONS, ET AL.

---

30(b)(6) Deposition of:

Student Loan Solutions, LLC

Corporate Designee:

CHRISTOPHER PAUL RUH

---

*September 10, 2024*

*Cain & Crane Court Reporters, LLC*

*Post Office Box 23833*

*Charlotte, North Carolina 28227*

*704.545.3510*

*www.cainandcrane.com*

```
          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK

ROXANNE DAWSON, individually   )
and on behalf of all persons   )
similarly situated,            )
                               )
              Plaintiffs,      ) No. 23 Civ. 9690 (MKV)
                               )
        -against-              )
                               )
STUDENT LOAN SOLUTIONS, LLC,   )
and ROACH & MURTHA ATTORNEYS   )
AT LAW, P.C.,                  )
                               )
              Defendants.      )
_____x
```

CERTIFIED ORIGINAL

CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO
PROTECTIVE ORDER

30(b)(6) DEPOSITION OF

STUDENT LOAN SOLUTIONS, LLC

CORPORATE DESIGNEE:  Christopher Paul Ruh

* * * * *

Taken by Plaintiffs in Charlotte, North Carolina

September 10, 2024

Reported by: Tavi L. Fraga, Stenographic Reporter
        Cain & Crane Court Reporters, LLC

A  P  P  E  A  R  A  N  C  E  S

COUNSEL FOR PLAINTIFFS:

Jessica Ranucci, Esquire

Danielle Tarantolo, Esquire

Andrea Ashburn, Esquire

NEW YORK LEGAL ASSISTANCE GROUP

100 Pearl Street, 19th Floor

New York, New York  10004

212-613-5000

jranucci@nylag.org

dtarantolo@nylag.org

aashburn@nylag.org

COUNSEL FOR DEFENDANTS:

Brendan H. Little, Esquire

LIPPES MATHIAS, LLP

50 Fountain Plaza, Suite 1700

Buffalo, New York  14202

716-853-5100

blittle@lippes.com

C O N T E N T S

PAGE

DIRECT EXAMINATION BY MS. RANUCCI                                6

PAGES CONTAINING CONFIDENTIAL TESTIMONY:                    51-55

62-66

164-166

197-201

* * *

REPORTER'S NOTE:

* If this transcript contains quoted material,

such material is reproduced as read or

quoted by the speaker.

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 15 |
| 2 | Defendant Student Loan Solutions, LLC's Objections and Responses to Plaintiff's First Set of Interrogatories | 22 |
| 3 | Summary of Accelerated Balance Bates No. SLS 441 | 88 |
| 4 | Affidavit in Support of Accelerated Balance Due Bates Nos. SLS 046-092 | 91 |
| 5 | 12/2/21 Letter Regarding Approval to Initiate Litigation Bates No. SLS 044 | 105 |
| 6 | Account Statement Bates No. SLS 045 | 105 |
| 7 | General Promissory Note Bates Nos. SLS 448-455 | 126 |
| 8 | Payment Report Bates Nos. SLS 078-079 | 141 |
| 9 | Summons Bates Nos. PLAINTIFF000002-000005 | 155 |



DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                                            Page 5

```
            I N D E X   O F   E X H I B I T S
                      (Continuing)


EXHIBIT         DESCRIPTION                             PAGE

   10           Installment Analysis                     159

                Bates Nos. PLAINTIFF000065-000065

   11           Defendant Student Loan Solutions,

                LLC's Answer to Plaintiff's Amended

                Class Action Complaint                   161

   12           Preliminary Statement                    161

   13           System Notes                             170

                Bates Nos. SLS 217-265

   14           9/11/13 Letter from Williams &

                Fudge, Inc., to Tameeka L. Colon         183

                Bates Nos. PLAINTIFF000755-000756

   15           5/30/16 Letter from Portia Chisolm

                to Roxanne Dawson                        184

   16           11/12/17 Letter from Williams &

                Fudge, Inc.                              188

                Bates Nos. PLAINTIFF000760-000761
```

On Tuesday, September 10, 2024, commencing at 9:29 a.m., the 30(b)(6) deposition of Student Loan Solutions, LLC, corporate designee Christopher Paul Ruh, was taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure on behalf of the Plaintiffs at the law offices of Cadwalader, Wickersham & Taft, LLP, 650 South Tryon Street, Suite 1400, Charlotte, North Carolina.

* * *

P R O C E E D I N G S

Whereupon, CHRISTOPHER PAUL RUH, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. RANUCCI:

Q.  Good morning.

A.  Good morning.

Q.  As I said, my name is Jessica Ranucci.  I'm here from the New York Legal Assistance Group representing plaintiff, Roxanne Dawson.

How are you doing?

A.  I'm doing great.  How about you?

Q.  Good.  Thanks.  And just to be clear, you pronounce your name Christopher Ruh; is that right?

A.  It is, but I go by Chris.

Q.   Chris.  Okay.

A.   So please --

Q.   Chris.

A.   -- call me Chris.

Q.   I might do Mr. Ruh, but --

A.   No.

Q.   I'm just going to start by going through a few guidelines generally about depositions.  You may be familiar with these.

As you know, this is being recorded by a court reporter.  You are now under oath.  So we ask that you tell the whole truth, meaning full and complete answers to questions.  Because it's being recorded, you have to give your answers out loud.  The court reporter can't record a nod or a shake of the head.

I'll try and wait until you're done speaking to speak.  I'm not perfect, but I want to try my best, and I ask that you do the same so that we can get a clean transcript.  If I ask a question and you don't know the answer, just tell me you don't know.  Don't guess unless I ask you to guess.  If there's a question you don't understand, you can ask me to clarify.

We're here all day.  You can take as many

breaks as you want, just not in the middle of a question -- when there's a question pending.  And then if later on today you realize that there's an answer that was incomplete or there's more that you want to say, that's fine.  Just go ahead and tell me that you want to add something.

I'm going to go ahead and get started with just some basic questions.  Just state your name again for the record.

A.  It's Christopher Paul Ruh, R-u-h.

Q.  Thanks.  And you're here as the corporate representative of Student Loan Solutions, LLC; is that right?

A.  Correct.

Q.  I might refer to Student Loan Solutions, LLC, as either Student Loan Solutions or SLS.  Do you understand?

A.  Yes.

Q.  Great.

A.  Sorry.  I just almost shook my head.

Q.  Have you ever been married?

A.  Yes.

Q.  Are you currently married?

A.  Yes.

Q.  What's your spouse's name?



A.    Jennifer.

Q.    Do you have kids?

A.    We do.

Q.    How many?

A.    Two.

Q.    What's the highest educational degree you have?

A.    College graduate.  Four-year.

Q.    What kind of degree?

A.    Finance and management.

Q.    And have you given a deposition before?

A.    Yes.

Q.    How many times?

A.    10 or 12.  10 to 12.

Q.    And have any of those been on behalf of a
corporation?

A.    Yes.

Q.    Which corporation?

A.    SLS and Williams & Fudge.

Q.    And Williams & Fudge.  All right.  Have you testified
at trial before?

A.    Yes.

Q.    How many times?

A.    I could not tell you.

Q.    More than ten?

A.    Yes.

Q.   More than 20?

A.   Yes.

Q.   On behalf of a corporation?

A.   Yes.

Q.   Which corporation?

A.   SLS.

Q.   And any others?

A.   No.

Q.   Have you ever been convicted of a crime?

A.   No.

Q.   What steps did you take to prepare for the deposition today?

A.   I reviewed the list that you guys sent over.  I don't remember the exact term that it's called.  And then the documents -- you know, the documents that are in our possession related to this case.

Q.   Which documents?

A.   It would be the documents of Ms. Dawson, the credit agreement, the loan documents, the note disclosure statement, the interrogatories that have gone back and forth, the requests for production, you know, the complaint, all those documents.

Q.   Great.  Did you meet with anyone to prepare for today?

A.   Yes.



Q.  Who?

A.  My attorney.

Q.  Anyone else?

A.  No.

Q.  Without telling me the contents of that conversation, how many times did you meet with your attorney to prepare for today?

A.  Twice.

Q.  And how?  In person or on the phone?

A.  Zoom or Teams.

Q.  And about how long each time?

A.  30 minutes.

Q.  Have you spoken -- withdraw that.

Did you listen to any audio recordings to prepare?

A.  I'm trying -- yes, there was one phone call I listened to, but I believe it was with the father.

Q.  And watch any video?

A.  No.

MR. LITTLE:  And just so the record is clear, when you say "the father," you mean Ms. Dawson's father?

THE WITNESS:  Yes.

MS. RANUCCI:  Thanks.

A.  I apologize.  The co-signer.

Q. Now going back to this whole case, how many times have you met with SLS's attorney about this case?

A. I have no idea.

Q. Have you met in person before about this case?

A. With?

Q. With SLS's attorney.

A. No.  Today was the first time we met in person.

Q. Other than those two calls on Teams or Zoom, have you done any other video calls with SLS's attorney?

A. No.

Q. So have your meetings been exclusively by phone and e-mail?

A. I think it's just been e-mail.

Q. E-mail?

A. Yeah.  I wouldn't really call them meetings.

Q. So other than those two Teams conversations, have you spoken with SLS's attorney by phone about this case?

A. I don't believe so, no.

Q. So just to make sure I'm understanding correctly, before the two Zoom meetings to prepare for today, you had never communicated with SLS's attorney other than by e-mail about this case?

A. Not that I can recall, but, you know, I talk to a lot of people.

Q. Thanks.  Is there anything today that may affect your

ability to understand the questions in the deposition?

A.  No.

Q.  Is there anything that might affect your ability to testify truthfully today?

A.  No.

Q.  Thanks.  Do you know what this case is about?

A.  Yes.

Q.  What?

A.  Well, this is a case where we sued Ms. Dawson to recover on a defaulted student loan that originated with Bank of America and a subsequent -- I believe it was a cross-complaint -- class action cross-complaint was filed against Student Loan Solutions for allegations of prior acceleration, statute of limitations.  I'm sure there's other things in there.

Q.  Do you know what court it was filed in?

A.  Not off the top of my head.

Q.  Do you know if it's a federal court or a state court?

A.  I do not.

Q.  Have you read the amended complaint that Ms. Dawson filed in this case?

A.  Yes.

Q.  Have you read SLS's answer in this case?

A.  Yes.

Q. And the amended answer?

A. Yes.

Q. Have you read any documents produced by Ms. Dawson in discovery to SLS?

A. I don't recall any documents that I've looked through.

Q. Have you read Ms. Dawson's interrogatory response?

A. I'm 99 percent sure, yes.

Q. Have you read SLS's interrogatory response?

A. Yes.

Q. Did you ever sign a verification for those interrogatory responses?

A. Yes.

Q. Have you read the documents produced by SLS to Ms. Dawson in this case?

A. Yes.

Q. Do you know whether SLS moved to dismiss plaintiff's complaint in this case?

A. SLS?

Q. Uh-huh.

A. Moved to dismiss it?  I know Murtha acting not on our behalf did.

Q. Sorry.  Just to be clear, I mean the complaint in this federal court --

A. Oh, I --

Q.   -- case.

A.   -- assume we did.

          MR. LITTLE:  Form.  You can answer.

A.   I don't know for sure.

Q.   So today, as I said at the beginning, you're here on
     behalf of Student Loan Solutions, LLC, the
     corporation, not yourself as an individual.  This is
     a 30(b)(6) deposition, meaning that you're here as a
     corporate representative.  The questions that I'm
     asking today you're going to answer on behalf of
     Student Loan Solutions, not on behalf of yourself.

          I will try my best when I ask questions to
     refer to SLS or Student Loan Solutions, but even if I
     don't say that, that's what I mean.  You're here in
     your role as a corporate capacity.  If you're ever
     not sure or confused, please just ask.

A.   Okay.

Q.   I'm going to hand --

          MS. RANUCCI:  Andrea, can we have the
     deposition notice.

Q.   I'm going to hand to the court reporter and ask her
     to mark as Exhibit 1 a document that's the deposition
     notice.

          (A document was marked for identification
     as Deposition Exhibit No. 1.)

Cain & Crane Court Reporters
704.545.3510

Q. I'm going to hand this document to you, Mr. Ruh. You can take a minute to look at it. I direct your attention to the Attachment A that's on the second page.

A. So this is the original one, I'm assuming, not the amended?

Q. Yes, this is the original one. Have you seen this --

MR. LITTLE: Just so you know, it looks like it's two-sided. Just so you're aware.

Q. Have you seen this document before?

A. Yes, I have.

Q. Do you recognize it?

A. Yes, ma'am.

Q. You testified earlier that you had reviewed a list of topics in preparation for this deposition. To the best as you can tell, does this list match the list that you reviewed?

A. Yes, ma'am.

Q. Are you prepared to testify on these topics?

A. Yes, ma'am.

Q. Are you knowledgeable to testify on behalf of SLS?

A. Yes.

Q. And are there any topics on here that you're not prepared to testify about today?

A. No.

Q.  Great.  Thank you.  We can just set that up here. All right.  Now I'm going to turn to some questions about Student Loan Solutions' business generally.

Can you tell me about what jobs you currently have?

MR. LITTLE:  Form.  Go ahead.  You can answer.

A.  For Student Loan Solutions?

Q.  Start there.

A.  I'm the managing member and the general manager.

Q.  Thank you.  And do you work -- you also work at Williams & Fudge; is that right?

A.  Yes.  I'm president of Williams & Fudge.

Q.  Do you have any other jobs right now?

A.  I have other entities that I don't know if they're jobs.

Q.  Let's just start with anywhere you get -- draw a salary.  Start with that.

A.  No other salaries.

Q.  What are your responsibilities as the managing member of SLS?

A.  I'm responsible for the day-to-day operations.

Q.  What -- could you list the operations you're responsible for?

A.  Pretty much responsible for running the company on a

day-to-day basis.  You know, that involves acquiring new lines of business.  You know, we're a passive debt buyer.  It involves doing things such as this right here.  You know, all aspects of the business.

Q.   Do you have different responsibilities as the -- I believe you said the general manager of --

A.   They're the same.

Q.   The same responsibilities.  So do those responsibilities include litigation?

A.   Yes.

Q.   And is one of your responsibilities to swear affidavits in connection with litigation?

A.   Yes.

Q.   How many times have you sworn an affidavit in connection with litigation brought by Student Loan Solutions?

A.   I have no idea.

Q.   More than 100?

A.   Yes.

Q.   More than 1,000?

A.   Probably.

Q.   Are you an officer of Student Loan Solutions?

A.   Student Loan Solutions is an LLC.  Well, it's an S corporation, so we really don't have officers.  It's members.

Q.   And are you a member?

A.   Yes.

Q.   Are there other --

A.   I'm the managing member.

Q.   Managing member.  Are there other members?

A.   Yes.

Q.   Who are the other members?

A.   Do you want their names?

Q.   Yes.

A.   Bob Perrin.  Clay Goodyear.  David Williams.  Gary Williams.  Chad Echols.

Q.   Do any of the other members have day-to-day responsibilities at Student Loan Solutions?

A.   Yes.

Q.   Could you describe those?

A.   Clay Goodyear is over the operations in the sense of, you know, the portfolio.

Q.   What does that mean?

A.   He manages, you know, the portfolio as far as the collection work being done by our third-party servicer.

Q.   Could you break that down into some concrete steps?  So what might he do, for example, on a typical day?

A.   Provide data as far as to recovery.  He's not involved in the litigation process.  You know,

approve settlements if a third-party vendor is contacted by --

THE COURT REPORTER:  I need you to slow down a little bit.  "You know, approve settlements if a third-party vendor is contacted by" --

A.  If a consumer makes contact through a third-party vendor and requests a settlement on the debt, he has authority to make approval on such things as that. It's more just -- you know, again, the biggest responsibility is making sure that the portfolio is being worked properly.

Q.  And do you in your role supervise Mr. Goodyear in that role?

A.  Yes.

Q.  So are there any other individuals who have day-to-day responsibilities at Student Loan Solutions?

A.  No.

Q.  Does anyone draw a salary from Student Loan Solutions?

A.  All members do.

Q.  All members do.  So as I understand it, just to make sure I understand correctly, you have general responsibility for the day-to-day operations of all aspects of Student Loan Solutions, including

supervision of Mr. Goodyear, who works on a subset of day-to-day responsibilities that include non-litigation collections?

A.   Yes.

Q.   Thank you.  Has SLS always had the same six members?

A.   Yes.

Q.   When was it created?

A.   September 2008.  I think it was September 19th, if you want the exact date.

Q.   And it's incorporated in South Carolina?

A.   Yes.

Q.   Where is the headquarters?

A.   Rock Hill, South Carolina.

Q.   At what address?

A.   300 Chatham Avenue, Suite 300.

Q.   Has that always been the headquarters?

A.   No.

Q.   Where was it previously?

A.   707 Land Fall Drive, Rock Hill, South Carolina.

Q.   Is the 300 Chatham Avenue an office building?

A.   300 Chatham Avenue, yes.

Q.   And is the 707 address an office building?

A.   No.

Q.   What's that?

A.   My residence.

Q. Does Student Loan Solutions pay rent now at the 300 Chatham address?

A. It's part of the agreement with our third-party servicer.

Q. Is that Williams & Fudge?

A. Yes.

Q. The third-party servicer?  So am I right to understand that the rent payments are included in -- as part of a broader agreement between SLS and Williams & Fudge?

A. That is correct.

Q. Did SLS pay rent when it was at your home?

A. I wish.  No.

Q. Does anyone besides you have knowledge about SLS's loan portfolio?

MR. LITTLE:  Form.

A. You're going to have to give me more on that.  I mean, knowledge?

Q. Yeah.  No problem.  Just give me a minute.

MS. RANUCCI:  Andrea, can I have the interrogatory responses.  I'm going to hand to the court reporter and ask her to mark as Exhibit B.

MS. TARANTOLO:  2.

MS. RANUCCI:  Sorry.  2.  Apologies.

(A document was marked for identification

as Deposition Exhibit No. 2.)

Q. Do you recognize this document?

A. Give me one second to read through it, please.

Q. No problem.  Take your time.

A. (Witness reviewing exhibit.)  Yes, I recognize it.

Q. Thank you.  Is that your signature at the end there?

A. Yes, it is.

Q. Did you read this at the time that you signed it?

A. Yes.

Q. And I direct your attention to the top of page 3, your response to Interrogatory 1.  I'm just going to read the interrogatory first to make sure I've read it correctly.

"State the name and job title of all persons presently or formerly acting on behalf of Student Loan Solutions with knowledge of the Transaction, any Loan, or Collection Action."

And then your response states, "a. Christopher Ruh, Managing Member of SLS.  And then "b" and "c" lists individuals at two third parties, Roach & Murtha and Williams & Fudge.

A. Correct.

Q. Is that correct?

A. Yes.

Q. So my question is, is there anyone else at Student

Loan Solutions who has knowledge about -- let's start with Ms. Dawson's loan?

MR. LITTLE:  Form.

Q.  You can answer.

A.  I would not say directly about Ms. Dawson's loan.

Q.  Were you involved in creating SLS?

A.  Yes.

Q.  Why did you create it?

A.  That's an interesting question.  It's a business.  I started a business.

Q.  And were the other five -- other five members involved in creating it with you?

A.  Can you explain what you mean by "creating it"?  Were they interested in starting Student Loan Solutions? Yes.

Q.  What businesses does SLS operate?

A.  Just one.  We're a passive debt buyer.

Q.  What does that mean?

A.  We purchase defaulted student loans.  We do not -- we outsource all activities.

Q.  How many sets of debts has Student Loan Solutions purchased?

A.  Can you explain what you mean by "sets"?

Q.  Sure.  How many transactions has Student Loan Solutions entered into to purchase debt?

MR. LITTLE:  I would object to the form. It's outside the scope of the notice.  His answer is not going to bind the company.  To the extent that you know the answer to that, Mr. Ruh, off the top of your head, you can answer the question.

A.  Three.

Q.  I'm sorry.  Three or 30?

A.  Three.

Q.  Three.  Thank you.  And is it correct that one of those was a transaction on October 31, 2017, to purchase loans from Bank of America?

A.  Yes.

Q.  If I refer to those as Bank of America loans, do you understand what I'm talking about?

A.  Yes.

Q.  I'm not talking about all loans Bank of America has ever made.  It's just shorthand to talk about a specific set of loans sold from Bank of America to Student Loan Solutions on October 31, 2017.

A.  Yes, ma'am.

Q.  Thanks.  Does Student Loan Solutions collect the debts it purchases?

A.  No.

Q.  Does Student Loan Solutions hire debt collectors?

MR. LITTLE:  Object to the form.  You can

answer.

A.  Yes.

Q.  Did Student Loan Solutions hire any debt collectors with respect to the Bank of America loans?

MR. LITTLE:  Object to the form.

A.  Yes.

Q.  Who?  Which ones?

A.  Williams & Fudge and Sunrise Credit Services.

Q.  Did Student Loan Solutions direct Williams & Fudge to collect the Bank of America -- collect on the Bank of America loans?

A.  I don't really like the word "direct."  They entered into an agreement to collect on the Bank of America loans.

Q.  Thanks.  And did Student Loan Solutions enter an agreement with Sunrise to collect on the Bank of America loans?

A.  Yes.

Q.  How often -- strike that.

Does Student Loan Solutions file debt collection lawsuits?

A.  No.

THE WITNESS:  Sorry.  Slow down?

MR. LITTLE:  No, you're good.  It was an involuntary motion.

THE WITNESS:  Okay.

Q.  Did Student Loan Solutions file a debt collection lawsuit against Ms. Dawson?

MR. LITTLE:  Object to the form.

A.  The lawsuit was filed by Murtha -- Roach & Murtha on behalf of Student Loan Solutions.

Q.  So does Student Loan Solutions hire attorneys to file lawsuits on its behalf to collect debt?

A.  No.

Q.  Then how do student lawsuits -- how do the lawsuits in which Student Loan Solutions is the plaintiff come to be filed?

MR. LITTLE:  Regarding the Bank of America debts?  Or generally?

Q.  Start with Ms. Dawson.  How did the lawsuit on behalf of Student Loan Solutions against Ms. Dawson come to be filed?

A.  It was collected on by Williams & Fudge and Ms. Dawson never made a payment, so Williams & Fudge reviewed the account to see if it was suit-worthy and made recommendation to me, which I approved to send it to outside counsel, which is contracted by Williams & Fudge.

Q.  Okay.  There was a lot in there.  Let me make sure I understand correctly.

So Student Loan Solutions contracted with Williams & Fudge to collect on Ms. Dawson's account. Williams & Fudge then recommended to Student Loan Solutions that a suit be filed?

A. After performing their own internal collection efforts.

Q. You mean after Williams & Fudge performed -- sorry. After --

A. Yes.

Q. -- Williams & Fudge performed Williams & Fudge's collection efforts, Williams & Fudge recommended to Student Loan Solutions that a lawsuit against Ms. Dawson be filed?

A. Yes.

Q. Then Student Loan Solutions approved that this lawsuit be filed?

A. Yes.

Q. And then Williams & Fudge retained outside counsel to file the lawsuit.

A. Yes.

Q. Is that correct?

A. That is.

Q. Is that a correct summary of what you testified to?

A. That is correct.

Q. Is there anything I'm missing in those steps there?

MR. LITTLE:  Object to the form.

A.  That's a broad approach, but yes.

Q.  Did SLS approve lawsuits to be filed against other consumers on Bank of America loans?

A.  Yes.

Q.  How many?

A.  I have no idea.

Q.  More than 100?

MR. LITTLE:  Object to the form.  Outside the scope of the notice.  His answer is not going to bind the company.  To the extent that you know, Mr. Ruh, off the top of your head, you can answer.

A.  I do not know how many.

Q.  More than 100?

A.  Yes.

Q.  More than 1,000?

MR. LITTLE:  Same objection.

A.  Again, I do not know the number.

Q.  Does Student Loan Solutions use the mail to collect debt?

A.  No.

Q.  Does anyone use the mail to collect debt on behalf of Student Loan Solutions?

A.  Anyone?

MR. LITTLE:  Object to the form.  If you

know.

A. Yes.

Q. Does Williams & Fudge use the mail to collect debt on behalf of Student Loan Solutions with respect to the Bank of America loans?

A. Yes.

Q. Does SLS hold any licenses?

A. Yes.

Q. What kinds?

A. There's states that require debt buyers, even passive debt buyers, to be licensed. Some states as a debt buyer. Some as a collection agency, even though we don't do any collections.

Q. Does Student Loan Solutions hold any licenses in New York?

A. Yes.

Q. Which ones?

A. I believe we're licensed with the state. Buffalo, the city.

Q. Does Student Loan Solutions contract with third parties to collect on Bank of America loans in all 50 states?

A. Could you ask that again? Because the way -- do we have third parties in all 50 states or --

Q. You testified that Student Loan Solutions contracts

with third parties to collect on Bank of America loans; is that correct?

A.   Yes.

Q.   Does that collection happen in all 50 states?

A.   Yes.

Q.   And you testified that SLS approves litigation with respect to the Bank of America loans?

A.   Yes.

Q.   Does SLS approve that litigation in all 50 states?

MR. LITTLE:  Object to form.  Outside the scope of the notice.  To the extent you know, Mr. Ruh, you can answer.  Otherwise, his answer is not going to bind the company.

A.   I don't recall the states off the top of my head, but there are states that we do not litigate.

Q.   Does Student Loan Solutions have any administrative or support staff?

A.   No.  There's no employees.

Q.   Other than Williams & Fudge and Sunrise, does Student Loan Solutions have other contractors?

A.   No.

Q.   Does Student Loan Solutions have a domain name?

A.   Like a website?

MR. LITTLE:  Are you talking about a website?



MS. RANUCCI:  Sure.  A website.

A.  No.

Q.  Does it have e-mail addresses specific to Student Loan Solutions?

A.  There is a generic one, but most of the times it's my e-mail address that's used.  My Williams & Fudge e-mail address.

Q.  And what is that e-mail address?

A.  My e-mail address?

Q.  Uh-huh.

A.  Cruh@wfcorp.com.

Q.  So most of the e-mail communication with Student Loan Solutions goes through your Williams & Fudge e-mail address that you just gave?

A.  Yes.

Q.  Does Student Loan Solutions have any record retention policies?

A.  No.

Q.  Does Student Loan Solutions have a computer server?

A.  No.

Q.  Does it have a database?

A.  What do you mean by a database?

Q.  If you'd look back at Exhibit 2, I'm going to direct your attention to the bottom of page 4, the response to Interrogatory 6.  I'm just going to read it.  Make

sure I read it correctly.

"All SLS account files are stored an a secure Microsoft SQL server database."

What does that mean?

A.  They're stored on a secured Microsoft SQL server database.

Q.  Is that SLS's --

A.  I'm not trying to be a smartass.  I'm really not.

Q.  Like, is that SLS's database?

A.  No.

Q.  Whose is it?

A.  Williams & Fudge.

Q.  Who maintains it?  The database.

A.  Who?

Q.  Maintains the database?

A.  Like company?  Individual?

Q.  Either one.

A.  It's maintained by Williams & Fudge.

Q.  Have you given everything on this database relating to Ms. Dawson's account to your attorney?

A.  Yes.

Q.  Does SLS maintain -- does SLS have any other records relating to Ms. Dawson's account?

A.  No.

Q.  How does SLS keep collection records?

MR. LITTLE: Form. You can answer if you know.

A. I'm not really understanding the question.

Q. Yeah. If a consumer makes a payment on a Bank of America loan, does SLS record that payment anywhere?

A. SLS does not accept any payments.

Q. Does someone accept payments on SLS's behalf?

A. The third-party servicers.

Q. So that's Williams & Fudge and Sunrise?

A. And attorneys that they contract with.

Q. Does SLS keep financial books and records?

A. Yes.

Q. Who keeps those?

A. What do you mean by "who"?

Q. Is there --

A. Like an --

Q. -- an accountant?

A. -- individual --

Q. Do you keep them at your house?

THE WITNESS: I'm sorry. Am I talking too fast again?

THE COURT REPORTER: Well, you're talking at the same time.

A. I don't know if I'm answering this correctly as you're asking, but they're SLS records, but I'm the

one that keeps them in connection with our CPA firm.

Q. So you hire an accountant that does accounting for Student Loan Solutions?

A. Yes.

Q. I'm not trying to be a trick question.

A. No.

Q. Just trying to figure out how it's working. Who files SLS's taxes?

A. You want the name of the firm? Our accountant?

Q. An accounting firm?

A. Yes.

Q. Hired by Student Loan Solutions?

A. Yes.

Q. Has SLS ever received a subpoena from a government agency?

MR. LITTLE: Object to the form.

A. From a government agency? No.

Q. An investigative demand from a government agency?

A. No.

Q. Any other inquiry that SLS has received from a government regulator?

MR. LITTLE: Object to the form. Outside the scope of the notice. His answer is not going to bind the company. To the extent you know, Mr. Ruh, you can answer.

A.   It was not part of my preparation, so no.

Q.   Have there ever been any regulatory proceedings
     against SLS?

          MR. LITTLE:   Object to the form.   Outside
     the scope of the notice.   His answer is not going
     to bind the company.   To the extent you know,
     Mr. Ruh, you can answer.

A.   No.

Q.   What are SLS's sources of revenue?

A.   Sources -- collections --

Q.   Are --

A.   -- from purchased portfolios.

Q.   And I believe you testified a few minutes ago that
     SLS does not collect money itself.   So where does
     that revenue come from?

A.   From third-party servicers that are hired to perform
     collection activity.

Q.   So SLS's revenue, just to make sure I understand,
     comes from the third parties who remit collections to
     SLS?

A.   Yes.

Q.   Are there any other sources of revenue for SLS?

A.   No.

Q.   When -- does SLS keep records that show what account
     the revenue is associated with?

MR. LITTLE:  Form.

A.  The statements provided by the third-party agencies.

Q.  Those statements show which consumer account is associated with the revenue?

MR. LITTLE:  Form.

A.  Yes.

Q.  And you stated that the members of SLS each draw a salary from the company; is that correct?

A.  Yes.

Q.  Are those members paid in any other way?

MR. LITTLE:  Form.

A.  What do you mean?  I mean, could you expand on that?

Q.  A bonus, for example, or a dividend, another arrangement other than a regular salary by which those individuals are paid.

A.  There could be circumstances.

Q.  Have there been?

A.  There's been bonuses paid out.

Q.  You testified that Williams & Fudge is a -- has a contract to collect debt on behalf of Student Loan Solutions; is that correct?

MR. LITTLE:  Are you asking if that was his testimony or are you asking if that is, in fact, what occurred?

Q.  Is that what you testified to?



A.   Are you asking does SLS have a contract with Williams & Fudge to perform collection services?

Q.   Yes.

A.   Yes.

Q.   How did that relationship come to be?

A.   We --

Q.   How did it come to be that Williams & Fudge had a contract with Student Loan Solutions?

A.   SLS hired them after they purchased their first portfolio.

Q.   And was the Bank of America loans SLS's first portfolio?

A.   No.

Q.   When was that approximately, if you know?

A.   The first purchase?

Q.   Uh-huh.

A.   2008.

Q.   And so around 2008 is when SLS and Williams & Fudge entered into this relationship?

A.   Yes.

Q.   Would you say that SLS and Williams & Fudge are affiliates?

A.   No.

          MR. LITTLE:   Object to the form.

A.   No.

Q.   I know that you have a different role that we're going to explore tomorrow with respect to Williams & Fudge.  I just want to -- you know, just to reiterate, you're here today on behalf of Student Loan Solutions.  There may be things that you know in your role as Williams & Fudge.  If you ever want to clarify that in an answer, feel free.

We're asking questions on behalf of Student Loan Solutions.  You're answering them on behalf of Student Loan Solutions, not Williams & Fudge.  But if there are things that you know in your role as Williams & Fudge where you think an answer would be clearer to explain separately what you know in one role versus what you know in another role, please go ahead and clarify if that helps.

I know it just is confusing.  I'll try my best to clarify, if you can try your best, too.

A.   Okay.  Thank you.

Q.   Are any of the other five members of SLS also employees of Williams & Fudge?

A.   Yes.

Q.   Which ones?

A.   Clay Goodyear and David Williams.

Q.   And do any of the six members have any ownership interest in Williams & Fudge?



Cain & Crane Court Reporters
704.545.3510

A.   Yes.

Q.   Which ones?

A.   David Williams and Gary Williams.

Q.   Not yourself?

A.   No.

Q.   Does SLS maintain any records relating to the Bank of America loans separate from Williams & Fudge's records?

A.   Could you explain what you mean by "records"?

Q.   Sure.  I believe earlier you testified that all records relating to Ms. Dawson's loan were stored in Williams & Fudge's database.  Did I understand that correctly?

          MR. LITTLE:  Object to the form.

A.   Yes.

Q.   And that SLS does not maintain records relating to Ms. Dawson's loan separate from the Williams & Fudge database.  Did I understand that correctly?

A.   Yes.

Q.   Is that true for all other Bank of America loans?

A.   Yes.

Q.   So the records relating to Bank of America loans are stored in Williams & Fudge's database?

A.   Yes.

Q.   And SLS does not separately maintain records relating

to the Bank of America loans other than the ones in Williams & Fudge's database?

A.   That is correct.

Q.   Thanks.

A.   See, we're already at the end of your list.

MS. TARANTOLO:  Don't ask how many lists.

THE WITNESS:  No, I see the pile.  I'm just giving myself hope.

Q.   Did SLS ever give Williams & Fudge instructions about record retention?

A.   Did SLS ever give Williams & Fudge -- no.

Q.   Next I'm going to turn to some questions about --

MR. LITTLE:  List number two.

A.   Am I done with this one?

Q.   Oh, yeah.  I'm sorry.  We may need it in a minute, but we can keep it there for now.

Before I get to the next, I just want to turn back.  Are you an owner in any other debt collection companies?

A.   Debt collection companies, no.

Q.   Any other kinds of companies?

MR. LITTLE:  Object to form.  Outside of the scope of the notice.  To the extent you know, Mr. Ruh, you can answer.

A.   Yes.

Q. What kinds of companies?

A. Passive debt buyer and then real estate.

Q. What's the name of the passive debt buyer or debt buyers that you're an owner of?

A. Loom Capital, LLC.

Q. How do you spell that?

A. Loom, L-o-o-m, Capital, LLC.

Q. Is that also a South Carolina LLC?

A. Yes.

Q. What types of loans does Loom Capital, LLC --

MR. LITTLE:  Object to the form.  He's not answering that question.  This is well outside the scope of the notice.  This is a deposition about SLS, not Mr. Ruh personally.

MS. RANUCCI:  Okay.

Q. Next I'm going to ask some questions about the sale of loans from Bank of America to Student Loan Solutions on October 31, 2017.  For ease of us talking about it, I'm just going to call that the sale.

Do you understand what I'm talking about?

A. Yes, ma'am.

Q. How did that sale come to be?

A. I was contacted directly by Bank of America when they were looking to sell their private student loan



portfolio, specifically the non-performing loans. They were selling the entire portfolio, the performing and non-performing at the same time.

Q. And when you were contacted, was that in your role at Williams & Fudge at the time or in your role in SLS at the time, if you know?

A. I would assume -- I don't know. I mean, I would assume my role was SLS because they were looking to sell the portfolio.

Q. And so at -- Bank of America essentially proposed a sale of a certain portfolio of loans?

A. Yes.

Q. Were all the loans that Bank of America proposed to sell being collected on by Williams & Fudge at the time?

A. Not all, but 99 percent of them.

Q. And you said that that includes both -- included at the time both performing and non-performing loans?

A. No. They were selling their performing and non-performing. They only contacted me about the non-performing.

Q. And was Williams & Fudge collecting for Bank of America both the performing and non-performing?

A. No. Performing is not in collections. Performing is still being serviced by a servicer. People are

making payments.  These are not collection items.

Q.  Okay.  I think I understand.  I'm just going to repeat it back to make sure I understand.

So Bank of America had a set of private student loans.  It had performing loans that it was not hiring Williams & Fudge to collect at the time.  It had non-performing loans that it was hiring Williams & Fudge to collect at the time.  And then Bank of America contacted you about a sale of private student loans?

A.  Non-performing.

Q.  The non-performing.

A.  Yes.

Q.  And nearly all of those non-performing loans were the ones Williams & Fudge was collecting for Bank of America?

A.  At the time that we were contacted, nearly all, but over time all had been at some point with Williams & Fudge.

Q.  Okay.  And do you remember who in Bank of America contacted you?

A.  I believe the initial contact was with Brian Kearns, and he -- his role was to sell the portfolio.

Q.  Besides Mr. Kearns, did you communicate with anyone else from Bank of America prior to the sale?

A.   SLS?

Q.   Yes.

A.   Prior to the actual sale or the discussions on the sale?

Q.   Prior to the sale, so including the discussions on the sale.

A.   Yes.

Q.   Who else from Bank of America?

A.   Shane Sands.  Candi.  I think Candi Lee.  There were several -- two ladies that had the same first name, and I can't recall their names right now.  It was probably four or five people in addition to Mr. Kearns.

Q.   And what did you talk to them about prior to the sale?

A.   Just understanding, you know, exactly what they were trying to accomplish.  Again, these were loans that were being serviced by Williams & Fudge.  We knew the portfolio.

Q.   Did you negotiate the purchase price?

A.   Yes.

Q.   Who proposed -- start over.

     When Mr. Kearns reached out to you, did he propose a purchase price?

A.   No.

Q. Did there come a time where the parties negotiated a purchase price?

A. Yes.

Q. And who was involved in those negotiations?

A. SLS side?

Q. Both sides, but --

A. I was involved in the SLS side, and I believe I was communicating with Mr. Kearns. It's been several years.

Q. Was there anyone else on the SLS side who was involved?

A. Not in the actual discussions, you know, between the two parties.

Q. These were all student loans?

A. Yes.

Q. All originated by Bank of America?

A. Yes. Well -- excuse me. Bank of America and also Fleet National Bank, which was acquired by Bank of America.

Q. What years were they originated?

A. I believe the bulk of the loans were in the 2007-plus era.

Q. Were they all charged off at the time of the sale?

A. Yes.

Q. And they were all defaulted at the time of the sale?

A.   Yes.

Q.   And all -- just to make sure I understand, all had been collected by Williams & Fudge at some point prior to the sale?

A.   Yes.

Q.   Direct your attention back to this exhibit.  If you look at -- Exhibit 2.  Apologies.  Exhibit 2.  At the top of page 3, the response to Interrogatory 1.  Subset (c), romanette (ii), "Bank of America placed the account with WFI" -- which I believe is Williams & Fudge -- "for collection for a period of time.  The account was recalled back to Bank of America prior to the sale to SLS."

     What does that mean that the account was recalled?

A.   So basically the account was -- Bank of America sent a closed file to Williams & Fudge on the day of the transaction and then the accounts were subsequently sold and then Williams & Fudge placed -- excuse me -- SLS placed them back with Williams & Fudge.

Q.   So --

A.   It's just changing who owned the account.

Q.   So it wasn't -- the recall to Bank of America was for all the Bank of America loans, not just Ms. Dawson's loan?

A.   Yes.

Q.   And it was essentially just a mechanism to allow the sale to happen?

A.   Correct.

Q.   Before the sale, did anyone perform an analysis of how much money you would make?

A.   You're talking about our projected return?

Q.   Uh-huh.

A.   Yes.

Q.   And who performed that analysis?

A.   It was done by myself and Clay Goodyear.

Q.   And what did it take into account?

A.   Well, this was a portfolio that was already being serviced by Williams & Fudge, so we were able to look into how the portfolio was already recovering, returning.

Q.   So you took into account the collections efforts that had already been made by Williams & Fudge?

A.   Yeah.  I mean, Williams & Fudge worked with Bank of America for years, so we had a long history of data.

Q.   Did you write down your analysis anywhere?

A.   It could have been on a scratch sheet of paper.

Q.   Did you provide any analysis to the other members?

A.   Other than the recommendation to purchase.

Q.   And did that recommendation to purchase explain why

you recommended to purchase?

A.  I don't have it in front of me, but, you know, I don't recall.

Q.  Yeah.  That recommendation to purchase, was that a written document?

A.  No.  I believe everything was just in verbal communication.

Q.  So -- and not by e-mail?

A.  I mean, I've checked my e-mail and there's nothing.

Q.  So you and Mr. Goodyear made some projections about -- sorry.  I don't want to put words in your mouth, so let me just ask --

A.  So please don't.

Q.  Yeah, I saw myself.  What sort of projections did you and Mr. Goodyear make?  Like rate of return?  Cash flow?  Return on investment?  How would you characterize the sort of projections that you made?

A.  I mean, the first thing was determining a purchase price and then the projected return on that.

Q.  Did you make -- use any modelling?

A.  No.

Q.  How did you come up with a proposed purchase price?

A.  Again, based on all the information we had available to us through our roles with Williams & Fudge.

Q.  And what kind of information was that?

A. Prior recovery information. Prior history.

Q. Did you budget any projected return?

A. What do you mean by "budget"?

Q. Like does SLS maintain a budget or a forecast that would have --

A. No.

Q. -- said how much -- okay. So you and Mr. Goodyear did these calculations without writing them down and recommended that the portfolio be purchased without sort of writing down your calculations?

A. Yes.

Q. Is that -- do you recall what the projected return was?

A. Yes.

* * *

(CONFIDENTIAL TESTIMONY FOLLOWS ON
PAGES 51 THROUGH 55.)

# CONFIDENTIAL PAGES

BY MS. RANUCCI:

Q. Did SLS review Bank of America's underwriting standards for these loans before this sale?

A. I mean, I wouldn't say review. We knew, you know, the process. We had discussions on how, you know, a person requested a loan and then, you know, was approved for a loan and was disbursed a loan.

Q. And was there anything in writing you got about that?

A. No.

Q. Did you review the age of the loans before the sale?

A. Yes.

Q. And how?

A. That was part of the loan tape.

Q. Loan tape. Did you review the charge-off date?

A. Yes.

Q. Again, part of the loan tape?

A. Yes.

Q. Same with last payment date?

A. Yes.

Q. And before the sale, you knew all these were non-performing loans? That was part of the sale?

A. Yes.

Q. Did you review whether or not the loans had been accelerated by Bank of America?

A. We know for a fact they were not.

Q.   How?

A.   Because that was not Bank of America's policy or procedure.

Q.   Do you have anything in writing stating that?

A.   No.

Q.   Did Bank of America ever warrant that -- like, provide any warranty -- I'm sorry.

     Did Bank of America provide any warranties or representations regarding acceleration?

A.   Nothing in writing.

Q.   And how did you know that wasn't Bank of America's standard procedures?

A.   Again, Williams & Fudge had been collecting for Bank of America since 2010.  We knew the processes.

Q.   Before the sale, did SLS perform any analysis of any statute of limitations on the loans?

A.   Yes.

Q.   What kind of analysis?

A.   Again, information received in the loan sale tape.

Q.   And so how would you translate information in the loan sale tape to analysis on statute of limitations?

A.   You could -- you know, based on age of the accounts -- I mean, there's several different factors that go in, but based on age of the account, knowing that these are installment loans and, you know,

knowing, you know, SLS took a blanket approach to utilizing four-year California statute of limitations due to the choice of law provision that's found in the contracts, with the exception of states that have a lesser statute of limitations, such as New York. Actually, I think New York we used three years because of North Carolina -- because New York has -- I mean, there's a whole lot of analysis that went into it.

Q. So just walk me through it. What would SLS look at to determine statute of limitations?

A. It would look at -- again, these are installment loans, so we would look at the number of installments within the applicable statute of limitations looking back three years, four years, and then plus all future payments due. So we use a software called Tru Value.

Q. Could you spell that?

A. Tru Value. T-r-u Value.

Q. And you used that software prior to this sale?

A. That was used in part of our analysis. That was a software that our CPA firm recommended.

Q. Again, prior to the sale?

A. Yes.

Q. And so I'm just -- I want to be clear. I want to

understand what information, from where, SLS had access to before the sale that it would have allowed this review.

So it sounds like you used information from the loan tape to input into the software?  Am I understanding correctly?

A.   Information from the loan tape, as well as what was already in Williams & Fudge's system.

Q.   And what information would you need to input to understand the statute of limitations?

A.   Input where?

Q.   Into the software.

A.   I mean, Tru Value is just an amortization.  It's just, you know, taking the information that you put in as far as number of payments still within the statute of limitations, plus all payments.

And when I say still within statute of limitations, I'm saying during the lookback period plus all future payments.  It's putting in -- again, and you derive this on an individual basis, but the principal balance of the account or the principal balance of the payments that were part of the original no disclosure statement, because SLS made the decision not to try to collect on the interest component on accelerated loans due to these were

variable rates based on LIBOR.

So, you know, when you're looking at the period of time, there's no way to go back and determine what the actual interest rate was. You know, LIBOR at the time plus the market. And so the determination was made to just review -- take the original repayment amount and look at just the principal component of it. So those are the type things that go into the Tru Value.

Q. So at the time of the sale, had the statute of limitations expired at any of the Bank of America loans?

A. I'm sure there were some that -- yes.

Q. At the time SLS purchased the Bank of America loans, did it intend to file lawsuits on them?

A. Yes.

Q. Immediately?

A. No. As a last resort. SLS would prefer someone pay the collection agency directly. And they're given many opportunities to do that and we're willing to take low payment arrangements. So it's not like Ms. Dawson couldn't have paid this before.

Q. How did --

MS. RANUCCI: Forewarning, Brendan, this may get into territory that's back to financial.

MR. LITTLE:  Okay.  Well, ask the question and I'll see.

MS. RANUCCI:  Yeah, exactly.  I just wanted to give you a heads-up.

MR. LITTLE:  Thank you.

* * *

(CONFIDENTIAL TESTIMONY FOLLOWS ON
PAGES 62 THROUGH 66.)

# CONFIDENTIAL PAGES

BY MS. RANUCCI:

Q. And did you retain BNA Accounting prior to the sale?

A. Yes.

Q. Is BNA Accounting --

A. It's BNA CPA.

Q. Oh, BNA CPA. What's the relationship between BNA CPA and the Tru Value software?

A. They just recommended -- we went to them explaining the Bank of America loans being installment loans and what would be the correct way to determine, you know, how much the accelerated balances would be on these loans. And they helped us come up with a formula on how to do that and recommended the Tru Value software, which we pay $60 a year for.

Q. And you -- all of that that you just talked about, that was all before the sale?

A. Yes.

        MS. RANUCCI:  Let's take a five-minute break.

        (There was a recess from 10:44 a.m. to 10:55 a.m.)

BY MS. RANUCCI:

Q. Can you go back to the interrogatory document still in front of you that's Exhibit 2. And then the response to Interrogatory 2 on page 3. I'm just

going to read it to start.

A.   Okay.

Q.   "Provide a general description of, and identify the location and custodian of, each type of document in Your possession concerning the Transaction, any Loan, or any Collection Action."

Did I read that correctly?

A.   Yes.

Q.   I'd like to discuss the documents in this second paragraph, "General Description of Documents."

A.   Okay.

Q.   Is this document a list -- sorry.  Is this list the set of documents that SLS had in its possession relating to Ms. Dawson's loan at the time that you swore this?

A.   If you don't mind me reading through them all.

Q.   Take your time.

MR. LITTLE:  You're just asking the second paragraph, correct?

MS. RANUCCI:  Correct.

A.   (Witness reviewing exhibit.)  And could you ask your question again?  I'm sorry.  Now that I've read it.

Q.   No problem.  At the time that you swore this in April of this year, were these the documents in SLS's possession relating to Ms. Dawson's loan?

A. I wouldn't think the insurance policy relates to it, but yes.

Q. And I just want to go through these. I don't want to belabor this, but I think it will make things easier if we're all talking about the same set of documents. So I'm just going to read the first set of documents.

"Approval to Initiate Litigation, Account Statement, Affidavit in Support of Accelerated Balance Due, Amortization Tables, Signed Credit Agreement, Note Disclosure Statement, Payment History."

Let me stop there. Those documents that I just -- did I read that correctly?

A. Yes.

Q. Each of those documents was specific to Ms. Dawson's account; is that correct?

A. Yes.

Q. And then the Bank of America redacted loan tape was specific to Ms. Dawson's account in the sense of the rest of the document was redacted except for Ms. Dawson's account information; is that correct?

A. Yes.

Q. There's a list of chain of title documents. One of them is the acceleration notice. That also is specific to Ms. Dawson's account; is that correct?

A.  It is, yes.

Q.  Are any of the other chain of title documents specific to Ms. Dawson's account?  I don't believe so, but I want to make sure my understanding is correct.

A.  No, they are not.

Q.  So the documents that are listed here, just to be very clear, I'm going to read them again.  I'm sorry to belabor it, but I think it's going to shortcut things later.  "Approval to Initiate Litigation, Account Statement, Affidavit in Support of Accelerated Balance Due, Amortization Tables, Signed Credit Agreement, Note Disclosure Statement, Payment History, Bank of America Redacted Loan Tape, and Acceleration Notice."

        I'm going to call those the interrogatory documents.  Is that okay?

A.  Yes.

Q.  Do you understand?

A.  Yes.

Q.  Are those interrogatory documents the only documents SLS possesses relating to Ms. Dawson's loan?

A.  Yes.

Q.  I'm sorry.  Specifically to Ms. Dawson's loan?

A.  Yes, ma'am.

Q.   Thank you.  Are there any other documents you can think of that SLS has relating to Ms. Dawson's loan specifically?

A.   No.

Q.   Thank you.  Other than those interrogatory documents, has SLS ever had any other documents relating to Ms. Dawson's loan?

A.   Not to my knowledge.

Q.   Does SLS have the same set of interrogatory documents as to each Bank of America loan?

A.   Yes.  Sorry.  I was reading through them again.

Q.   No.  Thank you.  Take your time.  Are there any other documents --

A.   Well, actually, could I go back and amend that?

Q.   Go ahead.

A.   Because if we haven't done litigation yet, there wouldn't be initiate litigation, nor account statement, nor an affidavit in support of accelerated balance due.  So you asked for all.  But if it hadn't been litigated or approved for litigation, those would not apply.

Q.   Understood.  So you're saying, just to be clear, some Bank of America loan accounts would have only a subset of these documents?

A.   Yes.  Because they're not in any type of litigation.

Q.  Uh-huh.  Would -- are there any other documents that are not on this list that SLS has for some Bank of America loans?

A.  I mean, there could be letters outside of the acceleration notice if they were letters that were still within the retention period at the time.

Q.  Okay.  I think I understand what you're saying, which is if there were letters -- for example, collections letters -- that still exist?

A.  Exactly.

Q.  Those may exist for some accounts, but may not exist for some accounts and do not exist for Ms. Dawson's account?

A.  Correct.

Q.  Thank you.  Any other kinds of documents that might exist on other Bank of America loans?

A.  No.

Q.  Turning to Interrogatory 6, which is on page -- the bottom of page 4.  "Dawson's loan file was transferred from Bank of America to SLS via secure SFTP File Transfer on November 1, 2017."

Did I read that correctly?

A.  You did.

Q.  What does that mean?

A.  So the closing was on October 31, 2017.  That's when

the loan sale agreement was signed.  On November 1st, Bank of America transmitted to SLS through Williams & Fudge's SFTP file transfer server, protocol, or whatever all the documents.  And I can't go into what exactly the SFTP process is.  I'm not an IT person.

Q.  Me neither.  What documents were transferred?

A.  Pretty much the documents we just discussed previously.

Q.  So it would have been a subset of the interrogatory documents that existed at the time?

A.  Yes.

Q.  Are there any documents that are not those interrogatory documents that were transferred on that day?

A.  No.

Q.  So just to go through, that would have included the signed credit agreement, correct?

A.  Yes.

Q.  Note disclosure statement?

A.  Yes.

Q.  Payment history?

A.  Yes.

Q.  Bank of America redacted loan tape?

A.  No.  It would have been the entire --

Q.  Entire loan tape?

A.  Yes.

Q.  Separately?

A.  And that was part of the closing documents, so that would not have been sent the next day.

Q.  Understood.  Because, again, the redacted loan tape is just a subset of the full loan tape?

A.  Yes, ma'am.

Q.  And it sounds like that's it; is that correct?

A.  Yes.

Q.  Does that file still exist?

A.  So the information was brought in through the SFTP site and then it was attached to all the accounts in Williams & Fudge's system.  So all the files exist, yes.

Q.  And they still exist in Williams & Fudge's system?

A.  Yes.

Q.  And SLS doesn't separately have --

A.  No.  Sorry.  No.

Q.  If you recall, were these documents sent in PDF?

A.  Yes.

Q.  Have you given all these documents to your attorney in this case?

A.  All the documents for Ms. Dawson's file?

Q.  Yes.

A.  Yes.

MS. RANUCCI:  I'm just noting for the record we haven't actually received any documents except as attached to a later created affidavit.  I don't -- just noting that for the record.

Q.  Do the original documents --

A.  I don't understand what you just said.

Q.  Sure.  We have -- and I'll show you in a minute -- an affidavit from you -- I don't know off the top of my head -- at some point after 2017.  That affidavit has a number of attachments.  A number of those attachments are the documents that we're talking about, but we haven't separately received, like, an original, for example, copy that would have -- you know, because the affidavit didn't exist until years later, like an original document separate from the that.

MR. LITTLE:  What I believe she's saying is that some of these documents that came over in PDF's are attached to your affidavit.  She's saying you're entitled to them, a second copy of those -- she's saying they want to see a second copy, not just the ones attached to your affidavit, I think is -- I think is what you're saying.

MS. RANUCCI:  Yeah, yeah, yeah.

Q.  My question is really do those still exist separately

from your affidavit that you created later --

A. Yes.  Because all --

Q. -- or is the only way --

A. -- the documents are electronic.

Q. So they still exist in their individual forms, not only attached to a later affidavit?

A. That is correct.

Q. Thanks.

A. Wow, I did not understand all of that.

Q. Did SLS ever get from Bank of America any bills that Bank of America sent about Bank of America loans?

A. Bills?

             MR. LITTLE:  Form.

Q. Uh-huh.

A. Could you explain bills?  What type of bills?

Q. Like a monthly statement that Bank of America sent to a consumer.

A. No.

Q. Did SLS ever obtain from Bank of America any charge-off statements for any Bank of America loans?

A. No.

Q. Did SLS ever obtain from Bank of America any collections letters?

A. No.

Q. And did SLS ever obtain from Bank of America any

records relating to any other servicer or collector?

A. There could have been notes if they were requested.

Q. Notes from who?

A. From a servicer.

Q. And so how would SLS have obtained those?

A. Those would have been requested on an individual basis. And they don't -- they're not applicable for all.

Q. And so how would SLS have come to acquire those notes?

A. By request to Bank of America.

Q. Prior to the sale?

A. I could request some today if they exist.

Q. So I think what you're saying is for some, but not all, Bank of America loans, SLS additionally acquired account notes?

A. So what I'm saying is --

MR. LITTLE: Object to the form. Go ahead.

A. What I'm saying is they were not part of the original documents that were provided. In some cases, there may be notes available from a servicer that were used by Bank of America. Most cases not because of record retention, again, but --

Q. And for Ms. Dawson's account, there was not?

A.   There was not.

Q.   Do you know how long Bank of America retains those records for?

A.   I do not.

Q.   If Bank of America had accelerated Ms. Dawson's loan, would the documents you got from Bank of America have shown that?

A.   They would have had to provide an acceleration notice, which there's no acceleration notice because that was not part of their practices.

Q.   And why would Bank of America have had to provide that?

A.   Because per the promissory note or the loan -- the loan agreement, they -- you know, if they call the whole loan due, they have to provide a written notice to the consumer.

        MR. LITTLE:  "They" meaning Bank of America?

A.   Bank of America.  I apologize.

Q.   And --

A.   Or any holder of the note.

Q.   And what makes you think that if -- that such an acceleration notice would have been given to SLS in the transaction?

A.   They would have had to because that would change the

whole analysis of the portfolio.  Because once an account is accelerated, the amount of the debt becomes static.  You understand what I mean?  You can't collect -- you know, you can't continue to add installments, take installments.  I mean, you could take installments away, but the debt becomes static.  And that was not -- you know, part of Bank of America's policy or procedures was not to accelerate the debt.

Q.  And how do you know that?

A.  Through conversations with Bank of America.

Q.  And what would have obligated Bank of America to provide that to you?

A.  The loan sale agreement, which obligated them to provide true and accurate information as to the state of the portfolio.

Q.  So did you ask Bank of America if the loans had been accelerated?

A.  Yes.

Q.  And what did they say?

A.  No.

Q.  Was there anything in writing --

A.  No.

Q.  -- relating to that?

A.  Maybe I have to clarify that question.  We worked

with Bank of America from 2010.  We knew their policies and procedures.  When I say "we," I am talking as Williams & Fudge.  But I think it was important to point that out.

Q.  Did Bank of America use the term "acceleration"?

MR. LITTLE:  Object to the form.

A.  What do you mean use the term "acceleration"?  That's a standard term.

Q.  So just go over this again.  I understood that SLS at the time of this sale understood that none of the Bank of America loans had been accelerated.

A.  Correct.

Q.  Can you -- how did SLS come to that understanding?

A.  Through conversations with Bank of America.

Q.  And in those conversations, did Bank of America use the term "accelerated" or "acceleration"?

A.  Yes.  The word "acceleration" was exactly used, as well as the terminology "whole loan due," which comes directly from the credit agreement.

Q.  And so at the time that -- of the sale, did Bank of America -- had Bank of America ever sought the whole loan due as to Ms. Dawson's loan?

A.  No.

Q.  How do you know?

A.  It had never been accelerated.

Q. So the term "whole loan due" means acceleration, as you understand it?

A. Yes.

Q. And as to any Bank of America loan, had Bank of America ever sought the whole loan due?

A. Not the loans that were sold to SLS.

Q. Does SLS have any written debt collection policies that would apply to Bank of America loans?

A. No.

Q. Does SLS have any informal debt collection policies that would apply to Bank of America loans?

MR. LITTLE:  Form.

A. I'm not sure what you mean by "informal policies."  I just answered we don't have policies.

Q. All right.  Does SLS have written policies on statute of limitations?

A. No.

Q. What was SLS's practice with respect to statute of limitations on Bank of America loans?

MR. LITTLE:  Form.

A. I'm not -- what do you mean?  I'm not trying to be contentious with you.  I really don't understand the question.

Q. Yeah, it's hard without leading.  So you explained earlier some of how SLS considered the statute of

limitations with respect to Bank of America loans, but earlier we were talking just about before the sale. I think now I want to talk about SLS's practice generally about statute of limitations on Bank of America loans, which may be the same, but I want to go through it.

A. I think I can answer that quickly.

Q. Yeah, go ahead.

A. SLS is not going to litigate on a debt that's past statute of limitations, bottom line.

Q. And so how does SLS determine the statute of limitations on a Bank of America loan?

MR. LITTLE: Just to be clear, because he's talking about there's an ongoing forward flow, we're talking about Bank of America loans that were part of the acquisition on October 31, 2017, correct?

MS. RANUCCI: Yeah.

MR. LITTLE: Just because there's a forward flow of additional Bank of America loans and there's a class allegation and I want to make sure that we're on the same page.

MS. RANUCCI: Yeah.

A. So originally we looked at statute of limitations based on each individual state, but it was later made

the determination to base the statute of limitations based on California choice of law, which is part of the credit agreements, again, with the exception of states North Carolina, South Carolina, and there's other states that have a shorter statute of limitations period.  And, again, that's based on where the consumer resides.

Q.    When did you make that change?

A.    It was shortly after the portfolio was purchased.

Q.    If you know, did you --

A.    And that's a conservative approach.  I mean, there's states out there with longer statute of limitations that you could -- you know, because the whole choice of law provision, there's arguments whether it's procedural.  And I'm not an attorney, so I'm not getting into that, but it was a conservative approach.

Q.    If it was shortly after you purchased the loans, is it correct to understand that all or virtually all of the Bank of America loans would have been subject to what you have just said is your -- to the policy you just explained?

A.    No.  There was original -- you know, don't know how many, but there were accounts that were sued under the applicable statute of limitations where the

consumer resided at the time.  And there were arguments made as far as procedural or -- I can't remember the other --

MR. LITTLE:  Substantive.

A.  Or substantive.  And it just became a pain in the ass and we were spending more money on fighting that issue.

Q.  So I understand at a certain point in time not too long after SLS purchased the Bank of America loans, SLS's position on statute of limitations became that the four-year California statute applies unless --

A.  Is shorter.

Q.  -- there's a shorter statute as determined by state law even if in some states, like New York, it's some domino effect of state law?

A.  Exactly.  You could see there was a lot of work put into this.

Q.  When does the statute of limitations start running on the Bank of America loans?

MR. LITTLE:  Object to the form.  Outside the scope of the notice.  You can answer if you know.  I think it calls for a legal opinion, but if you know.

A.  I can't really answer because I don't understand the question.

Q.   Yeah.  So if a statute of limitations on Ms. Dawson's account, let's say, is three years, when did that three years start and end?

A.   So it would -- you know, when you're doing the acceleration, you're looking back -- each installment runs its own statute of limitations period.  So as each installment comes due, the statute of limitations period, so we would look back three years for any -- so from the anticipated date of filing of the lawsuit, we would -- and we normally take it out 60 to 90 days when I'm talking about anticipated date of filing -- you look back three years, any installment within that three years, plus all future installments due.  And that's found -- I think you have this -- well, I know you have this information in the amortization table.

Q.   And as we discussed, the three years in another state may be four years or at one point may have even been longer than four years.

Setting that aside, is the rest of what you described the same in all the states?

A.   The how you determine --

Q.   Uh-huh.

A.   -- the number of installments within statute of limitations?

Q.   Yes.

A.   Yes.

Q.   If a loan hasn't been accelerated, what starts the statute of limitations?

         MR. LITTLE:  Object to the form.  Outside the scope of the notice.  You can answer if you know, but it's not going to bind the company.

A.   I cannot answer that question.

Q.   Did SLS ever file any lawsuits without -- on Bank of America loans without accelerating the loan?

         MR. LITTLE:  Object to the -- object to that question.  It's outside the scope of the notice.  His answer is not going to bind the company.  If you know, Mr. Ruh, you can answer.

A.   I do not know.

Q.   Does SLS have any written policies on acceleration?

A.   No.

Q.   How did SLS determine when to accelerate a Bank of America loan?

A.   When the litigation process starts.

Q.   And how did SLS determine when to start the litigation process?

A.   Once collection efforts have ceased by Williams & Fudge.

Q.   Who decides when Williams & Fudge ceases collection

efforts?

A.   It's up to the individual collector.

Q.   Collector meaning employee of Williams & Fudge?

A.   Yes.

Q.   How did SLS come to understand that the Bank of
     America loans were installment loans?

A.   It's pretty clear.  Again, we had copies of the
     credit agreements.

Q.   Anything else?

A.   No.  I mean, it was provided -- guidance was provided
     by outside counsel to us.

Q.   What outside counsel -- without disclosing the
     content of the conversations, what outside counsel?

A.   It would have been The Echols Firm.

Q.   The Echols Firm.  Does the contract say installment
     loan?

          MR. LITTLE:  What contract?

Q.   I understand you testified that you -- that it was
     pretty clear from looking at the contract that these
     were installment loans, so --

A.   The credit agreement.

Q.   The credit agreement.

A.   I don't believe it uses the exact word "installment."

          MS. RANUCCI:  Andrea, can I have 441.

Q.   I'm going to hand to the court reporter an exhibit

I'd ask to mark as Exhibit 3, which is Bates stamped SLS 441.

(A document was marked for identification as Deposition Exhibit No. 3.)

Q. Here you go, Mr. Ruh.

A. Chris.

Q. Chris.  I'll give you a minute to look, but once you're done looking, do you recognize this document?

A. (Witness reviewing exhibit.)  Yes.

Q. What is it?

A. It's just a summary of the accelerated balance for Ms. Dawson's account and with all the pertinent information as far as how the balance was determined.

Q. Who drafted it?

A. This is a Williams & Fudge document.

Q. How was it generated?

MR. LITTLE:  Form.

Q. If you know.

A. I don't know.

Q. What was it used for?

A. As stated, to determine the accelerated balance.

Q. Did it get sent to anyone?  Let me -- was it just used within Williams & Fudge?

A. It is sent to the attorney, along with the rest of the documents, when litigation is requested.

Cain & Crane Court Reporters
704.545.3510

Q.  And by "the attorney," you mean here the typically state court collection attorney that would have filed a state court --

A.  That --

Q.  -- collection action?

A.  -- is correct, yes.

Q.  How are payments credited here?

A.  If there had been payments, they would have been credited.

Q.  How?

A.  It's not -- it would not be on this document.

Q.  I think that's -- has any court ever found that SLS filed a lawsuit after the statute of limitations had passed?

        MR. LITTLE:  Object to the form.  Outside the scope of the notice.  His answer is not going to bind the company.  To the extent that you know, you can answer.

A.  I wasn't prepared to discuss that.  I don't have the information in front of me.

Q.  Is every student loan an installment loan?

        MR. LITTLE:  Object to the form.

A.  Every student loan?  I couldn't -- I can't answer that question.  I'm not familiar with every student loan.

Q.  Is Ms. Dawson's student loan an installment loan?

A.  Yes.

Q.  Why?

A.  It was repayable in 240 installments.

Q.  And would that have been the same if she lived in a different state?

MR. LITTLE:  Object to the form.  Outside the scope of the notice.  You can answer if you know, but it's not going to bind the company.

A.  I cannot answer that.  I wasn't prepared for that.

Q.  So if everything about Ms. Dawson's account was the same, but she lived in Connecticut or Michigan, would it still be an installment loan, or would your answer change based on --

MR. LITTLE:  Object to the question.  It's outside the scope of the notice.  And it's not -- his answer is not going to bind the company.  To the extent that you know, you can answer.

A.  I do not know.

Q.  Did any Bank of America loans have credit agreements that were the same as Ms. Dawson's credit agreement?

MR. LITTLE:  Object to the question. Outside the scope of the notice.  You can answer if you know.

A.  You can ask that again because I really don't think I

understand the question.

Q. That's fine.

MS. RANUCCI:  May I see, Andrea --

Q. Let me hand to the court reporter a document I'm asking to mark as Exhibit 4.  This is Bates stamped SLS 46 to 92.

(A document was marked for identification as Deposition Exhibit No. 4.)

Q. Here you go.  Go ahead and take a look at this document.

A. It could take a little while.  (Witness reviewing exhibit.)  Okay.

Q. Do you recognize this document?

A. I do.

Q. What is it?

A. Well, there's several different documents contained within this document.

Q. Well, let's start with the first one.  What's the first one?

A. The first one is the affidavit in support of accelerated balance due.

Q. And this is your affidavit, correct?

A. Yes, it is.

Q. And you swore to it on December 6th of 2021; is that correct?

A.   Yes.

Q.   And then?

A.   The next is the amortization tables.  There's two separate tables.  One is showing the amortization for full loan plus interest, which, again, SLS did not pursue any interest in this matter.  The second one is the amortization report for principal plus origination fees only, so just the principal balance of the note.

     And then you get back to the loan request/credit agreement that was signed by Ms. Dawson and Mr. Dawson on November 29, 2007.  The terms follow that.  The note disclosure statement, which shows the amount that was disbursed, who it was disbursed to, and the repayment terms.  The payment history, which there were never payments made prior to charge-off.  And then there's a copy of the redacted Annex I.  The next document has a bill of sale and blanket endorsements, as well as redacted Annex I table.  You have the acceleration notices that were sent to the Dawsons.  And these would have been part of the documents that were sent to the attorney that would have filed the suit.

Q.   And all of the other documents are attachments to this affidavit; is that correct?

A.   All the other -- I don't know if all of them.
     Exhibits A and B are.

Q.   And you stated earlier that the interrogatory
     documents were the only documents SLS had relating to
     Ms. Dawson's loan?

A.   Which are the documents we just reviewed, yes.

Q.   That's exactly what I was going to ask.  That's the
     same as these documents, correct?

A.   Yes, ma'am.

Q.   Thank you.  So can you explain what in here led you
     to an understanding that Ms. Dawson's loan is an
     installment loan?

A.   So, again, if you look at the note disclosure
     statement, you will see that this is an installment
     agreement where the amount that was financed she
     agreed to repay on a monthly basis over 240 months
     beginning December 9, 2010.  That's an installment
     loan.

Q.   And if this was exactly the same, but it listed her
     address in a different state, would it still be an
     installment loan?

          MR. LITTLE:  Object to that question.
     It's outside the scope of the notice.  It's not
     going to bind the company.  To the extent that you
     know, Mr. Ruh, you can answer.

A.    I'm not prepared to answer.

Q.    So you don't know whether or not an installment loan is state-specific or is general?

      MR. LITTLE:  Objection to the question. Outside the scope of the notice.  His answer is not going to bind the company.  To the extent you know, you can answer, Mr. Ruh.

A.    I do not know all 50 states specifically which ones, if there are any, that do not allow for the installments.

Q.    And so is it your understanding that any loan that had a disclosure statement that was payable in installments is an installment loan?

      MR. LITTLE:  Object to the form.  Outside the scope of the notice.  You can answer, Mr. Ruh, if you know, but your answer is not going to bind the company.

A.    Again, I'm not prepared to answer that.

Q.    So could you state again why you think Ms. Dawson's loan is an installment loan?

      MR. LITTLE:  Object to the form.  Asked and answered.  You can answer if you --

A.    I've answered the question already.

      MR. LITTLE:  Answer it one more time. I'll allow it five times.  Six times is when I

start screaming.

A.  So if you go again to the note disclosure statement --

Q.  Would you mind just reading the number that is at the top of the page --

A.  I'm sorry.

Q.  -- to make sure we're looking at the same thing?  No problem.  Just --

A.  SLS 074.  The note disclosure statement, which, again, just summarizes the terms of the note that the Dawsons both agreed to.  So originally $30,000 was the amount they requested.  The principal amount of the note was 33,519.55, which is including the 30,000 that was disbursed to Roxanne A. Dawson and Isaiah Dawson plus $3,519.55.  This was an installment contract where repayment was based on a term of 240 payments at $519.51 with the first payment due on December 9, 2010.

And, again, this was a variable rate note based on LIBOR plus a margin.  And for reference, if you want to know the margin amount, you can look at Bates Stamp SLS 065 and you will see the deferral period margin of 7.25, repayment period margin of 7.25, and a loan origination fee percentage of 10.5.

MS. RANUCCI:  Would you mind reading back

because I want to make sure I got this right.
There was -- the word "installment" appeared in
there.  I think you said perhaps installment loan
or installment -- could you read back what he said?

(The Court Reporter read back the
requested material, as set forth hereinabove.)

Q.   Were the words "installment contract" -- were you
reading those words?

A.   No.

Q.   What on this page led you to determine this was an
installment contract?

A.   I think I've answered this three or four times
already, but, again, on page Bates Stamp SLS 074,
your repayment schedule will be -- number of
payments, 240.  That's an installment.  There's 240
installments.

Q.   So any --

A.   Payable monthly.

Q.   Any number bigger than one would be payable in
installments?

MR. LITTLE:  Object to the form.  Outside
the scope of the notice.  His answer is not going
to bind the company.  To the extent you know,
Mr. Ruh, you can answer.

A.   I don't even understand the question, so I'm not

going to answer.

Q.  Okay.  Could I turn your attention in the same document to SLS 076 -- I'm sorry.  It's right -- I believe it's right in front of you.  Yeah.  Does this document show installment payments?

A.  This was a payment history, but there was never a payment made.

Q.  Sorry.  I should have started with that.  What is this document?  A payment history, if you know, from where?

A.  Bank of America.

Q.  Does it show any installments on this document?

MR. LITTLE:  Form.

A.  I don't -- are you saying installments as in a payment being made?

Q.  A payment being due or made, either one.

A.  There was never any payments made.

Q.  Does it show any installments due on this document?

A.  No.  This is a payment history.

Q.  Okay.  So I'm sure I'll need this again, but I think we can put it aside for now.

Stepping back in general, very high level, could you just tell me the steps that SLS would take before a lawsuit is initiated?  We talked about some at the beginning.  I can try to repeat them or you

can just say them in your own words, which might be better.

A.  So when you mean "SLS would take," I really -- I mean, could you be a little more specific on what you're asking?

Q.  Sure.  So I'll start by telling you what I think you've told me.  Again, I'm not trying to put words in your mouth, but I'm trying to summarize and be clear.

So first I understood you to say that the first step would be that SLS would direct Williams & Fudge to collect on an account, not via litigation?

A.  And I believe I said last time I don't like the word "direct."

Q.  Contract.

A.  We have a contract with Williams & Fudge.

Q.  And then there would come a time when Williams & Fudge would recommend litigation to SLS?

A.  That is correct.

Q.  Then there would come a time when SLS would approve the litigation?

A.  Yes.

Q.  At some point, the loan -- an acceleration notice would be sent?

A.  Yes.

Q. Is that after SLS has approved litigation or am I going out of order?

A. It's close in time, but SLS would approve that. So approve the litigation after.

Q. Okay. So --

A. One of the steps made prior to litigation is the acceleration.

Q. Is that made before or after Williams & Fudge recommends litigation?

A. It's made before -- is the acceleration done?

Q. Uh-huh.

A. It's done before the suit package is sent to me for signature.

Q. All right. So let me start over and make sure I'm going in the right order.

The first step is SLS contracts with Williams & Fudge to collect --

A. Right.

Q. -- on a loan? The second step is an acceleration notice is sent?

A. After the point where Williams & Fudge has exhausted their internal efforts.

Q. Okay. Then after that, Williams & Fudge recommends litigation?

A. Correct.



Q.  And then after that, SLS approves litigation?

A.  Correct.

Q.  And then at some point after that, a lawsuit is filed?

A.  That is correct.  That's high level, but yes.

Q.  Are there any other high-level steps that you think that I've missed?

A.  No.

Q.  Who makes the decision that Williams & Fudge has exhausted all their collections efforts?

A.  I think I said earlier that it's made on the individual collector basis.

Q.  Yeah.  And --

A.  And that is the Williams & Fudge collector.

Q.  The Williams & Fudge individual collector.  Is that decision communicated to SLS?

A.  Communicated through -- it's put into a different status.

Q.  And that's a status in Williams & Fudge's computer system?

A.  Yes.

Q.  And can you explain what an acceleration notice is?

A.  I can show you one.

Q.  Great.

A.  I believe if we go to the back of Exhibit 4 -- and

I'll give you the exact Bates stamp number.  SLS 089 is the acceleration notice that was sent to Ms. Dawson on December 1, 2021.  So in summary, if you look at the second paragraph, it states, "Pursuant to the Agreement, SLS hereby accelerates the loan and demands all payments due.  Consequently, $19,692.06 is now immediately due and owing to SLS."

Q. Was this same notice sent to all Bank of America loans that were accelerated?

A. I just want to make sure I'm answering correctly.  So all loans that have been accelerated, would they have gotten a similar --

Q. Uh-huh.

A. Yes.

Q. And obviously the consumer information would have been different --

A. Obviously, yes.

Q. -- but the notice would have been the same?

A. Sorry.

Q. Was it SLS's decision to send the notice or Williams & Fudge's decision to send the notice?

A. SLS has provided Williams & Fudge with the authority to send the notice prior to initiating the litigation.

Q. Who approved sending this notice?



MR. LITTLE:   The notice in general or the Dawson-specific notice?

Q.   Let's start with the Dawson notice.   Who approved the Dawson acceleration notice being sent?

A.   I don't understand what you mean by "approved." Again, part of the procedures or, you know, again, they're not written down or anything, but Williams & Fudge, once they've exhausted their internal efforts, they are to send the acceleration notice.   That's a directive made by SLS to Williams & Fudge to send this notice, which is an approved notice of Williams & Fudge's.

Q.   And that directive is blanket?

A.   Yes.

Q.   It's not that Williams & Fudge each individual time had to go to SLS and say I think this account is ready for an acceleration notice?

A.   That is correct.

Q.   They had essentially pre-approval?

A.   That is correct.

Q.   Okay.   Who drafted the template?

A.   This would have been drafted --

MR. LITTLE:   Form.   Go ahead.

THE WITNESS:   That's okay.   You're a little slow.



Cain & Crane Court Reporters
704.545.3510

MR. LITTLE:  I'm sleeping.

A.   This would have been drafted by counsel with Williams & Fudge's compliance team.

Q.   And that -- is that SLS's counsel or Williams & Fudge's counsel?

A.   That would be one and the same.

Q.   The Echols Firm?

A.   Yes.

Q.   How is the balance on this and Ms. Dawson's acceleration notice calculated?

A.   Do you want to go back to the amortization table?

Q.   Sure.

A.   I mean, I can summarize it without going back to that, but if we refer back to the exhibit -- the prior exhibit.

MR. LITTLE:  3.

Q.   Whatever is easiest for you.

A.   I believe it's Exhibit 3.  I think it clearly goes through.  And to summarize it, it's the principal component of the original repayment amount, which was -- I think original repayment amount was 500 and some-odd dollars is the principal component only looking back three years from anticipated date of filing, plus all future payments due.  That's, again, summarizing.  It matched, didn't it?

Q.   Did anyone review Ms. Dawson's account before the acceleration notice was sent?

MR. LITTLE:   Anyone at SLS?

Q.   Well, first anyone.

A.   I don't understand what you mean by that.

MR. LITTLE:   Object to the form.

A.   What do you mean by "review"?

Q.   Did anyone at SLS or Williams & Fudge look at any documents relating to Ms. Dawson's account before sending the acceleration notice?

MR. LITTLE:   Object to the form.

A.   SLS, no.   But Williams & Fudge would review the information to make sure that it's applicable.

Q.   And what information would they have reviewed?

A.   Basically the amortization information to make sure -- I mean, to be honest, we're not going to try to sue an account that's not worthy.   You know, $1,000.   $2,000.   You end up in depositions and you spend more time.

Am I done with this one or --

Q.   We might go back to it.

A.   Okay.

MS. RANUCCI:   Can we just take like another couple-minute break?

MR. LITTLE:   Sure.

                (There was a lunch recess from 11:47 a.m.
        to 12:48 p.m.)

                (Documents were marked for identification
        as Deposition Exhibit Nos. 5 and 6.)

        BY MS. RANUCCI:

Q.      Welcome back.  I'm going to hand you what's marked as
        Exhibits 5 and 6.  These are SLS 044 and 045.  044 is
        Exhibit 5 and 045 is Exhibit 6.  There you go.  Just
        for the sake of simplicity, go one at a time.

                So starting with SLS 044, which is
        Exhibit 5, once you've had a chance to look, could
        you tell me if you recognize this document?

A.      Yes, I do.

Q.      What is it?

A.      This is the approval to initiate litigation.

Q.      Who wrote this?

A.      This is a Williams & Fudge document that I signed.

Q.      So does that mean someone from Williams & Fudge wrote
        it?

A.      I mean, it's a template used by Williams & Fudge for
        approval to initiate litigation.

Q.      And it looks like you signed it on -- I think that's
        December 6th --

A.      It is.

Q.      -- 2020 --

A.   '1.

Q.   '1?

A.   Yeah.

          MR. LITTLE:   That's an interesting one.

Q.   Who was this document sent to?

A.   So this is part of the package that's provided to me
     from Williams & Fudge when they are sending an
     account for me to review for approval to litigate.
     This is just one of the documents and this is
     returned to Williams & Fudge prior to them sending it
     to outside counsel to pursue the litigation.

Q.   And I'm going to read a part at the very last
     sentence of this document above the signature.  "Any
     costs, fees, interests, or other amounts being
     claimed as due and owing by the institution/creditor
     is accurate, legal, and reasonable based on the
     applicable law and the contractual relationship
     between the consumer and the institution/creditor."
          Did I read that correctly?

A.   You did.

Q.   What does that mean?

A.   Basically that the information that's being provided,
     the basis for the complaint, is accurate.

Q.   And what did you look at to make that determination?

A.   The documents listed above.

Q. And which ones specifically?

A. Which would include the account statement, which is Exhibit 6, SLS 045, the written agreement with the consumer and Bank of America, which is now owned by SLS, and then the documents that -- you know, any payment history.  All the same documents we've been referring to that are related to the consumers.

Q. Right.  I think we called those -- just to make sure -- be very clear for the record, I think we called them at the beginning the interrogatory documents and those are also the same documents that are -- were enclosed with the affidavit --

A. That is correct.

Q. -- when we looked at that exhibit?  Yeah.  All right. Now taking a look at Exhibit 6, SLS 045, once you've had a chance to look, could you just tell me if you recognize this document?

A. Yes, I do.

Q. And what is this?

A. This is the account statement that I referenced earlier.

Q. And this was also signed by you?

A. Yes.

Q. Also on December 6, 2021?

A. Correct.



Q.   And this lists the total due on the account is
     $19,692.06; is that correct?

A.   That is correct.

Q.   When we spoke earlier, I believe you said that you
     got that number from the amortization table; is that
     correct?

A.   That is correct.

Q.   And who made this -- who wrote this document?

A.   This is -- again, is a Williams & Fudge document.

Q.   And, again, is it a template?

A.   Yes.

Q.   Now I'm going to go back to the affidavit, which was
     Exhibit 4.  I know we talked about this a little
     before, but I'm going to go through this in more
     detail now.  So looking at the first paragraph on
     SLS -- the first full paragraph on SLS 046, I'm going
     to read the second sentence in that.  "I have
     personally reviewed the documents and I am testifying
     as to my own personal knowledge."
             What documents did you review when you
     attested to this affidavit?

A.   Again, the same documents.  I forget what you called
     them.  The --

Q.   Interrogatory documents.

A.   Interrogatory documents.

Q.    Yeah.   And then the next sentence, "The matters set forth in this affidavit are based upon my personal knowledge or belief, or are reflected in the documents that SLS generates and maintains in the ordinary course of business."  Is that correct?

A.    Correct.

Q.    And so could you explain what that means?

A.    I think it's self-explanatory, but, you know, everything that I'm stating through -- in the affidavit comes from the documents that were previously reviewed specific to the account for the Dawsons.

Q.    Great.  Still on this first page down, where it says "Installment Schedule," the second sentence says, "Pursuant to the Note, Defendant agreed to pay the following monthly installments:  240 payments of $519.51."

      Did I read that correctly?

A.    Yes, you did.

Q.    And we went through earlier where you showed me that those numbers, the 240 and the 519.51, were on the disclosure statement; is that correct?

A.    The note disclosure statement.

Q.    The note disclosure statement.  Exactly.

A.    Yes.

Q.   Is that the basis on which you attested to this?

A.   Yes, because the note disclosure statement is incorporated into the loan agreement. If you want, I can give you the exact reference on the terms and conditions.

Q.   Yeah, that would be great. Thank you.

A.   If you look at SLS 067, which is page 3 of 7 of the terms and conditions, under B, "Important - Read this Carefully." Number 2, "How I agree to the terms of the loan." I can read this or you can see where the note disclosure statement will tell the amount of the loan that she approved, the amount of the loan origination fee, and other important information.

Q.   Yeah, I see that. Thank you.

A.   You're welcome.

Q.   Who wrote this affidavit?

A.   At the point -- I mean, again, this is a template that's used when an account is accelerated for the purposes of litigation.

Q.   And a Williams & Fudge template?

A.   Yes, ma'am.

Q.   I think I only asked about the other two. Apologies if I had asked about this one.

A.   No, that's okay.

Q.   So this affidavit in support of accelerated balance

due is a Williams & Fudge template?

A.   Yes, ma'am.  And I hope you don't get offended when I say yes, ma'am.  That's a southern thing.

Q.   Completely fine.  How was it given to you, as in mailed to --

A.   Hard copies.

Q.   -- your house?  Hard copies.  When the hard copies were given to you, what was in front of you?  Was it -- it's a hard question to ask, but --

A.   A picture of my family.  No, I'm just kidding.

Q.   No, was it -- do they hand you like a file that has the approval to initiate litigation, the account statement, the affidavit, and all these documents?

A.   It's a folder with all the pertinent documents.

Q.   Got it.  And those pertinent documents being Exhibits 4, 5, and 6 that we have put in here?

A.   4 -- as long as we're talking about 4 being all of these documents.

Q.   4 being all of those and then --

A.   Yes.

Q.   -- 5 and 6 being those two sheets --

A.   That is --

Q.   -- of paper?

A.   -- correct.

Q.   Was there anything else in front of you at the time

that you signed this affidavit?

A.   As far as in the folder that they provided to me?

Q.   Sure.  Start there, yes.  Anything else in the folder?

A.   No, this would be it.

Q.   Anything else you consulted before --

A.   I mean, if I had a specific question and I wanted to look at something, I would pull the account up on the system.

Q.   Which system?

A.   Williams & Fudge's system.

Q.   And we'll have plenty of time to get into that, but just for shorthand, what would you call that? Williams --

A.   It's called --

Q.   -- & Fudge's system?

A.   It's called Debt Manager, or DM for short.

Q.   Got it.  And so that was Williams & Fudge's collection software, for lack of a better term?

A.   Yeah, that's good.  Good term.

Q.   Thanks.  Did you pull up Ms. Dawson's account at the time you signed this affidavit from Williams & Fudge?

A.   I couldn't tell you.  I signed this in 2021.

Q.   Maybe you did, maybe you didn't, either way is possible?

A. As I'm reviewing the documents, if there's anything that I, you know, wanted to look at, then I would pull it up.

Q. When you signed these affidavits, would you do one at a time or like a whole batch on the same day?

A. It just depends on what's presented to me.

Q. How many times would you say you have executed an affidavit in support of accelerated balance due?

MR. LITTLE: For the Bank of America accounts or for --

MS. RANUCCI: For the bank accounts.

A. Again, that would go with the number that we've pursued litigation on, and I don't have the exact number in front of me.

Q. But I think you said before certainly more than 100?

A. Yes.

Q. More than 500, do you think?

A. I'd feel confident saying that.

Q. And they're all from the same Williams & Fudge template, all the affidavits in support of accelerated balance due?

A. Correct.

Q. Has that template changed over time?

A. No.

Q. Could you turn to the second page of the affidavit.

It's on SLS 047.  Just going to read the first sentence under that first paragraph.  "Pursuant to the Note, the Holder may, at its option, give notice that the outstanding principal balance, accrued interest, and any other amounts payable under the terms of the Note are due and payable at once."

What does that mean?

A.  Again, would you like me to reference exactly in the --

Q.  Sure.  Go ahead.

A.  So it's called whole loan due and you can find that SLS 068.  Page 4 of 7 at the bottom, you'll see where it says on the right-hand side, "I.  Whole Loan Due." And it's basically as stated.  It's SLS as the holder of the note providing notice to the consumer and/or the co-signer that we are demanding full payment, acceleration of the note.

Q.  And so when you use the term "acceleration," is this what you mean, give notice that the outstanding principal balance, accrued interest, and any other amounts payable under the terms of the note are due and payable at once?

A.  Correct.  Just with one exclusion.  We do not ask for interest.  We're allowed to per the note, but we do not.

Q.  Correct.  Then the next sentence says, "SLS, as Holder, accelerated the note for $19,692.06."
            Did I read that correctly?

A.  Yes.

Q.  What does this mean?

A.  SLS as holder of the note through purchase from Bank of America accelerated the note for $19,692.06, which is all installments three years past plus all future from the anticipated filing date.

Q.  Then the next sentence, "SLS sent Defendant written notice of acceleration via an Acceleration Notice dated December 1, 2021"?

A.  Correct.

Q.  So -- which just means that SLS notified Ms. Dawson that it had accelerated her loan in that notice that we looked at dated -- that we called the acceleration notice dated December 1, 2021 --

A.  Correct.

Q.  -- correct?  So does this mean that the loan had not been previously accelerated?

A.  Correct.

Q.  So just to be clear that I understand it, at the time that you swore this affidavit, your understanding was that the -- that Ms. Dawson's loan had never been previously accelerated?

A.  That is correct.

Q.  The next paragraph, "Amount Due."  I won't make you painstakingly listen to me read this, but, again, it states that the amount due is $19,692.06.

A.  Correct.

Q.  And, again, that's derived from the amortization table?

A.  Correct.

Q.  All right.  I'd now like to talk through some of the attachments to this affidavit.  We're still in Exhibit 4.

A.  Okay.

Q.  I'd like to look first at some of the numbers in the amortization table.  If we could look at SLS 049.

A.  Could I stop you real quick?

Q.  Sure.

A.  So the amortization table you're looking at right now would be if we did principal and interest.  It's not applicable because the amortization table that was used starts on 056, which is principal plus origination fee only.  I mean, I'm -- I'll be happy to answer any questions, but, you know, if we use this one with interest, we would have sued for $73,250.91.

Q.  Yeah.  I do want to ask a couple of questions about

this --

A.   Okay.

Q.   -- because I --

A.   I just wanted to clarify.

Q.   I appreciate your clarification and I understand.

A.   Okay.

Q.   I've been using the term "amortization table" to
     refer to both of them, but I agree with what you're
     saying, that just to be precise what you've been
     using to calculate the balance that we've discussed
     is the -- not this amortization table, but is the
     principal only amortization table that begins on SLS
     056.

A.   Yes.

Q.   Okay.  That being said, going back to 049, the top
     line of this chart, I read this to say that on
     November 9, 2010, the balance of Ms. Dawson's loan
     was 124,682 -- sorry -- $124,682.40; is that correct?

          MR. LITTLE:  Object to the form.

A.   So that would be -- if she had repaid the loan as
     originally described in the note disclosure
     statement, that would have been how much was paid
     over the life of the loan.

Q.   But it says balance, so wouldn't this indicate the
     balance on that date --

A. Well --

Q. -- before any of the repayments --

A. What it's --

Q. -- would have --

A. -- showing is --

Q. -- started?

THE COURT REPORTER: You've got to wait.

THE WITNESS: Sorry.

THE COURT REPORTER: Before any of the repayments would have started?

MS. RANUCCI: Yeah.

THE COURT REPORTER: Thank you.

MR. LITTLE: Object to the form. Where does it say balance?

MS. RANUCCI: Right above that number. Right above the 124 number. Sorry. Oh, Brendan, I'm sorry. I'm looking here at -- it's the top line of the shaded orange part on that same page.

MR. LITTLE: Over here. Gotcha.

MS. RANUCCI: Yeah. Sorry. I didn't realize the same number was above. Let me just start this whole section over.

Q. So there's a line that says loan date November 9, 2010, and then balance 124,682.40.

I understand that to mean that on

November 9, 2010, the balance of Ms. Dawson's loan was $124,682.40; is that correct?

MR. LITTLE:  Objection.

A.  No, that is not correct.  So if you look at that number, 124,682.40, and then you refer to SLS 074, which is the note disclosure statement, you will see -- and I'll give you a minute to get there.

Q.  Yeah, go ahead.

A.  You will see a -- boxes.  Annual percentage rate, finance charge, amount financed, total of payments. As stated, if the Dawsons, as originally agreed, had repaid the note based on the original terms, they would have paid 124,682.40.  So this -- what the amortization table is doing is just taking into account each payment and dropping it off.  So Payment No. 1, which was due December 9, 2010, essentially dropped the balance by $519.51.  Payment No. 2 dropped it by another 519.51.

Q.  Right.  But you used the term "balance."  I guess that's what I'm trying to figure out, is if the balance started at 124,682.40 and then it would drop each month were a payment to be made?

A.  Correct.

Q.  Is that --

MR. LITTLE:  Object to the form.

Q.   -- my understanding?  So what was the balance of Ms. Dawson's loan on November 9, 2010, I guess is a different way to ask the question?

A.   I don't know.  It would have been -- let's see if it's on the payment schedule.  You asked what would have been on November 9, 2010?

Q.   Uh-huh.

A.   I don't have that, but what the amortization table, again, is doing is showing -- and maybe that's not the great terminology showing that date, but it's just showing what she would have paid over the life of the loan and it's dropping it by each payment as they become due.  And so if you go all the way down to line 240 on SLS 054, you will see if paid as originally agreed, which did not occur, it would have been a 0 balance on 11/9/2030 after all payments had been applied.

Q.   Looking at line 16, this shows that the balance on March 9, 2012, was $116,370.24?

A.   Yes.

Q.   Was that the balance at the time?

A.   If the --

          MR. LITTLE:  Object to the form.  Go ahead.

          THE WITNESS:  Sorry.  I got to slow down.

A.   If the account had been accelerated previously.

Q.   And then the same on --

A.   These are -- let me -- these are hypotheticals assuming the account had been accelerated.  Because, again, these are installment contracts.  Each installment becomes due and payable and the statute of limitations runs from that period, so that's all this is for.  And, again, we're also talking about a document that has nothing to do with this lawsuit.

Q.   And then the same thing -- and this is the last one, but No. 20, the same thing, so on July 9, 2012, the balance stated here is $114,292.20.  You're saying that was a hypothetical balance that would have been the balance if, A, each payment had been made to that date and, B, acceleration had happened on that date?

          MR. LITTLE:   Form.

A.   Correct.

Q.   Turning now to SLS 065 and 066, do you recognize these documents -- this document -- these documents?  I'm not sure if you want to call it one or two documents.

A.   We can call it one document.

Q.   One document.

A.   Yes, I recognize it.

Q.   What is it?



A.   This is the loan request/credit agreement information page that was completed by Ms. Dawson and her co-signer, Isaiah Dawson, and signed on November 29, 2007, requesting a loan from Bank of America for an education maximizer undergraduate loan in the amount of $30,000.

Q.   How did SLS get this document?

A.   Directly from Bank of America.

Q.   And that was in the -- I forget the exact words, but the secure file transfer right around October 31, 2017, that we discussed?

A.   November 1st.

Q.   November 1, 2017?

A.   That is correct.

Q.   At the top, it's a little bit hard to see with the way that the numbers are stamped, but on SLS 065 it says page 2 of 3 --

A.   Uh-huh.

Q.   -- and then on SLS 066, it says page 3 of 3?

A.   Yes.

Q.   Have you ever seen page 1 of 3?

A.   No.

Q.   Do you know what it would be?

A.   My assumption is that it's a fax cover sheet.

Q.   Then turning to the next pages, SLS 067, 68, 69, 70,

and 71 --

A.  Yes.

Q.  -- do you recognize this document?

A.  I do.  These are the terms and conditions.

Q.  Of what?

A.  Of the agreement that the Dawsons signed on
    November 29, 2007.

Q.  If you look at the bottom of this page, these are
    stamped in a different way, 3 of 7, 4 of 7, 5 of 7, 6
    of 7, and 7 of 7; is that correct?

A.  That is correct.

Q.  Do you know where pages 1 and 2 are?

A.  Pages 1 and 2 are what we just talked about, SLS 065
    and SLS 066, which are the only pages that are
    required to be returned to Bank of America.

Q.  And how do you know that?

A.  It states right here.  Right above the signature line
    on -- I'm sorry.  On SLS 066, right above the
    signature line, it states, "Please sign below" -- I'm
    sorry.  I'll let you get there.  "Please sign below.
    Return This Page (and the Information Page)" -- which
    is SLS 065 -- "With Proof of Income and Other
    Information (if applicable)."

Q.  How did you obtain this document?  Again, looking
    just at SLS 067 to 71.

A.   These are basically form documents, but you can match it by the number at the bottom, the template number BK -- I'm sorry.  Let's go back to SLS 067.  And at the bottom, where it says 3 of 7, you'll see BK.07-08.CSX1.10DC.0107.  If you then refer back to SLS 065 and 066, you will also see the same numbers, BK.07-08.CSX1.10DC.0107.

Q.   And who put those numbers there?

A.   Those are -- these are Bank of America documents. You can also find -- and I wasn't done.  Sorry.

Q.   Okay.

A.   The top of SLS 066 in the -- which is the signature page, "By my signature, I certify that I have read, understand and agree to the terms" -- and I'm sorry, this is hard to read -- "of and undertake the obligations set forth in all seven pages of this Loan Request/Credit Agreement BK.07-08.CSX1.10DC.0107 (the 'Credit Agreement.')"

Q.   So -- and you said that Bank of America put those numbers on the bottom of each page?

A.   These are Bank of America documents.

Q.   So --

A.   Or were.

Q.   Did these -- so the documents -- I'm just trying to, like, literally figure out how these got to you.  You



sent -- the first two pages came via secure file transfer on November, 1, 2017.

Is that the same with the remaining five pages?

A.  Yes.

Q.  And did they come together as one document or as two separate documents, if you remember?

A.  These came as -- I don't know what the correct word is -- forms, documents, templates.  I mean, I don't know.  But basically there's different versions down here at the bottom, but this is the terms and conditions that go with this loan and this version.

Q.  And so did you get a different copy of the terms and conditions for each Bank of America loan?

A.  If there was a different type of BK number.

Q.  Oh.  I think I understand.

A.  I'm not explaining --

Q.  No, no.  I think I understand now.  You're saying that the BK number doesn't refer to a specific account.  It refers to a specific set of terms and conditions.

A.  Yes.

Q.  Am I understanding correctly?

A.  Yes, you are.  And the terms and conditions are not required to be returned to Bank of America.  They are

retained by the credit -- excuse me -- the consumer and/or the co-signer.

Q. So when Bank of America sent you these terms and conditions, did they send you these terms and conditions specifically for Ms. Dawson or just generally as to all Bank of America loans that had the same terms and conditions as Ms. Dawson's loan?

A. The second one.

Q. I'd like to ask the court reporter to mark Exhibit 7.

(A document was marked for identification as Deposition Exhibit No. 7.)

A. Am I done with 4, 5, and 6?

Q. We'll be back, but just going to take a little break for 7.

A. All right.

Q. Just take a look at this and when you're ready, tell me if you recognize it.

A. (Witness reviewing exhibit.)  Okay.  Yes.

Q. What is this document?

A. So this is the general promissory note example for BK.07-08.CSX1.10DC.0107.

Q. And you've stated that Bank of America provided you a copy of those terms and conditions that would be applicable not only to Ms. Dawson's loan, but to other Bank of America loans that had the same terms

and conditions.

Is this the form in which they provided it to you?

A. As a PDF, but yes.

Q. Who labeled it "General Promissory Note Example"?

A. That came from the suit package that was sent to the attorney. Or this could have come from the -- I don't know if it was part of the interrogatories, the suit package. I don't know.

Q. Okay. But Williams & Fudge or --

A. If this came as part of the suit package, yes. If it came from the attorney as part of an interrogatory, it would have been by them. Again, I don't know where you are providing this from.

Q. Yeah. Just from Brendan. So the question is back to you, but I understand. We can run that down later.

A. It doesn't change what it is, I mean, essentially.

Q. Yeah. Okay. Going back to Exhibit 4, now looking at SLS 072.

A. 072?

Q. It just says Exhibit B.

A. Yes.

Q. And then 73 says "Note Disclosure Statement" and then 74 is the note disclosure statement.

A. Yes.

Q.  Did you also obtain this document on the November 1, 2017, secure file transfer?

A.  You're talking --

Q.  074.

A.  -- about 072 or --

Q.  I'm sorry.

A.  -- 074?

Q.  074.

THE COURT REPORTER:  We're talking too much at the same time.  Sorry.

MS. RANUCCI:  Sorry.  I apologize.

Q.  For 074, did you obtain this also in the secure file transfer?

A.  Yes.

Q.  Now, looking at 76 and 77, I believe you stated earlier that this was a Bank of America document; is that correct?

A.  Yes, ma'am.

Q.  Did you also receive this on the November 1, 2017, secure file transfer?

A.  Yes.

Q.  What is it?

A.  It's a payment history, I think.  A payment history.

Q.  At the top, it says "Loan Program:  ALPLN."

What does that mean?

A. That's -- it's called an Alpine.  That's a Bank of America loan program.

Q. Do you know what it signifies?

A. I do not.

Q. If you look on line 13, this lists on November 11, 2010, an outstanding principal balance of $43,061.83; is that correct?

A. That is correct.

Q. And on line 20 on to the back -- the second page, I see on March 12th -- sorry, apologies -- on March 1, 2012, a principal balance of $47,441.33; is that correct?

A. That is correct.

Q. Those numbers don't match the numbers that we were talking about in the amortization table; is that correct?

A. That is correct.

Q. Could you explain why they're different?

A. Because at the time, the note had not been accelerated, so all payments had not become due and payable.  Again, this was a 20-year repayment term. This would have been -- let me further expand.  You know, do you understand what capitalization means?

Q. Uh-huh.

A. So the interest has been capitalized on this loan up

until charge-off.  This would have been some of the principal balance plus any interest that capitalized through March 1, 2012.  The holder of the note had the ability to continue to accrue interest.  SLS did not.  So if it had been accelerated previously and we were looking at the table with the acceleration, you know, that would have been for the full amount due.  This is only the principal and interest that had accumulated up until that point.

Q.   Why wouldn't SLS have had the ability to accrue interest?

A.   We had the ability.  We decided not to.  Again, I mentioned earlier, one, it's for the benefit of the consumer.  But, two, these are variable rate based on LIBOR and a margin and going back and calculating based -- I mean, LIBOR, I'm sure you understand, changes periodically.  It's just not worth the hassle.  It's also to the benefit of the consumer again.

Q.   That is what I'm trying to figure out and I don't see in this history from Bank of America anything about installments, and I'm trying to square that with the amortization table and just give you a chance to explain it again.

A.   What you don't see, which goes back to what we talked

about earlier, Bank of America never accelerated this loan.  That's why it's showing like this.  These are the $30,000 originally owed plus interest that had capitalized up until charge-off.  They had never accelerated the loan.

Q.  But you're saying that if Bank of America had accelerated the loan, the amount it would have accelerated for would not have been the outstanding balance that's listed here, but would have been the balance that's listed in the amortization table --

A.  If they had accelerated the loan, they would have looked back.  Again, applicable statute of limitations for looking back that period plus all future.  Here all they're showing on the payment history was the 30,000 original principal plus interest that had capitalized up until that date.  Which that date was -- I'm sorry.  I lost the page.  The day you were referencing was March 1, 2012.  It's not going forward all installments due after that date.

Q.  So --

A.  And I apologize if I'm not making this clear.

Q.  No.

A.  I'm trying to.

Q.  No, I think I understand.  Can we go back to page

SLS 068.  So I think this is where I'm getting hung up.

A.  Hold on one second.

Q.  Sure.  Take your time.

A.  Okay.

Q.  Okay.  I'm looking at this.  The same part you read to me, "I will be in default and you have the right to give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under the terms of this Credit Agreement are due and payable at once."

A.  Correct.

Q.  I'm looking at this and I see, just using November 11, 2010, as an example, Bank of America listed principal balance of $43,061.83, $0 in outstanding interest.  I don't know that they would have ability to seek all other amounts payable.  So the way I see it, the amount they could have accelerated for at the time was $43,061.83.

MR. LITTLE:  Object to form.

Q.  Does that seem right to you?

A.  I do not agree with you.  One, Bank of America never gave notice.  That's the key term right there.  Never gave notice.  At the same time, they had the right per the whole loan due to accelerate it at any time

by providing notice to the consumer that the whole loan due, which included the principal balance, interest due, and other amounts payable to you under the terms of the credit agreement, are due and payable at once.

Q. Right. But it says accrued interest, which I take to mean interest that had accrued, not interest that would accrue in the future.

A. Okay. I'm really trying to put this as simply as possible. Bank of America never accelerated the loan. SLS accelerated the loan. SLS did not accelerate the loan and ask for any interest that wasn't due and owing. Bottom line. So I don't know why we're even going through this questioning right here.

Q. Can we go back to SLS 74.

A. Sure. Is that the note of disclosure?

Q. Yeah. Exactly.

A. Okay.

Q. Sorry.

A. No, you're fine.

Q. I'm going to read some numbers from these first set of boxes. The first one I see, "Annual Percentage Rate. The cost of your credit as a yearly rate, 13.153 percent."

I understand that could have changed because it was a variable interest rate loan, but just at the time, what do you understand this to mean?

A.   That's the annual percentage rate.

Q.   So --

A.   As a yearly rate.

Q.   So that means that if Ms. Dawson owed a certain amount of money at the beginning of the year, didn't make any payments, the interest rate didn't vary, then at the end of the year, she would owe that same amount of money plus 13.153 percent of that amount of money.

Is that like a simple way to just say what it means or is there another way you could put it?

MR. LITTLE:   I'm going to object to the form.   Go ahead.   You can --

A.   I really -- I don't really know how to answer that because I really am not following your questioning on it.   I mean, this is a standard -- I'm sure you've received no disclosure statements and you receive annual percentage rates when you take out a mortgage. It's basically hypothetically this is going to be the rate over the term.

Q.   Right.   And so that at the end of each year of the term, that's how much interest would accrue.

Obviously payments could change that and a variable interest rate would change that.

But absent those, that's how much would accrue year after year?

A.   Correct.

Q.   And the next one says, "Finance Charge.  The dollar amount the credit will cost you, $94,682.40."

Is that right?

A.   So that's basically -- yes, that's right.

Q.   What does that mean?  Go ahead.  You know what I was going to say.  Go ahead.

A.   So that's basically taking the interest that you would have paid over the life of the loan and based on the $30,000 amount originally financed.

Q.   And I understand SLS to believe that was due immediately upon the loan.  Am I understanding the amortization table correctly?

MR. LITTLE:  Object to the form.

A.   And I'm going to state it again.  SLS did not ask for any interest.  So this really -- Box 1, Box 2 doesn't matter.  All we're looking at is the principal component of the loan that was payable over 240 payments.  And all we sued the Dawsons on was installments that were due three years from anticipated date of filing plus all future due.

Q.   Are there any documents from Bank of America that show when the installments were due?

A.   Yeah.  The one you're looking at.

Q.   But show when?  When?

A.   Right here.  Right underneath that.  "Your payment schedule will be:  Number of Payments, 240; Amount of Payments, 519.51; When Payments are due, on the 9th day of each month beginning December 2010."

Q.   And -- okay.  If we could take a look at SLS 78 and 79, which I believe go together, but you could correct me if I'm wrong about that.

A.   I don't have 79.

         MS. TARANTOLO:  It's written along the side because the document --

A.   I have 78 and then I go to 81.

         MR. LITTLE:  Me, too.

A.   I call for a mistrial.

Q.   We'll figure out how to deal with these when we come back.  That's not the most important thing in the world.

         (There was a discussion from 1:30 p.m. to 1:31 p.m.)

         BY MS. RANUCCI:

Q.   All right.  Turning to 81.

A.   Okay.

Q.   I understand this to be a portion of the full loan tape that SLS received around the time of the sale. This portion was later redacted to show only Ms. Dawson's account.

Am I understanding that correctly?

A.   You are correct.

Q.   Does SLS still have the full loan tape?

A.   Oh, yes.

Q.   What format?  Like an Excel file?  What format?

A.   Excel file.

Q.   This shows -- it's very small font -- a principal balance of $46,952.93, accrued interest of $1,398.84, and a current balance of $48,351.77?

A.   Correct.

Q.   That balance was current as of November 1, 2017?

A.   Yes.

Q.   And the next column shows a charge-off date of July 23, 2012; is that correct?

A.   Yes.

Q.   And a charge-off amount of $47,441.33; is that correct?

A.   That is correct.

Q.   Just doing the back of the envelope math, it looks like the balance in 2017 was about $1,000 more than the balance in 2012, going from 47,441 --

A. 900 and some-odd dollars.

THE WITNESS: I'm sorry.

Q. Why did the balance change during that time?

A. There was additional interest that accrued post-charge-off.

Q. For the full five years?

A. I don't know what time period. No, but that wouldn't have been -- I mean, based on the interest rate, that would not have been five years' worth of interest.

Q. Exactly. That's my question. Why didn't it accrue more interest?

A. Because they stopped accruing interest after charge-off.

Q. Why?

A. You'd have to ask Bank of America.

Q. Is it possible because they accelerated the loan?

A. No. If they accelerated the loan, the balance would have been a lot higher.

Q. Would acceleration typically stop accrual of interest on a loan?

MR. LITTLE: Object to the form. Outside the scope of the notice. You can answer, but it's not going to bind the company. To the extent you can, go ahead.

A. Could you ask it again?

Q.   Yeah.   When a Bank of America loan is accelerated, does interest stop accruing?

A.   Bank of America doesn't accelerate their loans.

Q.   When SLS accelerates a Bank of America loan, does the interest stop accruing?

A.   SLS doesn't accrue interest.

Q.   Is there any way that interest could accrue on a loan after acceleration?

          MR. LITTLE:   Object to the form.   Outside the scope of the notice.   It's not going to bind the company.   To the extent you know, you can answer.

A.   I don't know.   I don't have a way to answer that.

Q.   It would seem to me that if Bank of America at some point in, say, 2012 or 2013 accelerated the loan based on the principal and interest due at the time, that would explain why interest might stop accruing. Is that possible?

          MR. LITTLE:   Object to form.   Outside the scope of the notice.   If you can speak to Bank of America's practices, you can do so.   Otherwise --

A.   I cannot speak to Bank of America's practices and cannot answer that.

Q.   It's a question about Ms. Dawson's loan.   I --

A.   No.   You --

Q.  If you --

A.  -- asked me about --

Q.  -- don't know --

A.  You asked me about Bank of America.

Q.  Okay.  As to Ms. Dawson's loan --

A.  I guess I'm -- and I apologize for cutting you off.
    I'm still not understanding.  Are you trying to
    figure out where the difference from balance current
    and charge-off balance is coming from?  If so, we can
    do some math.

Q.  I think you and I both agree, but I don't want to put
    words in your mouth, that there was about $1,000 of
    interest, but if this loan had accrued interest for
    that entire five-year period, the interest would have
    been significantly more than $1,000?

A.  Right.  Bank of America stopped charging interest.
    So interest capitalized all the way up until -- I'm
    sorry.  I'll slow down.  Interest capitalized all the
    way up until the loan was charged off.  On July 23,
    2012, Bank of America charged off the loan for all
    capitalized interest, for $47,441.33.  At the same
    time, an additional interest had accrued of 1,398.84.
    And I'm sorry.  I'm referring to SLS 076 and 077.
            So if you add those two together, that would
    have been the charge-off plus additional interest

that had accrued since the capitalization had stopped.  At the same time, Bank of America was trying to collect on the charged-off balance and there were payments made post charge-off.  And I believe that's what you want to discuss with 078 and 079, if you'd like to go to that one.

Q.  Yeah.  Exactly.  Could we --

A.  I'm just trying to help us --

Q.  No.  Thank you.

MS. RANUCCI:  Can we go off the record for a second and just figure out how to get the exhibits straight.

(There was a discussion from 1:37 p.m. to 1:38 p.m.)

(A document was marked for identification as Deposition Exhibit No. 8.)

BY MS. RANUCCI:

Q.  I'm going to hand you what's marked as Exhibit 8.  This is Bates stamped SLS 78 and 79.  Give you a minute to look at it.  Once you do, can you let me know if you recognize this document.

A.  I do.

Q.  What is it?

A.  This was a -- from Williams & Fudge.  These are payments received by Williams & Fudge when the

account was being serviced by Williams & Fudge for Bank of America.

Q. And how is this document generated? Do you know?

A. This is a Williams & Fudge document.

Q. And this shows payments -- I'm just going to try to go through it quick. It shows payments on April 11, 2013; April 5, 2013; March 28, 2013; and March 22, 2013. However, it also shows two NSF -- what I assume to be insufficient funds -- notations on March 28, 2013, and April 10, 2013, effectively cancelling out, let's say, two of those payments. Am I --

A. That is correct.

Q. -- correct to understand? So is it right to say that this shows two payments that did go through and two payments that didn't go through?

A. Yes.

Q. Okay. And the last payment is the one in April 11, 2013, for $188.40, correct?

A. Correct.

Q. And that one did go through?

A. Yes.

Q. Thanks. All right. I'd like to go back to the start of Exhibit C -- sorry -- Exhibit 4.

A. Okay.

Q.   The affidavit in support of accelerated balance due. So just to make sure I understand what you stated earlier, which is you reviewed this affidavit along with the documents we've marked as 5 and 6 in paper form in a physical file along with all the attachments to this and that you may have also looked into Williams & Fudge's Debt Manager --

A.   Debt Manager.

Q.   -- Debt Manager computer system, but you may not have.  You just don't recall.  Is that correct?

A.   That is correct.

Q.   Is there any other review that you would have done at the time you swore this affidavit?

A.   Any other review?

Q.   As to Ms. Dawson's account.

A.   Outside of reviewing all the pertinent documents?

Q.   The documents we've spoken about.  Any other documents you might have reviewed we haven't talked about?

A.   No, no other review.

Q.   And was this process that you have described the same process for each Bank of America loan in which you executed an affidavit in support of accelerated balance due?

A.   Yes.



Q.   And was this affidavit in support of accelerated balance due one that you would execute prior to each lawsuit filed by Student Loan Solutions?

A.   Yes.

Q.   So essentially every lawsuit filed by Student Loan Solutions was preceded by the same type of affidavit, which was preceded by the same type of review?

A.   If it was accelerated.

Q.   Right.

A.   Because this is specific to accelerated balance due.

Q.   Did SLS bring lawsuits on Bank of America loans that had not been accelerated?

A.   I couldn't tell you.  I mean, could there have been? Yes.

Q.   But that would have been a different process?

A.   Yes.

Q.   Do you remember that happening?

A.   Not specific accounts.

Q.   I'm not trying to get you to say --

A.   No.

Q.   I understood you to say it could have happened, but you don't specifically remember a lawsuit brought by SLS on a Bank of America loan that was not accelerated?

A.   Correct.

Q. So would it be fair to say that the vast majority or all of SLS lawsuits on Bank of America loans were preceded by acceleration?

A. Yes.

Q. Are there circumstances -- under what circumstances would SLS sue on a Bank of America loan that hadn't been accelerated?

MR. LITTLE: Object to the form. Outside the scope of the notice. To the extent you know, you can answer. His answer is not going to bind the company.

A. I can't think of a circumstance.

Q. So as far as you can recall, all the SLS lawsuits were preceded by acceleration?

A. You just said all, so there could have been --

Q. Okay.

A. -- so I'm not going to say all.

Q. Sorry. I just had to -- yeah, I think we're on the same page here.

At any point prior to signing this affidavit, did SLS perform a review of Ms. Dawson's account?

A. I could not tell you. And, I mean, what do you mean by a review?

Q. For example, prior to Williams & Fudge sending the

acceleration notice, did SLS perform any review of Ms. Dawson's account?

A.   I doubt it.

Q.   Is that because Williams & Fudge may have performed that review?

A.   Again, I don't know what you're asking for, review.

Q.   Yeah.

A.   What are we reviewing?

Q.   Yeah, this is -- it is a little hard to do in the abstract because, you know, you're wearing two hats here, but I'm not trying to be tricky.  I'm just actually trying to figure out --

A.   And I'm not trying to be --

Q.   Yeah, yeah, yeah.

A.   -- contentious.  I just don't know what you mean by "review."

Q.   Yeah.

A.   What would be a reason for -- maybe if we go down that path.

Q.   Right.  For example, SLS could have performed this same review prior to Williams & Fudge sending the acceleration notice, but I understood you to say that's not what occurred, that SLS had essentially given Williams & Fudge pre-permission to send the acceleration notice without a specific account review

by SLS.

A.  Yes.

Q.  Is that correct?  So is there any other point in this process where SLS performed its own review of an account?

MR. LITTLE:  Object to the form.

A.  I'm struggling to answer because, you know, I could pull up an account for any reason.  I mean, there could have been a consumer -- and I'm not talking about the Dawsons, but someone could call in and have a question where Williams & Fudge contacts me and says, Hey, do you know anything about this?  That's technically a review.  So your questioning doesn't make sense to me.

Q.  I think I understood that to be an answer, which is if there was an individual problem raised by Williams & Fudge to you in your role at SLS, then you might perform a review of the consumer account?

A.  Yes.

Q.  So that's one time you did review with -- in connection with these affidavits, you did review.

Are there any other kinds of times you can think of where you might have reviewed individual account documents?

MR. LITTLE:  Object to the form.

A.   No.

Q.   The Debt Manager system has, as I understand it, some mechanism for recording what image files have been viewed in that system; is that correct?

A.   Yes.

Q.   We'll talk more about that tomorrow.

A.   Tomorrow.

Q.   But I think, if I'm understanding you correctly, you in your role at SLS may have performed a review in that system of various accounts at various times.

     Like, for example, if the consumer raised an issue that you, acting in your role at SLS, could have just individually gone in the Debt Manager system, pulled up a document, and that review would be recorded in Debt Manager; is that --

A.   Yes.

Q.   -- correct?  Do you have a separate log-in to Debt Manager in your SLS role as your Williams & Fudge role?

A.   No.

Q.   So there's really no way to know -- unless you personally remember why you were doing the review, there's really no way to know what role you were engaging in at the time?

A.   Correct.

Q.   Does SLS have paper files for consumer accounts?

A.   No.

Q.   Does Williams & Fudge?

A.   No.

Q.   So when these were -- paper files were created for you to sign the affidavit, those files were created just for that purpose; they weren't paper files that already existed?

A.   That's correct.

Q.   Do you know who physically prepared them?

A.   Who with Williams & Fudge?

Q.   Someone --

A.   Someone at Williams & Fudge.  I couldn't tell you who actually created this.

Q.   What happened once you signed it?

A.   It's returned to the department that creates these and then prepped to go to the attorney.

          I don't think your stack is getting any smaller.  Oh, because you keep recycling.

Q.   Yeah.  If that makes you feel any better, I keep putting them under.

A.   I keep watching and I'm like it's not getting smaller.

Q.   Does SLS have any written policies about litigation?

A.   No.

Q.   Did SLS provide any instructions to Williams & Fudge
     about what accounts were appropriate for litigation?

A.   Yes.

Q.   In writing?

A.   No.

Q.   What instructions, if you remember?

A.   It's pretty simple.  Anything above $2,000.

Q.   And what about -- you mentioned earlier that Williams
     & Fudge basically had to try non-litigation methods
     first.

          Was that something that SLS told Williams &
     Fudge to do or Williams & Fudge just decided on its
     own?

A.   No.  I mean, that's -- Williams & Fudge is a
     collection agency.  We contract with them to try to
     collect the debt prior to litigation.  We prefer not
     to litigate.  It's in the best interests of the
     consumer to try to pay it prior to litigation.

Q.   So other than the balance being 2,000 or more, was
     there like a time period, for example, that SLS gave
     to Williams & Fudge that said you can try for six
     months and then --

A.   No.

Q.   -- move to lawsuit?  Were there any other guidelines
     SLS gave Williams & Fudge about which --

A.  No.

Q.  -- cases were appropriate for lawsuits?

A.  No.

Q.  So that was at Williams & Fudge's discretion?

A.  Yes.

Q.  Were there times -- I believe you said that Williams & Fudge would recommend cases to SLS for suit?

A.  Yes.

Q.  Are there times where you disagreed with Williams & Fudge?

A.  I think there have been times.

Q.  On the Bank of America loans?

A.  Yes.

Q.  After SLS authorized a lawsuit, I understand that SLS signed these documents that we've been discussing, Exhibits 4, 5, and 6, each of which were signed by you in your role at SLS.

Were there any other steps that SLS itself took with respect to the lawsuits?

A.  No.

Q.  So all other steps in the litigation were handled through Williams & Fudge and then downstream the collection law firms hired by Williams & Fudge?

A.  Correct.

Q.  Did there come a time in collection actions on Bank

Q.   of America loans where SLS executed another set of affidavits?

A.   Yes.

Q.   In all litigated accounts or some of them?

A.   Not all.

Q.   Do you know what circumstances would --

A.   It could be an affidavit provided by the attorney for some reason.

Q.   Did you execute those on Ms. Dawson's account?  Do you know?

A.   I do not know.

Q.   I believe you testified earlier you didn't know how many lawsuits were commenced by SLS on Bank of America loans; is that correct?

A.   Yeah, I don't know off the top of my head.

Q.   What would you look at to find out?

A.   I would look at Debt Manager.

Q.   Is there a field, for lack of a better term, in Debt Manager for a lawsuit having been filed?

A.   There's a tag.

Q.   A tag.  I could ask you tomorrow, but what tag, if you know?

A.   There's several.

Q.   Okay.  Do you know what percentage of consumers in these lawsuits on Bank of America loans have lawyers?

MR. LITTLE:  Object to the form.  Outside the scope of the notice.  If you know, you can answer.  Otherwise, the answer is not going to bind the company.

A.  That's not something I was prepared -- no, I don't know.

Q.  Do you know if it's most of them or most don't have lawyers?

MR. LITTLE:  Same objection.

A.  Don't know.

Q.  Do you know how many of the Bank of America loan consumers have college degrees?

MR. LITTLE:  Same objection.

A.  I do not know.

Q.  Most of them?

MR. LITTLE:  Same objection.

A.  I do not know.

Q.  Do you know how many consumers on the Bank of America loans who have been sued by SLS assert statute of limitations as a defense?

MR. LITTLE:  Same objection.

A.  I do not.

Q.  What would you look at to find out?

MR. LITTLE:  Same objection.

A.  I do not.  I don't know.

Q. Does SLS keep court records?

A. What do you mean by "court records"?

Q. Like if SLS files a lawsuit and there's filings in that lawsuit, does SLS have a copy of those filings?

A. They're retained by Williams & Fudge if they're provided by the attorney.

Q. So for Ms. Dawson's case, for example, the papers that she filed in that lawsuit, like her answer, could be in Williams & Fudge's possession?

A. If they're provided by Murtha.

Q. So either Murtha or Williams & Fudge or both, but not separately by SLS somewhere?

A. It would not be either Williams & Fudge or Murtha. It would be Murtha or both.

Q. Yeah, understood. Why did you -- why did SLS sue Ms. Dawson?

A. To recover on a non-performing student loan that she took out with Bank of America and had not paid.

Q. Why did you wait so long after buying her loan?

A. Because we allow Williams & Fudge, at their discretion, to collect on the account and try to get Ms. Dawson to pay it directly and voluntarily without having to file litigation.

MS. RANUCCI: Andrea, could I have P.

Q. I think we might be done with those for now if you

want to --

A.  Are you sure?

Q.  Yeah.

(A document was marked for identification as Deposition Exhibit No. 9.)

Q.  I'm going to hand you an exhibit that's marked as Exhibit 9.  This is Bates stamped PLAINTIFF2, 3, 4, and 5.  Take a minute to look it over, but once you have done so, can you tell me if you recognize the document.

A.  (Witness reviewing exhibit.)  Yes, I do.

Q.  What is it?

A.  It's the original complaint filed against Ms. Dawson by Student Loan Solutions through its attorney.

Q.  Did you read this before it was filed?

A.  No.

Q.  So I assume that means you also didn't edit it before it was filed?

A.  Correct.

Q.  What state's law applies to this case?  I'm sorry.  "This case" being this collection action memorialized in the complaint in front of us.

MR. LITTLE:  Object to the form.  Outside the scope of the notice.  You can answer if you know.

A.   I guess I'm not understanding the question.

Q.   Does New York law apply?  California law apply?

A.   It was filed in New York, but the credit agreement has California statute of limitations -- or excuse me -- California choice of law.

Q.   Does SLS sue one person or more than one person?

A.   I'm not sure if we sued the co-signer or not based on this document.

Q.   At the top of the first page, it says plaintiff's address, 707 Land Fall Drive, Rock Hill, South Carolina 29732; is that correct?

A.   Yes.

Q.   That's your home?

A.   Yes.

Q.   I'm going to read from Paragraph 3 on the second page.  "Defendant(s) entered into an accelerated student loan promissory note on November 29, 2007, with Bank of America, N.A., to borrow money and/or have credit extended identified by loan number 3850, which money and/or credit was to be repaid by Defendant(s) in monthly installments plus interest."
           Going to stop there.  Did I read that correctly?

A.   You did.

Q.   What does that mean?

A.   Ms. Dawson entered into a private student loan promissory note installment agreement with Bank of America on November 29, 2007.  It provides the loan number, which is redacted except for the last four.  And this was an installment contract.

Q.   What's an accelerated student loan promissory note?

A.   I could not tell you.

Q.   Did Ms. Dawson borrow money or have credit extended or both?

A.   Borrowed money or have credit extended?  She took out a student loan.

Q.   Yeah.  This just says "borrow money and/or have credit extended," so which one or both?

A.   I cannot speak to that.

Q.   Reading from No. 8, "Plaintiff and its predecessors duly performed all conditions on its part under the agreement."

     What does that mean?

A.   Plaintiff, Student Loan Solutions, and its predecessor, which would be Bank of America, followed the terms and conditions of the original agreement with Ms. Dawson.

Q.   Is that true?

A.   I have no reason to believe it's not.

Q.   How would you know as to Bank of America?

A. Part of the loan sale agreement was Bank of America agreeing to sell loans to Student Loan Solutions that we could execute on. If they hadn't followed the terms and conditions, we would not be able to execute on those.

Q. Looking at the end of Paragraph 12, it says "it is against equity and good conscience to allow Defendant(s) to retain for themselves monies that rightfully belong to the Plaintiff" --

A. I'm not seeing that. Hold on.

Q. I'm sorry. I'm just reading at the very end of Paragraph 12.

A. Oh. Okay. Sorry.

Q. That's fine. I'll start over.

"It is against equity and good conscience to allow Defendant(s) to retain for themselves monies that rightfully belong to Plaintiff and its predecessors?"

What does that mean?

A. I have no earthly idea.

Q. Do you know what is lawful service of process in New York?

A. No.

Q. Do you know if Ms. Dawson was lawfully served?

A. I do not.

Q.   What would you look at if you needed to know?

A.   I have no idea.  Again, the attorneys are hired.  The attorneys are to follow, you know, their laws, regulations within the state that they perform.

Q.   I'm going to hand to the court reporter --

        MS. RANUCCI:  Can I have Q, Andrea.

Q.   -- a document to introduce marked as Exhibit 10.

        (A document was marked for identification as Deposition Exhibit No. 10.)

Q.   This is marked PLAINTIFF65 to 66.  Once you've had a chance to look, do you recognize this document?

A.   I do.

Q.   What is it?

A.   This is a page from a Student Loan Solutions document where we analyze certain states where large portions of the Bank of America portfolio -- large portions of students resided with a Bank of America portfolio and this was provided to attorneys to provide them case law surrounding the installment analysis.

Q.   Who wrote it?

A.   Frost Echols, or The Echols Firm at the time.

Q.   Has that full document been produced to your attorney in this case?

A.   I don't recall, but I'd be glad to.

Q.   To the best of your understanding, what does this

document say?

A.  That New York follows the installment analysis where a statute of limitations runs on each installment as it becomes due and payable.

Q.  And that's based on these two cases that are listed here?

A.  Yes.

Q.  Was this the entire legal analysis for New York state law that Student Loan Solutions relied upon?

MR. LITTLE:  Form.

A.  I couldn't tell you if there's been anything updated since.

Q.  This document, is there -- I don't know if there's a word for it that you would use, but is -- this is the document that SLS maintains that provides the applicable law on statute of limitations in New York?

A.  Yes.

Q.  Are there any other similar documents?

A.  No.

Q.  Do you know when this was made?

A.  I do not remember the exact date.

Q.  Do you know if it was before the sale or after?

A.  It was post.

Q.  Was there any different analysis done before the sale?

A.   Not that I can recall.  This was strictly put
together to assist attorneys of the various states.

Q.   Did SLS use it to make decisions on who to sue?

A.   Not really.

Q.   It says at the top after New York, 1,035 loans.  Does
that indicate the number of Bank of America loans in
New York?

A.   At the time, yes.

Q.   At the time.  But, again, you don't recall the time?

A.   No.

Q.   How was the lawsuit against Ms. Dawson resolved?

A.   I believe Murtha dropped the lawsuit.

Q.   With prejudice or without?

A.   I do not know.

Q.   Has Student Loan Solutions forgiven her debt?

A.   No.

Q.   Does it remain outstanding?

A.   Yes.

          MS. RANUCCI:  Anybody want a five-minute
break?  Now is a good time if you do.

          (There was a recess from 2:05 p.m. to
2:15 p.m.)

          (Documents were marked for identification
as Deposition Exhibit Nos. 11 and 12.)

BY MS. RANUCCI:

Q. I'm going to hand you documents the court reporter has marked as Exhibits 11 and 12.

A. Do you want me to look at them in that order or do you want to --

Q. You know, just first do you recognize these documents?

A. Yes.

Q. What's Document 11?

A. That's the answers to plaintiff's amended class action complaint.

Q. And what's Document 12?

A. The amended complaint.

Q. Thanks.  I'm going to direct your attention to Paragraph 33 of the -- well, here.  We'll start -- sorry.  Let's just start with Document 12.  Directing your attention to Paragraph 33, this states, "On information and belief, Ms. Dawson's Loan was one of nearly 12,000 loans that were sold from Bank of America to Student Loan Solutions in the October 31, 2017, transaction, with an aggregate loan balance of $208 million."  Is that correct?

A. Approximately.

Q. I mean did I read it correctly?

A. Yes.

                              *   *   *


     (CONFIDENTIAL TESTIMONY FOLLOWS ON

          PAGES 164 THROUGH 166.)

# CONFIDENTIAL PAGES

BY MS. RANUCCI:

Q. Would the accurate numbers be contained in the annexed -- the loan sale agreement?

A. Yes.

MR. LITTLE: Back off on the confidentiality.

Q. Looking at Paragraph 35, just going to read the beginning.

A. Still on 11?

Q. Yes.

A. Okay.

Q. "SLS denies Bank of America accelerated the Loan around the time of charge-off in 2012."

Is that correct?

A. Yes.

Q. You stated earlier that you understood Bank of America to have verbally told you that the Bank of America loans were not accelerated?

A. Correct.

Q. Is there any other basis on which SLS denies that Bank of America accelerated the loan around the time of charge-off?

A. No. Other than that not being the policy and procedure at Bank of America.

Q. Have you seen any documents that would show that?

A. No.

Q. Was it included in the loan sale agreement?

A. No.

Q. And when you say policies and procedures, are those in writing?

A. I have no idea. Again, I'm going off of factual information that was provided to me from Bank of America.

Q. Orally?

A. Orally.

Q. That you have not seen in writing?

A. That is correct.

Q. The next sentence states, "SLS denies Bank of America accelerated the Loan prior to its sale to SLS and, moreover, it denies Bank of America accelerated the Loan at any time."

Same answers to that? Those are -- your basis for that is exclusively from the oral representations from Bank of America prior to the sale?

A. Yes.

Q. Nothing in writing?

A. No.

Q. Nothing in the loan sale agreement?

A. No.

Q.   The next sentence, "The Loan was accelerated on December 1, 2021, via an acceleration letter sent to Plaintiff on behalf of SLS."

Did I read that correctly?

A.   Yes.

Q.   We've looked at that acceleration letter today, correct?

A.   We have.  I don't think I looked specifically at the date, but I'm going to trust you.

Q.   Directing your attention now to Paragraph 37, the last sentence there, "SLS denies that the Loan was previously accelerated at any time prior to December 1, 2021."

Did I read that correctly?

A.   Yes.

Q.   What's the basis upon which SLS states that denial?

A.   Haven't I answered this several times?  I mean, I'll answer it again, but, again, it's information provided by Bank of America.  It was not their policy or procedure to accelerate these loans.

Q.   Again, oral representations?

A.   That is correct.

Q.   Nothing in writing?

A.   That is correct.

Q.   What about anyone else who would have accelerated the

loan on Bank of America's behalf?

MR. LITTLE:  What's the question?

MS. RANUCCI:  Forget it.

MR. LITTLE:  Okay.

Q.  All right.  We can set those two aside.  I'll now hand the court reporter to mark as Exhibit 13.

(A document was marked for identification as Deposition Exhibit No. 13.)

Q.  It might take you a minute, but once you've had a chance to look, could you tell me if you recognize this document?

A.  I do.

Q.  What is this?

A.  These are the notes from Williams & Fudge's system specifically for Ms. Dawson's account.

Q.  If I look at the last entry on the last page --

A.  The last entry.

Q.  Yeah, on -- sorry.  For the record, this exhibit is from SLS 217 to 265, so we're now looking at the last entry on SLS 265.  I see here an entry from March 10, 2024.

Does that look right to you?

A.  Yes.

Q.  My understanding is that Williams & Fudge no longer has notations from before that date as to

Ms. Dawson's account; is that correct?

A. I know that because of my job with Williams & Fudge, so I'll answer that. But yes, that was a previous system.

Q. But in your role at SLS when you said you may or may not be able to review Williams & Fudge's notes, you could have reviewed notes from after March 10, 2014, but in your role at SLS, you could not have reviewed notes from before that date; is that correct?

A. Correct.

Q. We're going to be focusing on SLS's review, but because SLS reviewed Williams & Fudge's documents, there's going to be some overlap.

A. Okay. And I'll try to answer this best as possible.

Q. Thank you. So looking at this first page, SLS 217, I see here date account placed at Williams & Fudge, October 10, 2012.

A. Correct.

Q. So does that mean that Williams & Fudge was collecting on behalf of Bank of America from approximately October 10, 2012, to March 9, 2014, without records that we're now able to access?

MR. LITTLE: Form.

A. Yes. But I don't know if during that period there was any type of recall or anything.

Q.  Understood.  So at least at some point from October 10th to 2012 -- between October 10, 2012, and March 9, 2014, Williams & Fudge was collecting on Ms. Dawson's account?

A.  I have nothing to believe that's inaccurate.

Q.  Okay.  I understood that in 2015 Williams & Fudge went through a system conversion where it changed its software and that information from one year prior to the conversion was pulled into the new data system, but older information was not; is that correct?

A.  That is correct.

Q.  And so that's why the account notes from prior to 2014 are no longer available?

A.  That is correct.  Again, I'm answering as Williams & Fudge there.

Q.  Is this true for all Bank of America loans?

A.  All that were being serviced by Williams & Fudge?

Q.  Uh-huh.

A.  Yes.  Again, I'm answering as Williams & Fudge again.

Q.  Uh-huh.  Other than the interrogatory docs we spoke about this morning and have gone over in detail today, are there any other records that SLS has ever possessed about Ms. Dawson's loan prior to March 10, 2014?

A.  No.



Q. Has SLS ever seen any records about Ms. Dawson's loan prior to March 10, 2014?

A. No.

Q. So now I'm going to ask some questions about the time period prior to March 10, 2014, so prior to the time that these collection notes start as to Ms. Dawson's loan.

A. And that's fine, but, again, SLS didn't buy this account until 2017, so the question -- I'm just trying to understand how these questions can be related to SLS.

Q. Yeah.  I think you'll see.

A. Okay.

Q. Did anyone ever send bills to Ms. Dawson before March 10, 2014?

        MR. LITTLE:  Object to the form.

A. I couldn't tell you.

Q. Sitting here today, does SLS have any records that would show that?

A. No.  You have everything that we have.

Q. And in 2021, did SLS have any records that would show that?

A. No.  Again, you have everything that we have.

Q. Prior to March 10, 2014, did anyone ever send collections letters to Ms. Dawson?

A. I'm assuming, based on what you're showing me, yes. Williams & Fudge.

Q. Is there any way to know?

A. Not through their current system.

Q. Do they exist anywhere?

A. The letters?

Q. Those letters, yeah.

A. No. I'm sure they're no longer available.

Q. In 2021, did SLS have any records that would show that?

A. No. We had the same records.

Q. Is that also true for all Bank of America loans that SLS would not have any bills from before 2014?

MR. LITTLE: Object to the form.

A. Collection agencies don't send out bills, so there's no bills.

Q. But if Bank of America had sent out bills prior to the loan being referred to Williams & Fudge, you wouldn't know, I wouldn't know, SLS didn't have access to those. There's just no way to know; is that correct?

(Court reporter clarification.)

A. Correct.

MR. LITTLE: Object to the form.

A. Correct.

Q. Prior to 20 -- to March 10, 2014, did Bank of America hire any third parties other than Williams & Fudge to collect from Ms. Dawson?

A. I have no idea.

Q. Is there any way to know?

A. No.

Q. Is that the same for all Bank of America loans?

A. Yes.  I mean, Williams & Fudge did the collections for Bank of America.

Q. Prior to March 10, 2014, did Bank of America send a charge-off notice to Ms. Dawson?

MR. LITTLE:  Object to the form.

A. I have no idea.

Q. Is there any way to know?

A. I have no idea.

Q. Is that the same for Bank of America loans?

A. I have no idea.

Q. Prior to March 10, 2014, did anyone ever try to collect the full balance from Ms. Dawson on her loan?

MR. LITTLE:  Object to the form.

A. You're talking about the charged-off balance?

Q. Yeah.

A. I think we know that it was placed with Williams & Fudge, the charged-off balance.

Q. So do you know whether Williams & Fudge tried to

collect the full charged-off balance prior to March 10, 2014?

A.   Based on this first page.

Q.   So you think that Williams & Fudge did try to collect the full charged-off balance?

A.   The charged-off balance.

Q.   The -- just to be clear, that's the $48,840.17?

A.   Correct.

Q.   And that's the same for the other Bank of America loans that were referred to Williams & Fudge prior to the sale?

A.   I can't speak to those.

Q.   Prior to March 10, 2014, did anyone ever accelerate Ms. Dawson's loan?

A.   No.

Q.   How do you know?

A.   Again, I'll say it again.  The policy and procedure of Bank of America was not to accelerate the loans. I said it in a different way this time for you.

Q.   Again, just to be clear, nothing in writing, just --

A.   Correct.

Q.   -- your understanding based on oral conversations?

A.   That is correct.

Q.   My understanding is that prior to 2018, Williams & Fudge's letter vendor stored all of its letters and

purged the letters after one year so that any letter prior to 2018 sent by Williams & Fudge on behalf of SLS would have been purged by the letter vendor; is that correct?

A.  That is correct.

MR. LITTLE:  Form.

Q.  Does that mean that SLS no longer has copies of any letters sent to Ms. Dawson by Williams & Fudge prior to 2018?

A.  Correct.

Q.  And that's also true of other Bank of America loans?

A.  Correct.

Q.  I'm going to now direct your attention to -- I'll give the Bates numbers, but I think on this document it's actually a little easier to look at the page numbers.

A.  Yes, it is.

Q.  So this is Bates 262, but page 46 of 49.

A.  Okay.

Q.  There's an entry here on April 16, 2015, at 8:16 a.m. It's about in the middle of the page.

A.  I see it.

Q.  Do you see that?

A.  Yeah.

Q.  On the left side under action code for that entry, I

see the words "Sent Notice"; is that correct?

A.  That is correct.

Q.  What does that mean?

A.  Notice E was sent to Ms. Dawson.

Q.  I'm sorry.  Notice E?

A.  E.

Q.  And where do you see the E?  Does the E denote a template?

A.  Yes.  So right there you'll see "F04***SN-E."

Q.  And the E suggests the template?

A.  That is correct.

Q.  What does the F04 mean?

A.  That was the collector working the account.

Q.  Oh, it identifies a person?

A.  Yes.

Q.  Do you know who that is?

A.  Collector number.  No.

Q.  What about the SN?

A.  Sent notice.

Q.  And then the remainder of that says, "Notice sent to EXT IDX 02"; is that correct?

A.  That is correct.

Q.  What does that mean?

A.  I know the notice sent part.  I don't know what EXT IDX 02 means.

Q.  So am I correct to understand that this indicates a notice was sent to Ms. Dawson on April 16, 2015?

A.  That is correct.

Q.  Do you know what that notice said?

A.  I do not.

Q.  Do you know what Template E is?

A.  I know it's a template.  I don't know exactly what the letter says.

Q.  Do you have it?

A.  Not with me.

Q.  But Williams & Fudge has Template E?

A.  Yes.

Q.  Have you given it to your attorney?

A.  I do not know if we've given any templates.

Q.  Was that the same template in 2015 that it is now?

A.  I would not know that without researching.

Q.  Could you --

A.  And, again, I'm speaking as Williams & Fudge again.

Q.  Could you go back and -- as Williams & Fudge, go back and find the 2015 version of the E template?

A.  I doubt the 2015 version is available.

Q.  Okay.

A.  And, I mean, I'll go ahead and give you one.  They don't change much.  Collection letters are collection letters.

Q. So now turning to page 45. That's Bates 261. About two-thirds of the way down the page, there's another sent notice entry on June 22, 2015, at 7:48 a.m. Do you see that?

MR. LITTLE: I'm sorry. Where were we?

A. You said page 45?

Q. Yeah. Sorry. It's tough to find these. Yeah, on page 45. That's Bates --

A. Oh, I'm sorry.

Q. -- 261 --

A. I was going down. Yes, I see it. Sent Notice 8.

Q. And so that indicates that a notice was sent to Ms. Dawson on June 22, 2015?

A. Yes.

Q. And that was Template 8?

A. 8.

Q. Does that template still exist?

A. Yes.

Q. And is that the same answer, you're not sure whether or not the 2015 version would still exist?

A. Correct.

Q. Now, a little farther up on that page -- I believe it's the fifth entry down -- there's a mail reminder notice on July 23, 2015.

A. A mail reminder notice?

Q. Sorry. I added the word "notice." A mail reminder entry. I believe it's the fifth entry down on this page.

A. Oh, I see what you're saying. You're looking at the action code over there.

Q. Yeah. Yeah.

A. Okay.

Q. The action code says "Mail Reminder" on July 23, 2015, at 3:22 p.m.?

A. Yeah.

Q. What does this mean?

A. I have no idea.

Q. Is it possible that a reminder was mailed to Ms. Dawson?

A. No. That is not a -- notices are called notices. Not mail. This is an internal -- what's called a qmail, so that's where the collector put some type of reminder for that date.

Q. But you don't know what type of reminder?

A. The reminder is CC-CONS CBR.

Q. Okay. But you don't know what that means?

A. I have no idea. That was entered by the collector.

Q. Okay. I'm going to ask you a couple of questions not about that one because that is not a notice. But about the June 22, 2015, and April 16, 2015, notices

that I understand you to have said were sent -- it appears were likely sent to Ms. Dawson it appears were part of a template.

A.   Again, we're talking about notices sent.  I mean, I'll try to answer as SLS, but which hat am I wearing right now?

Q.   SLS.

A.   Okay.

Q.   Has SLS ever seen these notices?

A.   For Ms. Dawson's account?

Q.   Uh-huh.

A.   I cannot speak to ever seeing them.

Q.   So when you sat down, for example, to execute the affidavit for Ms. Dawson's account, you hadn't seen those notices?

A.   No.  There's no reason to.

Q.   Why not?

A.   Because they're just standard collection notices.

Q.   Is it possible that they collected the full balance from Ms. Dawson?

        MR. LITTLE:  Object to the form.

A.   They would have been -- again, for the balances placed with Williams & Fudge at the time by Bank of America, which was the charge-off balance.

Q.   So they could have collected $48,840.17?

A. Well, they didn't collect anything because Ms. Dawson never paid.

Q. But they could have sought that amount?

A. Yes.

Q. Which was the full balance referred from Bank of America to Williams & Fudge after?

A. The charged-off balance.

Q. Yeah.  Is it possible that those letters accelerated Ms. Dawson's loan?

A. No.  They're not acceleration notices.

Q. And as SLS, why do you know that?

A. One -- well, again, I know Letter 8 is a -- just a subsequent notice and Letter E, I think, is an offer to -- repayment options, but you wouldn't --

MR. LITTLE:  Payment terms or something.

THE WITNESS:  Yeah.

A. But you wouldn't send that on an accelerated loan.

MS. RANUCCI:  Andrea, can I have K and L.

(A document was marked for identification as Deposition Exhibit No. 14.)

Q. I'm going to hand you a document marked as Exhibit 14.  This appears to be a Williams & Fudge letter dated September 11, 2013, sent to a consumer who is not Ms. Dawson; is that correct?

A. Yes.

Q. Is it possible that one of those two 2015 notices on Ms. Dawson's account was substantially similar to this letter?

MR. LITTLE: Object to the form. Outside the scope of the notice. To the extent you can answer, you can do so. His answer is not going to bind the company.

A. Again, I'm not prepared to answer that without looking at the templates.

Q. Okay. You said that you were familiar with those attempts, I believe, Template E, Letter E, and No. 8. Does this appear to match either of those?

A. Number E -- or Letter E I said I guessed was --

Q. Okay.

A. And then Letter 8 was a subsequent notice, but, again, without comparing them.

Q. Okay. We can skip the other one.

MS. RANUCCI: Andrea, J. I believe we're up to 15 now.

(A document was marked for identification as Deposition Exhibit No. 15.)

Q. Handing you a document marked Exhibit 15. Take a minute to look at it and then could you let me know if you recognize this.

A. (Witness reviewing exhibit.) Yes.



Q.  What is this document?

A.  It's an e-mail from a Williams & Fudge collector to Ms. Dawson.

Q.  Did SLS review this e-mail prior to authorizing the lawsuit against Ms. Dawson?

A.  I couldn't tell you.

Q.  So it's possible you did; it's possible you didn't?

A.  It's available if I wanted to.

Q.  Uh-huh.  And I'm going to read this sentence, "We are contacting you and Isaiah Dawson on behalf of Bank of America regarding your educational loan SL732493850 in the amount of $48,351.77.  Roxanne, your balance listed is due and no payments have been received within the last 45 days."

Did I receive that correctly -- or did I read that correctly?

A.  Yes.

Q.  So this e-mail sought to collect the full charge-off balance of Ms. Dawson's loan; is that correct?

MR. LITTLE:  Form.

A.  I don't read it that way.

Q.  What do you read it to be?

A.  One, it's asking if her intent to pay via payments has changed.  That's the question.  "Have you or Isaiah's plans to pay your loan via payments

changed?"

Q. It's -- but it states that "your balance listed is due." The balance meaning the $48,351.77; is that correct?

A. Yeah, but it also doesn't demand payment as you stated.

Q. Did this accelerate Ms. Dawson's loan?

A. No.

Q. Why not?

A. It's not a proper acceleration notice. Plus it also talks about making payments. When you accelerate a loan, the whole loan comes due. You don't have the option to make payments.

Q. But this states "your balance listed is due," so that's the whole loan becoming due?

A. It doesn't say it's due. Where do you see due?

Q. It's just on the second line, "Roxanne" --

        MS. TARANTOLO:  Third line.

Q. I'm sorry. Third line. "Roxanne, your balance listed is due."

A. "And no payments have been received. Have you or Isaiah's plans to pay your loan via payments changed?"

Q. So your understanding is this didn't accelerate Ms. Dawson's loan because?



A.    I'm not an attorney, but I'll tell you this is not an acceleration notice.

Q.    If we could turn back to the account notes, which are Exhibit 13.  The Bates is 253, but it's easier, I think, to look at page 37.

A.    Okay.

Q.    The top three entries here are -- all have the same date and timestamp.  And each state placing notice requests -- or the first two state placing notice requests and the third one states placing recipient notice requests.

      Do you see those three entries?

A.    I do.

Q.    Could you explain what they mean?

A.    These are the requests to send the J2 notice.  These were on November 10, 2017, shortly after SLS purchased and placed the accounts with Williams & Fudge.  The J2 notice is the notice of purchase.

Q.    And was that the same notice that was sent to all -- on all Bank of America loans that SLS purchased?

A.    Yes.

Q.    So the same J2 notice?

A.    Correct.  It was sent to the consumers and the co-signers.

Q.    So I have here a couple of notices dated November 12,

2017, as to other consumers.  If you took a look at them, would you know whether those were the J2 notice, sitting here?

A.  Yes.

Q.  Okay.

(A document was marked for identification as Deposition Exhibit No. 16.)

Q.  I'm handing you an exhibit that's marked 16.  Take a moment to look at it and once you've done that, let me know if you recognize it, please.

A.  (Witness reviewing exhibit.)  I do.  Other than I don't have any idea who this was sent to.

Q.  Does this appear to be a letter from the J2 notice that would have been substantially similar to the one sent to Ms. Dawson at the same time?

A.  It appears to be, but without the second page.

Q.  Do you have the J2 template?

A.  Williams & Fudge has the template.

Q.  Williams & Fudge has the template.  Again, if you know, is that the same template from 2017?

A.  Yes.

Q.  Did SLS review either the J2 -- did SLS review the J2 template before you signed the affidavit authorizing suit against Ms. Dawson?

A.  Again, I have no idea.  This was back in 2021.

You're asking if I reviewed the J2 notice?

Q. Template, yeah.

A. I have no idea.

Q. But you -- in 2021, you wouldn't have been able to review the actual notice sent to Ms. Dawson because that would have been destroyed in 2018, right?

A. That is correct.

Q. And you may or may not have reviewed the J2 template notice?

A. Correct.

Q. If I could go back to page SLS 262, which is page 46 of these account notes.

A. Okay.

Q. The very bottom entry on this page on March 19, 2015, there's a lot of letters and numbers in here, but in the middle of those letters and numbers, it says "SOL DATE - 07-23-18."

A. Yes.

Q. Does that mean that statute of limitations date July 23, 2018?

A. That means the calculated statute of limitations date based off the charge-off date, not based off of acceleration.

Q. And did SLS review this notation before authorizing suit against Ms. Dawson?



A.  No.

Q.  Turning to page 30, SLS 246.

A.  Okay.

Q.  The seventh entry down states "Telephone Consumer" under the action code on August 8, 2018, at 3:21 p.m. Do you see that?

A.  I do.

Q.  Does this entry -- am I correct to understanding that this entry memorializes a telephone call made by Williams & Fudge?

A.  That is correct.

Q.  Did SLS review the notes of this call before it authorized a lawsuit against Ms. Dawson?

A.  Again, I do not recall.

Q.  Did SLS listen to the recording of this call before it authorized a lawsuit against Ms. Dawson?

A.  I cannot recall.

Q.  And there are a couple other phone calls that these notes show were made with respect to this account.

Is your answer the same with respect to those phone calls?

A.  Yes.

Q.  And with respect to other Bank of America loans, do you -- was it SLS's typical practice to listen to recordings of phone calls before authorizing lawsuit

on Bank of America loans?

MR. LITTLE:  Object to the form.  Outside the scope of the notice.  You can answer if you know.

A.  No.

Q.  Would SLS sometimes have listened to recordings of calls before authorizing suit on Bank of America loans?

A.  If there was a reason to, but no.

Q.  Looking at page 20, SLS 236.

MR. LITTLE:  Say that again, please.

MS. RANUCCI:  Page 20, which is SLS 236.

A.  Okay.

Q.  About a third of the way down the page, there's an entry on --

MS. RANUCCI:  Sorry, Brendan.  I'll let you get there.

MR. LITTLE:  Thanks.  I'm having a little trouble here.  Okay.

Q.  So about a third of the way down, there's an entry on April 11, 2019, at 1:16 a.m. that states, "Assigned Consumer Account Tab:  WU."

Do you know what that means?

A.  It's one of Williams & Fudge's tags.

Q.  Do you know what it is?

A.    I do not off the top of my head.

Q.    And did SLS review this entry before suing --
      authorizing suit against Ms. Dawson?

A.    No.

Q.    Going up to page 19, just below the middle of the
      page, on November 8, 2021, at 5:11 p.m. it states,
      "Unassigned Consumer Account Tab:  WU"?

A.    Uh-huh.

Q.    Do you know what that means?

A.    It was the tag that we used taking off.

Q.    And do you know what it is?

A.    Again, I don't know off the top of my head WU.

Q.    And did SLS review this entry before authorizing suit
      against Ms. Dawson?

A.    I would assume no, but, again, I can't speak to what
      I did in 2021.

Q.    If you could look up just three entries from there on
      November 9, 2021 at 11:02 a.m., the result code here
      says "Review Statute"?

A.    Wait a second.

Q.    Sure.

A.    Okay.  I see where you are.  Yes.

Q.    Could you take a look at this entry and tell me if
      you understand what it means.

A.    Uh-huh.  So this was where, again, as we mentioned

earlier, statute of limitations based off the charge-off date is 7/23/2012, and this account was reviewed for acceleration by Williams & Fudge and subsequently was accelerated.

Q. Did SLS direct that review?

A. That was part of the procedures of Williams & Fudge. You know, we talked about the blanket.

Q. But not specifically?

A. No.

Q. Yeah. Okay. Besides Williams & Fudge, has SLS ever hired a third party with respect to Ms. Dawson's account?

A. I do not believe this was ever with anyone else.

Q. You stated earlier that --

MR. LITTLE: Other than the law firm.

A. Other than the law firm. I apologize. I don't think about that because they're hired by Williams & Fudge.

MR. LITTLE: Sure.

Q. If I understood you correctly earlier, you said that SLS also hired Sunrise with respect to certain BOA loans?

A. Yes. Those were accounts that were with -- I'm giving you stuff so you don't have to ask. Those were accounts that were with Sunrise at the time of the sale that were making payments to Sunrise.

Q.  Do you have a sense of what portion of the BOA loans
those would have been?

A.  Like I said, less than 1 percent.

Q.  Okay.  So SLS hired a law firm called Robinson
Bradshaw prior to the sale?

A.  They were hired to help with writing the loan sale
agreement between Bank of America and SLS.

Q.  So we've talked about SLS hiring Robinson Bradshaw,
Williams & Fudge, Sunrise --

A.  Robinson Bradshaw had nothing to do with collections.

Q.  Right.  I'm just trying to get the universe.
Sunrise, The Echols Firm, and BNA Accounting and --

        MS. RANUCCI:  Sorry.  Can you remind me of
the name?

        MS. TARANTOLO:  That was BNA CPA.

Q.  BNA CPA.  Are there any other third parties that SLS
hired with respect to the Bank of America loans or
the sale?

A.  Not that I can think of.

Q.  And then, again, the law firms, but those law firms
were hired by Williams & Fudge?

A.  Correct.

Q.  On behalf of SLS?

A.  Correct.

        MS. RANUCCI:  All right.  I think we can

take a break.

(There was a recess from 3:04 p.m. to 3:30 p.m.)

BY MS. RANUCCI:

Q. We're going to go back to a few things now that we spoke about earlier. I've got a couple of follow-up questions. I'm going to ask some more questions about SLS's business and the participants in it.

So I understood you to say that there were six members of SLS earlier and you named them, correct?

A. Correct.

Q. Do they all have an equal stake or share in the business?

A. Yes.

Q. So one-sixth of the business is owned by each of those six people?

A. 16.67 percent.

Q. Thanks.

MR. LITTLE: .034.

Q. And you said that three of those six people personally lent money to the business to fund the sale?

A. Correct.

Q. Which three?

A.  Gary Williams, David Williams, and myself.

                          *  *  *

        (CONFIDENTIAL TESTIMONY FOLLOWS ON
              PAGES 197 THROUGH 201.)

# CONFIDENTIAL PAGES

BY MS. RANUCCI:

Q. So I believe we looked at a document that had a description of certain cases in New York State that you stated were created by The Echols Firm. That was part of a larger document that was created by The Echols Firm with respect to the Bank of America portfolio.

A. Yes.

Q. And then that document was provided, if I get this right, from Frost Echols to Student Loan Solutions, Student Loan Solutions to Williams & Fudge, Williams & Fudge to the state court attorneys, and then at least in some circumstances, state court attorneys to the court?

A. So yes, yes, no. It was provided by -- it would have been Frost Echols at the time -- excuse me. It would have been The Echols Firm at the time to Student Loan Solutions, who provided it to Williams & Fudge --

THE COURT REPORTER: Hold on. Slow down.

THE WITNESS: Sorry.

A. The Echols Firm provided it to Student Loan Solutions, who provided it to Williams & Fudge. These pages out of it that were -- you know, like, we didn't provide New York attorneys information on different states. And this was -- you know, most

attorneys just use it for reference. It wasn't a document that was just to be filed with complaints. It was just, you know, for reference.

Q. Okay.

MS. RANUCCI: Anything else?

Q. All right. Turning to the next topic, if you recall this morning, you and I -- maybe this afternoon. Who knows? I think this morning. You and I looked at the --

A. You're the one that wanted seven hours.

Q. -- the note disclosure statement that stated that 240 payments were due on the loan.

A. Specifically to Ms. Dawson?

Q. As to Ms. Dawson.

A. That is correct.

Q. Other than that part of the disclosure statement, is there any other document that forms the basis of SLS's position that Ms. Dawson's loan is an installment loan?

A. Truthfully, I would have to ask legal counsel on that. Not him. SLS legal counsel.

Q. Have you seen the term "installment loan" used in writing by Bank of America with respect to Ms. Dawson's loan?

A. I couldn't tell you.

Q.   And have you -- so you can't think -- specifically, sitting here today, think of anyplace where you have seen the term "installment loan" with respect to Ms. Dawson's loan?

A.   From Bank of America?  Not that I can --

Q.   Or -- yeah.  Did the transaction between Bank of America and Ms. Dawson have any goods exchanged?

A.   And, again, I'm not a Bank of America representative. I mean, it was a loan, a private student loan.  I don't know how much clearer to --

Q.   So there was no sale of goods?  No sale --

A.   What do you define as goods?

Q.   I can't think of any goods that were sold in this. I'm just confirming with you that you can't think of any --

A.   Again, I'm not an attorney and can't speak to that.

Q.   And same thing with services.  Any selling of services?

A.   I can't speak to that.

Q.   Does SLS hold a sales finance license in New York?

A.   I'd have to check with counsel.  We have a lot of licenses.

Q.   Okay.  Do you know if SLS specifically holds any state license that allows it to purchase installment loans?

A.   I'm not familiar.  Again, I'd have to ask counsel.

Q.   But I understood you to say this morning that SLS holds certain debt collection licenses?

A.   We have licenses where required, based on the individual states.

MS. RANUCCI:  Anything else there?

Q.   All right.  The next one is I believe that you stated earlier today that you weren't sure how much money had been collected on the Bank of America loans.

A.   Not off the top of my head.

Q.   What would you look at if you wanted to find the answer to that question?

A.   I'd run the report that I mentioned earlier, the history analysis.

Q.   And that is the one that shows at certain time periods how much money was remitted from Williams & Fudge to Student Loan Solutions?

A.   It's a live report.  So what I mean by that is if I run it today, it's going to show information through today.

Q.   So -- and broken down by each consumer?

A.   No.  No.

Q.   By each -- sorry.  How is it broken down?

A.   So it's broken down by placement.  So when the accounts are placed with Williams & Fudge, it's

broken down by that.

Q. Okay.

A. So you see the placement date on that report?

Q. Yeah.

A. The majority of the loans are going to show that November placement date.

Q. And then you didn't say this, but also by creditor; is that right? Like the amount -- you would look at that report specifically as to Student Loan Solutions and then specifically as to accounts placed on a certain date? Is that how you would look it up?

A. So it would be by placement date, and then yes, it is -- there are separate creditors. Like we have -- our portfolio is broken up into different -- you know, we don't lump it all together. So there's different creditors under the Student Loan Solutions umbrella.

Q. So it sounds like there would be -- there's a way in Williams & Fudge's system to figure out how much money has been collected on behalf of the Bank of America loans?

A. Yes.

Q. Okay. Is there a way to find out by consumer? So if you had the name or relevant account number of a consumer, is there a way to pull how much money that

consumer has ever been paid to SLS on the account?

A. Oh, definitely. You're talking about on an individual consumer basis?

Q. Exactly.

A. Because it would have to be done on an --

Q. Yeah.

A. -- individual basis.

Q. And then if I wanted to know how much SLS has collected just on cases where a lawsuit has been filed?

A. It would have to be on an individual basis again.

Q. So that would mean -- so taking what you said earlier and what you said just now, you would have to run Williams & Fudge's system, get a list of all -- however many hundred or thousand consumers who did have a lawsuit filed and then on each individual basis add up the amount that's been collected and that's how you get there?

A. Correct.

MR. LITTLE: Form. Go ahead.

A. Correct.

Q. Is there any less onerous way to come up with that number that you can think of?

A. Not that I can think of.

Q. Did Williams & Fudge provide to SLS on a periodic

basis statements of how much had been collected?

A.    They're provided weekly.  Yes.

Q.    Weekly.  And are those broken down in a way that would show the Bank of America loans?

A.    They're broken down by consumer.

Q.    But not -- there's not a top line number on that report that would show this much money was collected from the Bank of America loans this week?

A.    Well, again, these would be specific to different creditors of Student Loan Solutions.  And so during the week, it would show your account, your account, your account, he doesn't pay, my account, and then it would --

          MR. LITTLE:  Why am I the deadbeat?

          THE WITNESS:  There had to be one in the room.

A.    Does that make sense?

Q.    Yeah.

A.    Okay.  It's like an itemized statement.

Q.    So if I said how much money did SLS -- was collected on SLS -- on Bank of America loans last week, would that report give the answer to that?

A.    Yes.

Q.    And do you still have those reports for the last four years?

A.   I don't process them, so I don't know what period we have.

Q.   But another potential way to get out the total collections in theory would be to add up that number every week for the last however many weeks; is that right?

A.   That is a potential way.

Q.   Okay.  Thanks.  Just turning to the loan sale agreement, I'm going to ask some big picture questions, but if you want to see it, just let me know and I can introduce it.

     Has SLS kept this document confidential?

A.   Yes.

Q.   Who has had access to it?

A.   Myself.  Attorneys.  You know, if it's requested in a lawsuit, then we require a confidentiality provision.

Q.   And why is that?

A.   It's required by Bank of America.

Q.   Is there any specific reason that SLS wants it to be confidential other than it's required by Bank of America?

         MR. LITTLE:  Form.

A.   It's got financial information in it.

Q.   Where does the Bank of America's requirement that it be confidential come from?

A. What do you mean by where does it come from?

Q. Like is that part of the agreement itself or is there another agreement that you had with Bank of America that required it to be confidential?

A. I don't remember. I think it's part of the agreement, but, I mean, you have a copy of it.

Q. Is there harm that would come to Student Loan Solutions from it being public?

MR. LITTLE: Object to the form. Outside the scope of the notice. His answer is not going to bind the company. To the extent you know, you can answer.

A. I'm not an attorney. I really can't answer that.

Q. Has SLS made public the purchase price for the sale?

A. Has SLS made it public? No.

Q. Do you think there would be harm to SLS's business for making it public?

MR. LITTLE: Object to the form. Outside the scope of the notice. His answer is not going to bind the company. To the extent you can answer, go ahead.

A. I will answer because no, I don't think there's harm, but it's a business record. You know, most businesses don't want all their stuff out there.

MS. RANUCCI: Okay. I think that's what I

have.  Do you want a minute to talk or clear up anything for today?

MR. LITTLE:  I don't have any questions.

(Reading and signature were reserved.)

(The deposition was concluded at 3:47 p.m.)

A M E N D M E N T   P A G E

PLEASE DO NOT WRITE WITHIN THE TRANSCRIPT ITSELF. LIST ANY CORRECTIONS BY PAGE AND LINE NUMBER ON THIS SHEET.  IF ADDITIONAL PAGES ARE NECESSARY, PLEASE FURNISH SAME AND ATTACH THEM TO THIS AMENDMENT PAGE. YOU ARE ALLOWED 30 DAYS WITHIN WHICH TO COMPLETE THE SIGNATURE PAGE AND AMENDMENT PAGE.  AFTER COMPLETING THESE PAGES, PLEASE RETURN THEM TO CAIN & CRANE COURT REPORTERS, POST OFFICE BOX 23833, CHARLOTTE, NC 28227.

IN RE:  Roxanne Dawson, et al., v. Student Loan Solutions, et al.
30(b)(6) DEPOSITION OF:  Student Loan Solutions, LLC

      I, Christopher Paul Ruh, certify that I have read my deposition, which was taken on Tuesday, September 10, 2024, and request that the following changes, if any, be made:

Page_____  Line_____  Change_____

_____
Reason for Change_____

Page_____  Line_____  Change_____

_____
Reason for Change_____

Page_____  Line_____  Change_____

_____
Reason for Change_____

Page_____  Line_____  Change_____

_____
Reason for Change_____

Page_____  Line_____  Change_____

_____
Reason for Change_____

                    _____
                    Christopher Paul Ruh              Date

S I G N A T U R E   P A G E

IN RE:  Roxanne Dawson, et al., v. Student Loan Solutions, LLC

30(b)(6) DEPOSITION OF:  Student Loan Solutions, LLC

        I, Christopher Paul Ruh, do hereby certify that I have read the foregoing deposition and that the foregoing transcript is a true and correct record of my testimony, subject to the attached changes, if any, on the amendment page.


_____
Christopher Paul Ruh




        Subscribed and sworn to before me this _____ day of _____, 2024.



_____
Notary Public

My Commission Expires:

STATE OF NORTH CAROLINA      )
                             ) CERTIFICATE OF REPORTER
COUNTY OF IREDELL            )

I, Tavi L. Fraga, Professional Court Reporter and Notary Public in and for the aforesaid county and state, do hereby certify that the foregoing pages are an accurate transcript of the (30)(b)(6) deposition of Student Loan Solutions, LLC, which was reported by me on behalf of Plaintiffs in machine shorthand and transcribed by computer-aided transcription.

The deponent and parties reserved the signing of the deposition by the deponent.

I further certify that I am not financially interested in the outcome of this action, a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel.

This 18th day of September, 2024.

_____
Tavi L. Fraga
Professional Court Reporter
Notary Public #201229000172

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                                ·Index: $0..16.67

## Exhibits

**Exhibits 1-16, 30(b)(6) Student Loan Solutions**
4:3 5:3 15:22,25 22:22 23:1,5 32:23 47:6,7 67:24 68:21 87:25 88:1,4,9 91:5,8,12 100:25 103:14,15,18 105:4,8,11 107:3, 14,15 108:13 116:11 126:9,11,18 127:18,21 141:16,18 142:24 155:5,6,7,11 159:7,9 161:24 165:2 170:6,8,18 183:20,22 184:21,22,25 187:4 188:7,8,11

## $

**$0** 132:15

**$1,000** 104:18 137:24 140:12, 15

**$1,398.84** 137:12

**$114,292.20** 121:12

**$116,370.24** 120:19

**$124,682.40** 117:18 119:2

**$188.40** 142:19

**$19,692.06** 101:7 108:2 115:2, 7 116:4

**$2,000** 104:18 150:7

**$208** 162:22

**$3,519.55** 95:15

**$30,000** 95:11 122:6 131:3 135:14

**$43,061.83** 129:6 132:15,19

**$46,952.93** 137:12

**$47,441.33** 129:11 137:20 140:21

**$48,351.77** 137:13 185:12 186:3

**$48,840.17** 176:7 182:25

**$519.51** 95:17 109:17 119:17

**$60** 67:14

**$7** 51:24

**$73,250.91** 116:24

**$94,682.40** 135:7

## (

**(c)** 47:9

## 0

**0** 120:16

**02** 178:21,25

**034** 195:20

**044** 105:7,10

**045** 105:7,8 107:3,15

**046** 108:16

**047** 114:1

**049** 116:14 117:15

**054** 120:14

**056** 116:20 117:13

**065** 95:22 121:18 122:16 123:13, 22 124:6

**066** 121:18 122:19 123:14,18 124:6,12

**067** 110:7 122:25 123:25 124:3

**068** 114:12 132:1

**07-23-18** 189:17

**072** 127:19,20 128:5

**074** 95:9 96:13 119:5 128:4,7,8, 12

**076** 97:3 140:23

**077** 140:23

**078** 141:5

**079** 141:6

**089** 101:1

## 1

**1** 15:22,25 23:11 47:8 72:21 101:3 106:1,2 115:12,17 119:16 122:13,21 123:12,13 125:2 128:1,19 129:10 130:3 131:18 135:20 137:15 169:2,13 194:3

**1,000** 18:20 29:16

**1,035** 161:5

**1,398.84** 140:22

**1/2** 52:16

**10** 6:1 9:13 142:10 159:7,9 170:20 171:7,17,21 172:2,23 173:2,5,15,24 175:1,10,18 176:2, 13 187:16

**10.5** 95:24

**100** 18:18 29:8,14 113:15

**10:44** 67:20

**10:55** 67:21

**10th** 172:2

**11** 129:5 132:14 142:6,18 161:24 162:3,9 165:2 167:9 183:23 191:21

**11/9/2030** 120:16

**11:02** 192:18

**11:47** 105:1

**12** 9:13 158:6,12 161:24 162:3, 12,16 187:25

**12,000** 162:19

**124** 118:16

**124,682** 117:18

**124,682.40** 118:24 119:5,13,21

**12:48** 105:2

**12th** 129:10

**13** 129:5 170:6,8 187:4

**13.153** 133:25 134:11

**14** 183:20,22

**1400** 6:8

**15** 184:19,21,22

**150,000** 197:10

**16** 120:18 177:20 179:2 181:25 188:7,8

**16.67** 195:18

Case 1:23-cv-09690-MKV    Document 85-1    Filed 01/15/25    Page 204 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                                     ·Index: 164..55

**164** 163:4

**166** 163:4

**19** 189:14 192:5

**197** 196:6

**19th** 21:8

**1:16** 191:21

**1:30** 136:21

**1:31** 136:22

**1:37** 141:13

**1:38** 141:14

**1st** 73:1 122:12

---

**2**

**2** 22:23,24 23:1 32:23 47:7 67:24,25 110:9 119:17 122:17 123:12,13 135:20 197:25

**2,000** 150:19

**20** 10:1 51:11,12,13,15,16,17,18 52:22,23 121:11 129:9 175:1 191:10,12

**20-year** 129:21

**2007** 92:12 122:4 123:7 156:17 157:3

**2007-plus** 46:21

**2008** 21:8 38:17,18

**201** 196:6

**2010** 57:14 80:1 93:17 95:18 117:17 118:24 119:1,16 120:2,6 129:6 132:14 136:8

**2012** 120:19 121:11 129:11 130:3 131:18 137:18,25 139:15 140:20 167:13 171:17,21 172:2

**2013** 139:15 142:7,8,10,19 183:23

**2014** 171:7,21 172:3,13,24 173:2,5,15,24 174:13 175:1,10, 18 176:2,13

**2015** 172:6 177:20 179:2,15,20, 21 180:3,13,20,24 181:9,25 184:1 189:14

**2017** 25:10,19 42:18 72:21,25 75:9 82:16 122:11,13 125:2 128:2,19 137:15,24 162:21 165:15 173:9 187:16 188:1,20

**2018** 176:24 177:2,9 189:6,20 190:5

**2019** 191:21

**2020** 105:25

**2021** 91:24 101:3 107:24 112:23 115:12,17 169:2,13 173:21 174:9 188:25 189:4 192:6,16,18

**2024** 6:1 170:21

**217** 170:19 171:15

**22** 142:7 180:3,13 181:25

**23** 137:18 140:19 180:24 181:8 189:20

**236** 191:10,12

**240** 90:4 93:16 95:16 96:15 109:16,21 120:14 135:22 136:6 203:11

**246** 190:2

**250** 52:7

**253** 187:4

**261** 180:1,10

**262** 177:18 189:11

**265** 170:19,20

**28** 142:7,10

**29** 92:12 122:3 123:7 156:17 157:3

**29732** 156:11

**2:05** 161:21

**2:15** 161:22

---

**3**

**3** 23:10 47:8 52:16 67:25 88:1,4 103:16,18 110:7 122:17,19,21 123:9 124:4 155:7 156:15

**3.54** 52:19

**30** 11:12 25:7 190:2

**30(b)(6)** 6:2 15:8

**30,000** 95:13 131:15

**300** 21:15,20,21 22:1

**31** 25:10,19 42:18 72:25 82:16 122:10 162:20 165:15

**33** 162:15,17 164:20 165:12,16, 22

**33,519.55** 95:13

**35** 167:7

**37** 169:10 187:5

**3850** 156:19

**3:04** 195:2

**3:21** 190:5

**3:22** 181:9

**3:30** 195:3

**3:47** 211:6

---

**4**

**4** 32:24 72:19 91:5,8 100:25 108:13 111:16,17,19 114:12 116:11 123:9 126:12 127:18 142:24 151:16 155:7

**441** 87:24 88:2

**45** 180:1,6,8 185:14

**46** 91:6 177:18 189:11

**47,441** 137:25

**49** 177:18

---

**5**

**5** 105:4,7,8,11 111:16,21 123:9 126:12 142:7 143:4 151:16 155:8 197:25

**50** 30:21,24 31:4,9 94:8

**500** 103:21 113:17

**51** 50:19

**519.51** 109:21 119:18 136:7

**55** 50:19

Case 1:23-cv-09690-MKV    Document 85-1    Filed 01/15/25    Page 205 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                             ·Index: 5:11..action

**5:11** 192:6

---

**6**

---

**6** 32:25 72:18 105:4,7,8 107:3,
15,24 111:16,21 123:9 126:12
143:4 151:16 197:25

**60** 85:11

**62** 61:10

**650** 6:7

**66** 61:10 159:10

**68** 122:25

**69** 122:25

**6th** 91:24 105:23

---

**7**

---

**7** 110:7 114:12 123:9,10 124:4
126:9,11,14 197:24

**7.25** 95:23,24

**7/23/2012** 193:2

**70** 122:25

**707** 21:19,22 156:10

**71** 123:1,25

**73** 127:23

**74** 127:24 133:16

**76** 128:15

**77** 128:15

**78** 136:9,15 141:19

**79** 136:10,12 141:19

**7:48** 180:3

---

**8**

---

**8** 52:16,20 141:16,18 157:15
180:11,15,16 183:12 184:11,15
190:5 192:6 197:25

**81** 136:15,24

**8:16** 177:20

---

**9**

---

**9** 93:17 95:18 117:17 118:23
119:1,16 120:2,6,19 121:11
155:5,7 171:21 172:3 192:18

**90** 85:11

**900** 138:1

**92** 91:6

**99** 14:8 43:16

**9:29** 6:2

**9th** 136:7

---

**A**

---

**a.m.** 6:2 67:20,21 105:1 177:20
180:3 191:21 192:18

**ability** 13:1,4 130:4,10,12
132:17

**absent** 135:3

**abstract** 146:10

**accelerate** 79:8 86:18 132:25
133:12 139:3 169:20 176:13,18
186:7,11,24

**accelerated** 56:24 59:25 67:11
69:8 70:12 71:18 78:5 79:2,18
80:11,16,25 86:3 88:11,21 91:21
101:9,11 110:18,25 113:8,21
115:2,7,15,20,25 121:1,4 129:20
130:5 131:1,5,7,8,11 132:19
133:10,11 138:16,17 139:1,15
143:1,23 144:1,8,10,12,24 145:7
156:16 157:6 167:12,18,21
168:14,15 169:1,12,25 183:8,17
193:4

**accelerates** 101:5 139:4

**accelerating** 86:10

**acceleration** 13:15 57:9 69:24
70:15 72:5 78:8,9,23 80:5,7,16,
17 81:1 85:5 86:16 92:20 98:23
99:7,10,19 100:22 101:2 102:4,9,
17 103:10 104:2,10 114:17,18
115:11,16 121:15 130:6 138:19
139:8 145:3,14 146:1,22,25
169:2,6 183:10 186:10 187:2

189:23 193:3

**accept** 34:6,7

**access** 54:22 59:2 171:22
174:20 209:14

**accomplish** 45:17

**account** 27:20 28:2 33:2,20,23
36:24 37:3 47:10,12,14,16,22
48:12,17 53:18 54:3 57:24 59:21
69:7,16,19,21,25 70:3,11 71:17
72:13 77:16,25 79:2 85:2 88:12
90:11 98:12 102:16 104:1,9,17
106:8 107:2,20 108:1 109:11
110:18 111:12 112:8,21 119:15
121:1,4 125:20 137:4 142:1
143:15 145:22 146:2,25 147:5,8,
18,24 152:9 154:21 170:15
171:1,16 172:4,12 173:9 178:13
182:10,14 184:2 187:3 189:12
190:19 191:22 192:7 193:2,12
206:24 207:1 208:11,12

**accountant** 34:17 35:2,9

**accounting** 35:2,10 67:2,4
194:12

**accounts** 47:18 57:23 71:23
72:11,12 74:12 83:24 113:10,11
144:18 148:10 149:1 150:2 152:4
187:17 193:22,24 205:25 206:10

**accrual** 138:19

**accrue** 130:4,10 133:8 134:25
135:4 138:10 139:6,7

**accrued** 114:4,20 132:9 133:6,
7 137:12 138:4 140:13,22 141:1

**accruing** 138:12 139:2,5,17

**accumulated** 130:9

**accuracy** 164:6

**accurate** 79:15 106:16,23
165:16,22 167:2

**acquire** 77:9

**acquired** 46:18 77:15

**acquiring** 18:1

**acquisition** 82:16

**acting** 14:21 23:15 148:12

**action** 13:13 23:17 68:6 89:5
155:21 162:11 177:25 181:5,8

190:5

**actions** 151:25

**activities** 24:20

**activity** 36:17

**actual** 45:3 46:12 51:22,23 60:4 165:24 189:5

**add** 8:6 79:4 140:24 207:17 209:4

**added** 181:1

**addition** 45:12

**additional** 82:20 138:4 140:22, 25

**additionally** 77:15

**address** 21:14,22 22:2 32:6,7, 8,9,14 93:20 156:10

**addresses** 32:3

**administrative** 31:16

**admits** 165:13

**advice** 200:24

**advised** 200:9

**affect** 12:25 13:4

**affidavit** 18:14 69:8 70:11 71:18 75:3,8,9,14,19,22 76:1,6 91:20,22 92:25 107:12 108:12,21 109:2,10 110:16,25 111:13 112:1,22 113:8,25 115:23 116:10 143:1,3,13,23 144:1,6 145:21 149:6 152:7 182:14 188:23

**affidavits** 18:12 113:4,20 147:21 152:2

**affiliates** 38:22

**afternoon** 203:7

**age** 56:10 57:22,24

**agencies** 37:2 174:15

**agency** 30:12 35:15,17,18 60:19 150:15

**aggregate** 162:21

**agree** 110:9 117:8 124:14 132:22 140:11

**agreed** 93:16 95:11 109:15 119:11 120:15

**agreeing** 158:2

**agreement** 10:19 22:3,9 26:13, 16 52:11,12,15,21 53:2,5,11 69:10 70:13 73:1,17 78:14 79:14 80:19 87:21,22 90:21 92:11 93:15 101:5 107:3 110:3 122:1 123:6 124:17 132:11 133:4 156:3 157:2,17,21 158:1 164:9 167:3 168:2,24 194:7 199:20 200:13 209:9 210:2,3,6

**Agreement.'** 124:18

**agreements** 83:3 87:8 90:20

**ahead** 8:5,7 17:6 39:15 62:20 65:13 71:15 77:19 82:8 91:9 102:23 114:10 119:8 120:24 134:16 135:10,11 138:24 179:23 197:9 207:20 210:21

**allegation** 82:21

**allegations** 13:15

**alleged** 165:15

**allowed** 59:2 114:24

**Alpine** 129:1

**ALPLN** 128:24

**amend** 71:14

**amended** 13:21 14:1 16:6 162:10,13 165:4

**America** 13:12 25:11,13,16,18 26:4,10,11,13,17 27:13 29:4 30:5,21 31:1,7 34:5 38:11 40:7, 20,22 41:1 42:17,24 43:10,13,23 44:4,9,16,20,25 45:8 46:16,17,19 47:9,12,16,23,24 48:20 52:21 53:3,8,9,15,23,25 54:19 55:3 56:24 57:6,8,14 60:11,14 62:14 63:10 64:7 65:22 67:9 69:18 70:14 71:10,23 72:3,16,20 73:2, 23 76:10,11,16,19,20,22,25 77:11,15,23 78:2,5,6,11,18,19 79:11,12,17 80:1,5,11,14,15,21 81:4,5,8,11,19 82:1,5,12,15,20 83:20 84:9,19 86:10,19 87:6 90:20 97:11 101:8 107:4 113:9 115:7 122:4,8 123:15 124:9,19, 21 125:14,25 126:3,6,22,25 128:16 129:2 130:21 131:1,6 132:14,22 133:10 136:1 138:15 139:1,3,4,14 140:4,16,20 141:2

142:2 143:22 144:11,23 145:2,6 151:12 152:1,14,25 153:11,18 154:18 156:18 157:3,20,25 158:1 159:16,17 161:6 162:20 165:14 167:12,17,18,21,24 168:8,13,15, 19 169:19 171:20 172:16 174:12, 17 175:1,7,9,10,16 176:9,18 177:11 182:24 183:6 185:11 187:20 190:23 191:1,7 194:7,17 200:1,2,4 202:6 203:23 204:5,7,8 205:9 206:21 208:4,8,21 209:18, 21 210:3

**America's** 56:2 57:2,11 79:8 139:21,22 170:1 209:24

**America-related** 65:6

**amortization** 59:13 69:9 70:12 85:16 92:3,4,7 103:11 104:15 108:5 116:6,14,17,19 117:7,11, 12 119:14 120:8 129:15 130:23 131:10 135:17

**amount** 52:10,15,18 60:7 63:6 64:14 79:2 92:14 93:15 95:12,21 103:20,21 110:11,12 116:2,4 119:10 122:5 130:7 131:7 132:18 134:8,11,12 135:7,14 136:6 137:20 183:3 185:12 197:25 206:8 207:17

**amounts** 106:14 114:5,21 132:10,17 133:3

**analysis** 48:5,10,21,23 53:14 57:15,18,21 58:8,21 63:21 79:1 159:19 160:2,8,24 198:12,17 205:14

**analyze** 159:15

**and/or** 114:15 126:2 156:18,20 157:12

**Andrea** 15:19 22:20 87:24 91:3 154:24 159:6 183:18 184:18

**Annex** 92:18,20

**annexed** 167:3

**annual** 119:9 133:23 134:4,21

**anonymized** 54:15

**answering** 34:24 39:9 42:12 101:10 172:14,19

**answers** 7:13,14 162:10 168:17

**anticipated**  85:9,11 103:23 115:9 135:25 198:13

**anyplace**  204:2

**apologies**  22:24 47:7 110:22 129:10

**apologize**  11:25 78:19 128:11 131:22 140:6 193:16

**appeared**  96:2

**appears**  182:2 183:22 188:16

**applicable**  58:14 77:7 83:25 104:13 106:17 116:19 123:23 126:24 131:12 160:16

**application**  62:18

**applied**  62:10 120:17

**applies**  84:11 155:20

**apply**  71:21 81:8,11 156:2

**approach**  29:2 58:1 83:11,17

**approval**  20:8 69:7 70:10 105:15,21 106:8 111:12 165:20

**approve**  20:1,4 29:3 31:9 98:20 99:3,4

**approved**  27:21 28:15 56:7 71:20 99:1 101:25 102:3,5,11 110:12

**approves**  31:6 100:1

**approximately**  38:14 52:16 162:23 171:21

**April**  68:23 142:6,7,10,18 177:20 179:2 181:25 191:21

**area**  66:4

**arguments**  83:14 84:2

**arrangement**  37:14

**arrangements**  60:21

**aspects**  18:4 20:25

**ass**  84:5

**assert**  153:19

**Assigned**  191:21

**assist**  161:2

**Assistance**  6:19

**assume**  15:2 43:7,8 142:9 155:17 192:15

**assuming**  16:5 121:4 174:1

**assumption**  122:24

**attached**  74:12 75:3,19,22 76:6

**Attachment**  16:3

**attachments**  75:10,11 92:24 116:10 143:6

**attempts**  184:11

**attention**  16:3 23:10 32:24 47:6 97:2 162:14,17 165:12 169:10 177:13

**attested**  108:21 110:1

**attorney**  11:2,6 12:2,6,9,17,21 33:20 74:21 83:15 88:24 89:1,2 92:23 127:7,12 149:17 152:7 154:6 155:14 159:22 179:13 187:1 200:19,23 204:16 210:13

**attorneys**  27:7 34:10 159:2,3, 18 161:2 199:23 202:12,13,24 203:1 209:15

**audio**  11:14

**August**  190:5

**authenticity**  164:6

**authority**  20:8 101:22

**authorized**  151:14 190:13,16

**authorizing**  185:4 188:23 189:24 190:25 191:7 192:3,13

**Avenue**  21:15,20,21

**aware**  16:9

---

**B**

---

**back**  10:20 12:1 32:23 41:18 44:3 47:6,12,20 58:15 60:3,25 64:1 65:24 67:23 71:14 85:5,8,12 92:10 95:25 96:4,5 97:22 100:25 103:11,13,14,23 104:21 105:6 108:12 117:15 124:3,5 126:13 127:15,18 129:9 130:15,25 131:12,13,25 133:16 136:19 137:23 142:23 166:5 167:5 179:19 187:3 188:25 189:11 195:5

**balance**  51:19 59:21,22 69:9 70:12 71:19 88:11,13,21 91:21 92:8 103:9 110:25 113:8,21 114:4,20 117:10,17,24,25 118:14,24 119:1,17,19,21 120:1, 16,18,21 121:12,13,14 129:6,11 130:2 131:9,10 132:9,15 133:2 137:12,13,15,24,25 138:3,17 140:8,9 141:3 143:1,24 144:2,10 150:19 162:21 175:19,21,24 176:1,5,6 182:19,24 183:5,7 185:12,19 186:2,3,14,19

**balances**  67:11 182:22

**bank**  13:12 25:11,13,16,18 26:4, 10,13,16 27:13 29:4 30:5,21 31:1,7 34:4 38:11 40:6,20,22 41:1 42:17,24 43:10,13,22 44:4, 9,15,20,25 45:8 46:16,17,18 47:9,12,16,23,24 48:19 52:21 53:3,8,9,14,23,25 54:19 55:2 56:2,24 57:2,6,8,11,13 60:11,14 62:9,10,13,14,17 63:10 64:7,18 65:6,22 67:9 69:18 70:14 71:10, 23 72:2,16,20 73:2,23 76:10,11, 16,19,20,22,25 77:11,15,23 78:2, 5,6,11,17,19 79:7,11,12,17 80:1, 5,11,14,15,20,21 81:4,8,11,19 82:1,5,12,15,20 83:20 84:9,19 86:9,18 87:5 90:20 97:11 101:8 107:4 113:9,11 115:6 122:4,8 123:15 124:9,19,21 125:14,25 126:3,6,22,25 128:16 129:1 130:21 131:1,6 132:14,22 133:10 136:1 138:15 139:1,3,4,14,20,22 140:4,16,20 141:2 142:2 143:22 144:11,23 145:2,6 151:12,25 152:13,25 153:11,18 154:18 156:18 157:2,20,25 158:1 159:16,17 161:6 162:19 165:14 167:12,16,17,21,24 168:7,13,15, 19 169:19 170:1 171:20 172:16 174:12,17 175:1,7,9,10,16 176:9, 18 177:11 182:23 183:5 185:10 187:20 190:23 191:1,7 194:7,17 197:21 198:17,18 200:1,2,4 202:6 203:23 204:5,6,8 205:9 206:20 208:4,8,21 209:18,20,24 210:3

**base**  83:1

**based**  49:23 57:22,24 60:1 63:23 82:25 83:2,6 90:14 95:16, 20 106:16 109:2 119:12 130:14,

Cain & Crane Court Reporters
704.545.3510

Case 1:23-cv-09690-MKV    Document 85-1    Filed 01/15/25    Page 208 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                                ·Index: basic..CC-CONS

16 135:13 138:8 139:16 156:7 160:5 174:1 176:3,22 189:22 193:1 205:4

**basic** 8:8

**basically** 47:16 104:15 106:22 114:14 124:1 125:10 134:22 135:9,12 150:9

**basis** 18:1 59:20 77:7 93:16 100:12 106:23 110:1 167:20 168:18 169:16 198:17,18 203:17 207:3,7,11,17 208:1

**batch** 113:5

**Bates** 88:1 91:5 95:22 96:13 101:1 141:19 155:7 177:14,18 180:1,8 187:4

**beginning** 15:5 93:17 97:25 107:10 134:8 136:8 167:8

**begins** 117:12

**behalf** 6:5 9:14 10:3 14:22 15:6, 10,11 16:21 23:15 27:6,8,15 29:22 30:4 34:7 37:20 39:4,8,9 169:3 170:1 171:20 177:2 185:10 194:23 206:20

**belabor** 69:4 70:9

**belief** 109:3 162:18

**belong** 158:9,17

**benefit** 130:13,18

**big** 53:20 63:21 209:9

**bigger** 96:19

**biggest** 20:9

**bill** 92:18

**bills** 76:10,12,15 173:14 174:13, 15,16,17

**bind** 25:3 29:11 31:13 35:24 36:6 64:11 65:1 86:7,13 89:17 90:9,17 93:24 94:6,16 96:23 138:23 139:10 145:10 153:3 184:7 210:11,20

**bit** 20:4 122:15

**BK** 124:3 125:15,19

**BK.07-08.CSX1.10DC.0107** 124:17

**BK.07-08.CSX1.10DC. 0107.** 124:5,7 126:21

**blanket** 58:1 92:19 102:13 193:7

**BNA** 67:2,4,5,6 194:12,15,16

**BOA** 193:20 194:1

**Bob** 19:10

**bonus** 37:13

**bonuses** 37:18

**books** 34:11

**borrow** 156:18 157:8,12

**Borrowed** 157:10

**bottom** 32:24 72:19 82:10 114:12 123:8 124:2,4,20 125:11 133:13 189:14

**Box** 135:20

**boxes** 119:9 133:23

**Bradshaw** 194:5,8,10

**break** 19:22 67:19 104:24 126:13 161:20 195:1

**breaks** 8:1

**Brendan** 60:24 118:16 127:15 191:16 201:7

**Brian** 44:22

**bring** 144:11

**broad** 29:2

**broader** 22:9

**broken** 205:21,23,24 206:1,14 208:3,5

**brought** 18:15 74:11 144:22

**budget** 50:2,3,4

**Buffalo** 30:18

**building** 21:20,22

**bulk** 46:21

**business** 17:3 18:2,4 24:9,10 109:5 195:8,14,16,22 210:16,23

**businesses** 24:16 210:24

**buy** 173:8

**buyer** 18:3 24:17 30:12 42:2,3

**buyers** 30:10,11 42:4

**buying** 154:19

---

**C**

**Cadwalader** 6:6

**calculate** 117:10

**calculated** 103:10 189:21

**calculating** 130:15

**calculations** 50:8,10

**California** 58:2 83:2 84:11 156:2,4,5

**call** 7:4 11:16 12:15 42:19 70:16 78:14 112:13 121:20,22 136:17 147:10 190:9,12,15 198:12

**called** 10:14 58:16 107:8,10 108:22 112:15,17 114:11 115:16 129:1 181:15,16 194:4

**calls** 12:8,9 84:22 190:18,21,25 191:7

**cancelling** 142:11

**Candi** 45:9

**capacity** 15:15

**capital** 42:5,7,10 197:7

**capitalization** 129:23 141:1

**capitalized** 129:25 130:2 131:4,16 140:17,18,21

**Carefully** 110:9

**Carolina** 6:8 21:10,13,19 42:8 58:7 83:4 156:11

**case** 10:16 12:1,2,4,17,22 13:7, 10,22,24 14:15,18 15:1 51:11 74:22 154:7 155:20,21 159:18,23 197:6 201:1

**cases** 77:21,23 151:2,7 160:5 202:3 207:9

**cash** 49:15 197:11

**CBR** 181:20

**CC-CONS** 181:20

Case 1:23-cv-09690-MKV    Document 85-1    Filed 01/15/25    Page 209 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                        ·Index: ceased..confidential

**ceased** 86:23

**ceases** 86:25

**certify** 124:13

**Chad** 19:11 199:5,12,13 200:16

**chain** 69:23 70:2

**challenge** 51:8 52:6

**chance** 105:11 107:16 130:23 159:11 170:10

**change** 78:25 83:8 90:14 127:17 135:1,2 138:3 179:24

**changed** 113:23 134:1 172:7 185:24 186:1,23

**changing** 47:22

**characterize** 49:17

**charge** 119:10 135:6

**charge-off** 56:14 76:20 92:17 130:1 131:4 137:17,20 138:13 140:9,25 141:4 167:13,22 175:11 182:24 185:18 189:22 193:2

**charged** 46:23 140:19,20

**charged-off** 141:3 175:21,24 176:1,5,6 183:7

**charging** 140:16

**Charlotte** 6:8

**chart** 117:16

**Chatham** 21:15,20,21 22:2

**check** 204:21

**checked** 49:9

**choice** 58:3 83:2,13 156:5

**Chris** 6:25 7:1,3,4 88:6,7

**Christopher** 6:3,11,24 8:10 23:19

**circumstance** 145:12

**circumstances** 37:16 145:5 152:6 202:13

**city** 30:19

**Civil** 6:5

**claimed** 106:15

**clarification** 117:5 174:22

**clarify** 7:24 39:7,15,17 52:13 79:25 117:4

**class** 13:13 82:21 162:10

**Clay** 19:10,16 39:23 48:11 63:19

**clean** 7:20

**clear** 6:23 11:21 14:23 52:14 55:9,11 58:25 70:8 71:22 82:13 87:7,19 98:9 107:9 115:22 131:22 176:7,20 198:11 200:18 211:1

**clearer** 39:13 204:10

**close** 99:3 165:1

**closed** 47:17

**closing** 72:25 74:3

**co-signer** 11:25 114:16 122:3 126:2 156:7

**co-signers** 187:24

**code** 177:25 181:5,8 190:5 192:18

**collect** 25:21 26:10,13,16 27:8 28:2 29:19,22 30:3,21 31:1 36:14 37:20 44:6,8 52:22 59:24 79:4 98:12 99:17 141:3 150:16 154:21 175:3,19 176:1,4 183:1 185:18

**collected** 27:18 43:14 47:3 64:23 182:19,25 205:9 206:20 207:9,17 208:1,7,20

**collecting** 43:22 44:15 57:13 171:20 172:3

**collection** 19:20 23:17 26:21 27:2 28:5,11 30:12 31:4 33:25 36:17 38:2 41:19,20 44:1 47:11 60:19 68:6 81:7,10 86:23,25 89:2,5 112:19 150:15 151:23,25 155:21 173:6 174:15 179:24 182:18 205:3

**collections** 21:3 30:13 36:10, 19 43:24 48:17 53:17 72:8 76:23 100:10 173:25 175:8 194:10 209:4

**collector** 77:1 87:2,3 100:12, 14,15 178:13,17 181:17,22 185:2

**collectors** 25:24 26:3

**college** 9:7 153:12

**column** 137:17

**combination** 62:7

**commenced** 152:13

**commencing** 6:1

**communicate** 44:24

**communicated** 12:21 100:16, 17 198:14

**communicating** 46:8

**communication** 32:12 49:7

**companies** 41:19,20,21 42:1

**company** 17:25 25:3 29:11 31:13 33:16 35:24 36:6 37:8 64:11 65:2 86:7,14 89:17 90:9,17 93:24 94:6,17 96:23 138:23 139:11 145:11 153:4 184:7 197:8 210:11,20

**comparing** 184:16

**complaint** 10:22 13:21 14:18, 23 106:23 155:13,22 162:11,13 164:18 165:4

**complaints** 203:2

**complete** 7:13

**completed** 122:2

**Completely** 111:4

**compliance** 103:3

**complicated** 200:22

**component** 59:25 60:8 103:20,22 135:22

**computer** 32:19 100:19 143:9

**concluded** 211:5

**concrete** 19:22

**conditions** 110:5,8 123:4 125:12,14,21,24 126:4,5,7,23 127:1 157:16,21 158:4

**confident** 113:18

**confidential** 50:18 51:5 52:4 55:5,15 61:9 62:6 66:2,9 163:3 164:7,8,23 166:2,6,10 196:5 197:5,8,9 201:6,11 209:12,20,25 210:4

Case 1:23-cv-09690-MKV    Document 85-1    Filed 01/15/25    Page 210 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                          ·Index: confidentiality..data

**confidentiality** 51:6 164:8 167:6 209:16

**confirm** 164:20,24

**confirmed** 165:23

**confirming** 204:14

**confused** 15:16 200:9

**confusing** 39:16

**Connecticut** 90:12

**connection** 18:12,15 35:1 65:21 147:21

**conscience** 158:7,15

**conservative** 83:11,16

**considered** 81:25

**consulted** 112:6

**consumer** 20:6 34:4 37:3 54:17,18 76:17 78:16 83:7 84:1 101:15 106:18 107:4 114:15 126:1 130:14,18 133:1 147:9,18 148:11 149:1 150:18 183:23 190:4 191:22 192:7 205:21 206:23,25 207:1,3 208:5

**consumers** 29:4 107:7 152:24 153:12,18 187:23 188:1 207:15

**contact** 20:6 44:22

**contacted** 20:2,5 42:24 43:4, 20 44:9,17,21

**contacting** 185:10

**contacts** 147:11

**contained** 91:16 164:2 167:2

**content** 87:13 200:18

**contentious** 81:22 146:15

**contents** 11:5

**continue** 53:3 79:4 130:4

**continuous** 52:20 53:2

**contract** 30:20 34:10 37:20 38:1,8 52:10 87:15,17,19 95:16 96:7,11 98:15,16 150:15 157:5

**contracted** 27:22 28:1

**contractors** 31:20

**contracts** 30:25 58:4 99:16 121:5

**contractual** 106:17

**contributions** 197:7

**conversation** 11:5 200:19

**conversations** 12:16 79:11 80:14,15 87:13 176:22 200:21

**conversion** 172:7,9

**convicted** 10:9

**copies** 87:7 111:6,7 177:7

**copy** 54:7 75:13,20,21 92:17 125:13 126:23 154:4 210:6

**corporate** 6:3 8:11 15:9,15

**corporation** 9:15,17 10:3,5 15:7 18:24

**correct** 8:14 22:11 23:22,23 25:9 28:21,23,24 31:2 37:8,21 41:3 48:4 51:20 54:25 55:2 65:18 67:10 68:19,20 69:16,21,25 70:5 72:14 73:17 74:8 76:7 80:12 82:17 83:19 89:6 91:22,25 92:25 93:8 98:19 99:25 100:2,5 102:18, 20 107:13,25 108:2,3,6,7 109:5, 6,22 111:24 113:22 114:23 115:1,13,18,19,21 116:1,5,8 117:18 119:2,4,23 121:17 122:14 123:10,11 125:8 128:17 129:7,8, 12,13,16,17 132:12 135:5 136:11 137:6,14,18,21,22 142:13,14,19, 20 143:10,11 144:25 147:3 148:4,17,25 149:9 151:24 152:14 155:19 156:11 162:22 164:3,19 165:4 167:14,19 168:12 169:7, 22,24 171:1,9,10,18 172:10,11, 14 174:21,23,25 176:8,21,23 177:4,5,10,12 178:1,2,11,21,22 179:1,3 180:21 183:24 185:19 186:4 187:23 189:7,10 190:8,11 194:22,24 195:11,12,24 198:24 199:6,18 203:15 207:19,21

**correctly** 12:19 20:23 23:13 27:25 33:1 34:24 40:13,18 51:15 52:25 59:6 68:7 69:13 72:22 101:10 106:19 109:18 115:3 125:23 135:17 137:5 148:8 156:23 162:24 165:17 169:4,14 185:15,16 193:19

**cost** 133:24 135:7

**costs** 106:14

**counsel** 27:22 28:18 65:23 87:11,12,13 103:2,4,5 106:11 165:20 203:20,21 204:21 205:1

**couple** 116:25 181:23 187:25 190:18 195:6

**couple-minute** 104:24

**court** 7:11,15 13:17,19 14:24 15:21 20:3 22:22 34:22 87:25 89:2,3,12 91:4 96:5 118:7,9,12 126:9 128:9 154:1,2 159:5 162:2 170:6 174:22 202:12,13,14,19

**cover** 122:24

**covers** 54:17

**CPA** 35:1 58:22 67:5,6 194:15, 16

**create** 24:8

**created** 21:7 75:3 76:1 149:5,6, 14 202:4,5

**creates** 149:16

**creating** 24:6,12,13

**credit** 10:18 26:8 69:9 70:13 73:17 80:19 83:3 87:8,21,22 90:20,21 124:18 126:1 132:10 133:4,24 135:7 156:3,19,20 157:8,10,13

**credited** 89:7,9

**creditor** 53:21 206:7

**creditors** 206:13,16 208:10

**crime** 10:9

**cross-complaint** 13:13

**Cruh@wfcorp.com.** 32:11

**current** 137:13,15 140:8 174:4

**custodian** 68:4

**cutting** 140:6

---

**D**

---

**data** 19:24 48:20 172:9

Case 1:23-cv-09690-MKV    Document 85-1    Filed 01/15/25    Page 211 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                             ·Index: database..discussing

**database** 32:21,22 33:3,6,9,13, 15,19 40:12,18,23 41:2

**date** 21:9 56:14,18 63:23 85:9, 11 103:23 115:9 117:25 118:23 120:10 121:15 131:16,17,20 135:25 137:17 160:21 169:9 170:25 171:9,16 181:18 187:8 189:17,19,21,22 193:2 206:3,6, 11,12

**dated** 115:12,16,17 183:23 187:25

**dating** 65:24

**David** 19:10 39:23 40:3 196:1

**Dawson** 6:20 10:18 13:10,21 14:3,15 27:3,15,16,19 28:13 60:22 92:12 95:14,15 101:3 102:3,4 115:14 122:2,3 126:5 134:7 154:16,22 155:13 157:1,8, 22 158:24 161:11 173:14,25 175:3,11,19 177:8 178:4 179:2 180:13 181:14 182:2,20 183:1,24 185:3,5,10 188:15,24 189:5,25 190:13,16 192:3,14 203:13,14 204:7

**Dawson's** 11:22 14:7 24:2,5 28:2 33:20,23 40:11,17 47:24 68:14,25 69:15,19,21,25 70:3,22, 24 71:2,7 72:12,19 74:23 77:25 78:5 80:22 85:1 88:12 90:1,11,21 93:5,11 94:19 103:9 104:1,9 112:21 115:24 117:17 119:1 120:2 126:7,24 137:4 139:24 140:5 143:15 145:21 146:2 152:9 154:7 162:18 164:18 170:15 171:1 172:4,23 173:1,6 176:14 182:10,14 183:9 184:2 185:19 186:7,25 193:11 203:18,24 204:4

**Dawson-specific** 102:2

**Dawsons** 92:21 95:11 109:12 119:11 123:6 135:23 147:10

**day** 7:25 19:23 47:17 73:14 74:4 113:5 131:18 136:8

**day-to-day** 17:22 18:1 19:12 20:16,24 21:2

**days** 85:11 185:14

**deadbeat** 208:14

**deal** 52:4 64:1 136:18

**debt** 18:3 20:7 24:17,25 25:24 26:3,20 27:2,8 29:20,22 30:3,10, 11 37:20 41:18,20 42:2,3 79:2,6, 9 81:7,10 82:9 112:17 143:7,8,9 148:2,13,15,17 150:16 152:17,18 161:15 205:3

**debts** 24:21 25:22 27:14

**December** 91:24 93:17 95:18 101:3 105:23 107:24 115:12,17 119:16 136:8 169:2,13

**decided** 130:12 150:12

**decides** 86:25

**decision** 59:24 100:9,16 101:20,21

**decisions** 161:3

**default** 132:7

**defaulted** 13:11 24:19 46:25

**Defendant** 109:15 115:10

**Defendant(s)** 156:16,21 158:8,16

**defense** 153:20

**deferral** 95:22

**define** 204:12

**degree** 9:6,8

**degrees** 153:12

**demand** 35:18 186:5

**demanding** 114:16

**demands** 101:6

**denial** 169:16

**denies** 165:15 167:12,20 168:13,15 169:11

**denote** 178:7

**deny** 165:21

**department** 149:16

**depends** 113:6

**deposition** 6:2 9:10 10:11 13:2 15:8,20,22,25 16:15 23:1 42:13 88:4 91:8 105:4 126:11 141:16 155:5 159:9 161:24 170:8 183:20 184:21 188:7 211:5

**depositions** 7:8 104:18

**derive** 59:20

**derived** 116:6

**describe** 19:15

**description** 68:3,10 202:3

**designation** 52:5 66:3 166:2 201:6

**designee** 6:3

**destroyed** 189:6

**detail** 108:15 172:21

**determination** 60:6 83:1 106:24

**determine** 58:11 60:4 67:10 82:11 85:22 86:18,21 88:21 96:10

**determined** 84:13 88:13

**determining** 49:18

**difference** 140:8

**direct** 6:14 16:2 23:10 26:9,12 32:23 47:6 98:11,14 162:14 165:12 177:13 193:5

**Directing** 162:16 169:10

**directive** 102:10,13

**directly** 24:5 42:24 60:19 80:19 122:8 154:22

**disagreed** 151:9

**disbursed** 56:7 92:14,15 95:14

**disclosing** 87:12

**disclosure** 10:19 59:23 69:10 70:13 73:19 92:13 93:13 94:12 95:2,9 109:22,23,24 110:2,11 117:21 119:6 127:23,24 133:17 134:20 203:11,16

**discovery** 14:4 51:6

**discretion** 151:4 154:21

**discuss** 68:9 89:19 141:5

**discussed** 73:7 85:17 117:10 122:11

**discussing** 151:15

**discussion**  136:21 141:13

**discussions**  45:3,5 46:12 56:5

**dismiss**  14:17,21

**dispel**  164:24

**dividend**  37:13

**DM**  112:17

**docs**  172:20

**document**  15:22,24 16:1,10 22:25 23:2 49:5 63:24 67:23 68:4,12 69:20 75:15 88:3,8,15 89:11 91:4,7,10,13,17 92:18 97:3,5,9,12,18 105:12,17 106:5,13 107:17 108:8,9 121:9,19,22,23 122:7 123:3,24 125:6 126:10,19 128:1,16 136:14 141:15,21 142:3,4 148:14 155:4,10 156:8 159:7,8,11,14,22 160:1,13,15 162:9,12,16 165:6,13 170:7,11 177:14 183:19,21 184:20,22 185:1 188:6 202:2,5,9 203:2,17 209:12

**documents**  10:15,17,18,19,22 14:3,5,14 53:23 54:1,4,5,6 68:9,10,13,24 69:5,6,12,15,23 70:2,7,17,21 71:1,5,6,9,13,24 72:1,15 73:4,6,7,10,12,13 74:3,19,21,23 75:2,5,11,18 76:4 77:21 78:6 88:25 91:16 92:22,24 93:4,6,8 104:9 105:3 106:9,25 107:5,6,11 108:18,20,22,24,25 109:4,10 111:13,14,15,18 113:1 121:19,21 124:1,9,21,24 125:7,9 136:1 143:4,16,17,18 147:24 151:15 160:18 161:23 162:2,7 167:25 171:12

**dollar**  135:6

**dollars**  103:22 138:1

**domain**  31:22

**domino**  84:15

**doubt**  63:25 146:3 179:21

**downstream**  151:22

**drafted**  88:14 102:21,22 103:2

**draw**  17:17 20:19 37:7

**Drive**  21:19 156:10

**drop**  119:21

**dropped**  119:17,18 161:12

**dropping**  119:15 120:12

**due**  58:3,16 59:25 69:9 70:12 71:19 78:15 80:18,22 81:1,5 85:7,14 91:21 95:17 97:16,18 101:6,7 103:24 106:15 108:1 111:1 113:8,21 114:6,11,13,21 116:2,4 119:16 120:13 121:6 129:20 130:7 131:19 132:11,25 133:2,3,4,13 135:15,24,25 136:2,7 139:16 143:1,24 144:2,10 160:4 185:13 186:3,12,14,15,16,20 203:12

**duly**  6:12 157:16

---

**E**

---

**e-mail**  12:12,13,14,22 32:3,6,7,8,9,12,13 49:8,9 185:2,4,18

**earlier**  16:14 40:10 81:25 82:2 93:3 100:11 107:21 108:4 109:20 128:16 130:13 131:1 143:3 150:8 152:12 167:16 193:1,14,19 195:6,10 205:8,13 207:12

**earthly**  158:20

**ease**  42:18

**easier**  69:4 177:15 187:4

**easiest**  103:17

**Echols**  19:11 65:5,7,11,15,16,18,21,23 87:14,15 103:7 159:21 194:12 199:5,9,10,12,13,14,15,16,17,19,23 200:5,9,16,22 201:3 202:4,6,10,16,17,21

**edit**  155:17 165:10

**education**  122:5

**educational**  9:6 185:11

**effect**  84:15

**effectively**  142:10

**efforts**  28:6,11 48:17 86:23 87:1 99:22 100:10 102:8

**electronic**  76:4

**employee**  87:3

**employees**  31:18 39:20

**enclosed**  107:12

**end**  23:6 41:5 55:15 66:9 85:3 104:18 134:10,24 158:6,11 166:10 201:11

**endorsements**  92:19

**engaged**  53:6

**engaging**  148:24

**enter**  26:15

**entered**  24:25 26:12 38:19 156:16 157:1 181:22

**entire**  43:2 73:24,25 140:14 160:8

**entities**  17:15

**entitled**  75:20

**entries**  187:7,12 192:17

**entry**  170:16,17,20 177:20,25 180:3,23 181:2 189:14 190:4,8,9 191:15,20 192:2,13,23

**envelope**  137:23

**equal**  195:13

**equity**  158:7,15

**era**  46:22

**essentially**  43:10 48:2 102:19 119:16 127:17 144:5 146:23

**estate**  42:2

**eventually**  51:12,18

**exact**  10:14 21:9 87:23 101:1 110:4 113:13 122:9 160:21 197:25

**EXAMINATION**  6:14

**examined**  6:12

**Excel**  137:9,10

**exception**  58:4 83:3

**excess**  51:24 52:7

**exchanged**  204:7

**exclusion**  114:23

**exclusively**  12:11 168:18

Case 1:23-cv-09690-MKV    Document 85-1    Filed 01/15/25    Page 213 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                          30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                                      ·Index: excuse..format

**excuse** 46:17 47:19 53:9 126:1 156:4 200:5 202:16

**execute** 144:2 152:9 158:3,4 182:13

**executed** 113:7 143:23 152:1

**exhausted** 99:21 100:10 102:8

**exhibit** 15:22,25 22:22 23:1,5 32:23 47:6,7 67:24 68:21 87:25 88:1,4,9 91:5,8,12 100:25 103:14,15,18 105:4,8,11 107:3, 14,15 108:13 116:11 126:9,11,18 127:18,21 141:16,18 142:24 155:5,6,7,11 159:7,9 161:24 165:2 170:6,8,18 183:20,22 184:21,22,25 187:4 188:7,8,11

**exhibits** 93:2 105:7 111:15 141:12 151:16 162:3

**exist** 72:9,11,12,16 74:10,13,15 75:14,25 76:5 77:13 174:5 180:17,20

**existed** 73:10 149:8

**expand** 37:12 129:22

**expected** 51:12,18 52:22

**expired** 60:11

**explain** 24:13,23 39:13 40:9 48:25 53:16 54:15 76:15 93:10 100:22 109:7 129:18 130:24 139:17 187:14

**explained** 54:22 81:24 83:22

**explaining** 67:8 125:17

**explore** 39:2

**EXT** 178:21,25

**extended** 156:19 157:8,10,13

**extent** 25:3 29:11 31:11 35:24 36:6 41:23 64:11 65:2 89:17 90:18 93:24 94:6 96:23 138:23 139:11 145:9 184:5 210:11,20

---

**F**

---

**F04** 178:12

**F04***sn-e** 178:9

**face** 52:7

**fact** 37:24 56:25 198:9

**factor** 53:20

**factors** 57:23

**facts** 164:2 200:21

**factual** 168:6

**fair** 145:1

**Fall** 21:19 156:10

**familiar** 7:9 89:24 184:10 205:1

**family** 111:10

**farther** 180:22

**fast** 34:21

**father** 11:17,21,22

**fax** 122:24

**federal** 6:5 13:19 14:24

**fee** 95:24 110:13 116:21

**feel** 39:7 113:18 149:20

**fees** 92:8 106:14

**field** 152:18

**fighting** 84:6

**figure** 35:7 119:20 124:25 130:20 136:18 140:8 141:11 146:12 206:19

**file** 26:20 27:2,7 28:19 47:17 60:15 72:19,21 73:3 74:10,23 86:9 111:11 122:10 125:1 128:2, 12,20 137:9,10 143:5 154:23

**filed** 13:14,17,22 27:5,12,17 28:4,13,16 29:3 89:2,13 92:23 100:4 144:3,5 152:19 154:8 155:13,15,18 156:3 165:8 203:2 207:10,16

**files** 33:2 35:8 74:13 148:3 149:1,5,6,7 154:3

**filing** 85:9,12 103:24 115:9 135:25

**filings** 154:3,4

**finance** 9:9 119:10 135:6 204:20

**financed** 93:15 119:10 135:14

**financial** 34:11 52:3 55:6,7 60:25 197:7 209:23

**financials** 51:4

**find** 114:11 124:10 152:16 153:23 179:20 180:7 205:11 206:23

**fine** 8:5 91:2 111:4 133:21 158:14 173:8 197:16,20

**firm** 35:1,9,10 58:22 65:7,15,18, 21,23 87:14,15 103:7 159:21 193:15,16 194:4,12 199:10,13, 14,15,17,19,23 200:5,9 201:3 202:4,6,17,21

**firms** 151:23 194:20

**five-minute** 67:18 161:19

**five-year** 140:14

**Fleet** 46:18

**flow** 49:16 52:19,20 82:14,20

**focusing** 171:11

**folder** 111:14 112:2,4

**follow** 92:13 159:3

**follow-up** 195:6

**font** 137:11

**forecast** 50:4

**Forewarning** 60:24

**forget** 108:22 122:9 170:3

**forgiven** 161:15

**form** 15:3 17:6 22:16 24:3 25:1, 25 26:5 27:4 29:1,9,25 31:10 34:1 35:16,22 36:4 37:1,5,11 38:24 40:14 41:22 42:11 54:9 64:3,9 65:13 76:13 77:18 80:6 81:12,20 84:20 86:5 88:17 89:15, 22 90:7 94:14,21 96:21 97:13 102:23 104:6,11 117:19 118:13 119:25 120:23 121:16 124:1 127:2 132:20 134:16 135:18 138:21 139:9,19 143:5 145:8 147:6,25 153:1 155:23 160:10 171:23 173:16 174:14,24 175:12, 20 177:6 182:21 184:4 185:20 191:2 207:20 209:22 210:9,18

**format** 137:9

**formed** 65:11

**forms** 76:5 125:9 203:17

**formula** 67:12

**forward** 52:19,20 55:9 82:14,20 131:19

**found** 58:3 85:14 89:12

**four-year** 9:7 58:2 84:11

**free** 39:7

**freely** 164:25

**front** 49:2 67:24 89:20 97:4 111:8,25 113:14 155:22

**Frost** 65:5,7,10,16 159:21 199:16 200:5 201:3 202:10,16

**Fudge** 9:18,19 17:12,13 22:5,10 23:21 26:8,9 27:18,19,23 28:2,3, 7,10,11,18 30:3 31:19 32:6,13 33:12,18 34:9 37:19 38:2,7,18,21 39:3,6,10,12,20,25 40:17 41:9,11 43:5,14,22 44:6,8,15,19 45:18 47:3,11,17,19,20 48:14,18,19 49:24 54:23 57:13 63:22 80:3 86:24,25 87:3 88:15,23 98:12,16, 18 99:8,17,21,23 100:9,14,15 101:22 102:8,10,15 104:8,12 105:17,18,20 106:7,10 108:9 110:20 111:1 112:22 113:19 127:10 141:24,25 142:1,4 145:25 146:4,21,24 147:11,17 148:18 149:3,11,13 150:1,9,12,14,21,25 151:7,10,22,23 154:5,11,13,20 170:24 171:2,16,19 172:3,6,15, 17,19 174:2,18 175:2,8,24,25 176:4,10 177:2,8 179:11,18,19 182:23 183:6,22 185:2 187:18 188:18,19 190:10 193:3,6,10,17 194:9,21 198:20 202:11,12,18,22 205:17,25 207:25

**Fudge's** 28:10 40:7,12,23 41:2 59:8 62:15 63:9,16 73:3 74:13,15 100:19 101:21 102:12 103:3,5 112:11,16,18 143:7 151:4 154:9 170:14 171:6,12 176:25 191:24 206:19 207:14

**full** 7:12 54:7 74:6 92:5 108:16 114:16 130:7 137:1,7 138:6 159:22 175:19 176:1,5 182:19 183:5 185:18

**fund** 195:22 197:22

**funded** 62:2

**funds** 62:3 142:9

**future** 58:16 59:19 85:13 103:24 115:8 131:14 133:8 135:25

**G**

**Gary** 19:10 40:3 196:1

**gave** 32:14 132:23,24 150:20,25

**general** 17:10 18:6 20:23 68:3, 10 94:3 97:22 102:1 126:20 127:5

**generally** 7:8 17:3 27:14 82:4 126:6

**generated** 63:22 88:16 142:3

**generates** 109:4

**generic** 32:5

**give** 7:14 22:17,19 23:3 41:9,11 61:4 88:7 101:1 110:4 114:3,19 119:7 130:23 132:8 141:19 177:14 179:23 208:22

**giving** 41:8 193:23

**glad** 159:24

**good** 6:16,17,23 26:24 64:1 112:20 158:7,15 161:20

**goods** 204:7,11,12,13

**Goodyear** 19:10,16 20:12 21:1 39:23 48:11 49:10,15 50:7 63:19 198:12

**Gotcha** 118:19

**government** 35:14,17,18,21

**graduate** 9:7

**great** 6:22 8:19 10:23 17:1 100:24 109:13 110:6 120:10

**greater** 51:13

**Group** 6:19

**guarantee** 198:1,9

**guaranteed** 198:16,18

**guarantees** 62:21

**guess** 7:22 55:10 119:19 120:2 140:6 156:1 197:4

**guessed** 184:13

**guidance** 87:10 201:4

**guidelines** 7:8 150:24

**guys** 10:13

**H**

**hand** 15:18,21 16:1 22:21 87:25 91:4 105:6 111:11 141:18 155:6 159:5 162:2 170:6 183:21

**handing** 184:22 188:8

**handled** 151:21

**happen** 31:4 48:3 62:21

**happened** 121:15 144:21 149:15

**happening** 144:17

**happy** 116:21

**hard** 81:24 111:6,7,9 122:15 124:15 146:9

**harm** 210:7,16,22

**hassle** 130:18

**hat** 182:5

**hats** 146:10

**head** 7:16 8:20 13:18 25:5 29:12 31:14 75:9 152:15 192:1,12 205:10

**headquarters** 21:12,16

**heads-up** 61:4

**helped** 67:12

**helps** 39:15

**hereinabove** 96:6

**Hey** 147:12

**high** 97:22 100:5

**high-level** 100:6

**higher** 138:18

Case 1:23-cv-09690-MKV     Document 85-1     Filed 01/15/25     Page 215 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                                ·Index: highest..issue

**highest** 9:6

**Hill** 21:13,19 156:10

**hire** 25:24 26:3 27:7 35:2 175:2

**hired** 35:12 36:16 38:9 65:9 151:23 159:2 193:11,17,20 194:4,6,17,21

**hiring** 44:6,7 194:8

**history** 48:20 50:1 62:16 63:21 69:11 70:14 73:21 92:16 97:6,9, 19 107:6 128:23 130:21 131:15 205:14

**hold** 30:7,14 132:3 158:10 202:19 204:20

**holder** 78:21 114:3,14 115:2,6 130:3

**holds** 204:23 205:3

**home** 22:12 156:13

**honest** 104:16

**hope** 41:8 111:2

**hours** 203:10

**house** 34:19 111:7

**hundred** 207:15

**hung** 132:1

**hypothetical** 121:13

**hypothetically** 134:22

**hypotheticals** 121:3

---

**I**

---

**idea** 12:3 18:17 29:7 158:20 159:2 168:6 175:4,13,15,17 181:12,22 188:12,25 189:3

**identification** 15:24 22:25 88:3 91:7 105:3 126:10 141:15 155:4 159:8 161:23 170:7 183:19 184:20 188:6

**identified** 156:19

**identifies** 178:14

**identify** 68:3

**IDX** 178:21,25

**ii** 47:9

**image** 148:3

**immediately** 60:17 101:7 135:16

**important** 80:4 110:8,13 136:19

**inaccurate** 172:5

**include** 18:9 21:2 62:18 107:2

**included** 22:8 43:17 73:16 133:2 168:2

**includes** 43:17

**including** 20:25 45:5 95:13

**Income** 123:22

**incomplete** 8:4

**incorporated** 21:10 110:3

**individual** 15:7 33:16 34:18 54:3 59:20 62:7,8,24,25 63:5 64:20 76:5 77:6 82:25 87:2 100:12,15 102:15 147:16,23 199:23 205:5 207:3,7,11,16

**individually** 148:13

**individuals** 20:15 23:20 37:15

**informal** 81:10,13

**information** 49:23,25 50:1 54:17,18,19,23 55:1 57:19,20 59:1,4,7,9,14 62:13,15 63:9,11, 15 69:21 74:11 79:15 85:15 88:13 89:20 101:15 104:13,14,15 106:22 110:13 122:1 123:21,23 162:18 168:7 169:18 172:8,10 202:24 205:19 209:23

**initial** 44:22 52:23

**initiate** 69:7 70:10 71:17 105:15,21 111:12

**initiated** 97:24

**initiating** 101:23

**input** 59:5,9,11

**inquiry** 35:20

**installment** 57:25 58:12 67:9 85:5,7,13 87:6,15,20,23 89:21 90:1,13 93:12,14,17,21 94:2,13, 20 95:15 96:2,3,4,7,11,15 97:5

109:14 121:5,6 157:2,5 159:19 160:2,3 203:19,22 204:3,24

**installments** 58:13 79:5,6 85:14,24 90:4 94:10,13 96:16,20 97:12,14,18 109:16 115:8 130:22 131:19 135:24 136:2 156:21

**institution/creditor** 106:15, 18

**instructions** 41:9 150:1,6

**insufficient** 142:9

**insurance** 69:1

**intend** 60:15

**intent** 185:23

**interest** 39:25 59:24 60:4 92:5, 6 114:5,20,24 116:18,23 129:25 130:2,4,8,11 131:3,16 132:9,16 133:3,6,7,12 134:2,9,25 135:2, 12,20 137:12 138:4,8,9,11,12,19 139:2,5,6,7,16,17 140:13,14,16, 17,18,21,22,25 156:21

**interested** 24:14

**interesting** 24:9 106:4

**interests** 106:14 150:17

**internal** 28:5 99:22 102:8 181:16

**interrogatories** 10:20 127:8

**interrogatory** 14:7,9,12 22:21 23:11,12 32:25 47:8 67:23,25 70:16,21 71:5,9 72:18 73:9,13 93:3 107:10 108:24,25 127:12 172:20

**introduce** 159:7 209:11

**investigative** 35:18

**investment** 49:16

**involuntary** 26:25

**involved** 19:25 24:6,12 46:4,7, 11 200:16

**involves** 18:1,3

**Isaiah** 95:14 122:3 185:10

**Isaiah's** 185:25 186:22

**issue** 84:7 148:12

**issues** 200:11

**itemized** 208:19

**items** 44:1

### J

**J2** 187:15,18,22 188:2,13,17,22 189:1,8

**Jenna** 200:15 201:2

**Jennifer** 9:1

**Jessica** 6:18 55:4

**job** 23:14 171:2

**jobs** 17:4,14,16

**jokingly** 199:11

**July** 121:11 137:17 140:19 180:24 181:8 189:20

**June** 180:3,13 181:25

### K

**Kearns** 44:22,24 45:13,23 46:8

**key** 132:23

**kidding** 111:10

**kids** 9:2

**kind** 9:8 49:25 57:18

**kinds** 30:9 41:21 42:1 72:15 147:22

**knew** 45:18 53:20,21 56:4,20 57:14 80:1

**knowing** 57:24 58:1

**knowledge** 22:14,18 23:16 24:1 71:8 108:19 109:3

**knowledgeable** 16:21

### L

**L-O-O-M** 42:7

**labeled** 127:5

**lack** 112:19 152:18

**ladies** 45:10

**Land** 21:19 156:10

**large** 159:15,16

**larger** 202:5

**law** 6:6 58:3 65:7 83:2,14 84:14, 15 106:17 151:23 155:20 156:2,5 159:19 160:9,16 193:15,16 194:4,20

**lawful** 158:21

**lawfully** 158:24

**laws** 159:3

**lawsuit** 27:3,5,15 28:12,16,19 85:10 89:13 97:24 100:3 121:9 144:3,5,22 150:24 151:14 152:19 154:3,4,8 161:11,12 185:5 190:13,16,25 207:9,16 209:16

**lawsuits** 26:21 27:8,10 29:3 60:15 86:9 144:11 145:2,13 151:2,19 152:13,25

**lawyers** 152:25 153:8

**leading** 81:24

**led** 93:10 96:10

**Lee** 45:9

**left** 177:25

**legal** 6:19 84:22 106:16 160:8 200:24 203:20,21

**lending** 55:2

**lent** 63:5 195:22

**lesser** 58:5

**letter** 169:2,6 176:25 177:1,3 179:8 183:12,13,23 184:3,11,13, 15 188:13

**letters** 72:4,5,8,9 76:23 173:25 174:6,7 176:25 177:1,8 179:24, 25 183:8 189:15,16

**level** 97:22 100:5

**LIBOR** 60:1,5 95:20 130:15,16

**license** 204:20,24

**licensed** 30:11,18

**licenses** 30:7,14 204:22 205:3, 4

**lie** 199:1

**life** 117:23 120:11 135:13

**limitations** 13:16 57:16,21 58:2,5,11,14 59:10,16,18 60:11 81:16,19 82:1,4,10,12,24 83:1,6, 12,25 84:10,18 85:1,6,8,25 86:4 89:13 121:7 131:13 153:20 156:4 160:3,16 189:19,21 193:1 200:11

**lines** 18:2

**list** 10:13 16:14,16 17:23 41:5,13 68:12 69:23 72:2 197:5 207:14

**listed** 70:7 93:19 106:25 131:9, 10 132:15 160:5 185:13 186:2, 14,20

**listen** 11:14 116:3 190:15,24

**listened** 11:17 191:6

**lists** 23:20 41:6 108:1 129:5

**literally** 124:25

**litigate** 31:15 82:9 106:8 150:17

**litigated** 71:20 152:4

**litigation** 18:9,12,15 19:25 31:6,9 69:7 70:10 71:16,17,20,25 86:20,22 88:25 98:12,18,21 99:1, 4,6,9,24 100:1 101:24 105:15,21 106:11 110:19 111:12 113:13 149:24 150:2,16,18 151:21 154:23

**live** 63:25 205:18

**lived** 90:5,12

**LLC** 6:3 8:12,15 15:6 18:23 42:5,7,8,10

**LLP** 6:7

**loan** 6:3 8:12,15,16 10:19 13:11, 14 15:6,11,13 17:3,8 18:15,22,23 19:13 20:16,19,25 22:1,15 23:16, 17 24:1,2,5,14,21,24 25:19,21,24 26:3,9,15,20 27:2,6,7,11,16 28:1, 3,12,15 29:19,23 30:4,14,20,25 31:16,20,22 32:4,12,16,19 34:5 35:3,12 37:20 38:8 39:5,9,10 40:11,17 42:17,25 47:25 52:10, 11,12,15,17,19 53:5,11 54:7 56:6,7,13,14,16 57:19,21 59:5,7 62:9,10,11,17,18 64:18 68:5,14, 25 69:18 70:14,22,24 71:2,7,10,

23 72:19 73:1,23,25 74:5,6 78:5, 13,14,15 79:14 80:18,22 81:1,4,5 82:12 86:3,10,19 87:16 89:21,23, 25 90:1,13 92:5,10 93:5,11,12, 18,21 94:2,11,13,20 95:24 96:3 98:23 99:19 101:6 110:3,10,12 114:11,13 115:15,19,24 117:17, 20,23 118:23 119:1 120:2,12 122:1,4,5 124:16 125:12,14 126:7,24 128:24 129:2,25 131:2, 5,7,11 132:25 133:2,11,12 134:2 135:13,16,22 137:1,7 138:16,17, 20 139:1,4,7,15,24 140:5,13,19, 20 143:22 144:3,5,23 145:6 153:11 154:17,19 155:14 156:17, 19 157:1,3,6,11,19 158:1,2 159:14 160:9 161:15 162:18,20, 21 165:3 167:3,12,21 168:2,14, 16,24 169:1,11 170:1 172:23 173:1,7 174:18 175:19 176:14 183:9,17 185:11,19,25 186:7,12, 15,22,25 194:6 197:12,21 198:2, 9,17,18 199:24 200:12,23,24 202:10,11,17,21 203:12,18,19, 22,24 204:3,4,9 205:17 206:9,16 208:10 209:8 210:7

**loans**  24:19 25:11,13,16,18 26:4,11,14,17 29:4 30:5,21 31:2, 7 38:11 40:7,20,22 41:1 42:10,17 43:1,11,13,18 44:5,7,10,14 45:17 46:14,21 47:24 51:22,25 52:7 53:4,7,15,19,25 54:23 56:3,10, 21,23 57:16,25 58:13 59:25 60:12,14 62:8,14,25 63:10,16 64:8,20 65:7,22 67:9,12 72:3,16 76:11,20 77:15 79:17 80:11 81:6, 8,11,19 82:1,5,15,20 83:18,20 84:9,19 86:10 87:6,20 90:20 101:9,11 126:6,25 139:3 144:11 145:2 151:12 152:1,14,25 153:19 158:2 161:5,6 162:19 165:14 167:18 169:20 172:16 174:12 175:7,16 176:10,18 177:11 187:20 190:23 191:1,8 193:21 194:1,17 197:2 204:25 205:9 206:5,21 208:4,8,21

**location**  68:4

**log-in**  148:17

**long**  11:11 48:20 62:16 78:2 84:9 111:17 154:19

**longer**  83:12 85:19 170:24 172:13 174:8 177:7

**lookback**  59:18

**looked**  14:5 82:24 107:14 115:16 131:12 143:6 169:6,8 202:2 203:8

**Loom**  42:5,7,10

**lost**  131:17

**lot**  12:23 27:24 58:8 84:16 138:18 189:15 204:21

**loud**  7:14

**low**  60:21

**lump**  206:15

**lunch**  105:1

---

**M**

**m-a-s-k-e-d**  54:14

**made**  25:17 27:19,21 48:18 49:10,17 59:23 60:6 62:21 64:7 82:25 84:2 92:16 97:7,15,16,17 99:6,8,10 100:11 102:10 108:8 119:22 121:14 141:4 160:20 190:9,19 210:14,15

**mail**  29:19,22 30:3 180:23,25 181:1,8,16

**mailed**  111:5 181:13

**maintain**  33:22 40:6,16,25 50:4

**maintained**  33:18

**maintains**  33:13,15 109:4 160:15

**majority**  145:1 206:5

**make**  12:19 20:8,22 23:12 27:24 32:25 36:18 44:3 47:2 48:6 49:15,20 52:9 69:4 70:4 82:21 83:8 95:7 96:1 99:14 101:10 104:13,15 106:24 107:8 116:2 134:9 143:2 147:14 161:3 164:14,17 186:13 208:17

**makes**  20:6 34:4 78:22 100:9 149:20

**making**  20:10 44:1 131:22 186:11 193:25 210:17

**management**  9:9

**manager**  17:10 18:6 112:17 143:7,8,9 148:2,13,15,18 152:17, 19

**manages**  19:19

**managing**  17:10,20 19:4,5 23:19

**March**  120:19 129:10 130:3 131:18 142:7,10 170:20 171:7,21 172:3,23 173:2,5,15,24 175:1,10, 18 176:2,13 189:14

**margin**  95:20,21,23 130:15

**mark**  15:22 22:22 51:5 62:5 88:1 91:5 126:9 170:6 197:4,8

**marked**  15:24 22:25 88:3 91:7 105:3,6 126:10 141:15,18 143:4 155:4,6 159:7,8,10 161:23 162:3 164:7 170:7 183:19,21 184:20,22 188:6,8

**market**  60:5

**married**  8:21,23

**masked**  54:12,14

**masks**  54:18

**match**  16:16 124:1 129:14 184:12

**matched**  103:25

**material**  96:6

**math**  52:25 137:23 140:10

**matter**  92:6 135:21

**matters**  109:1

**maximizer**  122:5

**meaning**  7:12 15:8 78:17 87:3 186:3

**means**  54:16 81:1 109:7 115:14 129:23 134:7,14 155:17 178:25 181:21 189:21 191:23 192:9,24

**mechanism**  48:2 148:3

**meet**  10:23 11:6

**meetings**  12:11,15,20

**member**  17:10,20 19:1,4,5 23:19 63:6 200:23

**members**  18:25 19:5,7,12 20:21,22 21:5 24:11 37:7,10

Case 1:23-cv-09690-MKV   Document 85-1   Filed 01/15/25   Page 218 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                                ·Index: members'..object

39:19,24 48:23 62:7,8,23,24 63:5 195:10 198:1,7,14,16 199:4

**members'** 64:20

**memorialized** 155:21

**memorializes** 190:9

**mentioned** 130:13 150:8 192:25 201:2 205:13

**met** 12:2,4,7

**methods** 150:9

**Michigan** 90:12

**Microsoft** 33:3,5

**middle** 8:1 177:21 189:16 192:5

**million** 51:24 52:8 162:22 197:24

**mind** 68:16 95:4,25

**minute** 16:2 22:19 41:15 75:7 88:7 119:7 141:20 155:8 170:9 184:23 211:1

**minutes** 11:12 36:13

**missed** 100:7

**missing** 28:25

**mistrial** 136:17

**modelling** 49:20

**moment** 188:9

**money** 36:14 48:6 62:8 63:5 64:7 84:6 134:8,11,12 156:18,20 157:8,10,12 195:22 205:8,16 206:20,25 208:7,20

**monies** 158:8,16

**month** 119:22 136:8

**monthly** 76:16 93:16 96:18 109:16 156:21

**months** 93:16 150:22

**morning** 6:16,17 172:21 203:7, 8 205:2

**mortgage** 134:21

**motion** 26:25

**mouth** 49:12 98:8 140:12

**move** 150:24

**moved** 14:17,21

**moving** 55:4,6 166:1

**Murtha** 14:21 23:21 27:5 154:10,11,13,14 161:12

---

**N**

**N.A.** 156:18

**named** 195:10

**names** 19:8 45:11

**National** 46:18

**needed** 62:3 159:1

**negotiate** 45:20

**negotiated** 46:1

**negotiating** 200:7

**negotiations** 46:4

**nod** 7:15

**non-confidential** 55:10

**non-litigation** 21:3 150:9

**non-performing** 43:1,3,18, 20,21,23 44:7,11,12,14 56:21 154:17

**normal** 55:9

**North** 6:8 58:7 83:4

**Nos** 105:4 161:24

**notation** 189:24

**notations** 142:9 170:25

**note** 10:19 69:10 70:13 73:19 78:13,21 92:9,13 93:13 95:2,9, 10,13,19 109:15,23,24 110:2,11 114:3,6,15,17,21,24 115:2,6,7 117:21 119:6,12 126:20 127:5, 23,24 129:19 130:3 133:17 156:17 157:2,6 164:5 203:11

**noted** 164:22

**notes** 77:2,3,10,16,22 170:14 171:6,7,9 172:12 173:6 187:3 189:12 190:12,19

**notice** 6:4 15:20,23 25:2 29:10 31:11 35:23 36:5 41:23 42:13 64:10 65:1 69:24 70:15 72:5 78:9,15,23 84:21 86:6,13 89:16 90:8,16,23 93:23 94:5,15 96:22 98:23 99:20 100:22 101:2,8,18, 20,21,23,25 102:1,2,3,4,9,11,17 103:10 104:2,10 114:3,15,19 115:11,15,17 132:8,23,24 133:1 138:22 139:10,20 145:9 146:1, 22,25 153:2 155:24 175:11 178:1,4,5,19,20,24 179:2,4 180:3,11,12,24,25 181:1,24 183:13 184:5,15 186:10 187:2,8, 9,11,15,18,19,22 188:3,13 189:1, 5,9 191:3 197:18 210:10,19

**notices** 92:20 181:15,25 182:4, 9,15,18 183:10 184:1 187:25

**notified** 115:14

**noting** 75:1,4

**November** 72:21 73:1 92:12 117:17 118:23 119:1 120:2,6 122:3,12,13 123:7 125:2 128:1, 19 129:5 132:14 137:15 156:17 157:3 187:16,25 192:6,18 206:6

**NSF** 142:8

**number** 29:18 41:13 58:13 59:15 75:10 85:24 95:4 96:14,19 101:1 108:5 110:9 113:12,14 118:15,16,21 119:5 124:2 125:15,19 136:6 156:19 157:4 161:6 178:17 184:13 206:24 207:23 208:6 209:4

**numbers** 109:21 116:13 122:16 124:6,8,20 129:14 133:22 165:15,21,24 167:2 177:14,16 189:15,16

---

**O**

**oath** 7:11

**object** 25:1,25 26:5 27:4 29:1,9, 25 31:10 35:16,22 36:4 38:24 40:14 41:22 42:11 54:9 64:3,9 65:13 77:18 80:6 84:20 86:5,11 89:15,22 90:7,15,22 93:22 94:14, 21 96:21 104:6,11 117:19 118:13 119:25 120:23 132:20 134:15 135:18 138:21 139:9,19 145:8 147:6,25 153:1 155:23 164:4,5 173:16 174:14,24 175:12,20 182:21 184:4 191:2 210:9,18

**objection** 29:17 64:15,25 94:4 119:3 153:9,13,16,21,24

**obligated** 79:12,14

**obligations** 124:16

**obtain** 62:3 76:19,22,25 123:24 128:1,12

**obtained** 62:25 77:5 197:21

**occur** 120:15

**occurred** 37:24 146:23

**October** 25:10,19 42:18 72:25 82:16 122:10 162:20 165:15 171:17,21 172:1,2

**offended** 111:2

**offer** 183:13

**office** 21:20,22

**officer** 18:22

**officers** 18:24

**offices** 6:6

**older** 172:10

**one-sixth** 195:16

**onerous** 207:22

**ongoing** 53:2 82:14

**operate** 24:16

**operations** 17:22,23 19:16 20:24

**opinion** 64:4 84:22

**opportunities** 60:20

**option** 114:3 186:13

**options** 183:14

**oral** 168:18 169:21 176:22

**Orally** 168:9,10

**orange** 118:18

**order** 51:6 99:2,15 162:4

**ordinary** 109:5

**original** 16:5,7 52:18 59:23 60:7 75:5,13,15 77:20 83:23 103:20,21 119:12 131:15 155:13 157:21

**originally** 82:24 95:11 117:21 119:11 120:15 131:3 135:14

**originated** 13:11 46:16,20

**origination** 92:8 95:24 110:13 116:21

**outsource** 24:20

**outstanding** 114:4,19 129:6 131:8 132:8,16 161:17

**overlap** 171:13

**owe** 134:10

**owed** 131:3 134:7

**owing** 101:7 106:15 133:13

**owned** 47:22 107:4 195:16

**owner** 41:18 42:4 199:15

**ownership** 39:24

---

**P**

**p.m.** 105:2 136:21,22 141:13,14 161:21,22 181:9 190:5 192:6 195:2,3 211:6

**package** 99:12 106:6 127:6,9, 11

**pages** 50:19 61:10 122:25 123:12,13,14 124:16 125:1,4 163:4 196:6 202:23

**paid** 37:10,15,18 52:10,15,18,24 60:22 64:14 117:22 119:13 120:11,14 135:13 154:18 183:2 207:1

**pain** 84:5

**painstakingly** 116:3

**paper** 48:22 111:23 143:4 149:1,5,7

**papers** 154:7

**paragraph** 68:10,19 101:4 108:15,16 114:2 116:2 156:15 158:6,12 162:15,17 165:12,16,22 167:7 169:10

**part** 22:3,9 36:1 56:13,16,21 58:21 59:22 62:6 64:13 74:3 77:20 78:10 79:7 82:16 83:2 92:22 102:6 106:6,12 118:18

127:8,11,12 132:6 157:16 158:1 178:24 182:3 193:6 202:5 203:16 210:2,5

**participants** 195:8

**parties** 23:20 30:21,24 31:1 36:19 46:1,13 175:2 194:16

**party** 193:11

**passed** 89:14

**passive** 18:2 24:17 30:10 42:2, 3

**past** 62:16 82:9 115:8

**path** 146:19

**Paul** 6:4,11 8:10

**pay** 22:1,12 60:18 67:14 109:15 150:18 154:22 185:23,25 186:22 208:12

**payable** 94:12 96:18,19 114:5, 6,21,22 121:6 129:21 132:10,11, 17 133:3,5 135:22 160:4

**payday** 55:2

**payment** 27:19 34:4,5 56:18 60:21 69:10 70:13 73:21 92:15 95:17 97:6,7,9,15,16,19 107:6 114:16 119:15,17,22 120:5,12 121:14 128:23 131:14 136:5 142:18 183:15 186:5

**payments** 22:8 34:6,7 44:1 58:16 59:15,16,19,22 89:7,8 92:16 95:17 96:15 97:5,17 101:6 103:24 109:16 119:10 120:16 129:20 134:9 135:1,23 136:6,7 141:4,25 142:5,6,11,15,16 185:13,23,25 186:11,13,21,22 193:25 203:12

**PDF** 74:19 127:4

**PDF's** 75:19

**pending** 8:2

**people** 12:24 43:25 45:12 195:17,21

**percent** 14:8 43:16 51:11,12, 13,15,16,17,18 52:16,19,20,22, 23 133:25 134:11 194:3 195:18

**percentage** 95:24 119:9 133:23 134:4,21 152:24

Case 1:23-cv-09690-MKV    Document 85-1    Filed 01/15/25    Page 220 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                                ·Index: perfect..process

**perfect** 7:18

**perform** 36:16 38:2 48:5 57:15 145:21 146:1 147:18 159:4

**performed** 28:7,10 48:10 146:4,20 147:4 148:9 157:16 198:12 199:24

**performing** 28:5 43:3,18,19, 23,24 44:5

**period** 47:11 59:18 60:3 72:6 83:6 85:6,8 95:23 121:7 131:13 138:7 140:14 150:20 171:24 173:5 209:1

**periodic** 207:25

**periodically** 130:17

**periods** 205:16

**Perrin** 19:10

**person** 11:9 12:4,7 56:6 73:5 156:6 178:14 201:2

**personal** 62:20 108:19 109:2

**personally** 42:14 108:18 148:22 195:22 197:13,15 198:1, 9,16,18

**persons** 23:14

**pertinent** 88:12 111:14,15 143:16

**phone** 11:9,16 12:11,17 190:18, 21,25

**phrased** 198:4

**physical** 143:5

**physically** 149:10

**picture** 111:10 209:9

**pile** 41:7

**placement** 63:23 205:24 206:3,6,12

**placing** 187:8,9,10

**plaintiff** 6:20 27:11 157:15,19 158:9,17 165:16 169:3

**plaintiff's** 14:17 156:9 162:10 165:4

**PLAINTIFF2** 155:7

**PLAINTIFF65** 159:10

**Plaintiffs** 6:6

**plans** 185:25 186:22

**plenty** 112:12

**point** 44:18 47:3 75:9 80:4 84:8 85:18 98:23 99:21 100:3 110:17 130:9 139:15 145:20 147:3 172:1

**policies** 32:17 80:2 81:7,10,13, 14,15 86:16 149:24 168:4

**policy** 57:2 69:1 79:8 83:21 167:23 169:19 176:17

**poorly** 198:4

**portfolio** 19:17,19 20:10 22:15 38:10,12 43:1,2,9,11 44:23 45:19 48:13,15 50:9 51:16 52:18,23 53:21 79:1,16 83:9 159:16,17 165:14 198:19,20 202:7 206:14

**portfolios** 36:12

**portion** 55:15 66:9 137:1,3 166:10 194:1 201:11

**portions** 159:15,16 197:12

**position** 84:10 203:18

**possessed** 172:23

**possesses** 70:22

**possession** 10:16 68:5,13,25 154:9

**post** 141:4 160:23

**post-charge-off** 138:5

**potential** 209:3,7

**practice** 81:18 82:4 190:24

**practices** 78:10 139:21,22

**pre-approval** 102:19

**pre-permission** 146:24

**preceded** 144:6,7 145:3,14

**precise** 117:9

**predecessor** 65:16 157:20

**predecessors** 157:15 158:18

**prefer** 60:18 150:16

**prejudice** 161:13

**preparation** 16:15 36:1 64:13

**prepare** 10:11,23 11:7,15 12:20 65:4

**prepared** 16:19,24 89:19 90:10 94:1,18 149:10 153:5 184:8

**prepped** 149:17

**presented** 113:6

**presently** 23:15

**president** 17:13

**pretty** 17:25 73:7 87:7,19 150:7

**previous** 171:3

**previously** 21:18 73:8 109:11 115:20,25 121:1 130:5 169:12

**price** 45:20,24 46:2 49:19,22 51:14,21,22,23 197:24 210:14

**principal** 59:21 60:8 92:7,8 95:12 103:19,22 114:4,20 116:18,20 117:12 129:6,11 130:2,8 131:15 132:9,15 133:2 135:21 137:11 139:16

**prior** 13:15 44:25 45:3,5,14 47:4,12 50:1 53:13 54:24 58:20, 23 63:14 65:19,22,24 67:2 77:12 92:16 99:6 101:23 103:15 106:10 144:2 145:20,25 146:21 150:16, 18 168:14,19 169:12 172:8,12,23 173:2,5,24 174:17 175:1,10,18 176:1,10,13,24 177:2,8 185:4 194:5 199:19,25 200:4,6,10

**private** 42:25 44:4,9 157:1 204:9

**problem** 22:19 23:4 63:14 68:23 95:8 147:16

**procedural** 83:15 84:2

**procedure** 6:5 57:3 167:24 169:20 176:17

**procedures** 57:12 79:8 80:2 102:6 168:4 193:6

**proceed** 55:9

**proceedings** 36:2

**process** 19:25 56:5 73:5 86:20, 22 143:21,22 144:15 147:4 158:21 209:1

Case 1:23-cv-09690-MKV    Document 85-1    Filed 01/15/25    Page 221 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                               ·Index: processes..recipient

**processes** 57:14

**produced** 14:3,14 159:22

**production** 10:21

**profits** 51:4

**program** 128:24 129:2

**projected** 48:7 49:19 50:2,12

**projections** 49:10,14,17 62:18
64:24

**promissory** 78:13 126:20
127:5 156:17 157:2,6

**pronounce** 6:23

**Proof** 123:22

**proper** 186:10

**properly** 20:11

**propose** 45:24

**proposed** 43:10,13 45:22
49:22

**protected** 164:15,23,25

**protocol** 73:3

**provide** 19:24 48:23 53:23
57:7,8 62:13 68:3 78:8,11,15
79:13,15 150:1 159:18 202:24
207:25

**provided** 37:2 54:6,19 62:17
77:21 87:10 101:22 106:6,22
112:2 126:22 127:2 152:7 154:6,
10 159:18 168:7 169:19 201:4
202:9,15,18,21,22 208:2

**providing** 114:15 127:14 133:1
200:24

**provision** 58:3 83:14 209:16

**public** 210:8,14,15,17

**pull** 112:8,21 113:3 147:8
206:25

**pulled** 148:14 172:9

**purchase** 24:19,25 25:11
38:15 45:20,24 46:2 48:24,25
49:1,4,18,22 51:13,21,22,23 53:4
62:2 115:6 187:18 197:22,23
198:19 204:24 210:14

**purchased** 24:22 36:12 38:9
50:9 53:19 60:14 83:9,18 84:9

165:13 187:17,20

**purchases** 25:22

**purchasing** 53:7

**purged** 177:1,3

**purpose** 149:7

**purposes** 110:19

**pursuant** 6:4 51:5 53:11 101:5
109:15 114:2

**pursue** 92:6 106:11

**pursued** 113:13

**put** 49:11 59:14 63:6 84:16
97:21 98:7 100:17 111:16 124:8,
19 133:9 134:14 140:11 161:1
181:17

**putting** 59:19 62:7 149:21

**Q**

**qmail** 181:17

**question** 7:20,23 8:2 23:25
24:9 25:5 34:3 35:5 42:12 61:1
68:22 75:25 79:25 81:23 84:25
86:8,12 89:24 90:15,22 91:1
93:22 94:4,23 96:25 111:9 112:7
120:3 127:15 138:10 139:24
147:11 156:1 164:12 170:2 173:9
185:24 197:15 198:4 205:12

**questioning** 133:14 134:18
147:13

**questions** 7:13 8:8 13:1 15:9,
12 17:2 39:8 41:12 42:16 116:22,
25 173:4,10 181:23 195:7 200:17
209:10 211:3

**quick** 116:15 142:6

**quickly** 82:7

**R**

**R-U-H** 8:10

**raised** 147:16 148:11

**Ranucci** 6:15,18 11:24 15:19
22:20,24 32:1 42:15 51:1,7 55:7
56:1 60:24 61:3 62:1 64:5 65:8,

14 66:5 67:1,18,22 68:20 75:1,24
82:18,23 87:24 91:3 95:25
104:23 105:5 113:11 118:11,15,
20 128:11 136:23 141:10,17
154:24 159:6 161:19 162:1
164:1,11,16 166:3 167:1 170:3
183:18 184:18 191:12,16 194:13,
25 195:4 197:1,20 200:3 201:7
202:1 203:5 205:6 210:25

**rate** 49:15 51:16 60:4 95:19
119:9 130:14 133:24 134:2,4,6,9,
23 135:2 138:8

**rates** 60:1 134:21

**reached** 45:23

**read** 13:21,24 14:3,7,9,14 23:3,
8,12 32:25 33:1 52:9 68:1,7,22
69:6,13 70:8 72:22 96:4,5
106:12,19 108:17 109:18 110:8,
10 114:1 115:3 116:3 117:16
124:13,15 132:6 133:22 155:15
156:15,22 162:24 165:6,8,17
167:7 169:4,14 185:9,16,21,22

**reading** 68:16 71:11 95:4,25
96:8 157:15 158:11 211:4

**ready** 102:17 126:16

**real** 42:2 116:15

**realize** 8:3 118:21

**reason** 146:18 147:8 152:8
157:24 182:16 191:9 209:19

**reasonable** 106:16

**recall** 12:23 14:5 31:14 45:11
47:23 49:3 50:12 52:17 54:21
74:19 143:10 145:13 159:24
161:1,9 165:11 171:25 190:14,17
199:21 203:6

**recalled** 47:12,15

**receive** 128:19 134:20 185:15

**received** 35:14,20 57:19 75:2,
12 134:20 137:2 141:25 185:13
186:21

**recently** 65:11

**recess** 67:20 105:1 161:21
195:2

**recipient** 187:10

**recognize** 16:12 23:2,5 88:8 91:13 105:12 107:17 121:18,24 123:3 126:17 141:21 155:9 159:11 162:6 170:10 184:24 188:10

**recommend** 98:18 151:7

**recommendation** 27:21 48:24,25 49:4

**recommended** 28:3,11 49:1 50:9 58:22 67:8,13

**recommends** 99:9,23

**record** 7:15 8:9 11:20 32:16 34:5 41:10 55:8 75:2,4 77:23 107:9 141:10 170:18 210:23

**recorded** 7:10,14 148:15

**recording** 148:3 190:15

**recordings** 11:14 190:25 191:6

**records** 33:22,25 34:11,25 36:24 40:6,8,9,11,16,22,25 77:1 78:3 154:1,2 171:22 172:22 173:1,18,21 174:9,11

**recover** 13:11 51:18 154:17

**recovering** 48:15

**recovery** 19:24 50:1 51:16 63:23

**recycling** 149:19

**redacted** 69:18,20 70:14 73:23 74:5 92:18,19 137:3 157:4

**refer** 8:15 15:13 25:13 103:14 117:8 119:5 124:5 125:19

**reference** 95:20 110:4 114:8 203:1,3

**referenced** 107:20

**referencing** 131:18

**referred** 174:18 176:10 183:5

**referring** 52:11 107:7 140:23

**refers** 125:20

**reflected** 109:3

**regular** 37:14

**regulations** 159:4

**regulator** 35:21

**regulatory** 36:2 53:14,18

**reiterate** 39:4

**related** 10:16 51:4 107:7 173:11 200:2,3

**relates** 69:1

**relating** 33:19,23 40:6,11,16, 22,25 68:14,25 70:22 71:2,6 77:1 79:24 93:4 104:9

**relationship** 38:5,19 53:3 62:16 67:6 106:17

**release** 52:4 55:5 66:2 166:2

**relevant** 206:24

**relied** 55:1 160:9

**remain** 161:17

**remainder** 178:20

**remaining** 125:3

**remember** 10:14 44:20 51:21 84:3 125:7 144:17,22 148:22 150:6 160:21 197:23,25 210:5

**remind** 194:13

**reminder** 180:23,25 181:1,8, 13,18,19,20

**remit** 36:19

**remitted** 205:16

**remove** 201:5

**rent** 22:1,8,12

**repaid** 64:18,21 117:20 119:12 156:20

**repay** 93:16

**repayable** 90:4

**repayment** 60:7 92:15 95:16, 23 96:14 103:20,21 129:21 183:14

**repayments** 118:2,10

**repeat** 44:3 97:25

**report** 63:22,25 92:7 205:13,18 206:3,9 208:7,22

**reporter** 7:11,15 15:21 20:3 22:22 34:22 87:25 91:4 96:5

118:7,9,12 126:9 128:9 159:5 162:2 170:6 174:22 202:19

**reports** 208:24

**representations** 57:9 168:19 169:21

**representative** 8:12 15:9 204:8

**representing** 6:19

**request** 77:11,13

**request/credit** 92:11 122:1 124:17

**requested** 56:6 77:2,6 88:25 95:12 96:6 209:15

**requesting** 122:4

**requests** 10:21 20:7 187:9,10, 11,15

**require** 30:10 209:16

**required** 123:15 125:25 205:4 209:18,20 210:4

**requirement** 209:24

**researching** 179:16

**reserve** 51:7

**reserved** 211:4

**resided** 84:1 159:17

**residence** 21:25

**resides** 83:7

**resolved** 161:11

**resort** 60:18

**respect** 26:4 30:4 31:7 39:2 53:14 81:18 82:1 151:19 190:19, 20,23 193:11,20 194:17 200:10 202:6 203:23 204:3

**response** 14:7,9 23:11,18 32:24 47:8 67:25

**responses** 14:12 22:21

**responsibilities** 17:20 18:5,8, 9,11 19:13 20:16 21:2

**responsibility** 20:10,24

**responsible** 17:22,24,25

Case 1:23-cv-09690-MKV    Document 85-1    Filed 01/15/25    Page 223 of 228

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                                ·Index: rest..Setting

**rest**  69:20 85:20 88:24

**restart**  65:14

**result**  192:18

**retain**  65:5,18,21,23 67:2 158:8, 16

**retained**  28:18 126:1 154:5 199:19

**retainer**  199:20

**retains**  78:2

**retention**  32:16 41:10 72:6 77:24

**return**  48:7 49:15,16,19 50:2,12 62:19 123:21 198:13

**returned**  106:10 123:15 125:25 149:16

**returning**  48:16

**revenue**  36:9,15,18,22,25 37:4 51:13

**review**  56:2,4,10,14,23 59:3 60:6 63:18 104:1,7,12 106:8 108:20 143:12,14,20 144:7 145:21,24 146:1,5,6,16,21,25 147:4,13,18,20,21 148:9,14,22 171:6,11 185:4 188:22 189:5,24 190:12 192:2,13,19 193:5

**reviewed**  10:13 16:14,17 27:20 63:9,15 93:6 104:14 108:18 109:11 143:3,18 147:23 171:7,8, 12 189:1,8 193:3

**reviewing**  23:5 68:21 88:9 91:11 113:1 126:18 143:16 146:8 155:11 184:25 188:11

**right-hand**  114:13

**rightfully**  158:9,17

**risk**  53:14,17,18

**Roach**  23:21 27:5

**Robinson**  194:4,8,10

**Rock**  21:13,19 156:10

**role**  15:15 20:12,13 39:1,6,11,14 43:4,5,8 44:23 147:17 148:9,12, 18,19,23 151:17 171:5,8

**roles**  49:24

**romanette**  47:9

**room**  208:16

**roughly**  52:24 53:1

**Roxanne**  6:20 95:14 185:12 186:17,19

**Ruh**  6:4,11,24 7:5 8:10 16:1 23:19 25:4 29:12 31:12 35:25 36:7 41:24 42:14 64:12 65:2 86:14 88:5 93:25 94:7,15 96:24

**rules**  6:5 55:9,10

**run**  127:16 205:13,19 207:13

**running**  17:25 84:18

**runs**  85:6 121:7 160:3

**S**

**sake**  105:9

**salaries**  17:19

**salary**  17:18 20:19 37:8,14

**sale**  42:16,20,23 43:11 44:9,25 45:3,4,5,6,15 46:23,25 47:4,13 48:3,5 52:11,12,15 53:5,11,13,24 54:5,6,8,20,24 56:3,10,20,21 57:15,19,21 58:20,23 59:2 60:10 62:2,3,4 63:10,15 65:5,19,22,24 67:2,16 73:1 77:12 79:14 80:10, 20 82:3 92:19 137:2 158:1 160:22,25 167:3 168:2,14,20,24 176:11 193:25 194:5,6,18 195:23 198:13 199:19,25 200:2,4,6,7,10, 12 204:11 209:8 210:14

**sales**  204:20

**Sands**  45:9

**sat**  182:13

**schedule**  96:14 109:14 120:5 136:6

**scope**  25:2 29:10 31:11 35:23 36:5 41:23 42:13 64:10,25 84:21 86:6,12 89:16 90:8,16,23 93:23 94:5,15 96:22 138:22 139:10,20 145:9 153:2 155:24 184:5 191:3 197:18 210:10,19

**scratch**  48:22

**screaming**  95:1

**searched**  199:1

**section**  118:22

**secure**  33:3 72:20 122:10 125:1 128:2,12,20

**secured**  33:5

**seek**  132:17

**self-explanatory**  109:8

**sell**  42:25 43:9,14 44:23 158:2

**selling**  43:2,19 53:21 204:17

**send**  27:21 101:20,21,23 102:9, 10 126:4 146:24 173:14,24 174:15 175:10 183:17 187:15

**sending**  101:25 104:10 106:7, 10 145:25 146:21

**sense**  19:16 69:19 147:14 194:1 208:17

**sentence**  106:13 108:17 109:1, 14 114:2 115:1,10 168:13 169:1, 11 185:9

**separate**  40:7,17 75:15 92:4 125:7 148:17 206:13

**separately**  39:13 40:25 74:2, 17 75:12,25 154:12

**September**  6:1 21:8 183:23

**served**  158:24

**server**  32:19 33:3,5 73:3

**service**  158:21

**serviced**  43:25 45:18 48:14 142:1 172:17

**servicer**  19:21 22:4,7 43:25 77:1,4,22

**servicers**  34:8 36:16

**services**  26:8 38:2 204:17,18

**servicing**  198:21

**set**  17:1 25:18 44:4 68:13 69:5,6 71:9 96:6 109:1 124:16 125:20 133:22 152:1 164:8 170:5

**sets**  24:21,23

**Setting**  85:20

**settlement** 20:7

**settlements** 20:1,4

**seventh** 190:4

**SFTP** 72:21 73:3,5 74:11

**shaded** 118:18

**shake** 7:15

**Shane** 45:9

**share** 195:13

**sheet** 48:22 122:24

**sheets** 111:21

**shook** 8:20

**short** 112:17

**shortcut** 70:9

**shorter** 83:5 84:12,13

**shorthand** 25:17 112:13

**shortly** 83:9,18 187:16

**show** 36:24 37:3 75:7 97:5,12,
  18 100:23 136:2,4 137:3 167:25
  173:19,21 174:9 190:19 205:19
  206:5 208:4,7,11

**showed** 109:20

**showing** 62:16 92:4 118:5
  120:9,10,11 131:2,14 174:1

**shown** 78:7

**shows** 63:22 92:14 120:18
  137:11,17 142:5,6,8,15 205:15

**side** 46:5,7,10 114:13 136:14
  177:25

**sides** 46:6

**sign** 14:11 123:19,20 149:6

**signature** 23:6 99:13 106:13
  123:17,19 124:12,13 211:4

**signed** 23:8 69:9 70:12 73:1,17
  92:11 105:17,22 107:22 112:1,
  22,23 113:4 122:3 123:6 149:15
  151:15,16 188:23

**significantly** 140:15

**signifies** 129:3

**signing** 145:20

**similar** 101:12 160:18 184:2
  188:14

**simple** 134:13 150:7

**simplicity** 105:9

**simply** 133:9

**site** 74:12

**sitting** 173:18 188:3 204:2

**skip** 184:17

**SL732493850** 185:11

**sleeping** 103:1

**slow** 20:3 26:23 102:25 120:25
  140:18 200:20 202:19

**SLS** 8:16 9:18 10:6 14:4,14,17,
  19 15:13 16:21 17:21 21:5 22:9,
  12 23:19 24:6,16 29:3 30:7 31:6,
  9 33:2,22,25 34:5,6,11,25 35:14,
  20 36:3,14,20,22,24 37:7 38:1,9,
  18,21 39:19 40:6,16,25 41:9,11
  42:14 43:5,8 45:1 46:5,7,10
  47:13,20 50:4 53:6,23 54:20,22
  56:2 57:15 58:1,10 59:1,23
  60:14,18 62:3,12,13 63:5,15
  64:2,7,20,23 65:24 68:13 70:22
  71:2,6,9 72:2,20 73:2 74:17
  76:10,19,22,25 77:5,9,15 78:23
  80:9,13 81:6,7,10,15,25 82:9,11
  84:9 86:9,16,18,21 87:5 88:2
  89:12 91:6 92:5 93:4 95:9,22
  96:13 97:3,23 98:3,11,18,20
  99:1,3,16 100:1,16 101:1,5,7,22
  102:10,16 104:3,8,12 105:7,10
  107:3,5,15 108:16 109:4 110:7
  114:1,12,14 115:1,6,10,14
  116:14 117:12 119:5 120:14
  121:18 122:7,16,19,25 123:13,
  14,18,22,25 124:3,6,12 127:19
  130:4,10 132:1 133:11,16
  135:15,19 136:9 137:2,7 139:4,6
  140:23 141:19 144:11,23 145:2,
  6,13,21 146:1,20,23 147:1,4,17
  148:9,12,18 149:1,24 150:1,11,
  20,25 151:7,14,17,18 152:1,13
  153:19 154:1,3,4,12,15 156:6
  160:15 161:3 164:18 165:13,15
  167:12,20 168:13,14 169:3,11,16
  170:19,20 171:5,8,12,15 172:22
  173:1,8,11,18,21 174:9,13,19
  177:3,7 182:5,7,9 183:11 185:4
  187:16,20 188:22 189:11,24

190:2,12,15 191:6,10,12 192:2,
  13 193:5,10,20 194:4,7,8,16,23
  195:10 197:21 199:19 200:9
  203:21 204:20,23 205:2 207:1,8,
  25 208:20,21 209:12,19 210:14,
  15

**SLS's** 12:2,6,9,17,21 13:24 14:9
  22:14 33:7,9 34:7 35:8 36:9,18
  38:11 68:24 81:18 82:3 84:10
  101:20 103:4 171:11 190:24
  195:8 203:18 210:16

**small** 137:11

**smaller** 149:19,23

**smartass** 33:8

**SN** 178:18

**software** 58:16,20,22 59:5,12
  67:7,14 112:19 172:8

**SOL** 189:16

**sold** 25:18 47:19 81:6 162:19
  204:13

**Solutions** 6:3 8:12,15,16 13:14
  15:6,11,13 17:8 18:16,22,23
  19:13 20:17,20,25 22:1 23:16
  24:1,14,21,25 25:19,21,24 26:3,
  9,15,20 27:2,6,7,11,16 28:1,4,12,
  15 29:19,23 30:4,14,20,25 31:16,
  20,22 32:4,13,16,19 35:3,12
  37:21 38:8 39:5,9,10 42:18
  144:3,6 155:14 157:19 158:2
  159:14 160:9 161:15 162:20
  165:3 199:24 200:23,25 202:10,
  11,18,22 205:17 206:9,16 208:10
  210:8

**Solutions'** 17:3

**some-odd** 103:22 138:1

**sort** 49:14,17 50:10

**sought** 80:21 81:5 183:3
  185:18

**sounds** 59:4 74:8 206:18

**sources** 36:9,10,22

**South** 6:7 21:10,13,19 42:8
  62:17 83:4 156:10

**southern** 111:3

**speak** 7:18 139:20,22 157:14
  164:25 176:12 182:12 192:15

204:16,19

**speaking** 7:17 179:18

**specific** 25:18 32:3 62:13 63:12 69:15,19,25 70:3 98:4 109:11 112:7 125:19,20 144:10,18 146:25 208:9 209:19

**specifically** 43:1 70:24 71:3 94:8 107:1 126:5 144:22 169:8 170:15 193:8 203:13 204:1,23 206:9,10

**spell** 42:6 58:18

**spend** 104:19

**spending** 84:6

**spoke** 108:4 172:20 195:6

**spoken** 11:13 12:17 143:17

**spouse's** 8:25

**SQL** 33:3,5

**square** 130:22

**stack** 149:18

**staff** 31:17

**stake** 195:13

**stamp** 95:22 96:13 101:1

**stamped** 88:1 91:5 122:16 123:9 141:19 155:7

**standard** 57:12 80:8 134:19 182:18

**standards** 56:3

**start** 7:7 17:9,17,18 24:1 27:15 45:22 62:10 68:1 84:18 85:3 86:21 91:18 95:1 98:6 99:14 102:3 112:3 118:22 142:23 158:14 162:15,16 173:6

**started** 8:7 24:10 97:8 118:6,10 119:21

**starting** 24:14 105:10

**starts** 86:3,20 116:20

**state** 8:8 13:19 23:14 30:18 62:17 79:15 82:25 84:13,15 85:17 89:2,3 90:6 93:20 94:19 135:19 159:4 160:8 187:8,9 202:3,12,13 204:24

**state's** 155:20

**state-specific** 94:3

**stated** 37:7 63:14 88:21 93:3 114:14 119:11 121:12 126:22 128:15 143:2 167:16 186:6 193:14 202:4 203:11 205:7

**statement** 10:20 59:23 69:8,10 70:11,13 71:18 73:19 76:16 92:13 93:14 94:12 95:3,9 107:2, 20 109:22,23,24 110:2,11 111:13 117:22 119:6 127:23,24 203:11, 16 208:19

**statements** 37:2,3 76:20 134:20 208:1

**states** 23:18 30:10,11,22,24 31:4,9,14,15 58:4 83:4,5,12 84:14 85:21 94:8 101:4 116:4 123:17,19 159:15 161:2 162:17 165:13 168:13 169:16 186:2,14 187:10 190:4 191:21 192:6 202:25 205:5

**static** 79:3,6

**stating** 57:4 109:9

**status** 100:18,19

**statute** 13:15 57:16,21 58:2,5, 11,14 59:10,16,17 60:10 81:15, 18,25 82:4,10,11,24 83:1,5,12,25 84:10,11,13,18 85:1,6,7,24 86:4 89:13 121:6 131:12 153:19 156:4 160:3,16 189:19,21 192:19 193:1 200:10

**Stay** 166:3

**step** 98:11 99:16,19

**Stepping** 97:22

**steps** 10:11 19:22 28:25 97:23 99:6 100:6 151:18,21

**stop** 69:12 116:15 138:19 139:2, 5,17 156:22

**stopped** 138:12 140:16 141:2

**stored** 33:2,5 40:11,23 176:25

**straight** 141:12

**Street** 6:7

**strictly** 161:1

**strike** 26:19

**struggling** 147:7

**student** 6:2 8:12,15,16 13:11, 14 15:6,11,13 17:3,8 18:15,22,23 19:13 20:16,19,25 22:1 23:15,25 24:14,19,21,24 25:19,21,24 26:3, 9,15,20 27:2,6,7,10,11,16 28:1,3, 12,15 29:19,23 30:4,14,20,25 31:16,19,22 32:3,12,16,19 35:3, 12 37:20 38:8 39:4,8,10 42:17,25 44:5,10 46:14 89:21,23,24 90:1 144:3,5 154:17 155:14 156:17 157:1,6,11,19 158:2 159:14 160:9 161:15 162:20 165:3 199:24 200:23,24 202:10,11,17, 21 204:9 205:17 206:9,16 208:10 210:7

**students** 159:17

**stuff** 193:23 210:24

**subject** 52:5 83:20

**subpoena** 35:14

**subsequent** 13:12 183:13 184:15

**subsequently** 47:18 193:4

**subset** 21:1 47:9 71:24 73:9 74:6

**substantially** 184:2 188:14

**substantive** 84:4,5

**successor** 199:17

**sue** 104:17 145:6 154:15 156:6 161:3

**sued** 13:10 83:24 116:23 135:23 153:19 156:7

**suggests** 178:10

**suing** 192:2

**suit** 28:4 92:23 99:12 127:6,9,11 151:7 188:24 189:25 191:7 192:3,13

**suit-worthy** 27:20

**Suite** 6:8 21:15

**summarize** 98:8 103:13,19

**summarizes** 95:10

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/10/2024                               ·Index: summarizing..tough

**summarizing** 103:25

**summary** 28:23 88:11 101:3

**Sunrise** 26:8,16 31:19 34:9 193:20,24,25 194:9,12

**supervise** 20:12

**supervision** 21:1

**support** 31:17 69:8 70:11 71:18 91:20 110:25 113:8,20 143:1,23 144:1 197:7

**surrounding** 159:19

**swear** 18:11

**swore** 68:15,23 91:24 115:23 143:13

**sworn** 6:12 18:14

**system** 59:8 62:15 63:16 74:13,15 100:20 112:9,10,11,16 143:9 148:2,4,10,14 170:14 171:4 172:7,9 174:4 206:19 207:14

**T**

**T-R-U** 58:19

**Tab** 191:22 192:7

**table** 85:16 92:20 103:11 108:5 116:7,14,17,19 117:7,11,12 119:14 120:8 129:15 130:6,23 131:10 135:17

**tables** 69:9 70:12 92:3,4

**Taft** 6:7

**tag** 152:20,21 192:10

**tags** 191:24

**takes** 54:17

**taking** 59:14 107:15 119:14 135:12 165:2 192:10 207:12

**talk** 12:23 25:17 45:14 82:3 116:9 148:6 211:1

**talked** 67:15 97:24 108:13 123:13 130:25 143:18 193:7 194:8

**talking** 25:14,16 31:24 34:20,22 42:19,21 48:7 54:3 69:5 75:11 80:3 82:2,14,15 85:11 111:17

121:8 128:3,9 129:15 147:9 175:21 182:4 200:12 207:2

**talks** 186:11

**tape** 54:7 56:13,14,16 57:19,21 59:5,7 69:18 70:14 73:23,25 74:5,6 137:2,7

**TARANTOLO** 22:23 41:6 136:13 164:10 186:18 194:15

**taxes** 35:8

**team** 103:3

**Teams** 11:10 12:8,16

**technically** 147:13

**telephone** 190:4,9

**telling** 11:5 98:6

**template** 102:21 105:20 108:10 110:17,20 111:1 113:20,23 124:2 178:8,10 179:6,7,11,15,20 180:15,17 182:3 184:11 188:17,18,19,20,23 189:2,8

**templates** 125:9 179:14 184:9

**ten** 9:24

**term** 10:14 80:5,7,8,16 81:1 95:16 112:19,20 114:18 117:7 119:19 129:21 132:23 134:23,25 152:18 203:22 204:3

**terminology** 80:18 120:10

**terms** 52:4 92:13,15 95:10 110:4,8,9 114:6,21 119:12 123:4 124:14 125:11,13,20,24 126:3,4,7,23,25 132:10 133:4 157:21 158:4 183:15

**territory** 60:25

**testified** 6:12 9:19 16:14 28:23 30:25 31:6 36:13 37:19,25 40:10 87:18 152:12

**testify** 13:5 16:19,21,24 164:5

**testifying** 108:18

**testimony** 37:23 50:18 51:5 55:15 61:9 66:9 163:3 166:10 196:5 201:11

**theory** 209:4

**thing** 49:18 63:21 95:7 111:3 121:10,11 136:19 204:17

**things** 13:16 18:3 20:8 39:5,11 60:9 69:4 70:10 195:5

**third-party** 19:20 20:1,5,6 22:3,7 34:8 36:16 37:2

**thought** 200:8,12

**thousand** 207:15

**time** 11:11 12:7 23:4,8 34:23 43:3,5,6,15,18 44:6,8,17,18 46:1,23,25 47:11 51:9 52:24 60:3,5,10,14 68:14,17,23 71:12 72:6 73:10 80:10,20 84:1,8 94:24 98:13,17,20 99:3 102:15 104:19 105:9 111:25 112:12,22 113:5,23 115:22 120:21 128:10 129:19 132:4,19,24,25 134:3 137:2 138:3,7 139:16 140:22 141:2 143:13 147:20 148:24 150:20 151:25 159:21 161:8,9,20 167:13,21 168:16 169:12 173:4,5 176:19 182:23 188:15 193:24 199:13 200:16,25 201:4 202:16,17 205:15

**times** 9:12,22 11:6 12:1 18:14 32:5 52:24 94:25 96:12 113:7 147:22 148:10 151:6,9,11 169:17

**timestamp** 187:8

**timing** 65:9

**title** 23:14 69:23 70:2

**today** 8:3 10:12,24 11:7 12:7,20,25 13:5 15:5,10 16:24 39:4 53:7 77:13 169:6 172:22 173:18 204:2 205:8,19,20 211:2

**told** 98:7 150:11 167:17 197:23

**tomorrow** 39:2 148:6,7 152:21 197:15

**top** 13:18 23:10 25:5 29:12 31:14 47:8 75:8 95:5 117:15 118:17 122:15 124:12 128:24 152:15 156:9 161:5 187:7 192:1,12 205:10 208:6

**topic** 197:5 203:6

**topics** 16:15,19,23

**total** 51:19,21 108:1 119:10 209:3

**tough** 180:7

**transaction** 23:16 25:10 47:18 68:5 78:24 162:21 204:6

**transactions** 24:24

**transcript** 7:20 52:5 55:11 62:6

**transfer** 72:21 73:3 122:10 125:2 128:2,13,20

**transferred** 72:20 73:6,13

**translate** 57:20

**transmitted** 73:2

**trial** 9:20

**trick** 35:5

**tricky** 146:11

**trouble** 191:19

**Tru** 58:16,19 59:13 60:9 67:7,13

**true** 40:20 79:15 157:23 172:16 174:12 177:11

**trust** 169:9

**truth** 7:12

**truthfully** 13:5 203:20

**Tryon** 6:7

**Tuesday** 6:1

**turn** 17:2 41:12,18 97:2 113:25 187:3

**turning** 72:18 121:18 122:25 136:24 180:1 190:2 203:6 209:8

**two-sided** 16:9

**two-thirds** 180:2

**type** 60:8 68:4 71:25 76:15 125:15 144:6,7 171:25 181:17,19

**types** 42:10

**typical** 19:23 190:24

**typically** 89:1 138:19

---

## U

**Uh-huh** 14:20 32:10 38:16 48:8 54:2 72:1 76:14 85:23 99:11 101:13 120:7 122:18 129:24 165:5 172:18,20 182:11 185:9 192:8,25 197:14 198:15 199:8

**umbrella** 206:17

**Unassigned** 192:7

**undergraduate** 122:5

**underneath** 136:5

**understand** 7:23 8:17 13:1 20:22,23 22:8 25:14 27:25 36:18 40:12,18 42:21 44:2,3 47:2 51:7, 10 52:3 59:1,10 65:15 70:19 72:7 75:6 76:9 79:3 81:2,22 83:19 84:8,24 87:5,18 91:1 96:25 102:5 104:5 115:22 117:5 118:25 124:14 125:16,18 127:16 129:23 130:16 131:25 134:1,3 135:15 137:1 142:14 143:2 148:2 151:14 164:16,17 173:10 179:1 182:1 192:24 201:1

**understanding** 12:19 34:3 45:16 51:14 52:9 59:6 70:4 80:13 93:11 94:11 115:23 120:1 125:23 135:16 137:5 140:7 148:8 156:1 159:25 170:24 176:22,24 186:24 190:8

**understood** 51:9 63:14 71:22 74:5 80:9,10 98:10 144:21 146:22 147:15 154:15 164:11 167:16 172:1,6 193:19 195:9 198:8,11 200:8 201:1 205:2

**undertake** 124:15

**underwriting** 56:2

**universe** 194:11

**updated** 160:11

**utilizing** 58:2

---

## V

**validity** 164:20

**variable** 60:1 95:19 130:14 134:2 135:1

**vary** 134:9

**vast** 145:1

**vendor** 20:1,5,7 176:25 177:3

**verbal** 49:6

**verbally** 167:17

**verification** 14:11

**version** 125:12 179:20,21 180:20

**versions** 125:10

**versus** 39:14

**video** 11:18 12:9

**viewed** 148:4

**virtually** 83:19

**voluntarily** 154:22

---

## W

**wait** 7:17 118:7 154:19 192:20

**walk** 58:10

**wanted** 61:4 112:7 113:2 117:4 185:8 203:10 205:11 207:8

**wanting** 198:19

**warrant** 57:6

**warranties** 57:8

**warranty** 57:7

**watch** 11:18

**watching** 149:22

**wearing** 146:10 182:5

**website** 31:23,25 32:1

**week** 208:8,11,21 209:5

**weekly** 208:2,3

**weeks** 209:5

**WFI** 47:10

**Wickersham** 6:7

**Williams** 9:18,19 17:12,13 19:10,11 22:5,10 23:21 26:8,9 27:18,19,23 28:2,3,7,10,11,18 30:3 31:19 32:6,13 33:12,18 34:9 37:19 38:1,7,18,21 39:2,6,10,12, 20,23,25 40:3,7,12,17,23 41:2,9, 11 43:5,14,22 44:6,8,15,18 45:18 47:3,10,17,19,20 48:14,18,19 49:24 54:23 57:13 59:8 62:15 63:9,16,22 73:2 74:13,15 80:3 86:23,25 87:3 88:15,23 98:11,16, 17 99:8,17,21,23 100:9,14,15,19

101:20,22 102:7,10,11,15 103:2, 4 104:8,12 105:17,18,20 106:7, 10 108:9 110:20 111:1 112:11, 14,18,22 113:19 127:10 141:24, 25 142:1,4 143:7 145:25 146:4, 21,24 147:11,16 148:18 149:3, 11,13 150:1,8,11,12,14,21,25 151:4,6,9,22,23 154:5,9,11,13,20 170:14,24 171:2,6,12,16,19 172:3,6,14,17,19 174:2,18 175:2, 8,23,25 176:4,10,24 177:2,8 179:11,18,19 182:23 183:6,22 185:2 187:17 188:18,19 190:10 191:24 193:3,6,10,17 194:9,21 196:1 198:20 200:15 201:2 202:11,18,22 205:16,25 206:19 207:14,25

**withdraw** 11:13

**word** 26:12 80:17 87:23 96:2 98:13 125:8 160:14 181:1 199:9

**words** 49:11 96:7,8 98:1,7 122:9 140:12 178:1

**work** 17:11 19:20 84:16 199:12, 13,24

**worked** 20:11 48:19 79:25 199:24

**working** 35:7 178:13

**works** 21:1 199:16 201:3

**world** 136:20

**worth** 130:17 138:9

**worthy** 104:17

**Wow** 76:9

**write** 48:21 165:19

**writing** 50:8,10 56:8 57:4,10 79:22 150:4 168:5,11,22 169:23 176:20 194:6 198:23 199:2,3 203:23

**written** 49:5 78:15 81:7,15 86:16 102:7 107:3 115:10 136:13 149:24 165:20 199:20

**wrong** 136:11

**wrote** 105:16,18 108:8 110:16 159:20

**WU** 191:22 192:7,12

___

**Y**

**year** 65:12 67:14 68:24 134:8, 10,24 135:4 172:8 177:1

**yearly** 133:24 134:6

**years** 46:9,20 48:20 58:6,15 75:14 85:2,3,8,12,13,17,18,19 103:23 115:8 135:24 138:6 198:21 208:25

**years'** 138:9

**York** 6:19 30:15 58:5,6,7 84:14 156:2,3 158:22 160:2,8,16 161:5, 7 202:3,24 204:20

___

**Z**

**Zoom** 11:10 12:8,20