# EXHIBIT B

In the Matter of:

DAWSON

**-against-**

STUDENT LOAN SOLUTIONS, ET AL.

30(b)(6) Deposition of:

Williams & Fudge, Inc.

Corporate Designee:

CHRISTOPHER PAUL RUH

*September 11, 2024*

*Cain & Crane Court Reporters, LLC*

*Post Office Box 23833*

*Charlotte, North Carolina 28227*

*704.545.3510*

*www.cainandcrane.com*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROXANNE DAWSON, individually      )
and on behalf of all persons      )
similarly situated,               )
                                  )
                Plaintiffs,       ) No. 23 Civ. 9690 (MKV)
                                  )
          vs.                     )
                                  )
STUDENT LOAN SOLUTIONS, LLC,      )
and ROACH & MURTHA ATTORNEYS      )
AT LAW, P.C.,                     )
                                  )
                Defendants.       )
_____x

**CERTIFIED ORIGINAL**

CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO
PROTECTIVE ORDER

30(b)(6) DEPOSITION OF

WILLIAMS & FUDGE, INC.

CORPORATE DESIGNEE:  Christopher Paul Ruh

* * * * *

Taken by Plaintiffs in Charlotte, North Carolina

September 11, 2024

Reported by: Tavi L. Fraga, Stenographic Reporter
Cain & Crane Court Reporters, LLC

A P P E A R A N C E S


COUNSEL FOR PLAINTIFFS:

Jessica Ranucci, Esquire

Danielle Tarantolo, Esquire

Andrea Ashburn, Esquire

NEW YORK LEGAL ASSISTANCE GROUP

100 Pearl Street, 19th Floor

New York, New York  10004

212-613-5000

jranucci@nylag.org

dtarantolo@nylag.org

aashburn@nylag.org


COUNSEL FOR DEFENDANTS:

Brendan H. Little, Esquire

LIPPES MATHIAS, LLP

50 Fountain Plaza, Suite 1700

Buffalo, New York  14202

716-853-5100

blittle@lippes.com

                        A P P E A R A N C E S
                          (Continuing)


COUNSEL FOR WILLIAMS & FUDGE, INC.:

                David Grassi, Esquire

                FROST ECHOLS, LLC

                224 Oakland Avenue

                Rock Hill, South Carolina   29730

                803-329-8970

                david.grassi@frostechols.com

                          C O N T E N T S

                                                              PAGE

DIRECT EXAMINATION BY MS. RANUCCI                               6


PAGES CONTAINING CONFIDENTIAL TESTIMONY:                      44-46

                                                               49

                                                              88-97






                            *  *  *






REPORTER'S NOTE:

* If this transcript contains quoted material,

such material is reproduced as read or

quoted by the speaker.

I N D E X   O F   E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| 3 | Summary of Accelerated Balance | 124 |
|   | Bates No. SLS 441 | |
| 13 | System Notes | 136 |
|   | Bates Nos. SLS 217-265 | |
| 17 | Notice of Deposition | 10 |
| 18 | Contract | 46 |
|   | Bates Nos. SLS 141-46 | |
| 19 | 100.20 WFI Policy - Data Retention | 87 |
|   | Bates Nos. SLS 474-478 | |
| 20 | Schedule II to Loan Sale Agreement | |
|   | Purchaser's Policies and Servicing | |
|   | Practices | 106 |
|   | Bates Nos. SLS 153-211 | |
| 21 | Account & Consumer Information | |
|   | with Dates & Calculations | 125 |
|   | Bates Nos. SLS 444-447 | |

(Exhibits 3 and 13 marked in earlier deposition proceedings.)

On Wednesday, September 11, 2024, commencing at 9:21 a.m., the 30(b)(6) deposition of Williams & Fudge, Inc., corporate designee Christopher Paul Ruh, was taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure on behalf of the Plaintiffs at the law offices of Cadwalader, Wickersham & Taft, LLP, 650 South Tryon Street, Suite 1400, Charlotte, North Carolina.

* * *

P R O C E E D I N G S

Whereupon, CHRISTOPHER PAUL RUH, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. RANUCCI:

Q. Good morning.

A. Good morning.

Q. How are you?

A. I'm wonderful.  You?

Q. Good.  I'm going to go over some of the ground rules for depositions.  I apologize if this is repetitive, but it's important to do for the record.

This is, as you know, recorded by a court reporter.  You're under oath, so you -- we're looking

for full and complete answers to questions.  Please give your answers out loud.  You have to answer a question unless directed not to do so by your attorney.

The court reporter can't record shrugs or uh-huhs, so make sure you give verbal answers.  We'll try our best to wait while each other is done speaking before speaking to help the court reporter have a clean transcript.

If you don't know, tell me that you don't know.  Don't guess unless I ask you to.  If you don't understand a question, you can ask me to clarify.  We can take as many breaks as you want, just not while a question is pending.  And then if later on you remember more to an answer or realize that an answer was incomplete, just tell me that you want to add something.

Do you understand all those instructions?

A.  Yes, ma'am.

Q.  As you know, we were here yesterday.  There are going to be parts of this that are repetitive because there's overlapping content between the two depositions.  I'm going to try my best, where I can, to articulate my understanding based on yesterday rather than make you go through the identical series

of questions in order to save everybody's time.

A.  Okay.

Q.  I'm trying to be efficient here, but if it's not correct as to Williams & Fudge, just go ahead and explain that, and we can go through it in more detail.  I'm not trying to put words in your mouth that don't apply.  I just think that no one wants to sit here and ask the identical set of questions on back-to-back dates.

Can you state your name for the record.

A.  Christopher Paul Ruh.

Q.  What steps did you take to prepare for this deposition today?

A.  Reviewed the notice, along with the list of topics, and then the documents themselves.

Q.  Which documents?

A.  I don't have the notice in front of me, but basically the documents pertinent to the Dawson case, as well as other things that were on the list.

Q.  Did you meet with your -- did you meet with Williams & Fudge's attorney to prepare for this deposition?

A.  Yes.

Q.  How many times?

A.  Twice.

Q.  For how long?



A.  About 30 minutes each.

Q.  Is that Mr. Little that you're referring to or --

A.  No.

Q.  -- that was --

A.  Mr. Grassi.

Q.  Mr. Grassi.  And were those the same meetings that you met with Mr. Little in those same two 30-minute meetings or different?

A.  Same.

Q.  Same meetings.  Okay.  Did anyone else at Williams & Fudge meet with Mr. Grassi to prepare for this deposition?

A.  No.

Q.  Did you speak to anyone else at Williams & Fudge to prepare for this deposition?

A.  No.

Q.  Other than Mr. Little and Mr. Grassi, did you speak to anyone to prepare for this deposition?

A.  No.

Q.  Prior to two 30-minute preparation meetings, had you spoken with Mr. Grassi about this case?

A.  There could have been conversations in passing, but there were no, you know, direct meetings about it.

Q.  Thanks.  Is there anything that might affect your ability to understand questions today?

A. No.

Q. Is there anything that might affect your ability to testify truthfully?

A. No.

Q. As you know, you're here on behalf of the corporation Williams & Fudge as a corporate representative. You'll be answering questions today on behalf of Williams & Fudge, not on behalf of you personally.

Do you understand?

A. Yes.

Q. As you know from yesterday, this can get confusing because it's two corporations with the same individual person. We're sitting in the same room. I will try my best in my questions to clearly refer to Williams & Fudge. Even if I don't say that, that's what I mean. If you don't understand or you're confused or the question doesn't apply in a way that makes sense to you, please just ask me to clarify and I'll do so.

Do you understand?

A. Yes.

MS. RANUCCI: Can I have the notice? I'll ask you to mark this Exhibit 17.

(A document was marked for identification as Deposition Exhibit No. 17.)

Q.  I'm handing you a document that the court reporter has marked as Exhibit 17.  I'll give you a minute to look, but once you've done so, can you tell me if you recognize this document?

A.  (Witness reviewing exhibit.)  Yes, I do.

Q.  What is it?

A.  It's a notice of deposition, along with Attachment A, which is a deposition topics list.

Q.  And you said earlier that you reviewed these deposition topics prior to the deposition; is that correct?

A.  That is correct.

Q.  Are you prepared to testify about these topics listed here?

A.  To the best of my ability.

Q.  And are you knowledgeable about these topics?

A.  Yes.

Q.  Is there anything on this list that you're not knowledgeable about?

A.  No.

Q.  Is there anything that you're not prepared to testify about on this list?

A.  No.

Q.  Okay.  Thank you.  I believe that you stated yesterday you're currently the president of Williams

& Fudge; is that correct?

A.  Yes.

Q.  How long have you had that role?

A.  About a year.

Q.  And what are your responsibilities in that role?

A.  Responsible for the day-to-day operations of the company.

Q.  What does that include?

A.  Overseeing all departments and making sure the company is doing what it's supposed to do, and, again, responsible for the day-to-day operations.

Q.  What was your -- let me back up.  When did you first start working at Williams & Fudge?

A.  August 1999.

Q.  So I'm going to go chronologically backwards through -- I assume you may have had more than one role in between 1999 and 2023 through the roles that you had during that time.

So prior to being the president of Williams & Fudge, what was the role that you had immediately preceding that?

A.  Executive vice president.

Q.  And what years did you have that role?

A.  Could not tell you when I started that role, the exact year.

Q. If you were to guess --

A. I didn't bring my resume with me.

Q. That's all right.  5, 10, 15 years?  What would be your best guess?

A. Probably 2020, so three years.

Q. And what were your responsibilities in that role?

A. Similar to my current role.  I'm responsible for day-to-day operations of the company.

Q. Were there any responsibilities you have now that you didn't have then?

A. No.

Q. And then prior to the executive vice president role that you started in approximately 2020, what was your role immediately before that?

A. Vice president of sales and compliance.

Q. And which years did you have that role?

A. I'm going to say -- I don't remember back 25 years now.  I'm going to say in the 2012.

Q. And what were your responsibilities in that role?

A. I was responsible for the sales team for Williams & Fudge, as well as the client support team and then compliance, regulatory, state.  All compliance for the company.

Q. What does sales team mean?

A. Sales reps.  Sales individuals.  People that are

selling Williams & Fudge's services.

Q. To?

A. To clients.

Q. To clients?

A. Prospects.

Q. To prospective clients?

A. Correct.

Q. So in other words, a team of people whose job it is to try to obtain new business for Williams & Fudge in terms of clients that would hire Williams & Fudge to collect their debt?

A. Yes.

Q. And what is client support?

A. Self-explanatory, but they assist the clients with day-to-day needs.

Q. And compliance, just at a high level, what does that entail?

A. It's over -- compliance for the company.  You know, making sure we're adhering to all state laws, regulations, federal laws.

Q. So since at least approximately 2012 -- I won't hold you to that exact date -- you've been the person at Williams & Fudge that's responsible for compliance with state or federal -- state and federal laws; is that correct?

A.  Yes.

MR. LITTLE:  Object to the form.

Q.  Before that job, when you were the VP of sales and compliance starting in approximately 2012, what was the role that you had before that?

A.  VP of sales.

Q.  And what were your responsibilities in that role?

A.  Similar to the responsibilities with the exception of the compliance piece.

Q.  But also the client support, or no?

A.  Yes.

Q.  Okay.  And when did you hold that role approximately?

A.  2005.

Q.  And before that, which role did you have?

A.  I was an associate vice president of sales or a sales rep.  1999 to 2005 approximately.

Q.  You said yesterday that you have a bachelor's degree, correct?

A.  Correct.

Q.  Did you first start full-time employment after your bachelor's degree?

A.  Did I start full-time employment anywhere?

Q.  Yes.

A.  Yes.

Q.  What year was that?



Cain & Crane Court Reporters
704.545.3510

A.  I graduated in 1992.

Q.  So from 1992 to 1999, which jobs did you hold?

A.  I was in the restaurant industry.

Q.  So just to make sure I understand, you completed college in 1992, worked in the restaurant industry for approximately seven years until 1999, and at 1999 began a series of jobs at Williams & Fudge that you still hold today.  We just went through the series of them.  Is that correct?

A.  Yes, that is correct.

Q.  During this time period, have you had other jobs other than the restaurant industry jobs in the 1990's and your job at Williams & Fudge that's been for the past 25 years?

A.  Well, I mean, are you talking about my job with SLS?

Q.  Sure.  Start there.  So you have a job at SLS --

A.  Yes.

Q.  -- we discussed yesterday.

A.  Yes.

Q.  And I believe your position is general manager and managing member?

A.  Member.

Q.  Any other jobs?

A.  You also asked about Loom Capital yesterday.  Same position.



Q.   Both general manager and managing member at Loom Capital?

A.   (Witness nodding head.)

Q.   And how long has that been?

A.   2020.  December of 2020.

Q.   Anything else?

A.   No.  Isn't that enough?

Q.   Yeah.  How many staff are there at Williams & Fudge now today?

A.   Approximately --

        MR. LITTLE:  Form.

        MS. TARANTOLO:  Can we go off the record for a minute?

        (There was a discussion from 9:34 a.m. to 9:35 a.m.)

BY MS. RANUCCI:

A.   Would you mind repeating that question?

Q.   No problem.  How many employees does Williams & Fudge have?

A.   Approximately 275.

Q.   Are all of them staff that ultimately you oversee?

A.   Yes.

Q.   You stated yesterday that Clay Goodyear works at Williams & Fudge; is that right?

A.   Yes.

Q.  What's his role?

A.  Vice president of collections.

Q.  And what are his responsibilities in that job?

A.  He's responsible for the collections department.

Q.  And what does that mean?

A.  He's responsible for collections at Williams & Fudge.

Q.  You also stated yesterday that David Williams works at Williams & Fudge; is that correct?

A.  Yes.

Q.  What's his role?

A.  CEO.

Q.  What are his responsibilities?

A.  You'll have to ask him.

Q.  In your role as president, do you work with Mr. Williams as CEO?

A.  Yes.

Q.  In what context do you work with him?

A.  I report to him.

Q.  What's Williams & Fudge's address?

A.  300 Chatham Avenue, Suite 200, Rock Hill, South Carolina 29730.

Q.  If I'm correct, that's the same address as SLS?

A.  No.

Q.  No.  Is it different suites in the same building?

A.  Yes.



Q.   When was Williams & Fudge created?

A.   July 19, 1986.

Q.   So I think in these questions you've explained that Williams & Fudge's business contains at least collections, sales, client support, and compliance; is that right?

A.   Well, Williams & Fudge's business is a third-party debt collector.  Those are different departments within the business that you just described.

Q.   So starting there, what does the "third-party" in third-party debt collector mean?

A.   Seriously?

Q.   Just want to make sure we're on the same page.  I think I know.  I think you know.  But, I mean --

A.   They're hired by creditors to collect on debt that is owed to the creditors.  They are not first party. They are not the creditors themselves.

Q.   And so then we were -- I believe the word you might have used, if I'm correct, is "departments."

Is that the word you used to describe collections, sales, client support, compliance?

A.   Yes.

Q.   Are there other departments other than those four?

A.   Yes.

Q.   Which ones?



A.   IT, finance and accounting, marketing.

Q.   And are each of Williams & Fudge's employees within one of those departments other than management?

A.   Yes.

Q.   How many work in collections approximately?

A.   Including management, 200.

Q.   So that's the majority of the company is in collections?

A.   Yes.

Q.   Does Williams & Fudge have any other businesses other than being a third-party debt collector?

A.   Could you -- I don't understand the question.

Q.   I believe you stated earlier Williams & Fudge is a third-party debt collector.  Does it do anything else?

A.   No.

Q.   I understand that Williams & Fudge retains attorneys to file debt collection lawsuits on behalf of Williams & Fudge's clients; is that correct?

A.   That is correct.

Q.   Does Williams & Fudge do that for all clients or only some of them?

A.   Clients that request that service.

Q.   Today, again, we're going to be talking about a set of loans that were sold from Bank of America to

Student Loan Solutions, LLC, on October 31, 2017. I'm going to refer to these as the Bank of America loans.

To be clear, when I say that, I don't mean all loans by Bank of America. Here I really do understand that Williams & Fudge collected -- potentially collected or collects on other types of Bank of America loans from other time periods. Even when I use the term "Bank of America loans," I'm still just referring to this October 31, 2017, transaction and the set of loans that were sold on that date, not to loans by Bank of America generally.

Do you understand?

A. Yes.

Q. Thanks. Do you know how many debt collection lawsuits Williams & Fudge has directed to be filed on Bank of America loans?

A. I do not.

Q. Does Williams & Fudge use the mail to collect debt?

A. Yes.

Q. Every day?

A. Yes.

Q. Including on the Bank of America loans?

A. Yes.

Q. Does Williams & Fudge hold any licenses?

A.   Yes.

Q.   What kinds?

A.   Collection licenses where required.

Q.   You mean debt collection licenses, right?

A.   Correct.

Q.   And if you know, does it hold any sales finance license in New York?

A.   I do not know.

Q.   Do you know if Williams & Fudge holds any other kind of license that would allow it to acquire or collect on installment loans?

A.   Again, they have debt collection licenses where required by individual states.

Q.   Has Williams & Fudge ever received a subpoena from a government agency?

A.   Yes.

Q.   Which agencies?

A.   New York DCA.

Q.   Approximately when?

MR. GRASSI:  Objection.  Outside the scope.  He can answer if he knows.

A.   I do not know.

Q.   In the last five years?

A.   I could not tell -- I do not remember the time frame.

Q.   Any others?

MR. GRASSI:  Objection.  Outside the scope.  He can answer if he knows.

A.  I do not recall.

Q.  Did the New York DCA subpoena cover the Bank of America loans?

MR. GRASSI:  Objection.  Outside the scope.

A.  Again, I was not prepared to discuss and do not know.

Q.  Have any government enforcement agencies ever filed an enforcement action against Williams & Fudge?

MR. GRASSI:  Objection.  Outside the scope.

A.  No.  I'd be happy to answer that one.

Q.  Does Williams & Fudge have government audits or exams conducted by regulators?

MR. GRASSI:  Objection.  Outside the scope.

A.  And truthfully, I cannot answer that based on some of the confidentiality clauses.

Q.  What confidentiality clauses?

MR. GRASSI:  Objection.  Outside the scope.

A.  I cannot answer that.

Q.  Does Williams & Fudge retain The Echols Firm as outside counsel?

A.  Yes.

Q.  Are there any --

A.  Can I clarify my answer?  We retain Frost Echols.

Q.  If you know, when did The Echols Firm become Frost Echols?

        MR. GRASSI:  Objection.  Outside the scope.

A.  I do not know.

Q.  Prior to The Echols Firm becoming Frost Echols, did Williams & Fudge retain The Echols Firm as outside counsel?

A.  Yes.

Q.  Do you know when that relationship started?

        MR. GRASSI:  Objection.  Outside the scope.

A.  I do not.

Q.  If you recall, was it already in place when you started working at Williams & Fudge?

A.  No.

Q.  If you recall, was it already in place when you became the vice president of sales and compliance?

        MR. GRASSI:  Objection.  Outside the scope.

A.  Again, I do not remember the time frame.

Q.  Since approximately 2012 when you've been responsible

for compliance at Williams & Fudge, has Williams & Fudge retained outside counsel other than The Echols Firm?

MR. GRASSI:  Objection.  Outside the scope.

MR. LITTLE:  Object to the form.

A.  I do not recall.

Q.  Does Williams & Fudge regularly collect on Bank of America accounts?

A.  Just --

MR. LITTLE:  Form.

Q.  I'm sorry.  That -- let me try again because --

A.  Thank you.  Please do.

Q.  I think you understand what I mean, but let's be very clear.

Does Williams & Fudge regularly collect on behalf of America -- Bank of America on accounts still owned by Bank of America?

A.  No.

Q.  Did Williams & Fudge engage in that business in the past?

A.  Yes.

Q.  From at least the time period 2012 to 2017; is that correct?

A.  Yes.



Q.  If you recall, did Williams & Fudge collect again on behalf of Bank of America accounts that were still owned by Bank of America at the time prior to 2012?

A.  Yes.

Q.  For how long, if you remember?

A.  The original contract was in 2010.

Q.  And did that contract end in 2017?

A.  It ended when they sold the -- they basically got out of the student loan business.

Q.  In approximately 2017?

A.  Yes.

Q.  I'm going to talk -- I'm going to ask a set of questions about this time period from 2010 to 2017 when Williams & Fudge was collecting on behalf of Bank of America on accounts that were still at the time owned by Bank of America.

A.  Okay.

Q.  Did Bank of America provide directives or instructions to Williams & Fudge about collection on those accounts?

A.  Williams & Fudge was hired as a third-party debt collector to perform collection services on defaulted private student loans owned by Bank of America.  We were hired to collect on the charged-off balance. There was never any authority to accelerate these

loans.

Q.   And was there a -- was there a -- something in
     writing that memorialized that arrangement?

A.   Could you expand about "something in writing"?

Q.   Yeah.  For example, a contract or agreement between
     Bank of America and Williams & Fudge that
     memorialized Williams & Fudge's collection on behalf
     of Bank of America during that time period.

A.   Yes.

Q.   What document is that?

A.   The contract.

Q.   The contract.  And did that contract give
     instructions for Bank of America -- or I'm sorry.

           Did that contract give instructions to
     Williams & Fudge regarding collection of those
     accounts?

A.   I did not review the contract prior to coming in
     here.

Q.   And I believe you said that Bank of America
     instructed Williams & Fudge to collect on the
     charged-off balance; is that correct?

A.   No.  I believe I said Bank of America contracted with
     Williams & Fudge, not instructed, to collect on the
     charged-off balance, but was never provided with
     authority to accelerate the loans.

Q.   Were all those loans charged off?

A.   Yes.  And I'm -- just for clarification, when you say "all those loans," we're still talking about --

Q.   Apologies.  We are still talking about the set of loans from 2010 to 2017 that Williams & Fudge collected on behalf of Bank of America that were still owned by Bank of America at the time.

A.   Yes.

Q.   So put another way, during that time period, Bank of America contracted with Williams & Fudge only to collect on charged-off loans?

A.   Correct.

Q.   I believe you said yesterday -- you can correct me if this is wrong -- something along the lines that Williams & Fudge knew the process for approval and disbursement of these loans.

     Does that sound right?

     MR. LITTLE:  Form.

A.   Sorry.  Yes.  I mean, again, it was not, you know, per se, formal training, but we were given an overview of the process.

Q.   How?

A.   Just through conversations with Bank of America when we were onboarding.

Q.   And so that onboarding would have happened around



2010?

A.   Yes.

Q.   And was it in person?

A.   There were in person and phone calls.

Q.   Was there anything in writing?

A.   What do you mean "anything in writing"?

Q.   Any training materials in writing provided from Bank of America to Williams & Fudge in approximately 2010 as part of -- to begin that relationship?

A.   No.

          MR. GRASSI:  Objection.  Outside the scope.

Q.   When -- in the period from 2010 to 2017, when Williams & Fudge was collecting certain loans on behalf of Bank of America that were still owned by Bank of America, did Williams & Fudge treat those loans as installment loans?

A.   Again, Williams & Fudge was contracted by Bank of America to collect defaulted private student loans that had been charged off.  Williams & Fudge never had any authority to accelerate the loans.

Q.   Is there anything from that time period in writing that described those loans as installment loans?

A.   I do not recall.

Q.   Bank of America ever tell Williams & Fudge that those

were installment loans?

A.   Ever tell?  I could not tell you.

Q.   Do you recall any time where Bank of America did tell Williams & Fudge those loans were installment loans?

A.   I could not recall.

Q.   I'm now going to ask some questions about the relationship between Williams & Fudge and Student Loan Solutions.  As we know, this is a time where it can get very tricky because of your dual role.  So, again, I'm asking you these questions in your role as Williams & Fudge.  If something is not clear, please just let me know and I'll try my best to rephrase.

After 2017, I understand that Williams & Fudge collected on behalf of Student Loan Solutions a set of loans that we're talking about called the Bank of America loans that Student Loan Solutions purchased from Bank of America on October 31, 2017; is that right?

A.   I don't understand your question.

Q.   Let me break it up.  That was long.

A.   That was very long.

Q.   It was long.  On October 31, 2017, Student Loan Solutions purchased a set of loans from Bank of America, correct?

A.   Yes.



Q.  And those loans we're referring to as the Bank of America loans, correct?

A.  Yes.

Q.  And after that date, Williams & Fudge collected on the Bank of America loans, correct?

A.  For Student Loan Solutions.

Q.  Yes.

A.  Yes.

Q.  Yes, for Student Loan Solutions.  Was that collection at -- let me strike that.

SLS and Williams & Fudge contracted for that collection; is that correct?

A.  There was already a previous contract in place.

Q.  And Williams & Fudge could only collect on Student Loan Solutions' account if authorized by the contract, correct?

A.  Yes.

Q.  As in Williams & Fudge can't collect on debt unless the client authorizes Williams & Fudge to collect on it?  Not trying to be --

A.  Correct.

Q.  -- a trick question here.  Just a basic --

A.  Correct.

Q.  As I understand it, a third-party debt collector can't collect anything unless their client authorizes

it?

A.   Correct.

Q.   So put another way, Williams & Fudge couldn't engage in any collections on behalf of Student Loan Solutions unless Student Loan Solutions authorized Williams & Fudge to do so?

A.   Through a contract, yes.

Q.   During the time period before Student Loan Solutions had an office, was there work that Student Loan Solutions members performed for Student Loan Solutions at Williams & Fudge's office?

A.   Yes.

Q.   Would you say most of the Student Loan Solutions work was performed at Williams & Fudge's office?

A.   Yes.

Q.   Does -- again, before Student Loan Solutions moved into its own office space, did Williams & Fudge have a dedicated part of its office for Student Loan Solutions?

A.   No.

Q.   I believe you said yesterday that when you perform work for Student Loan Solutions, you use your Williams & Fudge e-mail address; is that right?

A.   Correct.

Q.   Is that true also of Mr. Goodyear and Mr. Williams?

A. Yes.

Q. Are there any other individuals who use Williams & Fudge's e-mail addresses when they're working for Student Loan Solutions?

A. I think I told you yesterday no one else works for Student Loan Solutions other than Clay Goodyear and myself.

Q. Does Student Loan Solutions have a separate phone number?

A. No.

Q. So were there times where someone would make a call on behalf of Student Loan Solutions using Williams & Fudge's phones?

A. Could have happened.

Q. Do you have a Williams & Fudge phone number, like a direct line or a Williams & Fudge cell phone?

A. Yes. Yes.

Q. A desk phone? A cell phone? Both ones?

A. Yes.

Q. Are they different numbers or the same?

A. Different.

Q. And have you used your Williams & Fudge cell phone in your role at SLS?

A. Yes.

Q. Have you used your Williams & Fudge desk phone in

your role at SLS?

A.   Yes.

Q.   I believe you said yesterday that you, in your role
at SLS, can access Williams & Fudge's Debt Manager
database?

A.   Yes.

Q.   And you don't have a separate log-in?

A.   Correct.

Q.   Same for Mr. Goodyear?

A.   Correct.

Q.   Is there any part of SLS's computer systems that you
wouldn't be able to access in your role at SLS?

A.   Could you ask that again?

Q.   Yeah.  Let me -- when you're working for SLS, is it
fair to say that you could access all of Williams &
Fudge's computer systems?

A.   Yes, through my role with Williams & Fudge.

Q.   Do Williams & Fudge and SLS share insurance coverage?

A.   Yes.

Q.   Why?

A.   SLS is named as an additional insured on Williams &
Fudge's policy.

Q.   And who made that decision?

A.   That was a request made by SLS to Williams & Fudge.

Q.   And this is a little silly, but just to be clear, was

that a request from you to you or from you to someone else?

A.  You can say you to me or me to you or -- yes.

Q.  So you made the decision that --

A.  Well, it was requested by the insurance carrier.

Q.  Would you say that Williams & Fudge controls SLS?

A.  No.

Q.  Would you say that Williams & Fudge directs SLS?

A.  No.

THE WITNESS:  Sorry.  I'll slow down on answering.

Q.  Now that SLS has an office in the same building -- I'm just going to ask some basic questions about that -- is it physically separate than the Williams & Fudge office?

A.  Yes.

Q.  Is there like a sign on the door that says Student Loan Solutions?

A.  It's on the wall next to the door.

Q.  Do other Williams & Fudge employees have access to that office other than you and Mr. Goodyear?

A.  I do not recall.  I mean, there could be a facilities person that would have access.

Q.  Is the door locked?

A.  Yes.



Q. But as you understand it, you can access that office, I assume, correct?

A. Yes.

Q. Mr. Goodyear?

A. Yes.

Q. And anybody else that you know of?

A. Not off the top of my head.

Q. Now I'm going to ask questions about you working in both these roles. So --

A. Okay.

Q. -- when I say "you" here, I mean Chris Ruh.

A. So is this separate from my deposition this afternoon? And I'm not trying to be smart.

Q. Yeah. Yeah. No, I think you'll understand. I just -- if you don't understand these questions, let me know. You're still here as a Williams & Fudge representative, but the content of these questions is about Williams & Fudge's president, who is you.

A. Okay.

Q. Is there any way that you keep track of what company you're working for at any given time?

A. No.

Q. Do you, like, clock in?

A. No.

Q. Do you, you know, for example, work for SLS only on

your lunch break?

A.  No.

Q.  Do you walk over to the SLS office if you're going to do work for SLS?

A.  No.

Q.  You still perform that in your Williams & Fudge office?

A.  Yes.

Q.  And you don't change e-mail addresses or phones?

A.  Correct.

Q.  You don't record it like in a payroll system, for example?

A.  No.

        MR. LITTLE:  Form.

Q.  If I were to try and figure out on any given day which one you were working for, is there any way to tell?

A.  No.

Q.  Does Mr. Goodyear keep track of which company he's working for at any given time?

A.  No.

Q.  Is there any way that I could know on any given day which one he was working for?

A.  No.

Q.  Does he perform work for SLS out of the Williams &

Fudge office?

A. Yes.

Q. And if you know, using his Williams & Fudge e-mail?

A. Yes.

Q. And phone?

A. Yes.

Q. When Williams & Fudge communicates with SLS, how does that happen?

A. That's a pretty broad question.  Could you --

Q. I'll start with does SLS e-mail Williams & Fudge?

A. Does SLS e-mail -- again, that doesn't make sense to me, that question.

Q. I understand because it's -- in some ways the question is do you e-mail yourself, but what kinds of -- I'll start with this.

What kinds of communications are there between SLS and Williams & Fudge?

A. There would be communications on collection matters that Williams & Fudge is hired to collect.  Again, they're a collection agency for SLS.

Q. One that we discussed yesterday, I believe, was affidavits.  So Williams & Fudge might transmit an affidavit to SLS and then SLS might transmit that affidavit back to Williams & Fudge; is that correct?

A. Correct.

Q.   Are there other kinds of communications like that you can think of?

A.   Not off the top of my head.

Q.   We also talked about payment summaries; is that right?

A.   Statements.

Q.   Statements.  Williams & Fudge sends those to SLS?

A.   They're uploaded to a client portal.  Same process they do for all clients.

Q.   So the payment statements, it sounds like no one really sends them.  Williams & Fudge uploads them, and then SLS could check them or not check them; is that right?

A.   Correct.

Q.   But they're not sent by e-mail or by physical mail?

A.   Correct.

Q.   As to the affidavits, are those -- you stated yesterday that Williams & Fudge provides affidavits to Student Loan Solutions in hard copy?

A.   Yes.

Q.   And then how does Student Loan Solutions return them?

A.   Same hard copy.

Q.   Also in hard copy?  So no e-mail.  No mail?

A.   (Witness shaking head.)

          THE WITNESS:  I said no to that.  I'm

sorry.  I shook my head.

Q.  When you're speaking to Williams & Fudge employees, do you make it clear when you're speaking on behalf of Student Loan Solutions?

A.  What employees are you referring to?  My primary contact at Williams & Fudge is the president.

Q.  All right.  So I guess if you were to speak to Williams & Fudge employees in your role as Student Loan Solutions, would you say something to clarify that you're acting as a client rather than as their boss?

A.  I don't communicate with Williams & Fudge employees as SLS.

Q.  Because the person you would communicate with is yourself?

A.  Yes.

Q.  Okay.  I think I understand now.  How many Bank of America loans did Williams & Fudge collect on behalf of Student Loan Solutions?

A.  So initially?

Q.  Right.  Yes.

A.  It was over 12,000.

Q.  And of that number, did Williams & Fudge engage in collections on all of them?

A.  I could not tell you if they engaged on all of them.

Q.   But your understanding would be the vast majority?

A.   Yes.

Q.   Not trying to be difficult, but just to get the lay
of the land.

So, again, going back to the pre-2017, which
I think you said was 2010 to 2017 collections that
Williams & Fudge performed on behalf of Bank of
America when Bank of America still owned certain
private student loans, how many of those private
student loans did Williams & Fudge collect on?

A.   I have no idea.

Q.   Do you think it's more than 12,000?

A.   Yes.

Q.   Substantially more?

A.   I could not tell you.

Q.   And I understood you to say yesterday that the second
group was a subset of the first group, as in all of
the loans that Student Loan Solutions purchased and
Williams & Fudge subsequently collected were loans
that prior to the sale, Williams & Fudge had at some
point collected upon from Bank of America --

A.   Yes.

Q.   -- on behalf of Bank of America; is that right?

MR. GRASSI:   Form.

A.   Yes.



Q.  Did Williams & Fudge's collection on behalf of SLS on Bank of America loans start immediately after the sale?

A.  Could you ask that again?  Too many fires in there.

Q.  No problem.  On October 31, 2017, Bank of America sold a set of student loans to Student Loan Solutions that we're going to call the Bank of America loans, correct?

A.  Yes.

Q.  I'm going to refer to that as the sale.  Do you understand that?

A.  Yes.

Q.  Did Williams & Fudge start collecting on the Bank of America loans immediately following the sale?

A.  What do you term immediately?

Q.  How soon after the sale did Williams & Fudge start collecting on the loans?

A.  Within -- probably within a two-week period.

Q.  And that collection continues to today?

A.  Yes.

Q.  How many lawsuits did Williams & Fudge direct to be filed on the Bank of America loans?

A.  I believe I already answered that.  I have no idea.

Q.  And you stated yesterday you're not sure which states?



Cain & Crane Court Reporters
704.545.3510

A.   (Witness nodding head.)

          MR. LITTLE:  Yes?

          THE WITNESS:  Yes.  Sorry.

          MR. LITTLE:  It's okay.

          THE WITNESS:  Kick me next time I do that.

Q.   Did Williams & Fudge collect -- strike that.

          Go one step at a time.  I understood yesterday you to say that Student Loan Solutions has purchased two other portfolios of debt besides the Bank of America loans; is that correct?

A.   Yes.

Q.   Did Williams & Fudge also collect on Student Loan Solutions' behalf for those portfolios?

A.   Yes.

Q.   How much does Student Loan Solutions pay Williams & Fudge?

A.   It's a contingency contract.

Q.   And is it the same for all accounts or does it differ by account?

A.   Explain what you mean by "all accounts."

Q.   Sorry.  For each consumer.  Is it the same contingency fee for each Bank of America loan?

A.   Yes.

          (CONFIDENTIAL TESTIMONY FOLLOWS ON

                    PAGES 44 THROUGH 46.)

# CONFIDENTIAL PAGES

BY MS. RANUCCI:

Q. Do you recognize this document?

A. I do.

Q. What is that?

A. It's the original contract between Student Loan Solutions and Williams & Fudge, as well as a contract addendum dated October 2017.

Q. Is this still applicable today?

A. Yes.

Q. Have there been -- sorry.

A. I believe there is another addendum for a more recent MSA.

Q. Do you know from approximately when?

A. I do not.

Q. Within the last year?

A. Yes.

Q. Turning to the last page, it looks like this addendum was filed on October 25, 2017; is that right?

A. Signed?

Q. Signed, yes.

A. Yes.

Q. That was just about a week before the sale?

A. Yes.

Q. Was this contract addendum signed specifically because of the anticipation of the sale?



A.   No.  It was signed specifically based on negotiations on a new fee structure.

Q.   And was it just a coincidence that it was a week before the sale?

A.   I mean, it could have been part of the discussions.

* * *

(CONFIDENTIAL TESTIMONY FOLLOWS ON

PAGE 49.)

# CONFIDENTIAL PAGES

BY MS. RANUCCI:

Q.   Is there a reason you wouldn't want to make this document public?  You as Williams & Fudge.

A.   It's a confidential document.

Q.   Do you think there would be harm to Williams & Fudge by making it public?

MR. LITTLE:  Object to the form.

MR. GRASSI:  Objection.  Outside the scope.

Q.   You can answer.

A.   I don't have an answer.

Q.   Can you explain to me how consumer payments are received by Williams & Fudge and accounted for?

A.   So just to make sure I'm understanding --

Q.   On Bank of America accounts.

A.   I wasn't asking about that piece.  I want to make sure I'm understanding.  You're talking about from when a consumer -- you know, when an account is placed with Williams & Fudge, when a consumer wants to make a payment, you want to know how?

Q.   Let's start there.  Yeah.

A.   Okay.  They can make payment through cash if they want to walk in the office, or mail it, personal check, ACH, credit card, money order, Venmo, PayPal.

Q.   And when Williams & Fudge receives those payments,

are they recorded in some system?

A.   Debt Manager.

Q.   Debt Manager.  If all is going according to policy, is every payment recorded in Debt Manager --

A.   Yes.

Q.   -- made by a consumer?

A.   Yes.

Q.   What about payments that are for cases that are in litigation?

A.   They are -- assuming that they're made directly to the attorney, the attorney then remits to Williams & Fudge and the payment is posted on Debt Manager. Debt Manager is the system of record.

Q.   And would the Debt Manager payment reflect the full consumer payment or the consumer payment less the state court attorney contingency?

A.   The full.

Q.   And then the state court attorney would be separately paid their contingency fee?

A.   Yes.

Q.   On the Bank of America loans, is there any way that consumers would have directly paid SLS?

A.   SLS has received payments which are then remitted to Williams & Fudge, similar to other clients, and they're posted by Williams & Fudge in Debt Manager.

Q. So the best as you understand it, every payment made on a Bank of America loan since the sale should be recorded in Debt Manager?

A. Is recorded in Debt Manager, yes.

Q. Thanks. How does Williams & Fudge transfer funds to SLS?

A. ACH.

Q. And how often?

A. Weekly.

Q. And that's in connection with the weekly reports that Williams & Fudge uploads?

A. Yes.

Q. And so the amount transferred via ACH would match the amount on that report?

A. Correct.

Q. Who literally hits the button to authorize the ACH transfer?

A. Someone in Williams & Fudge's accounting department.

Q. Supervised by you ultimately?

A. Supervised by our accounting manager, by our CFO, by me.

Q. Is that the same process you use for other clients --

A. Yes.

Q. -- of Williams & Fudge? Sorry. That one was my bad.

Do you know how much Williams & Fudge

remitted to SLS last week?

A.  Not off the top of my head.

Q.  Do you know a ballpark?

A.  I do not.

Q.  I'm now going to ask some questions going back to the sale in 2017.

A.  That Williams & Fudge was not a part of?

Q.  Well, that was my question.  What was Williams & Fudge's role in the sale?

A.  Williams & Fudge was not a part of the sale.

Q.  I understood that SLS used certain information from Williams & Fudge to form its projections as to a rate of return from the sale; is that correct?

A.  Yes.

Q.  Was Williams & Fudge involved in creating those projections?

A.  What do you mean by were they "involved in creating"?

Q.  Did Williams & Fudge create any projections for SLS?

A.  They were Williams & Fudge reports.

Q.  And who retrieved them?

A.  Myself or Clay Goodyear.

Q.  Did anyone else other than yourself and Clay Goodyear have any involvement in reviewing these accounts prior to the sale?

A.  No.



Q.   I understand that prior to the sale, The Echols Firm was counsel for Student Loan Solutions, correct?

A.   Am I here for Williams & Fudge or Student Loan Solutions?

Q.   Williams & Fudge.  If you don't know -- if you don't know in your role as Williams & Fudge, that's fine. I apologize if that's not clear, so --

A.   I'm not sure in my role as Williams & Fudge.

Q.   And at the same time, before 2017, The Echols Firm was outside counsel to Williams & Fudge, correct?

A.   Yes.

Q.   Was anyone from Williams & Fudge other than you or Mr. Goodyear present in any conversations between The Echols Firm and Student Loan Solutions regarding the sale?

A.   No.

Q.   Could you describe -- we'll start with present day -- SLS's -- I believe you called it the compliance department?

A.   Williams & Fudge.

          MR. LITTLE:  Williams & Fudge?

          (Court reporter clarification.)

          MS. RANUCCI:  I apologize.  They both corrected me.  I said the wrong thing.

Q.   Could you describe Williams & Fudge's compliance

department today?

A.   Could you ask me a question?  I mean --

Q.   Yeah.  How many people work there?

A.   In the compliance department, there's five.

Q.   And what are their roles?

A.   There's three compliance associates, a director of compliance.  And the director of compliance reports to the vice president of operations, who is over compliance.

Q.   And who is the VP of operations?

A.   Adam Parham, P-a-r-h-a-m.

Q.   And who is the director of compliance?

A.   Derek Hollis.

Q.   And is that roughly the structure of the compliance department since you were in charge of it starting in approximately 2012?

MR. LITTLE:  Object to the form.

A.   Structure, yes.

Q.   With approximately five staff?

A.   Yes.

Q.   What does the staff of the compliance department do on a day-to-day basis?

A.   They audit work performed by collections staff.  They process disputes by consumers.  They handle FCRA issues, such as e-OSCAR disputes.  They respond to

any complaints by consumers.  That's a very broad picture, but --

Q.   And that includes Bank of America loans, but certainly is not limited to them, correct?

A.   Correct.

Q.   Is there a particular person in the compliance department assigned to a particular client?

A.   No.

Q.   So anyone in the compliance department could work on the Bank of America loans?

A.   Yes.

Q.   Do the audits they perform include audits related to the statute of limitations?

          MR. GRASSI:  Objection.  Outside the scope.

A.   I'm not sure even how to answer that question.

Q.   I believe that you stated that the compliance department performs audits of work performed by collections staff; is that correct?

A.   Correct.

Q.   Do they perform audits specifically related to statute of limitations?

          MR. LITTLE:  Form.

A.   I'm not understanding what you mean by audits specific to statute of limitations.  I'm not trying

to be a pain, but --

Q. No, that's fine.  We can talk about it.

A. That's not really a question.

Q. We can talk about it later.  Once a case is in litigation, would a consumer complaint still go to the compliance department?

A. If it was made to Williams & Fudge.

Q. What about a complaint made to a -- to the state court law firm?

MR. LITTLE:  I'm sorry.  A complaint made to whom?

MS. RANUCCI:  To the state court law firm.

MR. LITTLE:  Form.

A. Are you asking would it come to us at that point?

Q. Yes.

A. If the attorney forwards it.

Q. Maybe stated a different way, is there a different department at Williams & Fudge that handles complaints once cases are in litigation, or if someone at Williams & Fudge handled that, would it still be within the compliance department?

A. Within the compliance department.

Q. Thanks.

MS. RANUCCI:  I think this is a good time for a short break.

THE WITNESS:  That works.

(There was a recess from 10:27 a.m. to 10:35 a.m.)

BY MS. RANUCCI:

Q.  I'm now going to ask a number of questions about Williams & Fudge's recordkeeping systems.

First, you explained yesterday that Williams & Fudge has template collection letters; is that right?

A.  Yes.

Q.  Like E8?  J2?

A.  Yes.

Q.  How are those stored?

A.  They're stored electronically.

Q.  On -- where?

A.  One of Williams & Fudge's servers.

Q.  And literally what would someone do to access them? Would they start up their computer and click on Windows Explorer?  Is there a Web-based --

A.  They would go to whatever drive they're stored on.

Q.  And that's like a shared drive that Williams & Fudge employees have access to?

A.  Yeah.  I mean, there's permission levels.

Q.  And are they kept in Word format?

A.  I would assume, but I couldn't tell you.

Q. And when a Williams & Fudge employee needs to use one of those collection letters for a particular consumer account, how do they -- how does the consumer's information get in there?

A. So these are just, you know, form template letters with print tokens. I'm sure you understand how print tokens work. So Williams & Fudge actually doesn't create the letter internally. We have a letter servicer. So these are letters maintained by the letter servicer that when -- you know, we talked about yesterday in that one example the SN and the letter code 8. That's just saying they want to request a notice. That sends the template to be created and sent to the letter servicer for mailing.

Q. And what does Williams & Fudge send to the letter servicer? Like an Excel file with the data?

A. No. It's actually -- so our old letter servicer we just sent the -- a file, but now we actually create the PDF's and send them to them for mailing.

Q. And how do you create the PDF? Like what does someone click on the computer?

A. I'm not involved at that level.

Q. Is it in Debt Manager, if you know?

A. I mean, everything -- Debt Manager is the system of record. Everything is created through Debt Manager,

but I'm not sure what the process from, you know, A to Z --

Q. I understand, but it starts out with the Williams & Fudge employee logging in to Debt Manager?

A. Correct.  They would request a notice, and then from there, you know, the notice would be generated -- created, generated, sent to the letter servicer for mailing.

Q. And so when you described earlier that those templates are kept on a shared drive, that's really just where a Williams & Fudge employee would go see what's in the template?

A. Employees with access, yes.

Q. But not where they would use the template to do something with it?

A. That is correct.

Q. So you, after this deposition ends, could go look at what those templates say on the --

A. Yes.

Q. -- system?  Does Williams & Fudge keep physical files of Bank of America loan accounts?

A. What do you mean by "physical files"?

Q. Let's start with Roxanne Dawson.  Does Williams & Fudge have a physical file for Roxanne Dawson's account?

A.  No.  Everything is electronic.

Q.  And that's typically your practice for Bank of
America loans?

A.  Yes.

Q.  When did Williams & Fudge start using Debt Manager?
Was that 2015?

A.  2015.

Q.  What actions does Williams & Fudge use Debt Manager
for?

A.  Again, it's their collection software system of
record.  All actions related to collections.

Q.  So on any given Bank of America loan account, every
collections action taken by Williams & Fudge since
2017 should be recorded in Debt Manager?

A.  Is recorded in Debt Manager.

Q.  Thanks.  And you've given everything on this database
relating to Ms. Dawson's loan to your attorney?

A.  Yes.

Q.  We're going to -- and the account notes that we
looked at yesterday are generated through Debt
Manager?

A.  Yes.

Q.  We're going to look at those in more detail later, so
I'll save most of my questions about Debt Manager
because I think it will be easier to do looking at

specific documents rather than in the abstract.

Just a couple high-level questions. If you can't answer in the abstract, we can talk about them with the papers.

I believe you said yesterday that there are certain tags on an account that indicates a lawsuit was filed; is that correct?

A.   There's tags that flow through the process.

Q.   And do you know what those are?

A.   They're L tags.

Q.   Is that the L-0, L-1, L-2?

A.   Correct.

Q.   And so if you were trying to determine which Bank of America loans had a lawsuit filed against the consumer, you would look at which, if any, of those L tags were on each consumer account?

A.   Yeah. I would have to look at each individual one.

Q.   What field on Debt Manager would you look at to find out if this is a Bank of America loan?

A.   I would look at the creditor, which is Student Loan Solutions, and then have to look further down into the general description to see which program for Student Loan Solutions, because as I mentioned before, you know, Williams & Fudge performs collection activities for other purchases of Student

Loan Solutions.

Q. Okay.  And you explained earlier that every amount collected from the consumer is recorded in Debt Manager.

A. Yes.

Q. Is that correct?  Where?  Is there a separate payment section of Debt Manager?

A. There's a financial summary.

Q. And so that is where you would look to see a consumer's payment history?

A. Yes.

Q. But that does not include payments made before Debt Manager was in use?

A. Yes.  It would reflect prior payments.

Q. And I understood that before 2015, Williams & Fudge used a different debt collection software; is that right?

A. Yes.

Q. Do you remember what it was called?

A. CRS.

Q. And am I correct to understand that in 2015 when Williams & Fudge switched from CRS to Debt Manager, all information that was more than a year old was destroyed?

A. All notes were --



MR. LITTLE:  Form.  Go ahead.

A.  All notes were not brought over, anything other than a year old, but all financial summaries or transactions were included.

Q.  Is there any copies of the old CRS system notes?

A.  Not that I'm aware of.

Q.  Do you have any documents that show how Debt Manager works?

A.  What type of documents?  Are you talking about training documents?

Q.  Start there, yeah.  Do you have training documents?

A.  I believe there's training documents that are utilized for new hires.

Q.  That Williams & Fudge creates?

A.  Yes.

Q.  And is that specifically for people in the collections department?

A.  Yes.

Q.  To show them how to use Debt Manager in their job --

A.  Yes.

Q.  -- doing collections?  Is there any documents that Williams & Fudge received from the company that runs Debt Manager showing how to use the program?

A.  I cannot tell you.

Q.  Like a user manual?



A.   Again, we're talking about 2015.

Q.   Who maintains Debt Manager for Williams & Fudge?  Is that your IT department?

A.   Our IT department.

Q.   Is there one person who is in charge of Debt Manager or is it the entire department?

A.   The entire department.

Q.   Does Williams & Fudge keep any frequently asked questions documents or similar about Debt Manager?

A.   No.

Q.   Are there ongoing updates for collections staff as to changes to Debt Manager?

A.   If there is an upgrade, but those are very rare.

Q.   Is there ever a time where Williams & Fudge wants to direct or reminds its collections staff how to do a certain task in Debt Manager?

A.   I'm not understanding that question.

Q.   Just wondering if periodic reminders go out to staff as to certain aspects of Debt Manager.

A.   I don't believe so.  It would be done on an individual basis if someone needs training.

Q.   So more or less, if a staff person starts in the collections department, they receive an initial training from Williams & Fudge with initial training documents and then rarely, if ever, would receive

additional written training on Debt Manager?

A.   It's not needed.

Q.   Are the collections staff logged in to Debt Manager the whole time they're at work?

A.   When they're working, yes.

Q.   And do all the 200 people in the collections department use Debt Manager?

A.   Yes.

Q.   Do people outside the collections department use Debt Manager?

A.   Yes.

Q.   I'm actually going to have you take a look at the account notes for Ms. Dawson --

A.   Okay.

Q.   -- which we marked yesterday as Exhibit 8 -- oh, no. Sorry.

          MR. LITTLE:   13.

          MS. RANUCCI:   Thank you.

Q.   13.   There you go.  I'm going to ask you a number of questions about this.  Not substantively yet, but just about how it was made and who made it.

A.   Okay.

Q.   So first, to start, this is -- these are all the account notes as to Ms. Dawson's account?

A.   Yes.



Q.  And if I'm understanding this correctly, the account notes go from pages 6 to 49 of this document; is that right?

A.  Correct.

Q.  And each of these pages at the top says "AR Events." What does AR events mean?  Do you know?

A.  Action result.

Q.  Okay.  And so is action result events just another way to say account notes?

A.  Well, if you look down one row, you'll see "Action Code," "Result Code," action, results.  So, again, this is all notes related to the accounts.

Q.  Okay.

A.  Specifically for Ms. Dawson on this one.

Q.  Yeah.  But other accounts are similar?

A.  Exactly the same.

Q.  Okay.  In these general questions about how the account notes work, my understanding is that Ms. Dawson's account is representative of how all accounts work in Debt Manager.

         If that's not correct for a specific question, can you go ahead and just explain to me that this is different?  Is that okay?

A.  There should be no reason that it's different, but yes.

Q.  I just don't want to have to ask you every time, so I'm glad we're on the same page.

All right.  Page 1 of this document at the top says "Consumer Details."  Is that a different part of Debt Manager, let's say, than the account notes part or is it all the same?

A.  I mean, it's all within the same -- there's just different -- broken up by different -- I don't know what you would call it -- boxes, you know, when you're looking at the screen.

Q.  Uh-huh.  So one is "Consumer Details," which is page 1 here.  And then I see page 2 says "Current Balance," "Balance at Close Date."  Page 3 and 4 have -- and 5 have payment details.

A.  Correct.

Q.  So does this document contain all information about Ms. Dawson's account that's in the Debt Manager system?

A.  Yes.

Q.  And is there a way that Williams & Fudge can essentially print all that information at once?

A.  This right here.

Q.  If you take a look at page 6, which is SLS 222 --

A.  Okay.

Q.  -- the last timestamp here is October 10, 2023.  Do

you know whether that's the latest timestamp because someone chose to print only a subset of the time for which her account was available or just because there were no events after October 10, 2023?

A. It's because this was the date that this report was created.

Q. Okay.  I understand.  Is there a way to print only a subset for a certain time period, or if you print the whole account, you have to print the whole --

A. You print --

Q. -- thing?

A. -- the whole thing.

Q. Can anyone at Williams & Fudge print a whole account like this?

A. Anyone with Debt Manager access who knows how to.

Q. Does Debt Manager allow a user to edit an account note after it's been made?

A. No.

Q. So what would happen if a debt collector entered an account note that was incorrect, maybe just had a typo, let's say?

A. They -- no, a typo, unless it's substantial, it's going to be ignored.  But, you know, if it was something that needed to be corrected, you know -- I don't know what a good example would be -- they just

put another note in, you know, ignore previous note.

Q. So it sounds to me like the Debt Manager printout of the full account really does show the full life of the loan?  That --

A. Again, yes.  Remember how you say you're not trying to trick me?  I'm not trying to trick you.

Q. Yeah.  Just -- can you take a look at on page 6 there's an entry right around in the middle of the page.  This is SLS 222.

A. It says what?

Q. Just going to let everybody get there.  Yeah.  It says --

A. I'm not seeing what you're --

Q. So on page 6, the middle of the page, it says, "Consumer lock overridden"?

A. Yes.  I see that.

Q. By an H. Douglas, who I believe -- what does consumer lock overridden mean?

A. That would mean someone else was in the account when she tried to access it.

Q. So just to make sure I understand, this user, H. Douglas, is a Williams & Fudge staff?

A. Yes.

Q. Do you know who it is?

A. That's Heather Douglas.



Q.   So what this means is just Heather Douglas tried to access the account, but couldn't access it because a different Williams & Fudge employee was currently accessing the account?

A.   Yes.

Q.   Okay.  And that would make sense if I'm just looking at this from a common sense point of view because I see some entries at the exact same time --

A.   Correct.

Q.   -- from someone D. Hollis.

A.   Correct.

Q.   Could you explain how image files work in Debt Manager?

A.   Could you expand upon that?

Q.   Sure.  So there's a number of entries here -- we can go through them later if we need to -- that show an image file was retrieved.

A.   Uh-huh.

Q.   What would a Williams & Fudge staff do that would lead to this entry being created?

A.   They would go to the area where images are saved in Debt Manager, which, again, would be specific to in this case Ms. Dawson's account, and they would click on the image to open it.

Q.   So certain documents about consumer accounts, let's

say PDF documents, is that fair to say are saved within Debt Manager?

A.   Could be.  You know, it could be e-mail correspondence -- and I'm not speaking specifically of Dawson.  I'm speaking --

Q.   General.

A.   -- in general.  It could be e-mail correspondence with the consumer.  It could be letters if they're still within record retention.  It could be attorney correspondence.  Any document that comes in that's related to an account is imaged and tied to that account directly.

Q.   Within --

A.   Debt Manager.

Q.   -- Debt Manager?

A.   Everything is within Debt Manager.

Q.   So there's no share drive where there's a file for a consumer like Roxanne Dawson where those documents --

A.   No.

Q.   -- might exist?

A.   Debt Manager is our system of record.

Q.   Is there a way to print all the documents on Debt Manager for a certain account?

A.   One by one, yes.

Q.   Is there a way to print a list of all the documents

in Debt Manager for a certain account?

A. Without taking a screenshot, I'm not aware.  I'm not saying there's not --

Q. Yeah.  Yeah.

A. -- but --

Q. When documents are saved in Debt Manager, are they titled?  For example, an e-mail to a consumer, would it say e-mail to a consumer?

A. Some of the older documents probably didn't have titles, per se, but everything has a specific sequence, which I think it's probably best to look at one to show you what I'm talking about.

Q. Yeah.  I think if you look at the top of page --

A. Page 6.

Q. -- 6.

A. Yeah.  So like that reference number cris08/04959465.pdf, that would be specific to one document.  And that's why if you look underneath, there's a different sequence of numbers and letters.

Q. And if Williams & Fudge staff was looking at an account like Ms. Dawson's and saw documents in that account, I think I understand you to say that sometimes that document would have a title that would helpfully explain what it is and sometimes it would just be a random series of numbers so that they

wouldn't know what it was unless they opened it?

A. Correct.

Q. I think you earlier explained there were different -- staff had different permissions in Debt Manager?

A. Yes.

Q. Can you explain some of the features of Debt Manager that you might have access to that not all staff at Williams & Fudge would have access to?

A. I mean, I would have access to more financial reporting, you know, that's related to the company as a whole, not to individual accounts. You know, team leaders, which are collection supervisors, would have access to adjust a balance based on a settlement, where a collector would not be able to do that. That's the type access that's different.

Q. In terms of viewing the account notes, can essentially every employee with a Debt Manager log-in view all the account notes and all the image files?

A. Yes.

Q. I believe we spoke yesterday that Williams & Fudge has a secure Microsoft SQL server database; is that right?

A. Yeah. We have 130 servers.

Q. And so are there consumer account documents that are stored on that database?



A. So, again, everything is stored in the DM, but there's specific servers based on what it is. Like images would be served -- stored on the CRIS -- CR image system, so -- but they're not accessible without going through DM. Now, IT is probably accessible, but they can do everything. They're gods.

Q. So in some ways, you would think of it as like a backup, if there's a server that has a backup? Or I guess you're saying it's a server where the documents are held?

A. That's what I'm saying.

Q. I believe we spoke yesterday about certain documents relating to the sale being stored on that database, such as standard terms and conditions that would be applicable to more than one Bank of America loan?

A. I'm not following you with --

Q. Yeah. Maybe I'm just misremembering. As part of the sale, SLS obtained certain loan note terms and conditions that were applicable to more than one Bank of America loan.

A. Oh, you're talking --

Q. Is that right?

A. -- about the account-specific terms and conditions?

Q. Correct.

A.  Yes.

Q.  But they weren't specific to just --

A.  Yes.

Q.  -- a single account?

A.  Yes.

Q.  They would be --

THE COURT REPORTER:  We're cutting each other off quite a bit.

MS. RANUCCI:  Sorry.

THE WITNESS:  Sorry.

THE COURT REPORTER:  But they weren't specific?

Q.  To a single account, but they could potentially be applicable to multiple accounts?

A.  Yes.

Q.  Where are those stored at Williams & Fudge today?

A.  They're on one of the drives.

Q.  So those drives might hold certain information that's relevant to consumer accounts, but not specific to a single consumer.  Is that fair to say?

MR. LITTLE:  Form.

A.  I'm not understanding that.

Q.  Yeah.  I -- if you had to access those terms and conditions, what would you open to try and find them?

A.  I have no idea where they're stored.

Q.   Where would you look first?

A.   I would ask someone.

Q.   Who would you ask?

A.   I would ask someone in our legal admin department because they're the ones that access those the most.

Q.   And what does the legal admin department do?

A.   They are the liaison between the attorneys and Williams & Fudge.

Q.   Which attorneys?

A.   Not these attorneys.  Collection attorneys.

Q.   Would that be the same for the loan tape?

A.   Could you ask the question again?

Q.   If you were to look for the full loan tape for the sale, where would you go to look for it?

A.   I would go to my U drive, which is specifically a drive that's -- only I can get into.

Q.   So that document, you know where it's stored and it's in your personal drive?

A.   I do.  And I probably have copies of those general terms and conditions in that drive, too.  I just don't remember.

Q.   How does Williams & Fudge keep phone records?

MR. LITTLE:  Form.

A.   Not understanding.

Q.   Where does Williams & Fudge maintain records of phone

calls made to consumers?

A. Debt Manager.

Q. Is there any other program that Williams & Fudge uses to record calls?

A. What do you mean "any other"?  Debt Manager doesn't record calls.

Q. Is there another program Williams & Fudge uses to record calls?

A. Yes.

Q. What's that called?

A. I'm not sure the name of it.  I mean, it's our recording -- voice recording.  I mean, we use call center solutions for those type.

Q. So just talk me through here.  I'm just trying to understand how records relating to phone calls are stored.  So if in --

A. They're stored on a drive.  A secure drive.

Q. So let's say today a Williams & Fudge employee goes to make a collections call.  Am I right to understand the fact of that call is recorded in an account note?

A. Yes.

Q. A summary of that call is often recorded in an account note?

A. Yes.

Q. And then an audio recording of the call itself is

separately made and stored?

A.   Correct.

Q.   Anywhere else?

A.   No.

Q.   Okay.  Prior to using Debt Manager, did Williams & Fudge -- going to test my memory -- use the same CRS program to keep phone records?

A.   Again, CRS is not a voice recording software.  CRS was the debt collection software.

Q.   But in that debt collection software, that is the place where Williams & Fudge would keep records that calls were made and perhaps the content of those calls?

A.   Yes.

Q.   And were those records also destroyed in approximately 2015 with the conversion, to the extent they were --

A.   They were not brought over to the DM, but they were not destroyed in 2015.

Q.   Do you know if they exist?

A.   I do not.

Q.   Some of the policies provided to us from Williams & Fudge reference SharePoint.

A.   Uh-huh.

Q.   Does Williams & Fudge use SharePoint?

A. For our policies.

Q. Are there -- so explain what that means.

A. Are you familiar with SharePoint?  Do you want me to explain SharePoint or explain --

Q. So does that mean that Williams & Fudge places certain policies on SharePoint for access by its staff?

A. Yes.  All policies.

Q. All policies.  What about templates?  Are there templates on SharePoint?

A. Templates for what?

Q. Collections letters or e-mails.

A. No.

Q. Is there anything else that Williams & Fudge uses SharePoint for besides policies?

A. Training documents.

Q. So, again, that are generally available to Williams & Fudge staff?

A. Yes.

Q. Is there any consumer-specific information on SharePoint?

A. No.

Q. So I'm going to try my best to check my understanding of this conversation we've had by where some of these documents may be stored.  See if -- see how well we

did.

When a check is written to Williams & Fudge, that check would -- a record of that payment having been made would be stored in Debt Manager; is that correct?

A.  Yes.

Q.  Is the copy of the check kept anywhere?

A.  I'm sure they're imaged, but I'm not -- you know, I don't know which server they're saved on.

Q.  Collection letters sent by Williams & Fudge would be kept as -- in Debt Manager and accessed as image -- able to be accessed as image files; is that right?

A.  After 2018.

Q.  Uh-huh.  And before 2018?

A.  They were not kept on DM.

Q.  Separately, templates of those letters might be kept on a server?

A.  Correct.

Q.  E-mails to consumers would be kept within Debt Manager?

A.  Yes.

Q.  Anywhere else?

A.  No.

Q.  Recordings of consumer phone calls we said were handled separately through a -- you said a call

center?

A.  I mean, it's part of our call center solution, but the actual WAV files or whatever format they're saved in are saved on a server.

Q.  Promissory notes or other loan contracts, again kept in Debt Manager?

A.  Yes.

Q.  Any other documentation from a creditor relating to a consumer account would be within Debt Manager?

A.  Yes.

Q.  What about when a case goes to litigation, when Williams & Fudge --

A.  Sends.

Q.  -- sends a case to litigation?  I believe you said yesterday sometimes Williams & Fudge obtains the filings in those cases and sometimes it doesn't; is that right?

A.  So all documentation sent by Williams & Fudge to the collection attorney is stored within Debt Manager. Whether we get copies of the complaints back, I mean, you know, if we get it, it's saved in Debt Manager, but not always.  And when I say complaints, the complaints that are filed by the collection attorney against the consumer.

Q.  How about consumer complaints?  Where are those

recorded?

A. Where are they recorded?

Q. Like --

A. They would be --

Q. In Debt Manager?

A. There would be an indication in Debt Manager, but the complaints are saved on a separate drive.

Q. What about a consumer's lawsuit against Williams & Fudge?  Like say that Ms. Dawson had sued Williams & Fudge.  Would that also go in Debt Manager or is it -- at that point it's a different --

A. It's different.

Q. Yesterday we spoke about an accounting program recommended by BNA CPA called Tru Value; is that correct?

A. Yes.

Q. Is that used by Williams & Fudge?

A. Yes.

Q. For how long has Williams & Fudge used it?

A. Well, it was paid for by SLS for Williams & Fudge's use for acceleration on the Bank of America portfolio.

Q. Does Williams -- sorry.

A. I was going to say it would have been around the 2017 time period.

Q. Does Williams & Fudge use that program on other creditors' accounts?

A. No.

Q. Within SLS's account, does Williams & Fudge use it only on student loans originally from Bank of America or Fleet Bank?

A. Yes.

Q. A number of your policies refer to in capital letters "Compliance Management System."  Are you familiar with that term?

A. Yes.

Q. What does it mean?

A. That's just a CMS.  It's a compliance management system.  You know, every agency has to have a compliance management system -- well, every good agency should have a compliance management system. And that's, you know, again, policies, procedures, documented complaints.  I mean, it's -- a CMS is all-encompassing of a lot of different things.

Q. But just so I understand, a CMS is a method by which Williams & Fudge manages its compliance with applicable laws and regulations?

A. Correct.

Q. Not a computer system?

A. Correct.



Cain & Crane Court Reporters
704.545.3510

Q.  Am I correct to understand that Williams & Fudge first developed -- or first issued document retention policies in 2023?

A.  Formalized policies, yes.

Q.  Was there anything in writing before 2023?

A.  No.

Q.  What's your understanding of what the document retention policy is supposed to do?

A.  Can you expand on that question?

Q.  Yeah.  What do you think the document retention policy is for?  What's its purpose?

A.  It states the period of time that documents are retained for.

Q.  Without disclosing the contents of any conversation, did you consult with any attorneys before creating this policy?

A.  Yes.

Q.  Which ones?

A.  The firm?

Q.  Yeah.

A.  Frost Echols.

Q.  Did Williams & Fudge have any record retention policies before 2023?

A.  No.

Q.  Under what circumstances, prior to 2023, did Williams

& Fudge purge documents?

A.  We didn't.

Q.  That means so prior to 2023, Williams & Fudge kept all documents forever?

A.  At that time, yes.

Q.  With the exception of, at least as we've noted, certain vendors or subcontractors may have not retained documents, like the letter vendors; is that right?

A.  Right.  But that wouldn't be part of our policy. That would be their own policy.

Q.  And then in terms of the CRS system notes, those weren't retained from before 2014?

A.  I'm not understanding what you're --

Q.  My understanding was when -- prior to Debt Manager, you used CRS?

A.  Right.

Q.  Account notes existed in that system that would have been applicable before 2014?

A.  Correct.

Q.  And those no longer exist.

A.  Correct.

Q.  Is that right?  So those were -- don't exist anymore. You know, purged or destroyed might have a certain connotation.  I don't mean that connotation, but they

no longer exist?

A.   Correct.

          MR. LITTLE:   Form.

Q.   Other than those two sets of records, can you think of any other sets of records from before 2023 that Williams & Fudge no longer has that it had at one point?

A.   I mean, not specifically.

          (A document was marked for identification as Deposition Exhibit No. 19.)

Q.   I'm going to hand you an exhibit marked by the court reporter as No. 19.  I'll give you a minute to look, and once you've done so, can you let me know if you recognize this document.

A.   (Witness reviewing exhibit.)  Yes, I do.

                              * * *

          (CONFIDENTIAL TESTIMONY FOLLOWS ON
                 PAGES 88 THROUGH 97.)

Cain & Crane Court Reporters
704.545.3510

# CONFIDENTIAL PAGES

THE WITNESS: We're off of this? Oh, am I still supposed to have this one?

MS. RANUCCI: You can put it back.

THE WITNESS: It's not in order, but --

MS. RANUCCI: Does anyone need a minute or are we okay to keep going?

MS. TARANTOLO: Let's go off the record for a second.

(There was a discussion from 11:29 a.m. to 11:30 a.m.)

BY MS. RANUCCI:

Q. We spent a long time yesterday talking about specific documents Student Loan Solutions received and Williams & Fudge holds on the Bank of America loans. I'm going to try and shortcut that very quickly so we can get through it.

My understanding is that there's a set of documents that Bank of America provided to Student Loan Solutions and Student Loan Solutions holds at Williams & Fudge relating to each Bank of America loan; is that correct?

A. Correct.

Q. Those documents are attached to an affidavit that you executed in December 2021, correct?

A. For Ms. Dawson's account, correct.

Q.   For Ms. Dawson's account.  And substantially similar
to the other Bank of America accounts, understanding
that some accounts may not have every single document
identical?

A.   Correct.

Q.   Those are also documents that we discussed you listed
in your interrogatory responses?

A.   Correct.

          MR. LITTLE:   In SLS's interrogatory
responses, just for the record.

          MS. RANUCCI:   Thanks, Brendan.  Yes, in
SLS's interrogatory responses, verified by
Christopher Ruh.

A.   Correct.

Q.   If you remember, what was the name of the letter
vendor that you used prior to 2018?

A.   RevSpring, R-e-v, Spring.

Q.   And is that the same one you used after 2018?

A.   No.

Q.   What's the current letter vendor?

A.   PCI Group.

Q.   When you started your arrangements with PCI Group,
that was about in 2018?

A.   I could not tell you.

Q.   Did you -- strike that.



Did Williams & Fudge direct RevSpring to keep records of letters only for a year?

A. That was their own policy.

Q. And Williams & Fudge didn't direct them to follow it or not follow it?

A. Correct.

Q. Did you have a written contract with RevSpring?

A. I'm sure we did.

Q. Why did you switch?

A. I couldn't tell you right now. I mean, lots of different reasons you switch vendors.

Q. Yesterday we discussed a letter sent by Williams & Fudge to Ms. Dawson in November 2017 and we looked at a different consumer's letter with the actual copy of the letter in November 2017.

A. The J2 letter.

Q. J2 letter?

A. Correct.

Q. Am I right to call that a validation notice? Is that a term you would use?

A. Yeah. I mean, it was the notification of the sale incorporated into a validation notice.

Q. And is the validation notice something that Williams & Fudge sends all consumers?

A. Yes. It's required by the FDCPA within five days of

contact or it can be sent upon placement.

Q. So a letter substantially similar to J2 would be sent each time SLS -- or apologies -- Williams & Fudge is hired for a new account?

MR. LITTLE:  Form.

A. It's sent at time of placement of an account or within five days of initial discussion of debt.

Q. And you mentioned earlier that letter is specifically oriented to meet the requirements of the Fair Debt Collection Practices Act?

A. Correct.

Q. We've spoken a number of times about template letters sent to consumers by the mail.

A. Template letters wouldn't be sent.

Q. Letters created from templates sent to consumers by mail.

A. Yes.

Q. Does Williams & Fudge send any letters by mail to consumers that are not created from templates?

A. No.

Q. What about e-mails?

A. Yes.

Q. So does Williams & Fudge have any templates for e-mails?

A. No.

Q.  So each e-mail sent to a consumer is potentially individualized to that consumer?

A.  Correct.

Q.  Are there requirements that collectors are supposed to follow when sending those e-mails?

A.  Yes.

Q.  And specific policies about the contents of those e-mails?

A.  Yes.

Q.  And all of that is true going back to 2012?

A.  Correct.

Q.  What about phone calls?  Are there specific scripts for calls?

A.  There are some scripts and then there's parts that are unscripted.

Q.  Same thing, are there policies that the collection staff is directed to follow when on the phone with consumers?

A.  Yes.

Q.  And are those policies for e-mails and phone calls developed in conjunction with the compliance department?

A.  Compliance department and outside counsel.

Q.  And intended to comply with applicable state and federal law?



A.  Correct.

Q.  I'm going to ask a series of questions that are similar to what I asked yesterday just to confirm that Williams & Fudge does not maintain certain documents, just as SLS, I believe, didn't maintain them.

So am I correct that Williams & Fudge has never had copies of any bill sent to Ms. Dawson?

A.  Correct.

MR. LITTLE:  Form.

A.  Correct.

Q.  And the same for other Bank of America loans?

A.  Correct.

Q.  That Williams & Fudge doesn't currently possess any copies of letters sent to Ms. Dawson prior to 2018?

A.  Correct.

Q.  And in 2021 also did not possess copies of those letters?

A.  Correct.

Q.  Williams & Fudge doesn't have any records of whether or not Bank of America hired a third party at any time to collect on Ms. Dawson's account other than Williams & Fudge?

A.  Could you do that -- that didn't make sense to me.

Q.  Yeah.  Do you know one way or another whether Bank of

America hired any third parties to collect on Ms. Dawson's account in addition to Williams & Fudge?

A.   I do not.

Q.   You don't have any records showing that?

A.   Correct.

Q.   Does Williams & Fudge have a charge-off notice for Ms. Dawson's loan?

MR. LITTLE:   Form.

A.   No.   It would have been provided to you.

Q.   And Williams & Fudge doesn't have charge-off notices for any of the Bank of America loans?

MR. LITTLE:   Form.

A.   Not that I'm aware of.

Q.   Prior to 2017, Williams & Fudge was retained by Bank of America to collect the charge-off balance on Ms. Dawson's loan?

A.   Yes.   Williams & Fudge had a contract with Bank of America to collect on its non-performing student loan portfolio accounts that had been charged off, but never had authority to accelerate loans.

Q.   And to collect on the charged-off balance?

A.   Correct.

Q.   As to Ms. Dawson's loan?

A.   Correct.

Q.   And the charged off --



A.   The contract was not specific to Ms. Dawson's loan, but yes.

Q.   And to collect the charged-off balance with respect to the other Bank of America loans --

A.   Yes.

Q.   -- which --

A.   I know what you mean by "other."

Q.   Yesterday we went through the steps taken by Williams & Fudge and SLS before a lawsuit is filed.  I'm going to try and summarize what I understand those to be.

          Number one, Williams & Fudge attempts to collect on an account; number two --

A.   And we're talking about the SLS portfolio?

Q.   Bank of America loans.  Exactly.  Number two, Williams & Fudge accelerates the account by sending an acceleration notice; number three, Williams & Fudge recommends litigation to SLS; number four, SLS approves litigation; and number five, Williams & Fudge sends the account to an attorney to litigate?

A.   That is all correct.

Q.   Great.  Starting with the step one, Williams & Fudge trying to collect on the loan, what does that mean?

A.   They make collection efforts through phone calls, letters, e-mails, trying to resolve the outstanding balance through the consumer through various payment

options that are available, including payment in full, settlement in full, payment arrangements.

Q. I'm going to hand to you in a moment a document marked by the court reporter as Exhibit 20.

(A document was marked for identification as Deposition Exhibit No. 20.)

Q. But before you take a look at it, let me just explain what it is so you don't get overwhelmed.  It's a lot of pages.  The Bates are SLS 153 to 211.  What I understand this to be is a set of policies that were applicable to Williams & Fudge at the time of the sale on October 31, 2017, and were incorporated into the loan agreement as a schedule.  That's why there's so many of them here.  But don't worry.  We'll identify each one at a time when I start to ask about them.  Go ahead.

A. I'd like to clarify.  It's not just Williams & Fudge. It's Sunrise, as well.  The first couple of pages, if you look at --

Q. Yeah.  So why don't you take a look and see, to the best of your understanding, if that's --

A. I'm going to trust you it is.  What you're saying is correct.

Q. Thanks.  Can we turn to page SLS 194, which is the settlement and payment guidelines.



Cain & Crane Court Reporters
704.545.3510

A.  Okay.

Q.  It's a three-page document, if you want to take a look at it.

A.  (Witness reviewing exhibit.)  Okay.

Q.  Do you recognize this document?

A.  I do.

Q.  Is it the settlement -- the Williams & Fudge settlement and payment guidelines policy that was applicable at least as of September 15, 2017?

A.  Yes.

Q.  Does Williams & Fudge today have a settlement and payment guidelines policy?

A.  I'm not sure it's labeled exactly like that, but it would have a general policy.

Q.  Looking at the middle of the first page under the "Payments" subheading.

A.  Yes.

Q.  I'm going to read that first sentence.  "Williams & Fudge, Inc., representatives shall initially request that the consumer pay the full balance due."

    Did I read that correctly?

A.  You did.

Q.  What does that mean?

A.  When they get consumers on the phone, they're initially going to request the full balance due.

Q. And this applies only to phone calls?

A. I mean, it could be through -- I mean, it's phone calls because you can't tier what you're going to do on a letter.

Q. Oh, I understand what you're saying.  So you're saying the import of this policy is essentially that the first request should be for the full balance?

A. That's not what I'm saying.

Q. Oh, okay.  Go ahead.

A. The policy is to request payment in full.  If that's not available, then there's different options that you can go with.  And, again, it's a request, not a demand.

Q. And as to Ms. Dawson's account, I believe we looked at yesterday, but I can show you the documents if it would be helpful, that the balance of her account at the time of the sale was the charge-off balance?

A. Correct.

Q. So this policy would require Williams & Fudge to request the full charge-off balance from Ms. Dawson --

A. Correct.

Q. -- in a --

A. Correct.

Q. -- communication?

A.   Correct.

Q.   Flipping back a couple of pages, SLS 190.  Again, this is a three-page document.  When you've had a chance to look, let me know if you recognize it.

A.   (Witness reviewing exhibit.)  I'm familiar with it.

Q.   Is this Williams & Fudge's required written and verbal disclosures policy that was applicable at least as of January 10, 2017?

A.   Yes.

Q.   The bottom of page 1 and the top of page 2 direct what disclosures must be made orally on calls directly to a consumer, authorized third party, or a consumer's attorney; is that right?

A.   Correct.

Q.   And at the top of the second page, one of those disclosures is the creditor's full name and the current total balance of the account; is that right?

A.   Yes.

Q.   So does that mean on each call made to a consumer, the current total balance of the account has to be disclosed?

A.   Yes.

Q.   And as for Ms. Dawson's account, again, at the time of the sale, that total amount would have been the charge-off amount?



A.   Yes.

Q.   Same to the other Bank of America loans?

A.   Yes.

Q.   Is that still Williams & Fudge's policy today?

A.   I'd have to review the current policy.

Q.   Do you know whether phone calls to consumers have to
     disclose the current total balance of the account?

          MR. LITTLE:   Form.

A.   I'd rather not say without looking at the policy.

Q.   Sure.

A.   You got to remember since 2017, Reg F came out.  That
     changed a lot of things.

Q.   When Williams & Fudge sends a case to litigation,
     does it provide settlement guidelines to its counsel?

A.   In most cases, there's either been settlement
     guidelines provided as a whole and -- for the
     attorney, but in most cases, it's on a one-off basis.

Q.   As to Bank of America loans, is it on the whole or
     one-off basis?

A.   One-off basis.

Q.   So can you walk me through who would speak to whom
     about authorizing settlement in litigation?

A.   We're talking about accounts that are placed with an
     attorney and the complaint has been filed?

Q.   Uh-huh.



A. You know, 99 percent of the time, that's going to be based off the consumer then contacting the attorney's office to discuss options available.  If settlement is brought up, then, you know, the attorney is going to find out what the consumer is offering, and most of the time the attorney is going to e-mail the Williams & Fudge legal admin team, who would then send it to me for either approval, counter, or denial.

Q. And when you mean send it to you, is that you in your role as the president of SLS and the client or you in your role as the president of Williams & Fudge?

A. Me in my role with SLS.

Q. And if it were not SLS, the same offer would be sent to a different client?

A. Correct.

MS. RANUCCI:  Okay.  I think we can pause here.

(There was a lunch recess from 11:49 a.m. to 12:51 p.m.)

BY MS. RANUCCI:

Q. All right.  Going back to the acceleration notice. Williams & Fudge sent those to -- sent an acceleration notice to Ms. Dawson, correct?

A. Correct.



Q.   And a similar notice derived from the same template to other consumers on Bank of America loans, correct?

A.   Correct.

Q.   And who at Williams & Fudge decided to send the acceleration notice to Ms. Dawson?  Start there.

A.   Who at Williams & Fudge?

Q.   Uh-huh.

A.   That would have been someone in our legal admin department.

Q.   And so how would the person in the legal admin department be made aware of Ms. Dawson's account?

A.   Could be several different ways.  It could have been sent directly to them for review from a collector. It could have been tagged.

So when accounts are placed -- and this is for all Williams & Fudge clients, but also for Bank of America, specifically Student Loan Solutions portfolio.  When accounts are placed, there's a field called delinquency date, which is going to be based off the charged-off date that is populated.  Again, this is for all.  Not just, you know, for the purpose of the statute of limitations.

So, you know, again, specifically for the Bank of America student loan, it's based off the charged-off date would be the delinquency date and

Williams & Fudge's system goes through and part of night processing is to recognize accounts that have reached a statute of limitations based on that date. Whether that's the true date or not, you know, that's the charge-off date in this case.

It would then move that account. It would tag it a WU and move the account to -- I believe it's Unit 80. At that point, the legal admin reviews accounts for SLS/Bank of America because that's one of the triggers that the account needs to be accelerated, because, as I mentioned, collection efforts have ceased at that point.

Q. So I think I understand this correctly, but let me just explain.

So one way that a Bank of America loan account could be put in front of the legal admin department to determine acceleration is just if an individual collector decided to do so, correct?

A. Correct.

Q. There's also a more automated way you explained --

A. Correct.

Q. -- in which the Debt Manager system has both a charge-off date for the loan, presumably from the loan tape?

A. It's called the delinquency date, but it's the

charge-off date that they use for this portfolio.

Q. And then a --

A. SOL date.

Q. An SOL date.  And you didn't say this, but I believe implicit in what you've said is also a number of years?

A. It's based off the state where the consumer resides. The -- and let me just say -- shouldn't say state, but the address for the consumer in Debt Manager, which should be where they reside.

Q. And so then once -- the charge-off date plus the number of years applicable in this state and the consumer's address, that leads to another date.  Once that date is hit, the account is automatically tagged WU and moved to Unit 80?

A. Correct.

Q. And then legal admin reviews all accounts in Unit 80?

A. All accounts specific to the Bank of America student loan portfolio.

Q. In Unit 80?

A. Yes.

Q. And then legal admin would determine whether or not to accelerate the account?

A. Yes.

Q. What would -- how many people work in legal admin?

A.   There's four.

Q.   Did all of them work on the Bank of America loans?

A.   Along with other clients, as well.

Q.   But, again, not one person was assigned to this?

A.   No.

Q.   So when one of those legal admin staff looks at an account to decide whether or not to send an acceleration notice, what do they look at?

A.   The big thing they are going to look at is the -- they are going to put the required information into the Tru Value software.  You know, you have to compute the principal amount of the payment that was due based on the original note disclosure statement, when the original payments were due.  You have to look at the anticipated filing date, again based on the state where the consumer resides.

        And then that information is going to spit out what the accelerated balance would be should it be accelerated through Debt Manager.  Again, Tru Value is separate just to give you the information that you need to determine if it's going to be accelerated.

Q.   And, again, you didn't say this, but also implicit in what you said, I believe, is that that would be the principal only chart in Tru Value --

A.   Yes.  I did say that.

          (Court reporter clarification.)

Q.   And then once they got that information, what would make one of the legal admin staff decide to accelerate or not accelerate the loan?

A.   The biggest determination is the balance.  I think we talked about that yesterday if it's above $2,000.

Q.   Then they would go ahead and accelerate?

A.   Correct.

Q.   Does the legal admin department review any documentation relating to the account before accelerating the loan?

A.   They would confirm that we have all the required documents.

Q.   And that would be?

A.   The documents that we've gone over for the last two days.

Q.   Okay.

A.   Not being smart.  Just the same ones.

Q.   Yeah.  And would they actually look at the documents or just look at the list of documents to make sure those documents were there?

A.   No.  They would look at the actual documents.

Q.   So someone would open the promissory note and look at the promissory note?

A.  Confirm that we have the documents.

Q.  Would they do any review as to what the promissory note says or just that it exists?

A.  Well, they have to look at the note disclosure statement to get the terms of the loan.

Q.  Right.  You said that before.  Would they review the account notes in Debt Manager?

A.  No.

Q.  And nothing else outside of Debt Manager and Tru Value?

A.  Correct.

Q.  Are there any written policies that explain the process you just told me?

A.  No.

Q.  How did the four staff in legal admin get trained to do this?

A.  Specifically, I do not remember how they were trained, but they were trained by an individual.  I couldn't tell you who that was.

Q.  And nothing was given to them in writing?

A.  No.

Q.  Is this same process used for acceleration notices as to other Williams & Fudge clients?

A.  I cannot speak to that.

Q.  When the -- is it the legal admin staff who make the

recommendation to sue to Student Loan Solutions?

A. They put together the packet, which is given to me to review.  So if you want to call it a recommendation, it's assembling a packet.

Q. Is there some reason why a legal admin staff would send an acceleration notice and then not give you a packet, or is it essentially that every acceleration notice then would lead to a packet being given to SLS?

A. Not necessarily, because an acceleration notice could be sent and then a consumer could reach out to Williams & Fudge based on that notice to try to resolve the debt.

Q. Is there a certain amount of time that is typical between the acceleration notice and the packet being given to you?

A. I would say in general it's, you know, less than two weeks.

Q. So if the consumer reached out in between, it would be pretty quick?

A. Correct.

Q. I think for Ms. Dawson they were all within a couple days.  Does that sound right?

A. I think they were within five days, to be exact.

Q. Did Williams & Fudge hire law firms -- sorry.  Let me

start over.

Does Williams & Fudge work with one debt collection law firm in each state or multiple debt collection law firms in each state, or it depends?

MR. LITTLE: What time period?

Q. Let's start with now.

A. There could be states with more than one. And then there's also firms that cover more than one state.

Q. And when Williams & Fudge retains those law firms, are they only for certain clients or for all of Williams & Fudge's clients?

A. All that approve litigation.

Q. Right. So, for example, Roach & Murtha was the law firm hired in connection with the litigation against Ms. Dawson, correct?

A. Correct.

Q. So Roach & Murtha is hired by Williams & Fudge not only for Bank of America loans, but also for Williams & Fudge's other clients?

A. Correct.

Q. And I believe in New York there's a second law firm; is that right?

A. There is.

Q. Is the retainer between Williams & Fudge and Roach & Murtha similar to the retainer between Williams &

Fudge and other state court collection firms?

MR. LITTLE:  Form.

A.   What do you mean "to the retainer"?  Are you talking about an actual dollar retainer or are you talking about the contract?

Q.   Apologies.  The contract.

A.   The contract is the same.

Q.   Did Williams & Fudge read the complaint that Roach & Murtha filed against Ms. Dawson before it was filed?

A.   Not that I'm aware.

Q.   When Williams & Fudge hires a law firm to litigate on a Bank of America loan, I understand that it provides the law firm the same account documents that we've been talking about; is that correct?

A.   Yes.

Q.   And I believe you said yesterday it also provides a certain statute of limitations analysis that was done by The Echols Firm or --

MR. GRASSI:  Object to form.

Q.   -- a document showing some case law that is state-specific?

A.   Whether the state follows the installment analysis.

Q.   That was prepared by The Echols Firm?

A.   Yes.

Q.   Is there something called work standards that are



**Cain & Crane Court Reporters**
704.545.3510

given from Williams & Fudge to the law firm?

A.  No.

Q.  Is -- and if there's account documentation as to a loan, that's, again, just the same documents we've been talking about?

A.  Yes.

Q.  If a debt collection attorney working on behalf of Williams & Fudge on a Bank of America loan had a question about statute of limitations, who from Williams & Fudge would speak to the firm?

A.  Well, the legal admin, as I mentioned earlier, are the liaisons between the attorneys and Williams & Fudge.

Q.  So it would be -- that would come -- the communication would come through the legal admin department?

A.  Yes.

Q.  Would the legal admin department then bring that question to you as the client?

A.  Depends on if they know the answer or if it's something that requires the client to be involved.

Q.  After a lawsuit is filed against a consumer on a Bank of America loan, Williams & Fudge you said would on a case-by-case basis consider a settlement of that lawsuit; is that correct?

A.  Williams & Fudge or SLS?

Q.  Both, I suppose, but SLS would?

A.  SLS.

Q.  And --

A.  And that's the same for all clients.  It's not Williams & Fudge, you know.  It's SLS with a creditor.

Q.  And would SLS consider payment plans?

A.  Oh, yes.

Q.  In addition to lump sum payments?

A.  Yes.

Q.  Thanks.

A.  Keep flipping.

Q.  Yeah.  I believe that you answered this question just now, but I want to make sure that I understand.

A.  Okay.

Q.  In the DM software -- and we'll look at it later -- as to Ms. Dawson's account has what's listed as an SOL date.

Is that date what you were explaining, the combination of the delinquency date that was derived from charge-off and then the number of years applicable in the statute of limitations where the consumer's address is?

A.  Correct.  And just to clarify that -- I'll hold my

clarification until we actually look at Ms. Dawson's debt.

Q.   So at the time of the sale -- give me a -- strike that.  Try again.

Debt Manager has had that feature the whole time Williams & Fudge has been using the software?

A.   Yeah.  That's part of the core functionality.

Q.   Including in 2017?

A.   Yes.

Q.   So at the time of the sale, each Bank of America loan would have already had a statute of limitations date put in Debt Manager?

A.   Well, it's not put in.  It's populated based off the default date that's entered.

MR. LITTLE:  Did you say auto-populated? I didn't hear you.

THE WITNESS:  It's computed, populated based off -- you know, taking into account the date of the applicable statute of limitations for that state.

Q.   And if you wanted to go back and find what in 2017 the system said was the statute of limitations date, would the way you would do that be to just read the account notes to find notations that said SOL date, or is there a different way that you would look for

that information?

A. I mean, there's an actual field that has -- but once it's accelerated, that is updated.

Q. And then once it's updated, that's no longer in a field?

A. Correct.

Q. So you would have to go back through the notes?

A. If there's a note to it.

Q. I'm going to hand you what was marked yesterday as Exhibit 3.  If I'm correct, although I'll admit my notes weren't perfect here, I believe you testified yesterday this document was created by Williams & Fudge.

A. That is correct.

Q. Is that correct?  On what computer system?

A. I mean, it's not through DM.  It's on the Williams & Fudge computer system, but I can't tell you what program.

Q. Like a Word document?  You just don't know?

A. I do not know.

Q. Who would have created this document?

A. The legal admin person that was reviewing the account.

Q. And so one of the roles of the legal admin team with respect to Bank of America loans is to create this



type of chart relating to the statute of limitations?

A. Yeah. I mean, basically they put the information into the system and then it creates.

Q. So you think this is derived from a template and just automatically populated from the information they would have put in?

A. Yes.

Q. And that's that same information we talked about from Tru Value?

A. Yes.

Q. Essentially all these same fields?

A. Exactly.

Q. I'm going to hand you a document in a moment that I'll ask the court reporter to mark as Exhibit 21.

(A document was marked for identification as Deposition Exhibit No. 21.)

Q. Once you've had a chance to take a look, could you tell me if you recognize this document.

A. Yes, I do.

Q. What is it?

A. It's basically just a complete summary of -- this one in particular is the Dawsons' loan.

Q. Who made it?

A. And --

Q. Sorry.



A. I'm sorry. This was created by the legal admin team as part of the amortization.

Q. And did the legal admin team create a similar document like this for each Bank of America loan that was accelerated?

A. Yes.

Q. That was one of the legal admin team's roles with respect to the Bank of America loans?

A. Yes.

Q. Was this also automatically populated from fields or was it manually inputted -- was the data manually inputted?

A. I believe this one was manually inputted.

Q. Are there any attorneys on the legal admin team?

A. Any attorneys? No.

Q. Was there any training to the legal admin team as to how to create this document?

A. Yes.

Q. Anything in writing?

A. No.

Q. Who did that training?

A. I could not tell you.

Q. Were there any instructions for how to -- to the legal admin team in writing as to how to create this document?

A.   I'm not aware of any in writing.

Q.   What was this document used for?

A.   Again, this is all part of the acceleration process just to make sure that we have all the pertinent information that's required.

Q.   And was it provided to the law firms if there was a lawsuit?

A.   I believe this was part of the package that goes to the law firms, yes.

Q.   Before we put these away, does this document which we've marked as 21 -- does this accurately represent Williams & Fudge's position as to the statute of limitations as to Ms. Dawson's account?

         MR. LITTLE:   Form.

A.   I'm really not comfortable answering that without you getting more specific.

Q.   Sure.

A.   I mean, if there's something on here you want me to look at.

Q.   No, I was just hoping to avoid --

A.   I mean, is there a field down here that says SOL used for litigation?  Yes.  Does it say three years?  Yes.

Q.   So turning to SLS 447 -- just really trying to do this without making you answer these questions that we've already talked about a lot of times -- this

chart, as I take it, memorializes the explanation that you gave yesterday as to the installment payments, how installment payments within the statute of limitations would be calculated, how the balance of those would be calculated, and other aspects relating to those calculations.

Is it fair to say that this is Williams & -- since this is a document created by Williams & Fudge, this is Williams & Fudge's position as to statute of limitations and installments as to Ms. Dawson's loan?

MR. GRASSI:  Object to the form.

MR. LITTLE:  Form.

A.  So you will see, if you look at Exhibit 3, as well as SLS 447, which is part of Exhibit 21, it's the same exact information.  I mean, it's what we talked about.  You know, it's the number of installments out of stat, number in stat, the principal component of payment multiplied by the number in stat to get the balance that was litigated upon.  Does that answer your question?

Q.  Yeah.  I'll going back and hand you the big policy document marked as Exhibit 20.  And turn to SLS 197.

A.  Okay.

MR. LITTLE:  You said 197?

MS. RANUCCI:  197, yes.

Q.   Is it Williams & Fudge's policy not to sue on
     time-barred debt?

A.   Yes.

Q.   Has that always been Williams & Fudge's policy?

A.   Yes.

Q.   About halfway down the page, under "Identifying an
     Out-of-Statute Account," I'm going to read part of
     this paragraph.  "Williams & Fudge, Inc., shall
     perform a daily scan to identify any account that is
     beyond the statute of limitations."
             Did I read that correctly?

A.   Uh-huh.  Yes.

Q.   Is that the same process you described earlier as to
     the delinquency date?

A.   Yes.

Q.   And so the daily scan identifies any account where
     the delinquency date plus the number of years of the
     home state statute of limitations makes it to be
     today; is that --

A.   Yes.

Q.   And then, as you said, automatically flags the
     account as WU and then 80?

A.   Yes.

Q.   And it's only different for each state in that the
     number of years would be different for each state?

A.  That is correct.

Q.  Later down in the paragraph, it says that these accounts shall -- and I am going to read -- "Be closed and returned to the creditor as being 'out-of-statute'; Transferred to the Statute of Limitations (SOL) unit for special handling only by collection management when a specific verbal disclosure is required by state law; or Remain in active collection units, absent any legal remedies or the communication thereof."

    Did I read that correctly?

A.  You did.

Q.  None of these to me look like the legal admin process you were describing before, but perhaps that's not my understanding.

    Is that different or is that the same as one of these bullets?

A.  No, because this -- what you're reading here is for accounts that are truly out of the stat.  The Bank of America accounts that are being accelerated are not truly out of stat.

Q.  So you're saying that even though the Bank of America accounts were -- would potentially have been identified as out of statute, they would have a different process than what's in this process?

A.   They're identified as out of the statute based off the original charge-off date, but that's not the true date with acceleration.

Q.   What's the -- sorry.  Go ahead.

A.   Again, I was going to state because these are installment contracts where the statute of limitations runs on each payment as it becomes due and payable, there's no way to program the system to do that.

Q.   What's the statute of limitations unit?  This says statute of limitations unit.  What --

A.   I didn't hear what you asked.  I'm sorry.

Q.   This says statute of limitations unit.  What is that?

A.   It's a unit where accounts can go, you know, because statute of limitations does not -- with the exception of certain states, statute of limitations does not prohibit you from continuing to collect on a debt. It just prohibits legal action.  So this -- where some accounts will go to the SOL unit, but they're only worked by collection management if a person calls in.

Q.   And is the SOL unit just certain staff people?

A.   SOL is just a holding unit.  There's no outbound attempts that go out of that unit.  It's strictly for collection management if someone calls in.

Q.   So it's not people.  It's a computer notation.

A.   It's a unit.  Like we talked about yesterday in the collector notes where each collector has a unit. This is a unit, but it's not manned by a person.

Q.   I see.  Turning to the next page, 198, at the top of this page, under "Written Disclosures Required," this says, "When specific written disclosures are required by state law, all outbound written communication regarding the 'out-of-statute' account shall contain the required disclosures."

      Did I read that correctly?

A.   Yes.

Q.   And then both New York City and New York State are on this list?

A.   That is correct.

Q.   Am I correct to understand this just means that any written communication to a New York State or New York City consumer, as determined by their address, would have to have certain required disclosures if that account is out of statute?

A.   Yes.

Q.   Moving to the bottom of the page, under the heading "Reopen Requirements for Out-of-Statute Accounts," "When authorized by the client, an out-of-statute account may be reopened for active collection

activity provided:  The account does not meet the requirements to be transferred to the SOL unit; and The collection of debt is not prohibited by state law."

Did I read that correctly?

A. You did.

Q. What does this mean?

A. It means when authorized by the client, an out of stat account may be reopened for a collection activity provided the account does not meet the requirements to be transferred to the SOL unit and the collection of debt is not prohibited by state law.  I think it's pretty self-explanatory.

Q. So is that what happens to SLS accounts if the system marks them as out of statute?

A. Yeah.  There's a process in place for what happens on these to accelerate them because Williams & Fudge was provided with authority by Student Loan Solutions to accelerate these loans at a point in time.

Q. Was there anything in writing that -- you just said SLS gave Williams & Fudge authority to accelerate the loans.  Was that in writing at all?

A. I don't know how many times I've answered this, but no.

Q. Can you turn to 186.  Do you recognize this document?

A.    I do.

Q.    What is it?

A.    This is the quality assurance policy that was current as of 6/26/2017.

Q.    I'm going to read from the middle of the page under "Quality Assurance Audits."  "Williams & Fudge, Inc., performs quality assurance audits to ensure compliance with policies and procedures.  Specific auditing is performed for, but not limited to, the proper handling regarding:"  And then there's a list of things.  One of the things on that list is, "Statutes of limitation."

       Did I read that correctly?

A.    You did.

Q.    What does this mean?

A.    Basically it's audits to ensure that we're not collecting on debts that we should not be collecting on.

Q.    Who performs that?

A.    This would be done by the compliance team, but most of it is automated through the processes we just talked about through the statute of limitations policy.

Q.    And so when you ran the compliance team, were you in charge of any quality assurance audits as to statute

of limitations?

A. I mean, I didn't do any, but that's a function of the compliance.

Q. You said most of it was done through this automated process. Is there any manual process that's done?

A. Not that I can think of.

Q. Did anyone from the compliance team ever audit Bank of America loans that were transferred to the legal admin team after the debt management system stated that the statute of limitations had expired?

A. Ever? How would I have -- I would have -- would not know that.

Q. I believe in your policies a number of times they refer to non-conformity?

A. Uh-huh.

Q. What is that?

A. Non-conformity is something that we've identified internally that was done incorrectly.

Q. And what happens when something is identified as a non-conformity?

A. It's documented as a non-conformity. You know, there's a process that we go through to -- you know, depending on what the non-conformity is, to see if -- you know, the root cause, how to keep it from happening again in the future.



Q. And that's done by the compliance unit?

A. That's part of the compliance department's responsibilities. A non-conformity, that could be identified by any member of the staff.

Q. I think now I'm going to go through some specific questions relating to the account notes, which are Exhibit 13. I know you're very familiar with this document, but if I'm going too fast, you just stop me.

Starting on the first page, SLS 217 marked as page 1, this page shows two accounts for Roxanne Dawson; is that correct?

A. Yes.

Q. One is an active account with the creditor Student Loan Solutions placed on November 8, 2017, correct?

A. Correct.

Q. With a total balance of $48,351.77, correct?

A. Correct.

Q. And was that the balance as of the date this was printed, which you said was October 10, 2023?

A. I cannot tell you.

Q. Then the closed account listed creditor Bank of America, date placed at Williams & Fudge October 10, 2012, total amount $48,840.17; is that right?

A. Correct.



Q.   And that is, as we understand it, the same loan. Both -- the closed account is when it was owned by Bank of America and collected by Williams & Fudge on behalf of Bank of America; the active account is when it's owned by SLS and collected by Williams & Fudge on behalf of SLS?

A.   Correct.

Q.   Thanks.  And when we've been talking today, a number of times we've mentioned the charge-off balance that Williams & Fudge would have been collecting on behalf of Student Loan Solutions.

As far as you know, that would be this $48,351.77 figure?

A.   That is the original balance that was placed with Student Loan Solutions.

Q.   Thanks.

A.   I'm sorry.  Not with Student Loan Solutions.  With Williams & Fudge.

Q.   All right.  I'm now going to ask you some questions going chronologically.  Because those notes go backwards, it's going to start with the last -- towards the end and go forward.  So apologies to everyone that we're --

A.   You just tell me the page.

Q.   -- going backwards.  Yeah, I'll get you there.  Not

everyone here might have read these as much as you and I have.

Directing your attention to page 262, which is numbered at the bottom 46.

A.   Okay.

Q.   The very last line on this page is timestamped March 19, 2015, at 10:41 a.m.  Do you see that?

A.   I do.

Q.   And I see in here there's some other letters, but in the middle of these letters, it says SOL date 7/23/18.  Do you see that?

A.   I do.

Q.   Is this the automated system that you were describing that populates a statute of limitations date based on this formula that we discussed?

A.   Yes.

Q.   Do you know what the formula was as applied to Ms. Dawson's account?

A.   I do not.

Q.   If I told you that the charge-off date on her account was July 23, 2012, and --

A.   That would seem right because New York is a six-year statute of limitations.

Q.   Just what I was going to say.  Exactly.  So it seems reasonable that that could have been where this came

from?

A. Yes.

Q. Is likely?

A. Yes.

Q. Moving up about halfway down the page, April -- up the page. I apologize. Up the page. April 16, 2015, at 8:16 p.m., there's a sent notice notation we discussed yesterday.

A. Yes.

Q. This is the notice that was sent to Ms. Dawson from Template E?

A. It was actually sent to the co-signer, so that is the co-signer validation notice.

Q. How do you know?

A. Because I know what Notice E is.

Q. Did you look between yesterday and today?

A. Yes.

Q. So Notice E is a co-signer --

A. Validation --

Q. -- validation --

A. -- notice.

Q. -- notice? Going up to page 45, that's SLS 261. A little below halfway on the page on June 22, 2015, there's another sent notice notation that we discussed yesterday as being sent, Notice 8?

A.   Uh-huh.

Q.   Is that correct?

A.   That is correct.

Q.   Do you know what Notice 8 is?

A.   I do.  That's a subsequent collection notice.

Q.   And what does that mean?

A.   It's basically a second notice after the validation notice.

Q.   And was that sent to Ms. Dawson?

A.   It does not identify here who it was sent to.

Q.   Is there any way to find out?

A.   I could not answer that, to tell you the truth.

Q.   That's fine.  Going up maybe five entries up on July 17, 2015, at 7:55 a.m., there's another entry here that says SOL date and then April 11, 2019.  Do you see that?

A.   I do.

Q.   Does that appear again to be another calculation from the automated system as to the statute of limitations date?

A.   It does.  But I do not know reason for the change.

Q.   If I told you that the last payment on Ms. Dawson's account was on April 11, 2013 --

A.   That would make sense.

Q.   You talked earlier about the automated system

populating based on charge-off date.  If a consumer later made a payment, would it repopulate?

A.   If it's a state that allows for payments to continue the statute of limitations period out.

Q.   There's a number of times here -- I'm not going to make you look at them -- where the system spits out this April 11, 2019, date and then the July 23, 2018, and then the April 11, 2019, and the July 23, 2018. I can show you if you want.  There's a couple in the middle of page 260, which is page 44.

Do you know why the system would have gone back and forth between those dates?

A.   I do not.

Q.   Going up to SLS 259, on December 14, 2015, at 3:16 p.m., there's a notation that says the action code is tag account.  What is -- what is a consumer account tag?

A.   A tag could be used for different statuses where it is in the collection process.  You know, there could be -- I mean, I guess that's the best way to put it. They're used for documenting the accounts.

Q.   And an account can have more than one tag?

A.   Yes.

Q.   Is there a document that says what all the tags mean?

A.   I'm sure there is, but I'm not -- could not tell you.

Q. Do you know what 57WF means?

A. I do not off the top of my head.

Q. Who would you ask?

A. I would probably start with our VP of operations.

Q. And so to the extent that there are codes here that you don't know -- I just don't want to ask you this question a million times.  If there are codes in this document you don't know, whether consumer tags or other kinds of shorthand, is what you would do for each of those to find out ask the VP of operations?

A. Yes.

Q. Going up to SLS 256.  This is page 40.

A. Okay.

Q. In the middle of the page, slightly more than halfway down, there's an e-mail listed here from a user name P. Chisolm.  Do you know who that is?

A. Yes.

Q. Who is it?

A. Portia Chisolm.

Q. Is that a collector for Williams & Fudge?

A. A previous collector.

Q. Then in the comment space, I believe this is the body of an e-mail that we looked at yesterday.

A. It is.

Q. Would an e-mail typically just -- the content be

pasted into a Debt Manager note?

A.   The collector copied and pasted it in there.

Q.   Is that what they're supposed to do for every e-mail?

A.   I don't know if it's required, but that's what most do.

Q.   Two above this notation, on June 14, 2016, at 2:52 p.m., there's a comment only action code that says "Review Statutes."  What does that mean?

A.   Could not tell you.

Q.   There's a number of those.

A.   Yeah, I see that.

Q.   Could the statutes there mean statute of limitations?

A.   I could not tell you.

Q.   Going up to page 255, the third entry from the bottom on September 1, 2016, at 4:32 p.m., the action code here is "ChgWrkg"?

A.   Change workgroup.

Q.   What is a workgroup?

A.   What we've talked about.  The F04, the SOL, the different units are the workgroups.

Q.   And for the SOL, you said there were no collectors assigned, but for other workgroups, did that mean -- is a particular collector assigned to a particular workgroup?

A.   Each collector has their own unit or workgroup.  So

like Portia Chisolm was F04.  But not every workgroup has to have a collector assigned to it.  There's different reasons for different workgroups.

Q. Uh-huh.  And so do you know -- so F04 here, does that just mean Portia Chisolm's accounts or does it mean something different?

A. That's her accounts -- that's her unit.  That's where all the accounts that she's working are in that unit.

Q. Got it.  And then so this notation says, "Moved Workgroup from F04 to BOAF04."  What does that mean?

A. I do not know for sure, but I'm assuming she must have had two units.  One was an F04 and one was a BOA F04.

Q. And then six lines above that, there's another, "Moved Workgroup."  Is this similar?

A. Yes.

Q. Stepping back, does it matter what workgroup an account is in as to how Williams & Fudge collects the debt?

A. Not really, unless it's in the SOL workgroup.

Q. Are there any other sort of special workgroups that would be treated differently?

A. There are.  There's other ones, you know, if a consumer has advised no contact, if there's a litigation going on.  And I'm talking about Williams

& Fudge is being sued.  You know, there's workgroups so that outbound attempts are kept from happening.

Q.   Moving up to SLS 253, starting on November 7, 2017, at 1:51 p.m.

Before I read the entry, if I have my dates right, this would be the first entry for Ms. Dawson's account after it was sold from Bank of America to SLS; is that correct?

A.   That is correct.

Q.   This entry by J. Lane states, "Assigned Consumer Account Tag:  YC"; is that right?

A.   Yes.

Q.   What does YC mean?

A.   That's a closing code.

Q.   And why would Ms. Dawson's account have been closed on that date?

A.   It was part of the sale.  Again, the accounts were recalled, so they were closed from the Bank of America and then placed with Student Loan Solutions.

Q.   Okay.  So this was -- you think that this reflects her Bank of America account being closed after the sale?

A.   Yes.

Q.   Okay.  I'm not trying to be difficult, but I just don't see anything here that would really refer to



whether this is the Bank of America account or the SLS account.

Is there something in here I'm missing that would show that?

A. No.

Q. The entry immediately above that states, "Moved Workgroup: From BP to 80"; is that right?

A. Correct.

Q. Is 80 -- is that the statute of limitations expired group that you referred to before?

A. No. The 80 is actually a closed unit.

Q. Oh, apologies.

A. Yes.

Q. You did refer to it before, but it was the WU was the statute of limitations and the 80 was the closed?

A. No. WU was a status code.

Q. Right.

A. Several different -- I know it's confusing.

Q. Yeah. So do you understand this to, again, essentially have been an indication of closing Ms. Dawson's Bank of America account?

A. So all those notes right here between 11/7 and 11/8 are the process of closing the accounts and then replacing it as Student Loan Solutions, and you'll see the note above there at 11/8/2017, 5:32 p.m.,

where they were merged. And so what that means is instead of creating a new Williams & Fudge account number, if you go back to SLS 217, the first page, where you see each consumer has an account number, it would -- well, actually they have a consumer ID.

So if you look up at the top, Ms. Dawson's consumer ID is 2632186. Accounts are merged so that there's one consumer ID, but can have multiple accounts underneath it. It keeps from only one collect -- it forces only one collector to be working on the account at a time. So, you know, if you have an account from BYU, Yale, NYU, University of South Carolina, it would be with one person instead of four different people making outreach. So that's what all these steps are doing.

Q. Thanks.

A. And most of these are automated steps.

Q. And then the one directly above that is moving it from 80, which is closed, to DFLTBNK.

A. Yes.

Q. Do you know what that is?

A. It's default bank. And that's put in there for distribution.

Q. What does that mean?

A. Distribution to a collector.

Q.  And then we discussed yesterday the top three entries on this page are requests to send the J2 validation notice --

A.  Correct.

Q.  -- to Ms. Dawson?

A.  That is correct.

Q.  And then going up to SLS 252, there's at the bottom of this page two other moved workgroups.

A.  It went from default bank to whatever default CAM is, and then it was assigned to Workgroup 924, which is similar to what we talked about like F04 for Portia. 924, I believe, is Beth Roach's unit.

Q.  Yeah.  Moving up this page, maybe five or six entries down, there's a few "Retrieved image file with reference number" entries on 11/16/2017 at 4:55 p.m.?

A.  Yes.

Q.  And those are what we discussed this morning.  Those are memorializations of somebody, in this case Beth Roach, accessing an image file through the debt management system?

A.  That is correct.

Q.  Earlier in this case, SLS's attorney provided us with a list of what each file path here corresponded to in terms of document.

        Did you create that list?



**Cain & Crane Court Reporters**
704.545.3510

A.  I did not myself.

Q.  Do you know how it was created?

A.  I believe our director of compliance did it for us and just basically pulled up each image, looked at the file name, and put a friendly name with it. Because we are friendly.

Q.  And that's the same for all the image file notations here?

A.  That is correct.  Yes, ma'am.

Q.  Same thing?

A.  Yes, ma'am.

Q.  Going up to page SLS 249.

A.  249.

Q.  Uh-huh.

A.  Okay.

Q.  On 3/26/2018 at 2:36 p.m., there's a notation that says, "Provided Mini-Miranda."  Could you just explain what the mini-Miranda is?

A.  That's the required notification that you have to provide to consumers that the account is in collections.  I mean, do you want me to say the mini-Miranda, per se?

Q.  No, no.  That's fine.  And so does this notation just indicate that in connection with a call to Mr. Dawson, the co-signer, that that mini-Miranda was

provided to him?

A.  So this is Beth basically saying she called number ending in 4845, which is the co-maker, Isaiah Dawson, she verified his ID, and then she provided the mini-Miranda.

Q.  Thanks.  And then just to go up to the entry immediately above that that I take it describes the contents of that call?

A.  That's correct.

Q.  On the -- it says, "I asked ABT POSS SIF."  Do you know what those --

A.  I asked about possible SIF at 24,175.89.

Q.  And what's SIF?

A.  Settlement in full.

Q.  I've always understood settlement in full to mean settlement for the full balance.  Is that what you understand it to mean?  Are you --

A.  Settlement in full is settling for less than the balance.

Q.  But in a single lump sum payment?

A.  Doesn't have to be.

Q.  So it's essentially almost the opposite of what I said.  It's a settlement that would fully resolve a consumer's account for a number that is not the full balance?

A.   That is exactly correct.

Q.   Thanks.  Going up to page 246.

A.   Okay.

Q.   August 8, 2018, at 3:21 and 3:32 p.m.

A.   Yes.

Q.   I understand these to be two entries that have notes
about a single phone call.  Does that look right?

A.   Yeah.  She's just expanding upon the notes.  I'll be
happy to go through them if you have questions.

Q.   Yeah.  Am I correct to understand that the consumer
said that he can't pay in full?

A.   Let's see.  Said that he can't pay in full and is no
longer able to obtain personal loan.  Said that he
can pay 500 a month.  She explained that I can do
that with a down payment of 25 percent at $12,087.94.
     Would you like me to continue?  I don't
mind.

Q.   Yeah.  Thank you.

A.   Co-maker said that he can come up with the down
payment -- he can't come up with the down payment.
His wife is not willing to help him with this and he
is a taxi driver.  I offered to extend monthly
payments to 63 months at 767.48.  He said that is
still too high for him.  I suggested he look over
finances and discuss with wife tonight.  Student and

I will talk -- will touch base at 4 p.m. Eastern on 8/9/2018.

Q. Thank you.

A. You're welcome.  Shorthand is a skill of collectors.

Q. Yeah.  Now I'm going to turn to page SLS 236.

A. Okay.

Q. I'm going to go through every entry here, but I promise not even for a full page, so bear with me.

All right.  Looking at April 11, 2019, at 1:04 a.m., there's a tag here, "Moved Workgroup: From C77 to SOL"?

A. Uh-huh.

Q. As I understand it, one of the two automated statute of limitations dates that was populated in Debt Manager was April 11, 2019.

So is this an automatic action by the system at 1 a.m. to move Ms. Dawson's account to the statute of limitations --

A. So it's taking it from the current collector workgroup to statute of limitations, assigning a WU tag, and then taking it from SOL to 80.

Q. And sorry.  You might have said this before, but just to make sure I understand, can there be more than one workgroup at a time or no?

A. No.



Q.  So why would this automatically go from statute of limitations and then to 80 all within a few minutes?

A.  Again, this is just an automated process.

Q.  I guess I'm just trying to figure out why it takes a journey through statute of limitations if it's going to 80.  Do you know?

A.  It was closed because of the statute of limitations based off the original charge-off date, and a payment made prior after that is the reason it was originally put in the SOL unit.  And the WU tag was assigned. But, again, this was not based on acceleration, nor each individual installment running its own statute of limitations.

Q.  Uh-huh.  Then the next entry -- so it remained in the 80 workgroup, I believe, through the next few entries.  On the next entry, which is May 23, 2019, at 4:51 p.m., this is from -- I guess now we know -- Clay --

A.  Yes.

Q.  -- Goodyear?  There's a number of these.  It says, "User accepted the compliance message," and there's some text after that.  What does that mean?

A.  So our system, if there's a specific requirement based on state law, it's considered a compliance message, and you have to read that message before you

can access the account.

Q. So almost like a pop-up that someone has to click to accept?

A. That's a good way to put it, yes.

Q. Then next entry is here from January 3, 2020, at 7:34 a.m., "Saved Consumer address."  What is this entry?

A. There was an address change.

Q. How would that have come about?

A. I have no idea.  I mean, there's different -- several different ways an address -- someone could have put a new address in for the person.  It could have been found through skip tracing.

Q. The user name here just says "system."  Does that mean it was automated?

A. The documentation is automated.  I don't know if it was automated as far as changing the address.

Q. But I guess does that mean that it wasn't an individual person who typed in a new address or you just don't know?

A. I don't know.  But, again, the address was updated is what it's showing.

Q. Uh-huh.  Then the next entry on January 9, 2020, at 4:39 p.m., "Assigned Consumer Account Tag:  L-0"?

A. Yes.

Q.  That's one of those litigation tags that we --

A.  That's review for legal.

Q.  And what does -- sorry.  L-0 means an account to be reviewed for legal?

A.  I'm 99 percent sure L-0 is review for legal.

Q.  And the system did this automatically?

A.  No.  Someone would have had to assign that tag.

Q.  Is there any way to know who?

A.  No.

Q.  What role -- what would the role be of someone who would assign a tag for legal?

A.  It could have been Clay.  It could have been someone in legal admin.  Someone within the legal department.

Q.  So on January 9, 2020, someone assigned Ms. Dawson's account to legal, but you don't know who or why?

A.  They put the L tag on for review for legal.

Q.  And then I see a pair of entries later this day that move the workgroup on her account from 80 to SLSA and then from SLSA back to 80.

        Am I understanding that correctly?

A.  Yes.

Q.  The first one is by D. Mapi, which is?

A.  That's not a person.  That's another automated process.

Q.  And then "system" is another automated process?



A.   Yeah.

MR. LITTLE:   Just to clarify, you read those numbers reversed.   You suggested that one took place before the other.   The timestamp is actually the other way.

MS. RANUCCI:   Oh, apologies.

MR. LITTLE:   So it started going from SLAS to 80 and then from 80 to SLAS based upon -- do you see the time difference?   Sorry for interrupting you.   Just want to make sure the record is clear.

MS. RANUCCI:   I think it's the other way because it's backwards.

A.   It went from 80 to SLSA.   Then SLSA to 80.

Q.   Right.   Why would that have happened?

A.   I do not know exactly, but my guess would be because at this point it had not been accelerated, so the SOL date had not been updated.   So the system is still going to believe that it was past statute of limitations.

Q.   Do you know what SLSA workgroup is?

A.   That's a review unit for -- I don't know what the A part stands for, but that's a specific SLS unit that's used for putting these accounts that need acceleration, so that's what the A stands for.

Q.   Okay.   So as I understand it, on November 9, 2020,

somebody, but we don't know who, came in and assigned a tag that would put Ms. Dawson's account to be reviewed for legal and also assigned a work -- that person or a different person on the same date -- 20 minutes later, it looks like -- assigned a workgroup that would have moved Ms. Dawson's account to a group of accounts that would have been reviewed for acceleration?

A.  The system moved it from 80 to SLSA, but then during night processing at 11:37 p.m., it was put back to 80 because the SOL date had not been updated because it had not been accelerated at that point.

Q.  And then on July 9, 2020, we see another accepting of the compliance message by?

A.  Katie Parham.

Q.  Uh-huh.  Going back to the previous page, but continuing forward in time -- now we're at July 17, 2020 -- there's a pair of entries in which a consumer tag is saved and then about an hour later unassigned.

Do I understand that correctly?

A.  Where are you?  All the way at the bottom?

Q.  Yes.

A.  Yes.

Q.  And is this a -- it appears to me to be that this tag might indicate an account that needs a request made

under the Service Members Civil Relief Act?

A.  It was, you know, to make sure that this was not a current member of the military.

Q.  Uh-huh.  Then on December 4, 2020, we have a pair of entries from about 5:35 a.m. and 12:15 p.m. that move the workgroup from 80 to NEWBIZ and NEWBIZ back to 80; is that right?

A.  That's correct.

Q.  What's NEWBIZ?

A.  NEWBIZ is a distribution unit for when new business comes in.

Q.  Why would Ms. Dawson's account have been assigned to that?

A.  I have no idea.  You would have to ask the computer system.  I'm not trying to be smart, but I don't know why that happened.

Q.  In any event, it was back a few hours later?

A.  I was going to say it fixed it.

Q.  And then we have a November -- sorry -- September 20, 2021, and then November 8, 2021, another four accepting of the compliance messages by Ms. Parham?

A.  Right.

Q.  You said Katie; is that right?

A.  Katie.

Q.  What unit does she work in?

A. She was a member of the legal admin team.

Q. And then I see here on November 8, 2021, at 5:11 p.m. Katie Parham unassigned the consumer account tag WU; is that right?

A. That is correct.

Q. So that means essentially she unassigned the tag that was applied to Ms. Dawson's account --

A. Yes.

Q. -- two and a half years earlier when the statute of limitations flag came up?

A. Yes.  So all this is part of the process of what happens when they're accelerating the loan.

Q. And so the system on that same day also moved the workgroup from 80 to SLSA?

A. Correct.

Q. Would it have done that automatically or did somebody --

A. She would have put in a request for that to happen.

Q. Thanks.  So other than a few days where the workgroup changed and then changed back, it looks to me like between April 11, 2019, and November 8, 2021, Ms. Dawson's account was assigned WU and then the Workgroup 80.

Am I understanding that correctly?

A. I would agree with that.



Q. And so during that time, Williams & Fudge's systems tagged her account as having had the statute of limitations expire?

A. Based off the charge-off date that was used as the date of delinquency, that computed the statute of limitations date not taking into account acceleration, nor that the statute of limitations runs on each installment as it becomes due and payable.

Q. Understood. Because of that tag, did anyone from Williams & Fudge make outbound communication to Ms. Dawson --

A. No.

Q. -- during that time period?

A. No. You would have seen it on here.

Q. Would they have been allowed to do so with the WU tag?

A. No.

Q. Why not?

A. They're not allowed to do it.

Q. Because of a policy prohibiting outbound calls?

A. It would not be in a collector unit, so no one -- unless it's in a collector unit, it's not going to get outbound attempts.

Q. And the reason it's not in a collector unit is that

it was moved to Workgroup 80?

A.   Correct.

Q.   And for that same period, no e-mails?

A.   No collection efforts.

Q.   Going up just right on the same page, November 9, 2021, there's a comment here saying review statute.

A.   Correct.

Q.   We talked about this yesterday.  This indicates that -- what does this indicate?

A.   So this was a qmail that was sent to Heather Douglas where it says review SLS account 6137918, which, if you want to look at the front page, matches Ms. Dawson's account, and then gives the SOL number for possible legal in New York with three years statute of limitations based on delinquency and DM 7/23/2012 review as acceleration.

Q.   Okay.  You said a lot of things in there.  Let me just get some of them -- qmail, is that --

A.   I think we just talked about this yesterday.  It's an internal communication.  That's it right there. You're reading the qmail.

Q.   And how do you know it's from Heather Douglas?

A.   I know it was sent to Heather Douglas because she's the next person to access the account.

Q.   Oh.

A. Received message.

Q. But you --

A. See right above it.

Q. Uh-huh.

A. Received message. I'm sorry. You know, you see comment only. Review statute. And then that note. If you go --

Q. Oh.

A. -- to the line above it, you'll see received message. Received message Heather Douglas. She accepted the compliance message and -- when she pulled up the account.

Q. Thank you.

A. You're welcome.

Q. That one was really not obvious. I appreciate it.

Do you know who sent this message?

A. I do not.

Q. I think you and I understand this, but just to make it clear, this says it was reviewed for a possible three-year statute of limitations in New York?

A. Correct.

Q. But previously we had been talking about a six-year statute of limitations in New York?

A. That is correct.

Q. Can you talk about your understanding of those two

numbers and why they're different?

A.  Yeah.  Again, I'm not an attorney, but New York has a six-year statute of limitations.  However, the original creditor is Bank of America, whose corporate office or -- incorporated in North Carolina.  There's some borrowing statute there, so the three-year statute of limitations is used.

Q.  But that wasn't used on the automated process that was tagged to the delinquency date because that was just based on Ms. Dawson's address?

A.  No.  It's because it's based on specific information concerning the original creditor.  Our system is designed for statute of limitations based on states.  We can't design a system to say, Well, for this creditor, you have to use this borrowing statute in this state, you know.  Again, that's why things are reviewed manually.  Do you understand it's specific -- I'm not trying to be smart.

Q.  No, no.

A.  It's specific to Bank of America being a North Carolina corporation, New York having -- and if I'm not calling it correctly borrowing statute, if someone could correct me, that's fine.  That's -- you know, it's a unique situation.

Q.  Yeah.  I understood that part.  I guess the part I

was struggling with is my impression was the prior statute being six years was just simply because New York statute --

A.   New York is --

Q.   -- is six years.

A.   -- six years, yes.

Q.   When I believe you said yesterday that at a certain point in time SLS changed -- SLS decided to apply a four-year statute of limitations unless a stricter statute of limitations applied; is that correct?

A.   Based on California choice of law provision in these contracts.

Q.   Did that also get changed in the automated delinquency system in Williams & Fudge's account?

A.   No.  We couldn't -- again, Williams & Fudge I don't know if you know, we work with over 1,500 clients across the United States.  Our system is built as a general.  Not as a one-off.

Q.   Right.  So --

A.   That's why there's the process to get the account to legal admin to review manually.  And I think you see going through all these pages the process works pretty good.

Q.   Do you know why it took two and a half years for Ms. Dawson?

A.   I don't know if I want to answer that as SLS or
     Williams & Fudge.  No, I do not know.  But,
     truthfully, that's to the benefit of Ms. Dawson.
     Because if it had been reviewed two years ago and
     accelerated, there would have been an additional two
     years of installments that would have been included
     in the acceleration.  So, you know, I think at 100
     and some-odd dollars, $139 at 24, it saved Ms. Dawson
     some money.

Q.   By that logic, 2027 would have been a good time to
     get sued.
              If you flip to the next page moving
     backwards, SLS 234 --

A.   Yes.

Q.   -- there's an entry here about a third of the way
     down the page, tag consumer -- saved consumer tag,
     details, and then the tag name IN legal review; is
     that right?

A.   Yes.

Q.   What does that mean?

A.   The -- it appears the IN legal review tag was added.

Q.   And what does the IN legal review tag mean?

A.   I believe that's the one that I was referring to
     earlier, the L-0.  I didn't put the IN part, just the
     legal review.



Q.  And then immediately above that, there's an action code CS and a result code 99.  Do you know what that is?

A.  It's -- a change status is a CS.  And result code 99, I do not know what that is.

Q.  And then immediately above that on -- still on December 1, 2021, "Placing notice request.  Template SLSA2"?

A.  Yes.

Q.  Am I right to understand this is a request to have the acceleration notice sent to Ms. Dawson?

A.  That is correct.

Q.  And an acceleration notice was from the template SLSA2?

A.  That is correct.  You're getting good at this.

Q.  And then immediately above, "Assigned Consumer Account Tag:  SLSAR"?

A.  I don't know what that tag is.

Q.  To the next page, again going backwards, December 2, 2021, 8:12 a.m., this states consumer adjustment.  It was by Heather Douglas; is that right?

A.  Where are you?

Q.  Sorry.  Near the bottom of the page, there's a consumer adjustment action code.

A.  Yes.



Q.   "Posted Consumer payment adjustment," in the amount of $28,659.71?

A.   Yes.  That would have been posting of the court costs that were billed to SLS for this account.  So it would have been putting the court costs in in order to generate the suit package.

Q.   Okay.  Let me tell you what I think this was, because I'm not sure I understand that, but maybe I'm completely misunderstanding.  My understanding was this was just adjusting the account down --

A.   Oh, I'm sorry.

Q.   -- to the previous balance.

A.   You're probably right.  She probably was just -- no, wait a second.  No, because she could not have -- she already requested the letter, so the balance would have already been adjusted before the letter could have been requested, unless I'm missing something.

Q.   I don't see a place where the balance is requested before this.  And I think you and I both understand what we're talking about, but I think we haven't said it out loud, which is that at a certain point upon acceleration, Williams & Fudge would have had to adjust --

A.   That is correct.

Q.   -- the balance on Ms. Dawson's account from the



Cain & Crane Court Reporters
704.545.3510

approximately 48,000 charge-off balance to the approximately 19,000 accelerated balance --

A.  Yes.

Q.  -- leaving a difference of about 28 to 29 thousand dollars?

A.  Yes.  And, I mean -- yeah, I mean, probably the 28,659.71.

Q.  Right.  So this entry memorializes that --

A.  Yes, that is --

Q.  -- adjustment?

A.  -- the adjustment.

MR. LITTLE:  Watch yourself, Chris, so you're not talking over each other.  I know you're anxious to get out of here.

THE WITNESS:  I'm just trying to help her.

MR. LITTLE:  No, I know.  It's for a cleaner transcript.

Q.  All right.  Three above that, we see, "Moved Workgroup:  From SLSA to SLSLEGAL."  What is SLSLEGAL?

A.  That would be another workgroup.  That's part of the process for getting the suit packets generated.

Q.  Three above that, there's a few entries that say, "Saved consumer user defined page."  What do those mean?

A.   User defined page is just -- like in this one, they're documenting which attorney it's going to be sent to.

Q.   And so what does LEGALRECORD40A mean?

A.   That's just one of the fields on the defined page.

Q.   Sorry.  What's a defined page?

A.   It's part of the -- user defined pages are just part of DM where they're just documenting, like in this case, who the attorney is.

Q.   And then "AttorneyRecord45," what's that?

A.   It's all part of that same.

Q.   And two above that, "Saved Consumer Tag," and then the name of this tag is, "REQ LEGAL APPROVE"?

A.   Uh-huh.  So it goes into the request legal approval when they're generating the suit package.  That would be, in turn, sent to me.

Q.   And then the entry above this, start with the action code CS is --

A.   CS 78.  78 is one of our result codes.  And then this just Heather memorializing everything she did.  She accelerated and adjusted the account.  The account was SL732493850.  Acceleration notice date was 12/1/2021.  The amount 19,692.06.  The file by date, again, we talked about an anticipated file by date was March 9, 2022.  So she used roughly 90 days.

State New York attorney code NY5, which is Roach & Murtha, the firm name. Court cost check NA because they're billed. And then the balance criteria, if the attorney has a balance criteria, that's where that's put in. So apparently Roach & Murtha have a $15,000 balance criteria.

Q. Thank you. And then again going to the next page, which is really the previous one, at the bottom of SLS 232.

A. Uh-huh.

Q. "Client contact." "Sent physical mail." "Suit packet ready for SLS Account(s)."

My understanding is this memorializes you being given the physical file we discussed yesterday?

A. Yes. In most clients, it's going to be mailed to them. In my case, it's walked into my office.

Q. And then two fields above, "Received signed approval," memorializing the receipt back of those signed documents?

A. That is correct.

Q. Two above that, "Assigned Consumer Account Tag: L-1." What does that mean?

A. I believe L-1 is sent to attorney. And, again, I know we provided you action result codes. I don't know if tags were part of that or not. I'm pointing

to that.  I'm assuming it's in that big one right there.

Q. Yeah.  I think we don't have tags, but I'm not the expert.

A few above that, the action code is CS. The result code is 70.  Am I right to understand that this memorializes a litigation packet being sent from Williams & Fudge to Roach & Murtha regarding --

A. Yes, that is correct.  Sorry.  I answered it too quickly.  Yes.

Q. The second entry on this page, changed creditor numbers.  Why would the creditor number have changed?

A. Because SLS has a unique creditor number for accelerated accounts and litigated accounts, which is the 11847.

Q. We talked yesterday about how you would obtain payment records from the debt management system.

Are they specific to the creditor numbers that you see here?

A. When you're asking -- you're asking for payment records.  Are you talking about for individual consumers?

Q. No.  I'm talking about for individual clients for --

A. So the state -- you're talking about the statement that's created?

Q.   I guess put a different way, is it possible to pull
     from the debt management system all payments that
     have been made to creditor 11847?

A.   There's a report that would show all amounts
     collected under 11847.

Q.   And then --

A.   But it would not be broken down by consumer.  That
     would be on a case-by-case basis.

Q.   And then a separate report that would show all money
     collected on 11191?

A.   Correct.

Q.   Are those the only two creditor numbers for SLS
     applicable to Bank of America accounts?

          MR. LITTLE:  Form.

A.   No.  There's at least one more.

Q.   Do you know what it is?

A.   12936.

Q.   And what does it connote?

A.   Am I speaking as SLS or Williams & Fudge?  It's part
     of the forward flow that we talked about.  It's
     forward flow accounts.

Q.   So each --

A.   So it's accounts they would have purchased after the
     original 10/31/2017.

Q.   Would you be able to pull from Debt Manager how many

accounts are under each creditor?

A.  Active?

Q.  Start there.

A.  Yes.

Q.  Including closed?

A.  I would not.

Q.  And each account can only have one creditor?

A.  Yes.  Each -- let's clarify that, though.  Each creditor reference ID and a Williams & Fudge account number, but a consumer ID could have multiple creditor numbers under it, like in this case right here.

Q.  When an payment is made, is it directed to a specific creditor number?

A.  It's directed to a specific account for the consumer.

Q.  I think I understand what you say.  A consumer could have multiple accounts, but each account can only have one creditor number?

A.  Yes.

Q.  Great.  So when Ms. Dawson's account was changed creditor numbers, she only had one account, so the 11191 went away and 11847 was applied?

A.  Correct.

Q.  So if you would look under 11191 today, you wouldn't find Ms. Dawson's account --



A. Correct.

Q. -- unless it was moved back?

A. That is correct.

Q. If you scroll up -- scroll, geez -- turn up to SLS 229.

A. Okay.

Q. The very -- sorry.  Pause there.  I'm trying to think if there's a better way to ask this question.  I don't think there is, so I apologize for this.

A. Where are we?

MR. LITTLE:  I'll object to form in advance then.  No.

Q. On page 230 --

A. Oh, 230.

Q. Yeah.  The lawsuit against Ms. Dawson was filed on November 7, 2022, and you see that in a comment on November 9, 2022?

A. Where am I seeing that?

Q. It's about --

A. Oh, there I see it, yes.  Case number CV, file date.

Q. Uh-huh.

A. Correct.

Q. If you recall, when we looked at the charts, which you may not recall -- you can take my word for it or look at them again -- those were based on an

estimated filing date of March 2022?

A.  Okay.

Q.  The case wasn't actually filed until November?

A.  And that's why if you look at the complaint, it was filed for less than the accelerated balance because additional installments dropped off.

Q.  I don't see any entries here that memorialize any of that.  Would any of that process have been in Debt Manager?

A.  No.  It would have been the attorney.  I don't know if they didn't communicate it or what, you know, again, but the attorney knowing that it wasn't filed by the proper date, knowing the installments that would have fallen off during that time period, has the ability to adjust, you know, because they're the one filing the complaint, to make sure that they're filing it for the correct amount.  They would file it.  Debt Manager is not going to get adjusted until a judgment is awarded.

Q.  So your best guess is that Roach & Murtha did the adjustment on its own?

A.  That would be my best guess, unless I went through here and found something that said differently.

Q.  Okay.  Thanks.  Going up to SLS 226.

A.  Okay.

Q. There's an e-mail near the bottom of the page. It looks to me from -- an e-mail from Tammy Jackson to a Heather. Do you know what Heather this is?

A. Where are you seeing this?

Q. Apologies. The second to last entry on 226 is an e-mail on February --

A. Oh, yes, I see that. Do I know who Heather is?

Q. Uh-huh.

A. Yes, I do.

Q. Who's that?

A. It's one of two Heathers in the legal admin department.

Q. And my understanding is this suggests that -- and who is Tammy Jackson?

A. She is another member of the legal admin team.

Q. So I understand that Tammy sent to Heather an e-mail that attached three affidavits that were -- you were supposed to sign?

A. Yes.

Q. And then up on 225, the second to last entry, Heather Douglas printed and gave you the affidavits to sign?

A. That is correct.

Q. And then the second entry from the top, Heather Douglas received the signed affidavits back from you and sent back to Tammy to send to the attorneys?

A.   Yeah.  I was slow signing those.  It must have been those ones that required the New York -- the attorney to sign, as well.

Q.   And then up to 223, we see here on October 10, 2023, at 8:44 a.m., an e-mail from Timothy Murtha perhaps to Heather Douglas, although I'm not sure.  You could tell me.  Is that correct?

A.   It would go to a general mailbox for the legal admin team.

Q.   Thanks.  "Good morning.  Please see attached letter from the consumer's attorney on this matter."

And then five minutes later, an e-mail from Heather Douglas to Chris.  Is that you?

A.   Yes.

Q.   "Please see the attached letter from the consumer's attorney."

A.   Correct.

Q.   Then going up another page on that same day, we see this very bottom entry.  This is C. Ruh.  I assume that's you?

A.   That is me.

Q.   And you received a message.  Does that indicate you received that e-mail that we just looked at?

A.   No.  This is just -- again, this is the user accepted the compliance message.

Q.   Thanks.  Do you know what you did in Ms. Dawson's account once you accepted that compliance message?

A.   I probably reviewed it based on receiving a letter from Murtha from, I'm assuming, you all.

Q.   Yeah, it was us.  And then we see here a number of entries from D. Hollis on October 10, 2023, retrieving image files.

Just to make sure I understand, that was Mr. Hollis.

A.   Yes.

Q.   Is that right?  Mr. Hollis on that day 10:59, 10:59, 10:59, 11:00, 11:01, 11:02.  Was --

A.   He was looking at all the images.

Q.   Yeah.  And there we are.  Anything else you want to tell me about that document?

A.   I think we've covered it.

MS. TARANTOLO:  Don't get his hopes up because we're not --

MS. RANUCCI:  I was going to say let's take like a five-minute break to regroup.  We'll try and make our list of things we need to do after this.  I don't expect it will be long, but I think there are some.

MR. LITTLE:  Okay.

(There was a recess from 2:24 p.m. to



2:32 p.m.)

BY MS. RANUCCI:

Q. Okay. I'm going to now just ask a sort of set of questions to follow up on some things we talked about earlier. Again, still as your role at Williams & Fudge capacity.

A. Okay.

Q. I understood you to say earlier that there were essentially two ways that an SLS account would be provided to the legal admin team to be reviewed for acceleration. One way was just if a collector decided to.

A. If a collector was -- sorry. I didn't mean to correct you -- stop you.

Q. And then the second way was if the automated system flagged the statute of limitations; is that right?

A. Yes.

Q. Under what circumstances would a collector decide to give an account to legal admin?

A. If they have exhausted all efforts with the consumer and are not getting anywhere anymore.

Q. Do you have a ballpark of where most accounts that were accelerated from that avenue of individually referred from collectors or were most from the automated system?



A.   I have no idea.

Q.   Do Williams & Fudge's collectors have the ability to add attachments to their e-mails?

A.   No.

Q.   Has that always been true since Debt Manager?

A.   Yes.

Q.   And the e-mails are sent through Debt Manager or different e-mail program?

A.   It's actually a program that we developed internally where they have to put the consumer number in and then they put the body and then prior to going out, it goes through a check to make sure that it fits all compliance requirements, there's no demand for payment, no violation of any type of law, spelling, grammar, things like that.  And then once it goes out, if there are state specific requirements that the have be to in communications, they're added, as well.

Q.   And so the individual collector doesn't have to type the New York --

A.   No.  No.

Q.   Is that a manual review or automatic?

A.   Is what?

Q.   The review you described of the e-mails.

A.   That's an automated system.

Q.  Earlier today you stated that there existed a contract between Bank of America and Williams & Fudge that related to the 2010 to 2017 collection by Williams & Fudge on behalf of Bank of America; is that right?

A.  Yes.

Q.  Do you know where that is?

A.  If it's still available, it would be in our contract files.

Q.  Which is on Williams & Fudge's computer files?

A.  No.  It would be a hard copy.

Q.  In the Williams & Fudge office?

A.  Yes.

Q.  You said earlier today that, if I understand you correctly, the insurer -- your insurer requested that Student Loan Solutions be on Williams & Fudge's policy.

A.  The insurer didn't request it.  We requested it of the insurer.  "We" being Williams & Fudge.

Q.  Okay.  I think I just misunderstood you.  So the insurer didn't request it.  Williams & Fudge requested it.

A.  Yes.

Q.  And that was because SLS --

A.  Requested it.

Q.    -- requested it?

A.    Yes.

Q.    Earlier today you described a client portal where the reports about payments were uploaded weekly; is that right?

A.    It's where statements and reports are uploaded depending upon the frequency of the client.  Some clients are weekly.  Some are bimonthly.  Some are monthly.

Q.    Is that client portal only for the financial statements or are there other things on it?

A.    Reports, as well.

Q.    What other kinds of reports?

A.    Close reports.  Address change reports.  I'm just trying to think of the ones that are available for clients to have provided to them.

Q.    If you in your SLS role were to log in to that client portal, do you have an SLS log-in?

A.    I do, but I go directly through my Williams & Fudge log-in.

Q.    Are the reports on that portal live or do they historically show the one from each week in the past?

A.    The reports are only run monthly and they're for that month, that time period.  The statements are weekly. And, again, that's specifically for SLS.  Other

creditors have -- other clients of Williams & Fudge have different schedules.

Q. Understood.  And do the -- is only the current month or week's report or statement available or are past months also available?

A. There's an archive, but I believe they're archived for 14 months.

Q. Do you know if Williams & Fudge separately maintains those reports in a different location for longer?

A. I don't believe so.

Q. Are those automatically run through Debt Manager?

A. I'm not sure what you mean by "automatically run through."

Q. Are those reports automatically created through Debt Manager?

A. Yes, they're all Debt Manager reports.

Q. We talked briefly about the Bank of America loans that were assigned from Bank of America to Student Loan Solutions after the sale as part of the forward flow agreement; is that right?

A. Uh-huh.

Q. And that --

MR. LITTLE:  Yes?

A. Yes.  It's getting late in the day.

Q. Those have a different creditor number?

A.    Yes.

Q.    Do you know how many approximately there are?

A.    I do not.

Q.    Do you have a sense if it's more or less than the approximately 12,000 that were originally assigned?

A.    A lot less.

Q.    And do there continue to be new ones assigned today?

A.    Monthly, if available.

Q.    And as far as you understand it, are those accounts different in nature than the accounts that were originally assigned?

A.    Yes.

         MR. LITTLE:   Object to the form.

A.    Yes, they are.

Q.    In what way?

A.    They're -- with a -- so they were sold -- you know, again, Bank of America sold their non-performing and sold their performing.  These were sold -- the performing, and so these would be ones that have defaulted since they were purchased by whoever bought the performing with the option to sell it back to Bank of America upon default and then sell it to Student Loan Solutions.

Q.    Very different.  But it sounds like they're generally from the same time period of the origination?

MR. LITTLE:  Form.

A.  I couldn't tell you without looking at them.

Q.  Has SLS -- or apologies.  Has Williams & Fudge sent acceleration notices on any of the Bank of America loans that SLS obtained pursuant to the forward flow agreement?

A.  No.  Because the purchaser of the accounts accelerates them themselves.

Q.  Is it one purchaser?

A.  I couldn't tell you that.

Q.  Do you know any of the purchasers?

A.  I do not.

Q.  So the forward flow agreements -- just to make sure I understand, the forward flow agreement loans are loans that went from Bank of America to another company, back to Bank of America, then to SLS?

A.  Correct.

Q.  That other company accelerated the debt?

A.  They accelerated prior to selling back to Bank of America.

Q.  But you don't know the name of any of those companies or company?

A.  I do not off the top of my head.

Q.  How would you find it out?

A.  I guess I could ask Bank of America.



Q.   Well, do you have, for example, chain of title documents on those --

A.   The bill of sale comes directly from Bank of America.

Q.   But would it contain the information about the sale to and from the company?

A.   It does not, because it's memorialized in the loan sale agreement.

Q.   Has Williams & Fudge sent any of the forward flow accounts to litigation?

A.   I couldn't tell you.

Q.   Just to be very clear about a topic we've discussed a number of times, but I just want to make sure we're totally on the same page here, the account notes from before 2014 that were in a different collection system, not in Debt Manager, those don't exist anymore, as far as you know?

A.   The system is no longer accessible.

Q.   So you don't have them and couldn't get them?

A.   The system is no longer accessible.

Q.   Thanks.  We spoke yesterday and a little bit today about the fact that after acceleration, SLS did not collect interest on Ms. Dawson's loan, correct?

A.   We haven't collected anything on Ms. Dawson's loan.

Q.   That SLS and Williams & Fudge did not seek -- neither sought to collect interest on Ms. Dawson's loan after

acceleration, correct?

A. And I would have to look at the complaint, but the complaint may ask for post-judgment interest.

Q. Fair point.  But in terms of pre-judgment interest?

A. Correct.

Q. Who made the decision not to collect interest on that account?

A. Myself.

Q. In your --

A. SLS.

Q. In your SLS role.  So Williams & Fudge didn't collect interest because?

A. They were directed by SLS.

Q. Thank you.  And that was true of all Bank of America loans that were accelerated?

A. Yes.

Q. Are you aware of any lawsuits against Williams & Fudge that argued that any Bank of America loan was time-barred?

            MR. GRASSI:  Objection.  Outside the scope.

A. I'm not prepared to discuss that.

Q. Did Williams & Fudge ever change any of its collections policies on Bank of America loans in response to lawsuits or consumer complaints?

A.   Williams & Fudge doesn't have client-specific policies.  We have policies and procedures related to the state laws, federal regulations, so no.

Q.   You spoke earlier about Williams & Fudge using Tru Value to create amortization tables for SLS.

A.   Correct.

Q.   Did you use Tru Value for any other clients?

A.   No, not specifically.

Q.   Did you make amortization tables for any other clients?

A.   Not that I'm aware of.

Q.   Does Williams & Fudge collect any other installment loans?

MR. GRASSI:  Objection.  Outside the scope.

A.   I'm not prepared to answer that.

Q.   Does Williams & Fudge send acceleration notices on any accounts other than SLS accounts?

MR. GRASSI:  Objection.  Outside the scope.

A.   I'm not prepared to answer that.

Q.   Does Williams & Fudge collect on any student loans other than the SLS accounts?

A.   Yes.  That's what Williams & Fudge specializes in.

Q.   What percentage of Williams & Fudge's business would

you say is student loan collection?

A. Student loans and receivables?

Q. By receivables, do you mean what I would call tuition debt?

A. Yes.  99.9 percent.

Q. And if you had to divide up between student loans and tuition debt, how would you -- what would you say?

A. I'd say student loans are around 30 percent and tuition 70.

Q. And of the student loans -- I'm not going to make you do the math, so just imagine we're just talking about the set of student loans you collect on -- what proportion would you say were by -- on behalf of the original creditor versus subsequent creditors?

MR. GRASSI:  Objection.  Outside the scope.

A. I would have to research that.  Not prepared to discuss.

Q. Do you have a sense of if most of the student loans are original creditors or not?

MR. GRASSI:  Objection.  Outside the scope.

A. I don't have a sense.

MS. RANUCCI:  All right.  Can we go off the record just for a minute.

(There was a discussion from 2:46 p.m. to 2:47 p.m.)

MS. RANUCCI:  I think that we're ready to close this out.

MR. LITTLE:  On behalf of Student Loan Solutions, I have no questions.

MR. GRASSI:  And I also have no questions.

(Reading and signature were reserved.)

(The deposition was concluded at 2:47 p.m.)

A M E N D M E N T   P A G E

PLEASE DO NOT WRITE WITHIN THE TRANSCRIPT ITSELF. LIST ANY CORRECTIONS BY PAGE AND LINE NUMBER ON THIS SHEET.  IF ADDITIONAL PAGES ARE NECESSARY, PLEASE FURNISH SAME AND ATTACH THEM TO THIS AMENDMENT PAGE. YOU ARE ALLOWED 30 DAYS WITHIN WHICH TO COMPLETE THE SIGNATURE PAGE AND AMENDMENT PAGE.  AFTER COMPLETING THESE PAGES, PLEASE RETURN THEM TO CAIN & CRANE COURT REPORTERS, POST OFFICE BOX 23833, CHARLOTTE, NC 28227.

IN RE:  Roxanne Dawson, et al., v. Student Loan Solutions, et al.
30(b)(6) DEPOSITION OF:  Williams & Fudge, Inc.

     I, Christopher Paul Ruh, certify that I have read my deposition, which was taken on Wednesday, September 11, 2024, and request that the following changes, if any, be made:

Page_____  Line_____  Change_____

_____
Reason for Change_____

Page_____  Line_____  Change_____

_____
Reason for Change_____

Page_____  Line_____  Change_____

_____
Reason for Change_____

Page_____  Line_____  Change_____

_____
Reason for Change_____

Page_____  Line_____  Change_____

_____
Reason for Change_____

                        _____
                        Christopher Paul Ruh              Date

Cain & Crane Court Reporters
704.545.3510

S I G N A T U R E   P A G E

IN RE:  Roxanne Dawson, et al., v. Student Loan Solutions, LLC

30(b)(6) DEPOSITION OF:  Williams & Fudge, Inc.

          I, Christopher Paul Ruh, do hereby certify that I have read the foregoing deposition and that the foregoing transcript is a true and correct record of my testimony, subject to the attached changes, if any, on the amendment page.


                    _____
                    Christopher Paul Ruh




          Subscribed and sworn to before me this _____ day of _____, 2024.



                    _____
                    Notary Public

My Commission Expires:

STATE OF NORTH CAROLINA      )
                             ) CERTIFICATE OF REPORTER
COUNTY OF IREDELL            )

        I, Tavi L. Fraga, Professional Court Reporter and Notary Public in and for the aforesaid county and state, do hereby certify that the foregoing pages are an accurate transcript of the (30)(b)(6) deposition of Williams & Fudge, Inc., which was reported by me on behalf of Plaintiffs in machine shorthand and transcribed by computer-aided transcription.

        The deponent and parties reserved the signing of the deposition by the deponent.

        I further certify that I am not financially interested in the outcome of this action, a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel.

        This 19th day of September, 2024.

_____
Tavi L. Fraga
Professional Court Reporter
Notary Public #201229000172

### Exhibits

**Exhibits 17-21, 30(b)(6)**
**Williams & Fudge** 5:3
  10:23,25 11:2,5 46:4,5,9 66:15
  87:10,11,15 93:19 106:4,6 107:4
  109:5 124:10 125:14,16 128:13,
  14,22 136:7

### $

**$12,087.94** 151:15

**$139** 165:8

**$15,000** 170:6

**$2,000** 116:7

**$28,659.71** 167:2

**$48,351.77** 136:17 137:13

**$48,840.17** 136:24

### 1

**1** 68:3,12 109:10 136:11 143:15
  152:17 166:7

**1,500** 164:16

**10** 13:3 68:25 69:4 88:10 109:8
  136:20,23 177:4 178:6

**10/31/2017** 172:24

**100** 165:7

**10:27** 58:2

**10:35** 58:3

**10:41** 138:7

**10:59** 178:11,12

**11** 6:1 140:15,23 141:7,8 152:9,
  15 159:21

**11/16/2017** 148:15

**11/7** 146:22

**11/8** 146:22

**11/8/2017** 146:25

**11191** 172:10 173:22,24

**11847** 171:15 172:3,5 173:22

**11:00** 178:12

**11:01** 178:12

**11:02** 178:12

**11:29** 98:9

**11:30** 98:10

**11:37** 157:10

**11:49** 111:19

**12,000** 40:22 41:12 184:5

**12/1/2021** 169:23

**12936** 172:17

**12:15** 158:5

**12:51** 111:20

**13** 66:17,19 136:7

**130** 74:23

**14** 141:14 143:6 183:7

**1400** 6:8

**145** 49:2

**15** 13:3 107:9

**153** 106:9

**16** 139:6

**17** 10:23,25 11:2 140:14 157:17

**18** 46:4,6

**186** 133:25

**19** 19:2 87:10,12 138:7

**19,000** 168:2

**19,692.06** 169:23

**190** 109:2

**194** 106:24

**197** 128:22,24,25

**198** 132:5

**1986** 19:2

**1990's** 16:12

**1992** 16:1,2,5

**1999** 12:14,17 15:16 16:2,6

**1:04** 152:10

**1:51** 145:4

### 2

**2** 68:12 109:10 166:19

**20** 44:5,7,21,22,24 49:9 106:4,6
  128:22 157:5 158:19

**200** 18:20 20:6 66:6

**2005** 15:13,16

**2010** 26:6,13 28:5 29:1,8,13
  41:6 181:3

**2012** 13:18 14:21 15:4 24:25
  25:23 26:3 55:16 102:10 136:24
  138:21

**2013** 140:23

**2014** 86:13,19 91:17 186:14

**2015** 61:6,7 63:15,21 65:1
  79:16,19 91:18 138:7 139:7,23
  140:14 141:14

**2016** 143:6,15

**2017** 21:1,10 25:23 26:7,10,13
  28:5 29:13 30:13,17,22 41:6 42:5
  47:7,18 53:6 54:9 61:14 83:24
  100:13,15 104:14 106:12 107:9
  109:8 110:11 123:8,21 136:15
  145:3 181:3

**2018** 81:13,14 96:10 99:16,18,
  23 103:15 141:7,8 151:4

**2019** 140:15 141:7,8 152:9,15
  153:16 159:21

**2020** 13:5,13 17:5 154:5,23
  155:14 156:25 157:13,18 158:4

**2021** 98:24 103:17 158:20
  159:2,21 161:6 166:7,20

**2022** 169:25 174:16,17 175:1

**2023** 12:17 68:25 69:4 85:3,5,
  23,25 86:3 87:5 88:4 92:23 95:14
  96:24 136:20 177:4 178:6

**2024** 6:1 88:11 95:25

**2027** 165:10

**21** 125:14,16 127:11 128:14

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 186 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024                                        Index: 211..80

**211** 106:9

**217** 136:10 147:3

**22** 139:23

**222** 68:23 70:9

**223** 177:4

**225** 176:20

**226** 175:24 176:5

**229** 174:5

**23** 138:21 141:7,8 153:16

**230** 174:13,14

**232** 170:9

**234** 165:13

**236** 152:5

**24** 165:8

**24,175.89** 150:12

**246** 151:2

**249** 149:12,13

**25** 13:17 16:14 47:18 151:15

**252** 148:7

**253** 145:3

**255** 143:14

**256** 142:12

**259** 141:14

**260** 141:10

**261** 139:22

**262** 138:3

**2632186** 147:7

**275** 17:20

**28** 168:4

**28,659.71** 168:7

**29** 168:4

**29730** 18:21

**2:24** 178:25

**2:32** 179:1

**2:36** 149:16

**2:46** 190:1

**2:47** 190:2,10

**2:52** 143:7

———————————

**3**

———————————

**3** 68:13 89:20 91:4 93:4 124:10 128:13 154:5

**3/26/2018** 149:16

**30** 9:1 44:6,8,23 45:25 46:2 49:8 189:8

**30(b)(6)** 6:2

**30-minute** 9:7,20

**300** 18:20

**31** 21:1,10 30:17,22 42:5 106:12

**3:16** 141:15

**3:21** 151:4

**3:32** 151:4

———————————

**4**

———————————

**4** 68:13 152:1 158:4

**40** 142:12

**44** 43:25 141:10

**447** 127:23 128:14

**45** 139:22

**46** 43:25 138:4

**474** 93:2

**476** 95:5

**477** 89:15 93:20

**48,000** 168:1

**4845** 150:3

**49** 48:10 67:2

**4:32** 143:15

**4:39** 154:24

**4:51** 153:17

**4:55** 148:15

———————————

**5**

———————————

**5** 13:3 68:14

**500** 151:14

**57WF** 142:1

**5:11** 159:2

**5:32** 146:25

**5:35** 158:5

———————————

**6**

———————————

**6** 67:2 68:23 70:7,14 73:14,15 92:9

**6/26/2017** 134:4

**6137918** 161:11

**63** 151:23

**650** 6:7

———————————

**7**

———————————

**7** 145:3 174:16

**7/23/18** 138:11

**7/23/2012** 161:16

**70** 171:6 189:9

**767.48** 151:23

**78** 169:19

**7:34** 154:6

**7:55** 140:14

———————————

**8**

———————————

**8** 59:12 66:15 136:15 139:25 140:4 151:4 158:20 159:2,21

**8/9/2018** 152:2

**80** 113:8 114:15,17,20 129:22 146:7,9,11,15 147:19 152:21 153:2,6,15 155:18,19 156:8,13 157:9,10 158:6,7 159:14,23 161:1

**88** 87:20

**8:12** 166:20

**8:16** 139:7

**8:44** 177:5

---

**9**

**9** 154:23 155:14 156:25 157:13 161:5 169:25 174:17

**90** 169:25

**924** 148:10,12

**97** 87:20

**99** 111:1 155:5 166:2,4

**99.9** 189:5

**9:21** 6:2

**9:34** 17:14

**9:35** 17:15

---

**A**

**a.m.** 6:2 17:14,15 58:2,3 98:9,10 111:19 138:7 140:14 152:10,17 154:6 158:5 166:20 177:5

**ability** 9:25 10:2 11:15 175:15 180:2

**absent** 130:9

**abstract** 62:1,3

**ABT** 150:10

**accelerate** 26:25 27:25 29:21 104:20 114:23 116:5,8 133:17, 19,21

**accelerated** 113:11 115:18,19, 22 124:3 126:5 130:20 156:16 157:12 165:5 168:2 169:21 171:14 175:5 179:23 185:18,19 187:15

**accelerates** 105:15 185:8

**accelerating** 116:12 159:12

**acceleration** 83:21 105:16 111:22,24 112:5 113:17 115:8 117:22 118:6,7,10,15 127:3 131:3 153:11 156:24 157:8 160:7

161:16 165:7 166:11,13 167:22 169:22 179:11 185:4 186:21 187:1 188:17

**accept** 154:3

**accepted** 153:21 162:10 177:24 178:2

**accepting** 157:13 158:21

**access** 34:4,12,15 35:20,23 36:1 58:17,22 60:13 69:15 70:20 71:2 74:7,8,9,13,15 76:23 77:5 80:6 88:13 154:1 161:24

**accessed** 81:11,12

**accessible** 75:4,6 186:17,19

**accessing** 71:4 148:19

**account** 31:15 43:19 45:19,21 50:18 59:3 60:25 61:12,19 62:6, 16 66:13,24 67:1,9,18,19 68:5,17 69:3,9,13,16,20 70:3,19 71:2,4, 23 72:11,12,23 73:1,21,22 74:16, 18,24 76:4,13 78:20,23 82:9 84:4 86:18 89:19,21,24 90:1,7,8,13,14 91:1 92:8,15 94:1,2,7,9,12,14,15 95:2,4 97:12 98:25 99:1 101:4,6 103:22 104:2 105:12,15,19 108:14,16 109:17,20,23 110:7 112:11 113:6,7,10,16 114:14,23 115:7 116:11 117:7 120:13 121:3 122:18 123:18,24 124:23 127:13 129:7,9,16,22 132:9,20,25 133:1, 9,10 136:6,14,22 137:2,4 138:18, 20 140:23 141:16,17,22 144:18 145:7,11,15,21 146:1,2,21 147:2, 4,11,12 149:20 150:24 152:17 154:1,24 155:3,15,18 157:2,6,25 158:12 159:3,7,22 160:2,6 161:11,13,24 162:12 164:14,20 166:17 167:4,10,25 169:21 170:21 173:7,9,15,17,20,21,25 178:2 179:9,19 186:13 187:7

**Account(s)** 170:12

**account-specific** 75:24

**accounted** 50:13

**accounting** 20:1 52:18,20 83:13

**accounts** 25:9,17 26:2,15,20 27:16 43:18,20 44:8,9 49:9,10 50:15 53:23 60:21 67:12,15,20

71:25 74:11 76:14,19 84:2 92:14 93:16 94:10 99:2,3 104:19 110:23 112:15,18 113:2,9 114:17,18 130:3,19,20,23 131:14,19 132:23 133:14 136:11 141:21 144:5,7,8 145:17 146:23 147:7,9 156:23 157:7 171:14 172:13,21,23 173:1,17 179:22 184:9,10 185:7 186:9 188:18,23

**accurate** 97:8

**accurately** 127:11

**ACH** 50:24 52:7,13,16

**acquire** 22:10

**Act** 101:10 158:1

**acting** 40:10

**action** 23:10 61:13 67:7,8,10,11 93:7 131:18 141:15 143:7,15 152:16 166:1,24 169:17 170:24 171:5

**actions** 61:8,11

**active** 130:9 132:25 136:14 137:4 173:2

**activities** 62:25

**activity** 89:21 90:1,7,8,11,12 133:1,10

**actual** 82:3 100:14 116:23 120:4 124:2

**Adam** 55:11

**add** 7:16 180:3

**added** 165:21 180:17

**addendum** 47:7,11,17,24

**addition** 104:2 122:10

**additional** 34:21 66:1 165:5 175:6

**address** 18:19,22 32:23 114:9, 13 122:24 132:18 154:6,8,11,12, 17,19,21 163:10 182:14

**addresses** 33:3 37:9

**adhering** 14:19

**adjust** 74:13 167:23 175:15

**adjusted** 167:16 169:21 175:18

**adjusting** 167:10

**adjustment** 166:20,24 167:1 168:10,11 175:21

**admin** 77:4,6 111:7 112:8,10 113:8,16 114:17,22,25 115:6 116:4,10 117:15,25 118:5 121:11,15,18 124:22,24 126:1,3, 7,14,16,24 130:13 135:9 155:13 159:1 164:21 176:11,15 177:8 179:10,19

**admit** 124:10

**advance** 174:12

**advised** 144:24

**affect** 9:24 10:2

**affidavit** 38:23,24 98:23

**affidavits** 38:22 39:17,18 176:17,21,24

**afternoon** 36:13

**agencies** 22:17 23:9

**agency** 22:15 38:20 84:14,16

**agree** 159:25

**Agreed** 49:17

**agreement** 27:5 106:13 183:20 185:6,14 186:7

**agreements** 185:13

**ahead** 8:4 64:1 67:22 106:16 108:9 116:8 131:4

**all-encompassing** 84:19

**allowed** 160:16,20

**America** 20:25 21:2,5,8,9,12, 17,23 23:5 25:9,17,18 26:2,3,15, 16,18,23 27:6,8,13,19,22 28:6,7, 10,23 29:8,15,16,19,25 30:3,16, 17,24 31:2,5 40:18 41:8,21,23 42:2,5,7,14,22 43:10,22 45:12 50:15 51:21 52:2 56:3,10 60:21 61:3,12 62:14,19 75:16,21 83:21 84:5 98:14,18,20 99:2 103:12,21 104:1,11,15,18 105:4,14 110:2, 18 112:2,17,24 113:9,15 114:18 115:2 119:18 120:12 121:8,23 123:10 124:25 126:4,8 130:20,22 135:8 136:23 137:3,4 145:7,19, 21 146:1,21 163:4,20 172:13

181:2,4 183:17,18 184:17,22 185:4,15,16,20,25 186:3 187:14, 18,24

**amortization** 126:2 188:5,9

**amount** 52:13,14 63:2 109:24, 25 115:12 118:14 136:24 167:1 169:23 175:17

**amounts** 172:4

**analysis** 120:17,22

**answering** 10:7 35:11 127:15

**answers** 7:1,2,6

**anticipated** 115:15 169:24

**anticipation** 47:25

**anxious** 168:14

**anymore** 86:23 179:21 186:16

**apologies** 28:4 101:3 120:6 137:22 146:12 156:6 176:5 185:3

**apologize** 6:22 54:7,23 88:9 139:6 174:9

**apparently** 170:5

**appears** 157:24 165:21

**applicable** 47:8 75:16,20 76:14 84:22 86:19 102:24 106:11 107:9 109:7 114:12 122:23 123:19 172:13

**applied** 138:17 159:7 164:10 173:22

**applies** 108:1

**apply** 8:7 10:17 164:8

**approval** 28:15 111:8 169:14 170:18

**approve** 119:12 169:13

**approved** 45:19

**approves** 105:18

**approximately** 13:13 14:21 15:4,12,16 16:6 17:10,20 20:5 22:19 24:25 26:10 29:8 47:13 55:16,19 79:16 168:1,2 184:2,5

**April** 139:5,6 140:15,23 141:7,8 152:9,15 159:21

**AR** 67:5,6

**archive** 183:6

**archived** 183:6

**area** 71:21

**areas** 97:2

**argued** 187:18

**arrangement** 27:3

**arrangements** 99:22 106:2

**articulate** 7:24

**aspects** 65:19 128:5

**assembling** 118:4

**assign** 155:7,11

**assigned** 56:7 115:4 143:22,23 144:2 145:10 148:10 153:10 154:24 155:14 157:1,3,5 158:12 159:22 166:16 170:21 183:18 184:5,7,11

**assigning** 152:20

**assist** 14:14

**associate** 15:15

**associates** 55:6

**assume** 12:16 36:2 58:25 177:19

**assuming** 46:11 51:10 144:11 171:1 178:4

**assurance** 134:3,6,7,25

**attached** 98:23 176:17 177:10, 15

**Attachment** 11:7

**attachments** 180:3

**attempts** 105:11 131:24 145:2 160:24

**attention** 138:3

**attorney** 7:4 8:21 45:17,20,21 51:11,16,18 57:16 61:17 72:9 82:19,23 105:19 109:13 110:17, 24 111:4,6 121:7 148:22 163:2 169:2,9 170:1,4,23 175:10,12 177:2,11,16

**attorney's** 111:2

**Attorneyrecord45** 169:10

**attorneys** 20:17 44:12,14,16, 18 77:7,9,10 85:15 121:12 126:14,15 176:25

**audio** 78:25

**audit** 55:23 135:7

**auditing** 134:9

**audits** 23:14 56:12,18,21,24 134:6,7,16,25

**August** 12:14 151:4

**authority** 26:25 27:25 29:21 104:20 133:18,21

**authorize** 52:16

**authorized** 31:15 32:5 109:12 132:24 133:8

**authorizes** 31:19,25 45:13,14

**authorizing** 110:22

**auto-populated** 123:15

**automated** 113:20 134:21 135:4 138:13 140:19,25 147:17 152:13 153:3 154:15,16,17 155:23,25 163:8 164:13 179:15, 25 180:25

**automatic** 152:16 180:22

**automatically** 114:14 125:5 126:10 129:21 153:1 155:6 159:16 183:11,12,14

**avenue** 18:20 179:23

**avoid** 127:20

**awarded** 175:19

**aware** 64:6 73:2 104:13 112:11 120:10 127:1 187:17 188:11

---

**B**

---

**bachelor's** 15:17,21

**back** 12:12 13:17 38:24 41:5 53:5 82:20 93:2 98:3 102:10 109:2 111:22 123:21 124:7 128:21 141:12 144:17 147:3 155:19 157:10,16 158:6,17 159:20 170:18 174:2 176:24,25 184:21 185:16,19

**back-to-back** 8:9

**backup** 75:9

**backwards** 12:15 137:21,25 156:12 165:13 166:19

**bad** 52:24

**balance** 26:24 27:21,24 68:13 74:13 104:15,21 105:3,25 107:20,25 108:7,16,17,20 109:17,20 110:7 115:18 116:6 128:4,19 136:17,19 137:9,14 150:16,19,25 167:12,15,18,25 168:1,2 170:3,4,6 175:5

**ballpark** 53:3 179:22

**bank** 20:25 21:2,5,8,9,12,17,23 23:4 25:8,17,18 26:2,3,15,16,18, 23 27:6,8,13,19,22 28:6,7,9,23 29:7,15,16,18,25 30:3,15,17,23 31:1,5 40:17 41:7,8,21,23 42:2,5, 7,13,22 43:10,22 45:12 50:15 51:21 52:2 56:3,10 60:21 61:2,12 62:13,19 75:16,20 83:21 84:5,6 98:14,18,20 99:2 103:12,21,25 104:11,14,17 105:4,14 110:2,18 112:2,16,24 113:15 114:18 115:2 119:18 120:12 121:8,22 123:10 124:25 126:4,8 130:19,22 135:7 136:22 137:3,4 145:7,18,21 146:1,21 147:22 148:9 163:4,20 172:13 181:2,4 183:17,18 184:17,22 185:4,15,16,19,25 186:3 187:14,18,24

**base** 152:1

**based** 7:24 23:18 48:1 74:13 75:2 111:2 112:19,24 113:3 114:7 115:13,15 118:12 123:13, 18 131:1 138:14 141:1 153:8,11, 24 156:8 160:4 161:15 163:10, 11,13 164:11 174:25 178:3

**basic** 31:22 35:13

**basically** 8:17 26:8 125:2,21 134:16 140:7 149:4 150:2

**basis** 55:22 65:21 110:17,19,20 121:24 172:8

**Bates** 106:9

**bear** 152:8

**began** 16:7

**begin** 29:9

**behalf** 6:6 10:5,7,8 20:18 25:17 26:2,14 27:7 28:6 29:15 30:14 32:4 33:12 40:3,18 41:7,23 42:1 43:13 121:7 137:4,6,10 181:4 189:13 190:5

**benefit** 165:3

**Beth** 148:12,18 150:2

**big** 45:9 115:9 128:21 171:1

**biggest** 116:6

**bill** 103:8 186:3

**billed** 167:4 170:3

**bimonthly** 182:8

**bit** 76:8 186:20

**BNA** 83:14

**BOA** 144:12

**BOAF04** 144:10

**body** 142:22 180:11

**borrowing** 163:6,15,22

**boss** 40:11

**bottom** 93:3 109:10 132:22 138:4 143:14 148:7 157:21 166:23 170:8 176:1 177:19

**bought** 184:20

**boxes** 68:9

**BP** 146:7

**break** 30:20 37:1 57:25 178:20

**breaks** 7:13

**Brendan** 99:11

**briefly** 183:17

**bring** 13:2 121:18

**broad** 38:9 56:1

**broken** 68:8 172:7

**brought** 64:2 79:18 111:4

**building** 18:24 35:12

**built** 164:17

**bullets** 130:17

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 190 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024                                Index: business..co-signer

**business** 14:9 19:4,7,9 25:20 26:9 158:10 188:25

**businesses** 20:10

**button** 52:16

**BYU** 147:12

**C**

**C77** 152:11

**Cadwalader** 6:7

**calculated** 128:4,5

**calculation** 140:18

**calculations** 128:6

**California** 164:11

**call** 33:11 42:7 68:9 78:12,19,20, 22,25 81:25 82:2 100:19 109:19 118:3 149:24 150:8 151:7 189:3

**called** 30:15 54:18 63:19 78:10 83:14 112:19 113:25 120:25 150:2

**calling** 163:22

**calls** 29:4 78:1,4,6,8,15 79:12, 13 81:24 102:12,13,20 105:23 108:1,3 109:11 110:6 131:21,25 160:21

**CAM** 148:9

**capacity** 179:6

**capital** 16:24 17:2 84:8

**card** 50:24

**Carolina** 6:9 18:21 147:13 163:5,21

**carrier** 35:5

**case** 8:18 9:21 57:4 71:23 82:11,14 93:4 94:21 110:13 113:5 120:20 148:18,22 169:9 170:16 173:11 174:20 175:3

**case-by-case** 121:24 172:8

**cases** 51:8 57:19 82:16 110:15, 17

**cash** 50:22

**ceased** 113:12

**cell** 33:16,18,22

**center** 78:13 82:1,2

**CEO** 18:11,15

**certificate** 95:9

**certificates** 95:6,12,16,18,23

**CFO** 52:20

**chain** 186:1

**chance** 109:4 125:17

**change** 37:9 140:21 143:17 154:8 166:4 182:14 187:23

**changed** 110:12 159:20 164:8, 13 171:11,12 173:20

**changing** 154:17

**charge** 55:15 65:5 134:25

**charge-off** 104:6,10,15 108:17,20 109:25 113:5,23 114:1,11 122:22 131:2 137:9 138:20 141:1 153:8 160:4 168:1

**charged** 28:1 29:20 104:19,25

**charged-off** 26:24 27:21,24 28:11 104:21 105:3 112:20,25

**Charlotte** 6:8

**chart** 89:19 91:3 115:25 125:1 128:1

**charts** 174:23

**Chatham** 18:20

**check** 39:12 50:24 80:23 81:2, 3,7 170:2 180:12

**Chgwrkg** 143:16

**Chisolm** 142:16,19 144:1

**Chisolm's** 144:5

**choice** 164:11

**chose** 69:2

**Chris** 36:11 168:12 177:13

**Christopher** 6:4,12 8:11 99:13

**chronologically** 12:15 137:20

**circumstances** 85:25 90:4 94:15 179:18

**City** 92:4,14,18,24 132:13,18

**city-specific** 92:4,19

**Civil** 6:5 158:1

**clarification** 28:2 54:22 116:2 123:1

**clarify** 7:12 10:19 24:3 40:9 44:10 97:11 106:17 122:25 156:2 173:8

**clauses** 23:19,20

**Clay** 17:23 33:6 53:21,22 153:18 155:12

**clean** 7:9

**cleaner** 168:17

**clear** 21:4 25:15 30:11 34:25 40:3 49:2 54:7 156:10 162:19 186:11

**click** 58:18 59:21 71:23 154:2

**client** 13:21 14:13 15:10 19:5, 21 31:19,25 39:8 40:10 56:7 94:11,13,17,20 111:11,15 121:19,21 132:24 133:8 170:11 182:3,7,10,17

**client-specific** 188:1

**clients** 14:3,4,6,10,14 20:19,21, 23 39:9 45:6 51:24 52:22 112:16 115:3 117:23 119:10,11,19 122:5 164:16 170:15 171:23 182:8,16 183:1 188:7,10

**clock** 36:23

**close** 68:13 90:20 94:1 182:14 190:4

**closed** 90:13,14,21 94:7,10,15, 16 97:13 130:4 136:22 137:2 145:15,18,21 146:11,15 147:19 153:7 173:5

**closing** 145:14 146:20,23

**closure** 95:3

**CMS** 84:13,18,20

**co-maker** 150:3 151:19

**co-signer** 139:12,13,18 149:25

Cain & Crane Court Reporters
704.545.3510

**code**  59:12 67:11 90:19,21 141:16 143:7,15 145:14 146:16 166:2,4,24 169:18 170:1 171:5,6

**codes**  90:20 142:5,7 169:19 170:24

**coincidence**  48:3

**collect**  14:11 19:15 21:19 22:10 25:8,16 26:1,24 27:20,23 28:11 29:19 31:14,18,19,25 38:19 40:18 41:10 43:6,12 103:22 104:1,15,18,21 105:3,12,22 131:17 147:10 186:22,25 187:6, 11 188:12,22 189:12

**collected**  21:6,7 28:6 30:14 31:4 41:19,21 63:3 137:3,5 172:5,10 186:23

**collecting**  26:14 29:14 42:13, 17 134:17 137:10

**collection**  20:18 21:15 22:3,4, 12 26:19,22 27:7,15 31:9,12 38:18,20 42:1,19 58:8 59:2 61:10 62:25 63:16 74:12 77:10 79:9,10 81:10 82:19,23 95:25 96:1 101:10 102:16 105:23 113:11 119:3,4 120:1 121:7 130:7,9 131:20,25 132:25 133:3,9,12 140:5 141:19 161:4 181:3 186:14 189:1

**collections**  18:2,4,6 19:5,21 20:5,8 32:4 40:24 41:6 46:2 55:23 56:19 61:11,13 64:17,21 65:11,15,23 66:3,6,9 78:19 80:12 149:21 187:24

**collector**  19:8,11 20:11,14 26:22 31:24 69:19 74:14 112:13 113:18 132:3 142:20,21 143:2, 23,25 144:2 147:10,25 152:19 160:22,23,25 179:11,13,18 180:19

**collectors**  102:4 143:21 152:4 179:24 180:2

**collects**  21:7 144:18

**college**  16:5

**combination**  122:21

**comfortable**  127:15

**commencing**  6:2

**comment**  142:22 143:7 161:6 162:6 174:16

**common**  71:7

**communicate**  40:12,14 175:11

**communicates**  38:7

**communication**  108:25 121:15 130:10 132:8,17 160:11 161:20

**communications**  38:16,18 39:1 92:8 180:17

**companies**  95:10 185:21

**company**  12:7,10 13:8,23 14:18 20:7 36:20 37:19 64:22 74:10 185:16,18,22 186:5

**complaint**  57:5,8,10 110:24 120:8 175:4,16 187:2,3

**complaints**  56:1 57:19 82:20, 22,23,25 83:7 84:18 187:25

**complete**  7:1 125:21

**completed**  16:4

**completely**  167:9

**compliance**  13:15,22 14:16, 18,23 15:4,9 19:5,21 24:21 25:1 54:18,25 55:4,6,7,9,12,14,21 56:6,9,17 57:6,21,22 84:9,13,15, 16,21 102:21,23 134:8,20,24 135:3,7 136:1,2 149:3 153:21,24 157:14 158:21 162:11 177:25 178:2 180:13

**comply**  102:24

**component**  128:17

**compute**  115:12

**computed**  123:17 160:5

**computer**  34:11,16 58:18 59:21 84:24 124:15,17 132:1 158:14 181:10

**concluded**  190:9

**conditions**  75:15,20,24 76:24 77:20

**conducted**  23:15

**confidential**  43:24 44:4 46:10, 17 48:9 49:3,16,21 50:4 87:19

88:23,24 89:14,17,18 97:17,22

**confidentiality**  23:19,20

**confirm**  103:3 116:13 117:1

**confused**  10:17

**confusing**  10:11 146:18

**conjunction**  102:21

**connection**  52:10 93:10 119:14 149:24

**connotation**  86:25

**connote**  172:18

**considered**  153:24

**consult**  85:15

**consumer**  43:21 50:12,18,19 51:6,15 57:5 59:2 62:15,16 63:3 68:4,11 70:15,17 71:25 72:8,18 73:7,8 74:24 76:19,20 81:24 82:9,24,25 89:19,24 93:16 94:5 95:2 96:2,11,20 102:1,2 105:25 107:20 109:12,19 111:2,5 114:7, 9 115:16 118:11,19 121:22 132:18 141:1,16 142:8 144:24 145:10 147:4,5,7,8 151:10 154:6, 24 157:18 159:3 165:16 166:16, 20,24 167:1 168:24 169:12 170:21 172:7 173:10,15,16 179:20 180:10 187:25

**consumer's**  59:3 63:10 83:8 100:14 109:13 114:13 122:24 150:24 177:11,15

**consumer-specific**  80:20

**consumers**  51:22 55:24 56:1 78:1 81:19 92:24,25 100:24 101:13,15,19 102:18 107:24 110:6 112:2 149:20 171:22

**contact**  40:6 101:1 144:24 170:11

**contacting**  111:2

**contained**  96:10

**content**  7:22 36:17 79:12 142:25

**contents**  85:14 102:7 150:8

**context**  18:17

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 192 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024                                Index: contingency..David

**contingency** 43:17,22 44:14, 15,16 46:1 51:16,19

**continue** 141:3 151:16 184:7

**continues** 42:19

**continuing** 131:17 157:17

**contract** 26:6,7 27:5,11,12,14, 17 31:13,16 32:7 43:17 47:5,6,24 100:7 104:17 105:1 120:5,6,7 181:2,8

**contracted** 27:22 28:10 29:18 31:11

**Contractors** 88:19

**contracts** 82:5 131:6 164:12

**controls** 35:6

**conversation** 80:24 85:14

**conversations** 9:22 28:23 54:13

**conversion** 79:16

**copied** 143:2

**copies** 64:5 77:19 82:20 103:8, 15,17

**copy** 39:19,22,23 81:7 96:8,14, 17,21 100:14 181:11

**core** 123:7

**corporate** 6:3 10:6 163:4

**corporation** 10:5 163:21

**corporations** 10:12

**correct** 8:4 11:11,12 12:1 14:7, 25 15:18,19 16:9,10 18:8,22 19:19 20:19,20 22:5 25:24 27:21 28:12,13 30:24 31:2,5,12,16,21, 23 32:2,24 34:8,10 36:2 37:10 38:24,25 39:14,16 42:8 43:10 52:15 53:13 54:2,10 56:4,5,19,20 60:5,16 62:7,12 63:6,21 67:4,21 68:15 71:9,11 74:2 75:25 79:2 81:5,18 83:15 84:23,25 85:1 86:20,22 87:2 88:12 91:2,6,24 92:1,5,11,12,13 93:13 95:20 96:7,18,23 98:21,22,24,25 99:5, 8,14 100:6,18 101:11 102:3,11 103:1,7,9,11,13,16,19 104:5,22, 24 105:20 106:23 108:18,22,24 109:1,14 111:16,24,25 112:2,3

113:18,19,21 114:16 116:9 117:11 118:21 119:15,16,20 120:14 121:25 122:25 124:6,10, 14,15 130:1 132:15,16 136:12, 15,16,17,18,25 137:7 140:2,3 145:8,9 146:8 148:4,6,21 149:9 150:9 151:1,10 158:8 159:5,15 161:2,7 162:21,24 163:23 164:10 166:12,15 167:24 170:20 171:9 172:11 173:23 174:1,3,22 175:17 176:22 177:7,17 179:14 185:17 186:22 187:1,5 188:6

**corrected** 54:24 69:24

**correctly** 67:1 89:22 91:5 107:21 113:13 129:11 130:11 132:11 133:5 134:13 155:20 157:20 159:24 163:22 181:15

**corresponded** 148:23

**correspondence** 72:4,7,10

**cost** 170:2

**costs** 45:1,23,24 167:3,5

**counsel** 23:25 24:11 25:2 54:2, 10 102:23 110:14

**counter** 111:8

**couple** 62:2 106:18 109:2 118:22 141:9

**court** 6:24 7:5,8 11:1 45:24 46:5 51:16,18 54:22 57:9,12 76:7,11 87:11 106:4 116:2 120:1 125:14 167:3,5 170:2

**cover** 23:4 119:8

**coverage** 34:18

**covered** 178:16

**CPA** 83:14

**CR** 75:3

**create** 53:18 59:8,18,20 124:25 126:3,17,24 148:25 188:5

**created** 19:1 59:14,25 60:7 69:6 71:20 92:16 96:1,12,13 101:15,19 124:12,21 126:1 128:8 149:2 171:25 183:14

**creates** 64:14 96:5 125:3

**creating** 53:15,17 85:15 147:2

**creation** 92:10

**credit** 50:24

**creditor** 62:20 82:8 122:7 130:4 136:14,22 163:4,12,15 171:11, 12,13,18 172:3,12 173:1,7,9,11, 14,18,21 183:25 189:14

**creditor's** 109:16

**Creditor-client** 92:8

**creditors** 19:15,16,17 183:1 189:14,20

**creditors'** 84:2

**CRIS** 75:3

**cris08/04959465.pdf** 73:17

**criteria** 170:3,4,6

**CRS** 63:20,22 64:5 79:6,8 86:12, 16

**CS** 166:2,4 169:18,19 171:5

**current** 13:7 68:12 88:10 99:20 109:17,20 110:5,7 134:3 152:19 158:3 183:3

**cutting** 76:7

**CV** 174:20

---

**D**

**daily** 129:9,16

**data** 59:16 88:3 89:20,24 91:1 93:3,9 97:6,9,10 126:11

**database** 34:5 61:16 74:21,25 75:14

**date** 14:22 21:12 31:4 68:13 69:5 89:20,25 92:9,16 112:19,20, 25 113:3,4,5,23,25 114:1,3,4,11, 13,14 115:15 122:19,20,21 123:11,14,18,22,24 129:14,17 131:2,3 136:19,23 138:10,14,20 140:15,20 141:1,7 145:16 153:8 156:17 157:4,11 160:4,5,6 163:9 169:22,23,24 174:20 175:1,13

**dated** 47:7

**dates** 8:9 141:12 145:5 152:14

**David** 18:7

**Dawson** 8:18 60:23 66:13 67:14 72:5,18 83:9 97:11 100:13 103:8,15 108:21 111:24 112:5 118:22 119:15 120:9 136:12 139:10 140:9 148:5 149:25 150:3 160:12 164:25 165:3,8 166:11 174:15

**Dawson's** 60:24 61:17 66:24 67:19 68:17 71:23 73:21 98:25 99:1 103:22 104:2,7,16,23 105:1 108:14 109:23 112:11 122:18 123:1 127:13 128:10 138:18 140:22 145:6,15 146:21 147:6 152:17 155:14 157:2,6 158:12 159:7,22 161:13 163:10 167:25 173:20,25 178:1 186:22,23,25

**Dawsons'** 125:22

**day** 21:21 37:15,22 54:17 155:17 159:13 177:18 178:11 183:24

**day-to-day** 12:6,11 13:8 14:15 55:22

**days** 100:25 101:7 116:17 118:23,24 159:19 169:25

**DCA** 22:18 23:4

**debt** 14:11 19:8,11,15 20:11,14, 18 21:15,19 22:4,12 26:21 31:18, 24 34:4 43:9 51:2,3,4,12,13,14, 25 52:3,4 59:23,24,25 60:4 61:5, 8,14,15,20,24 62:18 63:3,7,12, 16,22 64:7,19,23 65:2,5,9,12,16, 19 66:1,3,7,9 67:20 68:5,17 69:15,16,19 70:2 71:12,22 72:2, 14,15,16,21,22 73:1,6 74:4,6,17 78:2,5 79:5,9,10 81:4,11,19 82:6, 9,19,21 83:5,6,10 86:15 90:17 96:3,4,8 97:6 101:7,9 113:22 114:9 115:19 117:7,9 118:13 119:2,3 121:7 123:2,5,12 129:2 131:17 133:3,12 135:9 143:1 144:19 148:19 152:14 171:17 172:2,25 175:8,18 180:5,7 183:11,14,16 185:18 186:15 189:4,7

**debts** 134:17

**December** 17:5 98:24 141:14 158:4 166:7,19

**decide** 115:7 116:4 179:18

**decided** 112:4 113:18 164:8 179:12

**decision** 34:23 35:4 187:6

**dedicated** 32:18

**default** 123:14 147:22 148:9 184:22

**defaulted** 26:22 29:19 184:20

**defined** 168:24 169:1,5,6,7

**degree** 15:17,21

**deleting** 97:6,9,10

**delinquency** 112:19,25 113:25 122:21 129:14,17 160:5 161:15 163:9 164:14

**demand** 108:13 180:13

**denial** 111:9

**department** 18:4 52:18 54:19 55:1,4,15,21 56:7,9,18 57:6,18, 21,22 64:17 65:3,4,6,7,23 66:7,9 77:4,6 102:22,23 112:9,11 113:17 116:10 121:16,18 155:13 176:12

**department's** 136:2

**departments** 12:9 19:8,19,23 20:3

**depending** 135:23 182:7

**depends** 119:4 121:20

**deposition** 6:2 8:13,21 9:12, 15,18 10:25 11:7,8,10 36:12 46:4 60:17 87:10 106:6 125:16 190:9

**depositions** 6:22 7:23

**Derek** 55:13

**derived** 112:1 122:21 125:4

**describe** 19:20 45:18 54:17,25

**describes** 150:7

**describing** 130:14 138:13

**description** 62:22

**design** 163:14

**designation** 97:17

**designed** 163:13

**designee** 6:3

**desk** 33:18,25

**destroy** 91:1 94:2 95:10 97:14

**destroyed** 63:24 79:15,19 86:24 94:25 95:3

**destroying** 97:3

**destruction** 95:6,9,12,15,18

**detail** 8:6 61:23

**details** 68:4,11,14 165:17

**determination** 116:6

**determine** 62:13 113:17 114:22 115:21

**determined** 132:18

**developed** 85:2 102:21 180:9

**DFLTBNK** 147:19

**differ** 43:18

**difference** 156:9 168:4

**differently** 144:22 175:23

**difficult** 41:3 90:9 145:24

**direct** 6:15 9:23 33:16 42:21 65:15 100:1,4 109:10

**directed** 7:3 21:16 102:17 173:13,15 187:13

**Directing** 138:3

**directives** 26:18

**directly** 45:3 51:10,22 72:12 109:12 112:13 147:18 182:19 186:3

**director** 55:6,7,12 149:3

**directs** 35:8

**disbursement** 28:16

**disclose** 110:7

**disclosed** 89:6 109:21

**disclosing** 85:14

**disclosure** 115:13 117:4 130:8

**disclosures** 109:7,11,16 132:6,7,10,19

**discovery** 88:23

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 194 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024                                  Index: discuss..exist

**discuss** 23:8 111:3 151:25 187:22 189:18

**discussed** 16:18 38:21 99:6 100:12 138:15 139:8,25 148:1,17 170:14 186:11

**discussing** 88:4 91:8

**discussion** 17:14 98:9 101:7 190:1

**discussions** 48:5

**disputes** 55:24,25

**distribution** 147:23,25 158:10

**divide** 189:6

**DM** 75:1,5 79:18 81:15 122:17 124:16 161:15 169:8

**document** 10:24 11:1,4 27:10 46:3 47:2 49:13 50:3,4 67:2 68:3, 16 72:10 73:18,23 77:17 85:2,7, 10 87:9,14 89:14,18 99:3 106:3,5 107:2,5 109:3 120:20 124:12,19, 21 125:13,15,18 126:4,17,25 127:2,10 128:8,22 133:25 136:8 141:24 142:8 148:24 178:15

**documentation** 82:8,18 116:11 121:3 154:16

**documented** 84:18 135:21

**documenting** 141:21 169:2,8

**documents** 8:15,16,18 62:1 64:7,9,10,11,12,21 65:9,25 71:25 72:1,18,22,25 73:6,9,21 74:24 75:10,13 80:16,25 85:12 86:1,4,8 98:13,18,23 99:6 103:5 108:15 116:14,16,20,21,22,23 117:1 120:13 121:4 170:19 186:2

**dollar** 120:4

**dollars** 165:8 168:5

**door** 35:17,19,24

**Douglas** 70:17,22,25 71:1 161:10,22,23 162:10 166:21 176:21,24 177:6,13

**drive** 58:20,21 60:10 72:17 77:15,16,18,20 78:17 83:7

**driver** 151:22

**drives** 76:17,18

**dropped** 175:6

**dual** 30:9

**due** 107:20,25 115:13,14 131:7 160:8

**duly** 6:13

---

**E**

**e-mail** 32:23 33:3 37:9 38:3,10, 11,14 39:15,23 72:3,7 73:7,8 102:1 111:6 142:15,23,25 143:3 176:1,2,6,16 177:5,12,23 180:8

**e-mails** 80:12 81:19 101:21,24 102:5,8,20 105:24 161:3 180:3,7, 24

**e-oscar** 55:25

**E8** 58:11 91:10

**earlier** 11:9 20:13 49:8 60:9 63:2 74:3 91:9 101:8 121:11 129:13 140:25 148:22 159:9 165:24 179:5,8 181:1,14 182:3 188:4

**easier** 61:25

**Eastern** 152:1

**Echols** 23:24 24:3,4,5,9,10 25:2 54:1,9,14 85:21 120:18,23

**edit** 69:16 91:16

**efficient** 8:3

**efforts** 105:23 113:12 161:4 179:20

**electronic** 61:1

**electronically** 58:14

**employee** 59:1 60:4,11 71:3 74:17 78:18

**employees** 17:18 20:2 35:20 40:2,5,8,12 58:22 60:13 88:15 89:1,3

**employment** 15:20,22

**end** 26:7 46:17 49:21 97:22 137:22

**ended** 26:8

**ending** 150:3

**ends** 60:17

**enforcement** 23:9,10

**engage** 25:20 32:3 40:23

**engaged** 40:25

**ensure** 134:7,16

**entail** 14:17

**entered** 69:19 123:14

**entire** 65:6,7

**entries** 71:8,15 140:13 148:1, 13,15 151:6 153:16 155:17 157:18 158:5 168:23 175:7 178:6

**entry** 70:8 71:20 140:14 143:14 145:5,6,10 146:6 150:6 152:7 153:14,16 154:5,7,23 165:15 168:8 169:17 171:11 176:5,20,23 177:19

**essentially** 68:21 74:17 108:6 118:7 125:11 146:20 150:22 159:6 179:9

**estimated** 175:1

**event** 158:17

**events** 67:5,6,8 69:4

**everybody's** 8:1

**exact** 12:25 14:22 71:8 118:24 128:15

**EXAMINATION** 6:15

**examined** 6:13

**exams** 23:14

**Excel** 59:16

**exception** 15:8 86:6 131:15

**executed** 98:24

**executive** 12:22 13:12

**exhausted** 179:20

**exhibit** 10:23,25 11:2,5 46:4,5,9 66:15 87:10,11,15 93:19 106:4,6 107:4 109:5 124:10 125:14,16 128:13,14,22 136:7

**exist** 72:20 79:20 86:21,23 87:1 186:15

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 195 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024                                Index: existed..Fudge

**existed** 86:18 181:1

**exists** 117:3

**expand** 27:4 71:14 85:9

**expanding** 151:8

**expect** 178:22

**expert** 171:4

**expire** 160:3

**expired** 135:10 146:9

**explain** 8:5 43:20 50:12 67:22 71:12 73:24 74:6 80:2,4 106:7 113:14 117:12 149:18

**explained** 19:3 58:7 63:2 74:3 113:20 151:14

**explaining** 122:20

**explanation** 128:1

**Explorer** 58:19

**extend** 151:22

**extent** 79:16 142:5

---

**F**

---

**F04** 143:19 144:1,4,10,12,13 148:11

**facilities** 35:22

**fact** 78:20 186:21

**fair** 34:15 72:1 76:20 101:9 128:7 187:4

**fallen** 175:14

**familiar** 80:3 84:9 109:5 136:7

**fast** 136:8

**fault** 88:9

**FCRA** 55:24

**FDCPA** 100:25

**feature** 123:5

**features** 74:6

**February** 176:6

**federal** 6:5 14:20,24 102:25 188:3

**fee** 43:22 48:2 51:19

**field** 62:18 112:18 124:2,5 127:21

**fields** 125:11 126:10 169:5 170:17

**figure** 37:15 90:11 137:13 153:4

**file** 20:18 45:17,22 59:16,18 60:24 71:17 72:17 148:14,19,23 149:5,7 169:23,24 170:14 174:20 175:17

**filed** 21:16 23:9 42:22 47:18 62:7,14 82:23 93:12 105:9 110:24 120:9 121:22 174:15 175:3,5,12

**files** 60:20,22 71:12 74:18 81:12 82:3 93:16 178:7 181:9,10

**filing** 45:20 115:15 175:1,16,17

**filings** 82:16

**filled** 95:25

**finance** 20:1 22:6

**finances** 151:25

**financial** 63:8 64:3 74:9 182:10

**find** 62:18 76:24 111:5 123:21, 24 140:11 142:10 173:25 185:24

**fine** 54:6 57:2 140:13 149:23 163:23

**fires** 42:4

**firm** 23:24 24:4,9,10 25:3 54:1,9, 14 57:9,12 85:19 119:3,14,21 120:11,13,18,23 121:1,10 170:2

**firms** 118:25 119:4,8,9 120:1 127:6,9

**fits** 180:12

**five-minute** 178:20

**fixed** 158:18

**flag** 159:10

**flagged** 93:3,9,10 179:16

**flags** 129:21

**Fleet** 84:6

**flip** 165:12

**flipping** 109:2 122:13

**flow** 62:8 172:20,21 183:20 185:5,13,14 186:8

**follow** 100:4,5 102:5,17 179:4

**forces** 147:10

**forever** 86:4

**form** 15:2 17:11 25:6,11 28:18 37:14 41:24 50:7 53:12 55:17 56:23 57:13 59:5 64:1 76:21 77:23 87:3 88:22 89:7 94:6,18 101:5 103:10 104:8,12 110:8 120:2,19 127:14 128:11,12 172:14 174:11 184:13 185:1

**formal** 28:20

**Formalized** 85:4

**format** 58:24 82:3

**formula** 138:15,17

**forward** 137:22 157:17 172:20, 21 183:19 185:5,13,14 186:8

**forwards** 57:16

**found** 154:13 175:23

**four-year** 164:9

**frame** 22:24 24:24

**frequency** 182:7

**frequently** 65:8

**friendly** 149:5,6

**front** 8:17 113:16 161:12

**Frost** 24:3,4,9 85:21

**Fudge** 6:3 8:4 9:11,14 10:6,8,15 12:1,13,20 13:21 14:9,10,23 16:7,13 17:8,18,24 18:6,8 19:1 20:10,13,17,21 21:6,16,19,25 22:9,14 23:10,14,24 24:10,18 25:1,2,8,16,20 26:1,14,19,21 27:6,15,20,23 28:5,10,15 29:8, 14,16,18,20,25 30:4,7,11,14 31:4,11,14,18,19 32:3,6,17,23 33:15,16,22,25 34:17,18,24 35:6, 8,15,20 36:16 37:6 38:1,3,7,10, 17,19,22,24 39:7,11,18 40:2,6,8, 12,18,23 41:7,10,19,20 42:13,16, 21 43:6,12,16 44:11,13 45:4,5, 13,16,21 47:6 50:3,5,13,19,25 51:12,24,25 52:5,11,24,25 53:7,

Cain & Crane Court Reporters
704.545.3510

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 196 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024    Index: Fudge's..hired

10,12,15,18,19 54:3,5,6,8,10,12, 20,21 57:7,18,20 58:8,21 59:1,7, 15 60:4,11,20,24 61:5,8,13 62:24 63:15,22 64:14,22 65:2,8,14,24 68:20 69:13 70:22 71:3,19 73:20 74:8,20 76:16 77:8,22,25 78:3,7, 18 79:6,11,23,25 80:5,14,18 81:2,10 82:12,15,18 83:9,10,17, 19 84:1,4,21 85:1,22 86:1,3 87:6 88:15 89:3,5,14 90:15 91:1,22 93:8,11,12,16,24 94:1,10,21,24 95:11,15,21 96:6,12,14,16,19,24 97:2 98:14,20 100:1,4,13,24 101:3,18,23 103:4,7,14,20,23 104:2,6,10,14,17 105:9,11,15,17, 19,21 106:11,17 107:7,11,19 108:19 110:13 111:7,12,23 112:4,6,16 117:23 118:12,25 119:2,9,17,24 120:1,8,11 121:1, 8,10,13,23 122:1,6 123:6 124:13, 17 128:8 129:8 133:17,21 134:6 136:23 137:3,5,10,18 142:20 144:18 145:1 147:2 160:11 164:15 165:2 167:22 171:8 172:19 173:9 179:6 181:2,4,12, 19,21 182:19 183:1,8 185:3 186:8,24 187:11,18,23 188:1,4, 12,17,22,24

**Fudge's** 8:21 14:1 18:19 19:4,7 20:2,19 27:7 32:11,14 33:3,13 34:4,16,22 36:18 42:1 44:23 45:25 52:18 53:9 54:25 58:6,16 83:20 88:3 109:6 110:4 113:1 119:11,19 127:12 128:9 129:1,4 160:1 164:14 180:2 181:10,16 188:25

**full** 7:1 51:14,17 70:3 77:13 97:1 106:2 107:20,25 108:7,10,20 109:16 150:14,15,16,18,24 151:11,12 152:8

**full-time** 15:20,22

**fully** 150:23

**function** 135:2

**functionality** 123:7

**funds** 52:5

**future** 135:25

## G

**gave** 128:2 133:21 176:21

**geez** 174:4

**general** 16:20 17:1 62:22 67:17 72:6,7 77:19 96:16 107:14 118:17 164:18 177:8

**generally** 21:12 80:17 184:24

**generate** 167:6

**generated** 60:6,7 61:20 168:22

**generating** 169:15

**give** 7:2,6 11:2 27:12,14 46:6 87:12 115:20 118:6 123:3 179:19

**glad** 68:2

**gods** 75:7

**good** 6:17,18,21 57:24 69:25 84:15 154:4 164:23 165:10 166:15 177:10

**Goodyear** 17:23 32:25 33:6 34:9 35:21 36:4 37:19 53:21,22 54:13 153:20

**government** 22:15 23:9,14

**graduated** 16:1

**grammar** 180:15

**Grassi** 9:5,6,11,17,21 22:20 23:1,6,11,16,21 24:6,14,22 25:4 29:11 41:24 50:8 56:14 89:8,13 94:6 120:19 128:11 187:20 188:14,19 189:15,21 190:7

**Great** 105:21 173:20

**ground** 6:21

**group** 41:17 99:21,22 146:10 157:7

**guess** 7:11 13:1,4 40:7 75:10 141:20 153:4,17 154:18 156:15 163:25 172:1 175:20,22 185:25

**guidelines** 106:25 107:8,12 110:14,16

## H

**half** 159:9 164:24

**halfway** 129:6 139:5,23 142:14

**hand** 46:5 87:11 106:3 124:9 125:13 128:21

**handing** 11:1

**handle** 55:24

**handled** 57:20 81:25

**handles** 57:18

**handling** 130:6 134:10

**happen** 38:8 69:19 159:18

**happened** 28:25 33:14 156:14 158:16

**happening** 135:25 145:2

**happy** 23:13 151:9

**hard** 39:19,22,23 181:11

**harm** 50:5 89:5

**head** 17:3 36:7 39:3,24 40:1 43:1 53:2 95:13,17 142:2 185:23

**heading** 132:22

**hear** 123:16 131:12

**Heather** 70:25 71:1 161:10,22, 23 162:10 166:21 169:20 176:3, 7,16,20,23 177:6,13

**Heathers** 176:11

**held** 75:11

**helpful** 108:16

**helpfully** 73:24

**high** 14:16 151:24

**high-level** 62:2

**higher** 44:11

**Hill** 18:20

**hire** 14:10 118:25

**hired** 19:15 26:21,24 38:19 94:11,13 101:4 103:21 104:1 119:14,17

**Cain & Crane Court Reporters**
704.545.3510

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 197 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024                                      Index: hires..kinds

**hires** 64:13 120:11

**historically** 182:22

**history** 63:10 88:8

**hit** 114:14

**hits** 52:16

**hold** 14:21 15:12 16:2,8 21:25 22:6 76:18 93:4,9 122:25

**holding** 131:23

**holds** 22:9 98:14,19

**Hollis** 55:13 71:10 178:6,9,11

**home** 129:18

**hopes** 178:17

**hoping** 127:20

**hour** 157:19

**hours** 158:17

**hundred** 97:8

---

**I**

**ID** 147:5,7,8 150:4 173:9,10

**idea** 41:11 42:23 49:14 76:25 154:10 158:14 180:1

**identical** 7:25 8:8 99:4

**identification** 10:24 46:3 87:9 106:5 125:15

**identified** 130:24 131:1 135:17,19 136:4

**identifies** 129:16

**identify** 106:15 129:9 140:10

**Identifying** 129:6

**ignore** 70:1

**image** 71:12,17,24 74:18 75:4 81:11,12 148:14,19 149:4,7 178:7

**imaged** 72:11 81:8

**images** 71:21 75:3 178:13

**imagine** 189:11

**immediately** 12:20 13:14 42:2, 14,15 146:6 150:7 166:1,6,16

**implemented** 96:24

**implicit** 114:5 115:23

**import** 108:6

**important** 6:23

**impression** 164:1

**include** 12:8 56:12 63:12

**included** 64:4 165:6

**includes** 56:3

**including** 20:6 21:23 92:8 106:1 123:8 173:5

**incomplete** 7:16

**incorporated** 100:22 106:12 163:5

**incorrect** 69:20

**incorrectly** 135:18

**indication** 83:6 146:20

**individual** 10:13 22:13 62:17 65:21 74:11 113:18 117:18 153:12 154:19 171:21,23 180:19

**individualized** 102:2

**individually** 179:23

**individuals** 13:25 33:2

**industry** 16:3,5,12

**information** 53:11 59:4 63:23 68:16,21 76:18 80:20 93:10 96:2, 11,20 115:10,17,20 116:3 124:1 125:2,5,8 127:5 128:15 163:11 186:4

**initial** 65:23,24 101:7

**initially** 40:20 107:19,25

**inputted** 96:21 126:11,12,13

**installment** 22:11 29:17,23 30:1,4 120:22 128:2,3 131:6 153:12 160:8 188:12

**installments** 128:10,16 165:6 175:6,13

**instructed** 27:20,23

**instructions** 7:18 26:19 27:13, 14 126:23

**insurance** 34:18 35:5

**insured** 34:21

**insurer** 181:15,18,19,21

**intended** 102:24

**interest** 186:22,25 187:3,4,6,12

**internal** 161:20

**internally** 59:8 135:18 180:9

**interrogatory** 99:7,9,12

**interrupting** 156:9

**involved** 53:15,17 59:22 121:21

**involvement** 53:23

**Isaiah** 150:3

**issued** 85:2

**issues** 55:25

---

**J**

**J2** 58:11 91:10 100:16,17 101:2 148:2

**Jackson** 176:2,14

**January** 109:8 154:5,23 155:14

**job** 14:8 15:3 16:13,15,16 18:3 64:19

**jobs** 16:2,7,11,12,23

**journey** 153:5

**judgment** 175:19

**July** 19:2 88:10 138:21 140:14 141:7,8 157:13,17

**June** 139:23 143:6

---

**K**

**Katie** 157:15 158:23,24 159:3

**Kick** 43:5

**kind** 22:9

**kinds** 22:2 38:14,16 39:1 142:9 182:13

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 198 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024                                     Index: knew..Loom

**knew** 28:15

**knowing** 175:12,13

**knowledgeable** 11:16,19

---

**L**

---

**L-0** 62:11 154:24 155:3,5 165:24

**L-1** 62:11 170:22,23

**L-2** 62:11

**labeled** 107:13

**land** 41:4

**Lane** 145:10

**late** 183:24

**latest** 69:1

**law** 6:6 57:9,12 90:2,25 102:25 118:25 119:3,4,9,13,21 120:11, 13,20 121:1 127:6,9 130:8 132:8 133:4,13 153:24 164:11 180:14

**laws** 14:19,20,24 84:22 188:3

**lawsuit** 45:17,20,22 62:6,14 83:8 93:11 94:22 105:9 121:22, 25 127:7 174:15

**lawsuits** 20:18 21:16 42:21 187:17,25

**lay** 41:3

**lead** 71:20 118:8

**leaders** 74:12

**leads** 114:13

**leaving** 168:4

**legal** 44:6,10 77:4,6 93:3,7,9 111:7 112:8,10 113:8,16 114:17, 22,25 115:6 116:4,10 117:15,25 118:5 121:11,15,18 124:22,24 126:1,3,7,14,16,24 130:9,13 131:18 135:8 155:2,4,5,11,13,15, 16 157:3 159:1 161:14 164:21 165:17,21,22,25 169:13,14 176:11,15 177:8 179:10,19

**LEGALRECORD40A** 169:4

**letter** 59:8,10,12,14,15,17 60:7 86:8 91:4,7 95:19,22,25 96:1,13, 15 99:15,20 100:12,14,15,16,17

101:2,8 108:4 167:15,16 177:10, 15 178:3

**letters** 58:8 59:2,5,9 72:8 73:19 80:12 81:10,16 84:8 91:11 95:19 100:2 101:12,14,15,18 103:15,18 105:24 138:9,10

**level** 14:16 59:22

**levels** 58:23

**liaison** 77:7

**liaisons** 121:12

**license** 22:7,10

**licenses** 21:25 22:3,4,12

**life** 70:3

**limitation** 134:12

**limitations** 56:13,22,25 112:22 113:3 120:17 121:9 122:23 123:11,19,22 125:1 127:13 128:4,10 129:10,18 130:6 131:7, 10,11,13,15,16 134:22 135:1,10 138:14,23 140:19 141:4 143:12 146:9,15 152:14,18,20 153:2,5,7, 13 156:19 159:10 160:3,6,7 161:15 162:20,23 163:3,7,13 164:9,10 179:16

**limited** 56:4 134:9

**lines** 28:14 144:14

**list** 8:14,19 11:8,18,22 72:25 93:22 116:21 132:14 134:10,11 148:23,25 178:21

**listed** 11:13 99:6 122:18 136:22 142:15

**Lists** 93:21

**literally** 52:16 58:17

**litigate** 105:19 120:11

**litigated** 44:8 49:9 128:19 171:14

**litigation** 45:1,13,14 51:9 57:5, 19 82:11,14 93:17,20,22,23 105:17,18 110:13,22 119:12,14 127:22 144:25 155:1 171:7 186:9

**live** 182:21

**LLC** 21:1

**LLP** 6:7

**loan** 21:1 26:9 30:8,14,16,22 31:6,9,15 32:4,5,8,9,10,13,16,18, 22 33:4,6,8,12 35:18 39:19,21 40:4,9,19 41:18 42:6 43:8,12,15, 22 45:3,5,14,15 47:5 52:2 54:2,3, 14 60:21 61:12,17 62:19,20,23 63:1 70:4 75:16,19,21 77:11,13 82:5 98:13,19,21 104:7,16,18,23 105:1,22 106:13 112:17,24 113:15,23,24 114:19 116:5,12 117:5 118:1 120:12 121:4,8,23 123:10 125:22 126:4 128:10 133:18 136:15 137:1,11,15,17 145:19 146:24 151:13 159:12 181:16 183:19 184:23 186:6,22, 23,25 187:18 189:1 190:5

**loans** 20:25 21:3,5,8,9,11,12, 17,23 22:11 23:5 26:23 27:1,25 28:1,3,5,11,16 29:14,17,19,21,23 30:1,4,15,16,23 31:1,2,5 40:18 41:9,10,18,19 42:2,6,7,14,17,22 43:10 45:12 51:21 56:3,10 61:3 62:14 84:5 98:14 103:12 104:11, 20 105:4,14 110:2,18 112:2 115:2 119:18 124:25 126:8 133:19,22 135:8 183:17 185:5, 14,15 187:15,24 188:13,22 189:2,6,8,10,12,19

**location** 183:9

**lock** 70:15,18

**locked** 35:24

**log** 182:17

**log-in** 34:7 74:17 182:18,20

**logged** 66:3

**logging** 60:4

**logic** 165:10

**long** 8:25 12:3 17:4 26:5 30:20, 21,22 83:19 98:12 178:22

**longer** 86:21 87:1,6 90:3 94:9, 10,12,16 124:4 151:13 183:9 186:17,19

**looked** 46:7 61:20 100:13 108:14 142:23 149:4 174:23 177:23

**Loom** 16:24 17:1

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 199 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024    Index: lot..morning

**lot** 84:19 106:8 110:12 127:25 161:17 184:6

**lots** 100:10

**loud** 7:2 167:21

**lump** 122:10 150:20

**lunch** 37:1 111:19

## M

**made** 34:23,24 35:4 49:13 51:6, 10 52:1 57:7,8,10 63:12 66:21 69:17 78:1 79:1,12 81:4 109:11, 19 112:11 125:23 141:2 153:9 157:25 172:3 173:13 187:6

**mail** 21:19 39:15,23 50:23 101:13,16,18 170:11

**mailbox** 177:8

**mailed** 170:15

**mailing** 59:14,19 60:8

**maintain** 77:25 91:18 95:19 103:4,5

**maintained** 59:9 91:12,22

**maintains** 65:2 183:8

**majority** 20:7 41:1

**make** 7:6,25 16:4 19:13 33:11 38:11 40:3 44:7 50:2,14,16,20,22 70:21 71:6 78:19 103:24 105:23 116:4,21 117:25 122:15 127:4 140:24 141:6 152:23 156:10 158:2 160:11 162:18 175:16 178:8,21 180:12 185:13 186:12 188:9 189:10

**maker** 44:25

**makes** 10:18 129:18

**making** 12:9 14:19 50:6 127:24 147:14

**management** 20:3,6 84:9,13, 15,16 130:7 131:20,25 135:9 148:20 171:17 172:2

**manager** 16:20 17:1 34:4 51:2, 3,4,12,13,14,25 52:3,4,20 59:23, 24,25 60:4 61:5,8,14,15,21,24 62:18 63:4,7,13,22 64:7,19,23 65:2,5,9,12,16,19 66:1,3,7,10

67:20 68:5,17 69:15,16 70:2 71:13,22 72:2,14,15,16,21,23 73:1,6 74:4,6,17 78:2,5 79:5 81:4,11,20 82:6,9,19,21 83:5,6, 10 86:15 90:17 96:3,4,8 97:6 113:22 114:9 115:19 117:7,9 123:5,12 143:1 152:15 172:25 175:9,18 180:5,7 183:11,15,16 186:15

**manages** 84:21

**managing** 16:21 17:1

**manned** 132:4

**manual** 64:25 91:4,7 135:5 180:22

**manually** 126:11,13 163:17 164:21

**Mapi** 155:22

**March** 138:7 169:25 175:1

**mark** 10:23 44:3 125:14

**marked** 10:24 11:2 46:3,6 66:15 87:9,11 90:14 106:4,5 124:9 125:15 127:11 128:22 136:10

**marketing** 20:1

**marks** 133:15

**match** 52:13

**matches** 161:12

**materials** 29:7

**math** 189:11

**matter** 144:17 177:11

**matters** 38:18

**means** 71:1 80:2 86:3 91:12 92:13 93:9 132:16 133:8 142:1 147:1 155:3 159:6

**meet** 8:20 9:11 101:9 133:1,10

**meetings** 9:6,8,10,20,23

**member** 16:21,22 17:1 136:4 158:3 159:1 176:15

**members** 32:10 158:1

**memorializations** 148:18

**memorialize** 175:7

**memorialized** 27:3,7 186:6

**memorializes** 128:1 168:8 170:13 171:7

**memorializing** 169:20 170:18

**memory** 79:6

**mentioned** 62:23 101:8 113:11 121:11 137:9

**merged** 147:1,7

**message** 153:21,25 157:14 162:1,5,9,10,11,16 177:22,25 178:2

**messages** 158:21

**met** 9:7

**method** 84:20

**Microsoft** 74:21

**middle** 70:8,14 91:3 93:20 107:15 134:5 138:10 141:10 142:14

**military** 158:3

**million** 142:7

**mind** 17:17 151:17

**mini-miranda** 149:17,18,22, 25 150:5

**Minimum** 91:4

**minute** 11:2 17:13 46:6 87:12 98:5 189:25

**minutes** 9:1 153:2 157:5 177:12

**misremembering** 75:18

**missing** 146:3 167:17

**misunderstanding** 167:9

**misunderstood** 181:20

**moment** 106:3 125:13

**money** 44:24 45:11 50:24 165:9 172:9

**month** 151:14 182:24 183:3

**monthly** 151:22 182:9,23 184:8

**months** 151:23 183:5,7

**morning** 6:17,18 148:17

177:10

**mouth** 8:6

**move** 113:6,7 152:17 155:18 158:5

**moved** 32:16 114:15 144:9,15 146:6 148:8 152:10 157:6,9 159:13 161:1 168:18 174:2

**moving** 132:22 139:5 145:3 147:18 148:13 165:12

**MSA** 47:12

**multiple** 76:14 119:3 147:8 173:10,17

**multiplied** 128:18

**Murtha** 119:13,17,25 120:9 170:2,5 171:8 175:20 177:5 178:4

---

### N

**NA** 170:2

**named** 34:21

**nature** 184:10

**necessarily** 118:10

**needed** 66:2 69:24

**negotiations** 48:1

**NEWBIZ** 158:6,9,10

**night** 113:2 157:10

**nodding** 17:3 43:1

**non-conformity** 135:14,17, 20,21,23 136:3

**non-legal** 44:5

**non-litigated** 44:8 49:10

**non-performing** 104:18 184:17

**North** 6:8 163:5,20

**notation** 132:1 139:7,24 141:15 143:6 144:9 149:16,23

**notations** 123:24 149:7

**note** 69:17,20 70:1 75:19 78:20, 23 89:16 115:13 116:24,25 117:3,4 124:8 143:1 146:25

162:6

**noted** 49:7 86:6 88:23

**notes** 61:19 63:25 64:2,5 66:13, 24 67:2,9,12,18 68:6 74:16,18 82:5 86:12,18 117:7 123:24 124:7,11 132:3 136:6 137:20 146:22 151:6,8 186:13

**notice** 6:4 8:14,17 10:22 11:7 59:13 60:5,6 100:19,22,23 104:6 105:16 111:22,24 112:1,5 115:8 118:6,8,10,12,15 139:7,10,13,15, 18,21,22,24,25 140:4,5,7,8 148:3 166:7,11,13 169:22

**notices** 104:10 117:22 185:4 188:17

**notification** 100:21 149:19

**November** 100:13,15 136:15 145:3 156:25 158:19,20 159:2,21 161:5 174:16,17 175:3

**number** 33:9,15 40:23 58:5 66:19 71:15 73:16 84:8 101:12 105:11,12,14,16,17,18 114:5,12 122:22 128:16,17,18 129:17,25 135:13 137:8 141:5 143:10 147:3,4 148:15 150:2,24 153:20 161:13 171:12,13 173:10,14,18 174:20 178:5 180:10 183:25 186:12

**numbered** 138:4

**numbers** 33:20 49:8 73:19,25 156:3 163:1 171:12,18 172:12 173:11,21

**NY5** 170:1

**NYU** 147:12

---

### O

**oath** 6:25

**object** 15:2 25:6 50:7 55:17 88:22 89:7 94:6 120:19 128:11 174:11 184:13

**objection** 22:20 23:1,6,11,16, 21 24:6,14,22 25:4 29:11 50:8 56:14 89:8,12,13 187:20 188:14, 19 189:15,21

**obtain** 14:9 96:17 151:13 171:16

**obtained** 75:19 185:5

**obtains** 82:15

**obvious** 162:15

**October** 21:1,10 30:17,22 42:5 47:7,18 68:25 69:4 106:12 136:20,23 177:4 178:6

**offer** 111:14

**offered** 151:22

**offering** 111:5

**office** 32:9,11,14,17,18 35:12, 15,21 36:1 37:3,7 38:1 50:23 111:3 163:5 170:16 181:12

**offices** 6:7

**older** 73:9

**onboarding** 28:24,25

**one-off** 110:17,19,20 164:18

**ongoing** 65:11

**open** 71:24 76:24 116:24

**opened** 74:1

**operations** 12:6,11 13:8 55:8, 10 142:4,10

**opposite** 150:22

**option** 184:21

**options** 106:1 108:11 111:3

**orally** 109:11

**order** 8:1 50:24 88:24 98:4 167:5

**oriented** 101:9

**original** 26:6 47:5 115:13,14 131:2 137:14 153:8 163:4,12 172:24 189:14,20

**originally** 84:5 153:9 184:5,11

**origination** 184:25

**out-of-statute** 129:7 132:9,23, 24

**out-of-statute'** 130:5

**outbound** 131:23 132:8 145:2

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 201 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024                                 Index: outreach..point

160:11,21,24

**outreach**  147:14

**outstanding**  105:24

**overlapping**  7:22

**overridden**  70:15,18

**oversee**  17:21

**Overseeing**  12:9

**overview**  28:21

**overwhelmed**  106:8

**owed**  19:16

**owned**  25:18 26:3,16,23 28:7
29:15 41:8 137:2,5

---

**P**

---

**P-A-R-H-A-M**  55:11

**p.m.**  111:20 139:7 141:15 143:7,
15 145:4 146:25 148:15 149:16
151:4 152:1 153:17 154:24
157:10 158:5 159:2 178:25 179:1
190:1,2,10

**package**  127:8 167:6 169:15

**packet**  118:2,4,7,8,15 170:12
171:7

**packets**  168:22

**pages**  43:25 67:2,5 87:20
106:9,18 109:2 164:22 169:7

**paid**  44:15 45:24 46:2 51:19,22
83:20

**pain**  57:1

**pair**  155:17 157:18 158:4

**papers**  62:4

**paragraph**  129:8 130:2

**Parham**  55:11 157:15 158:21
159:3

**part**  29:9 32:18 34:11 48:5 53:7,
10 68:5,6 75:18 82:2 86:10 89:16
113:1 123:7 126:2 127:3,8
128:14 129:7 136:2 145:17
156:22 159:11 163:25 165:24
168:21 169:7,11 170:25 172:19
183:19

**parties**  104:1

**parts**  7:21 102:14

**party**  19:16 103:21 109:12

**passing**  9:22

**past**  16:14 25:21 91:21,22
156:18 182:22 183:4

**pasted**  143:1,2

**path**  148:23

**Paul**  6:4,12 8:11

**pause**  111:17 174:7

**pay**  43:15 44:11 107:20 151:11,
12,14

**payable**  131:8 160:9

**payment**  39:4,10 50:20,22
51:4,12,14,15 52:1 63:6,10 68:14
81:3 105:25 106:1,2,25 107:8,12
108:10 115:12 122:8 128:18
131:7 140:22 141:2 150:20
151:15,20 153:8 167:1 171:17,20
173:13 180:14

**payments**  50:12,25 51:8,23
63:12,14 107:16 115:14 122:10
128:3 141:3 151:23 172:2 182:4

**Paypal**  50:24

**payroll**  37:11

**pays**  44:13 45:1,22

**PCI**  99:21,22

**PDF**  59:20 72:1 96:5,8,10

**PDF'ED**  96:3

**PDF's**  59:19

**pending**  7:14

**people**  13:25 14:8 55:3 64:16
66:6,9 114:25 131:22 132:1
147:14

**percent**  44:2,5,6,7,8,21,22,23,
24 45:25 46:2 49:9 97:8 111:1
151:15 155:5 189:5,8

**percentage**  188:25

**perfect**  124:11

**perform**  26:22 32:21 37:6,25
56:12,21 129:9

**performed**  32:10,14 41:7
55:23 56:18 134:9

**performing**  184:18,19,21

**performs**  56:18 62:24 134:7,19

**period**  16:11 25:23 26:13 27:8
28:9 29:13,22 32:8 42:18 69:8
83:25 85:12 90:2,3,22,24 93:4
119:5 141:4 160:14 161:3 175:14
182:24 184:25

**periodic**  65:18

**periods**  21:8

**permission**  58:23

**permissions**  74:4

**person**  10:13 14:22 29:3,4
35:23 40:14 56:6 65:5,22 112:10
115:4 124:22 131:20 132:4
147:13 154:12,19 155:23 157:4
161:24

**personal**  50:23 77:18 151:13

**personally**  10:8

**pertinent**  8:18 127:4

**phone**  29:4 33:8,15,16,18,22,25
38:5 77:22,25 78:15 79:7 81:24
102:12,17,20 105:23 107:24
108:1,2 110:6 151:7

**phones**  33:13 37:9

**physical**  39:15 60:20,22,24
170:11,14

**physically**  35:14

**picture**  56:2

**piece**  15:9 50:16

**place**  24:17,20 31:13 79:11
88:24 133:16 156:4 167:18

**placement**  101:1,6

**places**  80:5

**Placing**  166:7

**Plaintiffs**  6:6

**plans**  122:8

**point**  41:21 57:14 71:7 83:11
87:7 97:15 113:8,12 133:19
156:16 157:12 164:8 167:21
187:4

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 202 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024    Index: pointing..question

**pointing** 170:25

**policies** 79:22 80:1,6,8,9,15 84:8,17 85:3,4,23 102:7,16,20 106:10 117:12 134:8 135:13 187:24 188:2

**policy** 34:22 51:3 85:8,11,16 86:10,11 88:3,4,13 92:18,19 93:14,18,25 94:25 95:2,14 96:25 100:3 107:8,12,14 108:6,10,19 109:7 110:4,5,9 128:21 129:1,4 134:3,23 160:21 181:17

**pop-up** 154:2

**populated** 112:20 123:13,17 125:5 126:10 152:14

**populates** 138:14

**populating** 141:1

**portal** 39:8 182:3,10,18,21

**portfolio** 83:22 104:19 105:13 112:18 114:1,19

**portfolios** 43:9,13

**Portia** 142:19 144:1,5 148:11

**PORTION** 46:17 49:21 97:22

**position** 16:20,25 127:12 128:9

**POSS** 150:10

**possess** 103:14,17

**post-judgment** 187:3

**posted** 51:12,25 167:1

**posting** 167:3

**potentially** 21:7 76:13 102:1 130:23

**practice** 61:2 96:16

**Practices** 101:10

**pre-2017** 41:5

**pre-judgment** 187:4

**preceding** 12:21

**preparation** 9:20

**prepare** 8:12,21 9:11,15,18

**prepared** 11:13,21 23:8 120:23 187:22 188:16,21 189:17

**present** 54:13,17

**president** 11:25 12:19,22 13:12,15 15:15 18:2,14 24:21 36:18 40:6 55:8 111:11,12

**pretty** 38:9 118:20 133:13 164:23

**previous** 31:13 70:1 142:21 157:16 167:12 170:8

**previously** 162:22

**primary** 40:5

**principal** 115:12,25 128:17

**print** 59:6 68:21 69:2,7,8,9,10, 13 72:22,25

**printed** 136:20 176:21

**printout** 70:2

**prior** 9:20 11:10 12:19 13:12 24:9 26:3 27:17 41:20 53:24 54:1 63:14 79:5 85:25 86:3,15 92:23 95:14 96:10 99:16 103:15 104:14 153:9 164:1 180:11 185:19

**private** 26:23 29:19 41:9

**problem** 17:18 42:5

**Procedure** 6:6

**procedures** 84:17 134:8 188:2

**process** 28:15,21 39:8 45:2 52:22 55:24 60:1 62:8 117:13,22 127:3 129:13 130:13,25 133:16 135:5,22 141:19 146:23 153:3 155:24,25 159:11 163:8 164:20, 22 168:22 175:8

**processes** 134:21

**processing** 113:2 157:10

**program** 62:22 64:23 78:3,7 79:7 83:13 84:1 96:4 124:18 131:8 180:8,9

**prohibit** 131:17

**prohibited** 133:3,12

**prohibiting** 160:21

**prohibits** 131:18

**projections** 53:12,16,18

**promise** 152:8

**promissory** 82:5 116:24,25 117:2

**proper** 134:10 175:13

**proportion** 189:13

**prospective** 14:6

**Prospects** 14:5

**provide** 26:18 110:14 149:20

**provided** 27:24 29:7 79:22 95:10 98:18 104:9 110:16 127:6 133:1,10,18 148:22 149:17 150:1,4 170:24 179:10 182:16

**provision** 164:11

**public** 49:13 50:3,6

**publicly** 89:6

**pull** 172:1,25

**pulled** 149:4 162:11

**purchased** 30:17,23 41:18 43:9 172:23 184:20

**purchaser** 185:7,9

**purchasers** 185:11

**purchases** 62:25

**purge** 86:1

**purged** 86:24

**purpose** 85:11 112:21

**pursuant** 6:4,5 88:23 185:5

**put** 8:6 28:9 32:3 70:1 90:21 98:3 113:16 115:10 118:2 123:12,13 125:2,6 127:10 141:20 147:22 149:5 153:10 154:4,11 155:16 157:2,10 159:18 165:24 170:5 172:1 180:10,11

**putting** 156:23 167:5

---

**Q**

---

**qmail** 161:10,18,21

**quality** 134:3,6,7,25

**question** 7:3,12,14 10:17 17:17 20:12 30:19 31:22 38:9,12,14 45:10 53:8 55:2 56:16 57:3 65:17 67:22 77:12 85:9 90:9 121:9,19

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 203 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024                               Index: questions..reporter

122:14 128:20 142:7 174:8

**questions** 7:1 8:1,8 9:25 10:7, 14 19:3 26:13 30:6,10 35:13 36:8,15,17 53:5 58:5 61:24 62:2 65:9 66:20 67:17 103:2 127:24 136:6 137:19 151:9 179:4 190:6, 7

**quick** 118:20

**quickly** 45:8 98:15 171:10

---

**R**

**R-E-V** 99:17

**ran** 134:24

**random** 73:25

**RANUCCI** 6:16 10:22 17:16 44:1 47:1 49:1,3,6,15 50:1 54:23 57:12,24 58:4 66:18 76:9 88:1 98:3,5,11 99:11 111:17,21 128:25 156:6,11 178:19 179:2 189:24 190:3

**rare** 65:13

**rarely** 65:25

**rate** 44:5,6,10,14,15 53:12

**reach** 118:11

**reached** 113:3 118:19

**read** 89:22 91:5 92:7 107:18,21 120:8 123:23 129:7,11 130:3,11 132:11 133:5 134:5,13 138:1 145:5 153:25 156:2

**reading** 93:18 130:18 161:21 190:8

**ready** 170:12 190:3

**realize** 7:15

**reason** 50:2 67:24 118:5 140:21 153:9 160:25

**reasonable** 138:25

**reasons** 100:11 144:3

**recall** 23:3 24:17,20 25:7 26:1 29:24 30:3,5 35:22 93:1 174:23, 24

**recalled** 145:18

**receipt** 170:18

**receivables** 189:2,3

**receive** 65:23,25

**received** 22:14 50:13 51:23 64:22 98:13 162:1,5,9,10 170:17 176:24 177:22,23

**receives** 50:25

**receiving** 178:3

**recent** 47:11 91:19

**recess** 58:2 111:19 178:25

**recognize** 11:4 46:8 47:2 87:14 107:5 109:4 113:2 125:18 133:25

**recommendation** 118:1,3

**recommended** 83:14

**recommends** 105:17

**record** 6:23 7:5 8:10 17:12 37:11 51:13 59:25 61:11 72:9,21 78:4,6,8 81:3 85:22 92:10,16 93:14 98:7 99:10 156:10 189:25

**recorded** 6:24 51:1,4 52:3,4 61:14,15 63:3 78:20,22 83:1,2 92:9

**recording** 78:12,25 79:8

**Recordings** 81:24

**recordkeeping** 58:6

**records** 77:22,25 78:15 79:7, 11,15 87:4,5 92:7,14,24 94:2,25 95:1,2,6,9,10,12,15,18 97:3,9 100:2 103:20 104:4 171:17,21

**redactions** 49:11

**refer** 10:14 21:2 42:10 84:8 135:14 145:25 146:14

**reference** 73:16 79:23 148:15 173:9

**referred** 146:10 179:24

**referring** 9:2 21:10 31:1 40:5 45:3 165:23

**reflect** 51:14 63:14

**reflected** 90:17

**reflects** 145:20

**Reg** 110:11

**regroup** 178:20

**regularly** 25:8,16

**regulations** 14:20 84:22 188:3

**regulators** 23:15

**regulatory** 13:22 92:21

**related** 56:12,21 61:11 67:12 72:11 74:10 181:3 188:2

**relating** 61:17 75:14 78:15 82:8 92:14 98:20 116:11 125:1 128:6 136:6

**relationship** 24:13 29:9 30:7

**relevant** 76:19

**Relief** 158:1

**Remain** 130:8

**remained** 153:14

**remedies** 130:9

**remember** 7:15 13:17 22:24 24:24 26:5 63:19 70:5 77:21 99:15 110:11 117:17

**reminders** 65:18

**reminds** 65:15

**remits** 51:11

**remitted** 51:23 53:1

**remove** 97:17

**reopen** 94:19,20 132:23

**reopened** 95:4 132:25 133:9

**rep** 15:16

**repeating** 17:17

**repetitive** 6:22 7:21

**rephrase** 30:12

**replacing** 146:24

**repopulate** 141:2

**report** 18:18 52:14 69:5 172:4,9 183:4

**reporter** 6:25 7:5,8 11:1 46:6 54:22 76:7,11 87:12 106:4 116:2

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 204 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.                    30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024                              Index: reporting..section

125:14

**reporting** 74:10

**reports** 52:10 53:19 55:7 182:4, 6,12,13,14,21,23 183:9,14,16

**represent** 127:11

**representative** 10:6 36:17 67:19

**representatives** 107:19

**reps** 13:25

**REQ** 169:13

**request** 20:23 34:24 35:1 59:13 60:5 107:19,25 108:7,10,12,20 157:25 159:18 166:7,10 169:14 181:18,21

**requested** 35:5 94:19 96:15 167:15,17,18 181:15,18,22,25 182:1

**requests** 94:20 148:2

**require** 108:19

**required** 22:3,13 100:25 109:6 115:10 116:13 127:5 130:8 132:6,7,10,19 143:4 149:19 177:2

**requirement** 90:25 92:4,21 153:23

**requirements** 93:15 101:9 102:4 132:23 133:2,11 180:13,16

**requires** 90:2 121:21

**research** 189:17

**reserved** 190:8

**reside** 114:10

**resides** 114:7 115:16

**resolve** 105:24 118:13 150:23

**resolved** 93:5

**respect** 105:3 124:25 126:8

**respond** 55:25

**response** 187:25

**responses** 99:7,10,12

**responsibilities** 12:5 13:6,9, 19 15:7,8 18:3,12 136:3

**responsible** 12:6,11 13:7,20 14:23 18:4,6 24:25

**restaurant** 16:3,5,12

**result** 67:7,8,11 166:2,4 169:19 170:24 171:6

**results** 67:11

**resume** 13:2

**retain** 23:24 24:3,10

**retained** 25:2 85:13 86:8,13 89:25 95:6,21 104:14

**retainer** 119:24,25 120:3,4

**retaining** 45:17

**retains** 20:17 119:9

**retention** 72:9 85:2,8,10,22 88:3 90:2 93:4,14,15

**retrieved** 53:20 71:17 148:14

**retrieving** 178:7

**return** 39:21 53:13

**returned** 130:4

**reversed** 156:3

**review** 27:17 110:5 112:13 116:10 117:2,6 118:3 143:8 155:2,5,16 156:21 161:6,11,16 162:6 164:21 165:17,21,22,25 180:22,24

**reviewed** 8:14 11:9 155:4 157:3,7 162:19 163:17 165:4 178:3 179:10

**reviewing** 11:5 46:9 53:23 87:15 93:19 107:4 109:5 124:22

**reviews** 113:8 114:17

**Revspring** 99:17 100:1,7

**Roach** 119:13,17,24 120:8 148:19 170:1,5 171:8 175:20

**Roach's** 148:12

**Rock** 18:20

**role** 12:3,5,17,20,23,24 13:6,7, 12,14,16,19 15:5,7,12,14 18:1, 10,14 30:9,10 33:23 34:1,3,12,17 40:8 53:9 54:6,8 111:11,12,13 155:10 179:5 182:17 187:11

**roles** 12:17 36:9 55:5 124:24 126:7

**room** 10:13

**root** 135:24

**roughly** 55:14 169:25

**row** 67:10 89:19

**Roxanne** 60:23,24 72:18 136:11

**Ruh** 6:4,12 8:11 36:11 99:13 177:19

**rules** 6:5,21

**run** 182:23 183:11,12

**running** 153:12

**runs** 64:22 131:7 160:8

**S**

**sale** 41:20 42:3,10,14,16 47:22, 25 48:4 52:2 53:6,9,10,13,24 54:1,15 75:14,19 77:14 100:21 106:12 108:17 109:24 123:3,10 145:17,22 183:19 186:3,4,7

**sales** 13:15,20,24,25 15:3,6,15 19:5,21 22:6 24:21

**save** 8:1 61:24

**saved** 71:21 72:1 73:6 81:9 82:3,4,21 83:7 96:8 154:6 157:19 165:8,16 168:24 169:12

**scan** 129:9,16

**schedule** 106:13

**schedules** 183:2

**scope** 22:21 23:2,7,12,17,22 24:7,15,23 25:5 29:12 50:9 56:15 89:9 187:21 188:15,20 189:16,22

**screen** 68:10

**screenshot** 73:2

**scripts** 102:12,14

**scroll** 174:4

**secret** 88:21,25

**section** 46:11 63:7

**secure** 74:21 78:17

**seek** 186:24

**self-explanatory** 14:14 133:13

**sell** 184:21,22

**selling** 14:1 185:19

**send** 59:15,19 94:21 101:18 111:8,10 112:4 115:7 118:6 148:2 176:25 188:17

**sending** 102:5 105:15

**sends** 39:7,11 45:21 59:13 82:13,14 100:24 105:19 110:13

**sense** 10:18 38:11 71:6,7 103:24 140:24 184:4 189:19,23

**sentence** 107:18

**separate** 33:8 34:7 35:14 36:12 63:6 83:7 96:4 115:20 172:9

**separately** 51:18 79:1 81:16, 25 183:8

**September** 6:1 107:9 143:15 158:19

**sequence** 73:11,19

**series** 7:25 16:7,8 73:25 103:2

**served** 75:3

**server** 74:21 75:9,10 81:9,17 82:4

**servers** 58:16 74:23 75:2

**service** 20:23 45:1 158:1

**servicer** 59:9,10,14,16,17 60:7 95:22 96:13,15

**services** 14:1 26:22

**set** 8:8 20:24 21:11 26:12 28:4 30:15,23 42:6 98:17 106:10 179:3 189:12

**sets** 87:4,5

**settlement** 74:13 106:2,25 107:7,8,11 110:14,15,22 111:3 121:24 150:14,15,16,18,23

**settling** 150:18

**shaking** 39:24

**share** 34:18 72:17

**shared** 58:21 60:10

**Sharepoint** 79:23,25 80:3,4,6, 10,15,21 88:14

**shook** 40:1

**short** 57:25

**shortcut** 98:15

**shorthand** 142:9 152:4

**show** 64:7,19 70:3 71:16 73:12 108:15 141:9 146:4 172:4,9 182:22

**showing** 64:23 104:4 120:20 154:22

**shows** 136:11

**shrugs** 7:5

**SIF** 150:10,12,13

**sign** 35:17 176:18,21 177:3

**signature** 190:8

**signed** 47:19,20,24 48:1 170:17,19 176:24

**signing** 177:1

**silly** 34:25

**similar** 13:7 15:8 51:24 65:9 67:15 99:1 101:2 103:3 112:1 119:25 126:3 144:15 148:11

**simply** 164:2

**single** 76:4,13,20 99:3 150:20 151:7

**sit** 8:8

**sitting** 10:13

**situation** 163:24

**six-year** 138:22 162:22 163:3

**skill** 152:4

**skip** 154:13

**SL732493850** 169:22

**SLAS** 156:7,8

**slightly** 142:14

**slow** 35:10 177:1

**SLS** 16:15,16 18:22 31:11 33:23 34:1,4,12,14,18,21,24 35:6,8,12 36:25 37:3,4,25 38:7,10,11,17, 20,23 39:7,12 40:13 42:1 45:24, 25 49:2 51:22,23 52:6 53:1,11,18 68:23 70:9 75:19 83:20 89:15 93:2 101:3 103:5 105:9,13,17 106:9,24 109:2 111:11,13,14 118:9 122:1,2,3,6,8 127:23 128:14,22 133:14,21 136:10 137:5,6 139:22 141:14 142:12 145:3,8 146:2 147:3 148:7 149:12 152:5 156:22 161:11 164:8 165:1,13 167:4 170:9,12 171:13 172:12,19 174:4 175:24 179:9 181:24 182:17,18,25 185:3,5,16 186:21,24 187:10,11, 13 188:5,18,23

**SLS's** 34:11 54:18 84:4 99:9,12 148:22

**SLS/BANK** 113:9

**SLSA** 155:18,19 156:13,20 157:9 159:14 168:19

**SLSA2** 166:8,14

**SLSAR** 166:17

**SLSLEGAL** 168:19,20

**smart** 36:13 116:19 158:15 163:18

**SN** 59:11

**software** 61:10 63:16 79:8,9,10 115:11 122:17 123:6

**SOL** 114:3,4 122:19 123:24 127:21 130:6 131:19,22,23 133:2,11 138:10 140:15 143:19, 21 144:20 152:11,21 153:10 156:16 157:11 161:13

**sold** 20:25 21:11 26:8 42:6 145:7 184:16,17,18

**solution** 82:2

**solutions** 21:1 30:8,14,16,23 31:6,9 32:5,8,10,11,13,16,19,22 33:4,6,8,12 35:18 39:19,21 40:4, 9,19 41:18 42:6 43:8,15 45:3,5, 14,16 47:6 54:2,4,14 62:21,23 63:1 78:13 98:13,19 112:17 118:1 133:18 136:15 137:11,15, 17 145:19 146:24 181:16 183:19

184:23 190:6

**Solutions'** 31:15 43:13

**some-odd** 165:8

**sort** 144:21 179:3

**sought** 186:25

**sound** 28:17 118:23

**sounds** 39:10 70:2 97:10 184:24

**South** 6:8 18:20 147:12

**space** 32:17 142:22

**speak** 9:14,17 40:7 95:23 110:21 117:24 121:10

**speaking** 7:8 40:2,3 72:4,5 172:19

**special** 130:6 144:21

**specializes** 188:24

**specific** 56:25 62:1 67:21 71:22 73:10,17 75:2 76:2,12,19 92:23 93:23 94:13 98:12 102:7,12 105:1 114:18 127:16 130:7 132:7 134:8 136:5 153:23 156:22 163:11,18,20 171:18 173:13,15 180:16

**specifically** 47:24 48:1 56:21 64:16 67:14 72:4 77:15 87:8 97:4 101:8 112:17,23 117:17 182:25 188:8

**spelling** 180:14

**spent** 98:12

**spit** 115:17

**spits** 141:6

**spoke** 74:20 75:13 83:13 186:20 188:4

**spoken** 9:21 101:12

**Spring** 99:17

**SQL** 74:21

**staff** 17:8,21 55:19,21,23 56:19 65:11,15,18,22 66:3 70:22 71:19 73:20 74:4,7 80:7,18 102:17 115:6 116:4 117:15,25 118:5 131:22 136:4

**standard** 75:15

**standards** 120:25

**stands** 156:22,24

**start** 12:13 15:20,22 16:16 38:10,15 42:2,13,16 50:21 54:17 58:18 60:23 61:5 64:11 66:23 90:22 106:15 112:5 119:1,6 137:21 142:4 169:17 173:3

**started** 12:24 13:13 24:13,18 97:3,6 99:22 156:7

**starting** 15:4 19:10 55:15 105:21 136:10 145:3

**starts** 60:3 65:22

**stat** 128:17,18 130:19,21 133:9

**state** 8:10 13:22 14:19,24 51:16, 18 57:8,12 90:2,25 102:24 114:7, 8,12 115:16 119:3,4,8 120:1,22 123:20 129:18,24,25 130:8 131:5 132:8,13,17 133:3,12 141:3 153:24 163:16 170:1 171:24 180:16 188:3

**state-specific** 92:3 120:21

**stated** 11:24 17:23 18:7 20:13 39:17 42:24 56:17 57:17 135:9 181:1

**statement** 115:13 117:5 171:24 183:4

**statements** 39:6,7,10 182:6, 11,24

**states** 22:13 42:25 85:12 89:19 95:5 119:7 131:16 145:10 146:6 163:13 164:17 166:20

**status** 146:16 166:4

**statuses** 141:18

**statute** 56:13,22,25 112:22 113:3 120:17 121:9 122:23 123:11,19,22 125:1 127:12 128:3,9 129:10,18 130:5,24 131:1,6,10,11,13,15,16 132:20 133:15 134:22,25 135:10 138:14, 23 140:19 141:4 143:12 146:9,15 152:13,17,20 153:1,5,7,12 156:18 159:9 160:2,5,7 161:6,15 162:6,20,23 163:3,6,7,13,15,22 164:2,3,9,10 179:16

**statutes** 134:12 143:8,12

**step** 43:7 105:21

**Stepping** 144:17

**steps** 8:12 105:8 147:15,17

**sticking** 45:9,12

**stop** 46:10 136:8 179:14

**stored** 58:13,14,20 74:25 75:1, 3,14 76:16,25 77:17 78:16,17 79:1 80:25 81:4 82:19 92:15

**Street** 6:8

**stricter** 164:9

**strictly** 131:24

**strike** 31:10 43:6 99:25 123:3

**structure** 48:2 55:14,18

**struggling** 164:1

**student** 21:1 26:9,23 29:19 30:7,14,16,22 31:6,9,14 32:4,5,8, 9,10,13,16,18,22 33:4,6,8,12 35:17 39:19,21 40:4,8,19 41:9, 10,18 42:6 43:8,12,15 45:3,5,14, 15 47:5 54:2,3,14 62:20,23,25 84:5 98:13,18,19 104:18 112:17, 24 114:18 118:1 133:18 136:14 137:11,15,17 145:19 146:24 151:25 181:16 183:18 184:23 188:22 189:1,2,6,8,10,12,19 190:5

**subcontractors** 86:7

**subheading** 107:16

**subpoena** 22:14 23:4

**subsequent** 140:5 189:14

**subsequently** 41:19

**subset** 41:17 69:2,8

**substantial** 69:22

**substantially** 41:14 99:1 101:2

**substantively** 66:20

**successful** 46:2

**sue** 94:2,4 118:1 129:1

**sued** 83:9 145:1 165:11

**suggested** 151:24 156:3

**suggests** 176:13

**suit** 167:6 168:22 169:15 170:11

**Suite** 6:8 18:20

**suites** 18:24

**sum** 122:10 150:20

**summaries** 39:4 64:3

**summarize** 105:10

**summary** 63:8 78:22 125:21

**Sunrise** 106:18

**Supervised** 52:19,20

**supervisors** 74:12

**support** 13:21 14:13 15:10 19:5,21

**suppose** 122:2

**supposed** 12:10 85:8 98:2 102:4 143:3 176:18

**switch** 100:9,11

**switched** 63:22

**sworn** 6:13

**system** 37:11 51:1,13 59:24 60:20 61:10 64:5 68:18 72:21 75:4 84:9,14,15,16,24 86:12,18 113:1,22 123:22 124:15,17 125:3 131:8 133:14 135:9 138:13 140:19,25 141:6,11 148:20 152:16 153:23 154:14 155:6,25 156:17 157:9 158:15 159:13 163:12,14 164:14,17 171:17 172:2 179:15,25 180:25 186:15, 17,19

**systems** 34:11,16 58:6 160:1

**T**

**tables** 188:5,9

**Taft** 6:7

**tag** 113:7 141:16,17,18,22 145:11 152:10,21 153:10 154:24 155:7,11,16 157:2,19,24 159:3,6 160:10,17 165:16,17,21,22 166:17,18 169:12,13 170:21

**tagged** 112:14 114:14 160:2 163:9

**tags** 62:6,8,10,16 141:24 142:8 155:1 170:25 171:3

**takes** 153:4

**taking** 73:2 123:18 152:19,21 160:6

**talk** 26:12 57:2,4 62:3 78:14 152:1 162:25

**talked** 39:4 59:10 116:7 125:8 127:25 128:15 132:2 134:22 140:25 143:19 148:11 161:8,19 169:24 171:16 172:20 179:4 183:17

**talking** 16:15 20:24 28:3,4 30:15 50:17 64:9 65:1 73:12 75:22 89:17 98:12 105:13 110:23 120:3,4,14 121:5 137:8 144:25 162:22 167:20 168:13 171:21,23, 24 189:11

**Tammy** 176:2,14,16,25

**tape** 77:11,13 113:24

**TARANTOLO** 17:12 98:7 178:17

**task** 65:16

**taxi** 151:22

**team** 13:20,21,24 14:8 74:11 111:7 124:24 126:1,3,14,16,24 134:20,24 135:7,9 159:1 176:15 177:9 179:10

**team's** 126:7

**template** 58:8 59:5,13 60:12,14 91:15,16,17,23 95:25 96:1,2,11, 19 101:12,14 112:1 125:4 139:11 166:7,13

**templates** 60:10,18 80:9,10,11 81:16 91:4,7,8,14 101:15,19,23

**ten** 95:6

**term** 21:9 42:15 84:10 100:20

**terms** 14:10 74:16 75:15,19,24 76:23 77:20 86:12 117:5 148:24 187:4

**test** 79:6

**testified** 6:13 49:8 124:11

**testify** 10:3 11:13,21

**TESTIMONY** 43:24 46:17 48:9 49:21 87:19 97:22

**text** 153:22

**thereof** 130:10

**thing** 54:24 69:11,12 102:16 115:9 149:10

**things** 8:19 84:19 96:22 110:12 134:11 161:17 163:16 178:21 179:4 180:15 182:11

**third-party** 19:7,10,11 20:11, 14 26:21 31:24

**thousand** 168:4

**three-page** 107:2 109:3

**three-year** 90:22,24 162:20 163:6

**tied** 72:11

**tier** 108:3

**time** 8:1 12:18 16:11 21:8 22:24 24:24 25:23 26:3,13,16 27:8 28:7,9 29:22 30:3,8 32:8 36:21 37:20 43:5,7 54:9 57:24 65:14 66:4 68:1 69:2,8 71:8 83:25 85:12 86:5 90:3 98:12 101:3,6 103:22 106:11,15 108:17 109:23 111:1,6 118:14 119:5 123:3,6,10 133:19 147:11 152:24 156:9 157:17 160:1,14 164:8 165:10 175:14 182:24 184:25

**time-barred** 129:2 187:19

**times** 8:23 33:11 101:12 127:25 133:23 135:13 137:9 141:5 142:7 186:12

**timestamp** 68:25 69:1 156:4

**timestamped** 138:6

**Timothy** 177:5

**title** 73:23 186:1

**titled** 73:7

**titles** 73:10

**today** 8:13 9:25 10:7 16:8 17:9 20:24 42:19 47:8 55:1 76:16 78:18 95:24 107:11 110:4 129:19

Case 1:23-cv-09690-MKV    Document 85-2    Filed 01/15/25    Page 208 of 210

DAWSON -against- STUDENT LOAN SOLUTIONS, ET AL.          30(b)(6), Confidential
Christopher Paul Ruh on 09/11/2024                        Index: tokens..verified

137:8 139:16 173:24 181:1,14 182:3 184:7 186:20

**tokens** 59:6,7

**told** 33:5 88:25 117:13 138:20 140:22

**tonight** 151:25

**top** 36:7 39:3 45:25 53:2 67:5 68:4 73:13 89:19 95:5,13,17 109:10,15 132:5 142:2 147:6 148:1 176:23 185:23

**topic** 186:11

**topics** 8:14 11:8,10,13,16

**total** 44:22,24 109:17,20,24 110:7 136:17,24

**totally** 186:13

**touch** 152:1

**tracing** 154:13

**track** 36:20 37:19

**tracker** 93:21,22

**trained** 117:15,18

**training** 28:20 29:7 64:10,11,12 65:21,24 66:1 80:16 126:16,21

**transaction** 21:11

**transactions** 64:4

**transcript** 7:9 89:17 97:18 168:17

**transfer** 52:5,17

**transferred** 52:13 130:5 133:2, 11 135:8

**transmit** 38:22,23

**treat** 29:16

**treated** 92:24 144:22

**trick** 31:22 45:10 70:6

**tricky** 30:9

**triggers** 113:10

**Tru** 83:14 115:11,19,25 117:9 125:9 188:4,7

**true** 32:25 102:10 113:4 131:2 180:5 187:14

**trust** 106:22

**truth** 140:12

**truthfully** 10:3 23:18 165:3

**Tryon** 6:8

**tuition** 189:3,7,9

**turn** 106:24 128:22 133:25 152:5 169:16 174:4

**turning** 47:17 127:23 132:5

**two-week** 42:18

**type** 64:9 74:15 78:13 125:1 180:14,19

**typed** 154:19

**types** 21:7

**typical** 118:14

**typically** 61:2 142:25

**typo** 69:21,22

---

### U

**Uh-huh** 68:11 71:18 79:24 81:14 95:8 110:25 112:7 129:12 135:15 140:1 144:4 149:14 152:12 153:14 154:23 157:16 158:4 162:4 169:14 170:10 174:21 176:8 183:21

**uh-huhs** 7:6

**ultimately** 17:21 52:19

**unassigned** 157:19 159:3,6

**underneath** 73:18 147:9

**understand** 7:12,18 9:25 10:9, 16,20 16:4 20:12,17 21:6,13 25:14 30:13,19 31:24 36:1,14,15 38:13 40:17 42:11 44:7 45:10 49:10 52:1 54:1 59:6 60:3 63:21 69:7 70:21 73:22 78:15,19 84:20 85:1 92:3,13 97:12 105:10 106:10 108:5 113:13 120:12 122:15 132:16 137:1 146:19 150:17 151:6,10 152:13,23 156:25 157:20 162:18 163:17 166:10 167:8,19 171:6 173:16 176:16 178:8 181:14 184:9 185:14

**understanding** 7:24 41:1 50:14,17 56:24 65:17 67:1,18 76:22 77:24 80:23 85:7 86:14,15 98:17 99:2 106:21 130:15 155:20 159:24 162:25 167:9 170:13 176:13

**understood** 41:16 43:7 53:11 63:15 95:24 150:15 160:10 163:25 179:8 183:3

**unique** 163:24 171:13

**unit** 113:8 114:15,17,20 130:6 131:10,11,13,14,19,22,23,24 132:2,3,4 133:2,11 136:1 143:25 144:7,8 146:11 148:12 153:10 156:21,22 158:10,25 160:22,23, 25

**United** 164:17

**units** 130:9 143:20 144:12

**University** 147:12

**unscripted** 102:15

**updated** 124:3,4 154:21 156:17 157:11

**updates** 65:11 88:5

**upgrade** 65:13

**uploaded** 39:8 182:4,6

**uploads** 39:11 52:11

**user** 64:25 69:16 70:21 142:15 153:21 154:14 168:24 169:1,7 177:24

**utilized** 64:13

---

### V

**validation** 100:19,22,23 139:13,19,20 140:7 148:2

**vast** 41:1

**vendor** 95:19 96:6 99:16,20

**vendors** 86:7,8 100:11

**Venmo** 50:24

**verbal** 7:6 109:7 130:7

**verified** 99:12 150:4

**version** 88:8,10 91:15,17,18,19

**versions** 88:5 91:18,23

**versus** 189:14

**vice** 12:22 13:12,15 15:15 18:2 24:21 55:8

**view** 71:7 74:18

**viewing** 74:16

**violation** 180:14

**voice** 78:12 79:8

**VP** 15:3,6 55:10 142:4,10

### W

**wait** 7:7 94:1 167:14

**walk** 37:3 50:23 110:21

**walked** 170:16

**wall** 35:19

**wanted** 123:21

**Watch** 168:12

**WAV** 82:3

**ways** 38:13 75:8 112:12 154:11 179:9

**Web-based** 58:19

**Wednesday** 6:1

**week** 47:22 48:3 53:1 182:22

**week's** 183:4

**weekly** 52:9,10 182:4,8,24

**weeks** 118:18

**Wickersham** 6:7

**wife** 151:21,25

**Williams** 6:3 8:4,20 9:10,14 10:6,8,15 11:25 12:13,19 13:20 14:1,9,10,23 16:7,13 17:8,18,24 18:6,7,8,15,19 19:1,4,7 20:2,10, 13,17,19,21 21:6,16,19,25 22:9, 14 23:10,14,24 24:10,18 25:1,8, 16,20 26:1,14,19,21 27:6,7,15, 20,23 28:5,10,15 29:8,14,16,18, 20,25 30:4,7,11,13 31:4,11,14, 18,19 32:3,6,11,14,17,23,25 33:2,12,15,16,22,25 34:4,15,17,

18,21,24 35:6,8,14,20 36:16,18 37:6,25 38:3,7,10,17,19,22,24 39:7,11,18 40:2,6,8,12,18,23 41:7,10,19,20 42:1,13,16,21 43:6,12,15 44:11,13,22 45:4,5, 13,16,21,25 47:6 50:3,5,13,19,25 51:11,24,25 52:5,11,18,24,25 53:7,8,10,12,15,18,19 54:3,5,6,8, 10,12,20,21,25 57:7,18,20 58:6, 7,16,21 59:1,7,15 60:3,11,20,23 61:5,8,13 62:24 63:15,22 64:14, 22 65:2,8,14,24 68:20 69:13 70:22 71:3,19 73:20 74:8,20 76:16 77:8,22,25 78:3,7,18 79:5, 11,22,25 80:5,14,17 81:2,10 82:12,15,18 83:8,9,17,19,20,23 84:1,4,21 85:1,22,25 86:3 87:6 88:3,15 89:2,5,14 90:15,25 91:22 93:8,11,12,16,24,25 94:10,21,24 95:11,15,21 96:6,12,14,16,19,24 97:2 98:14,20 100:1,4,12,23 101:3,18,23 103:4,7,14,20,23 104:2,6,10,14,17 105:8,11,15,16, 18,21 106:11,17 107:7,11,18 108:19 109:6 110:4,13 111:7,12, 23 112:4,6,16 113:1 117:23 118:12,25 119:2,9,11,17,18,24, 25 120:8,11 121:1,8,10,12,23 122:1,6 123:6 124:12,16 127:12 128:7,8,9 129:1,4,8 133:17,21 134:6 136:23 137:3,5,10,18 142:20 144:18,25 147:2 160:1,11 164:14,15 165:2 167:22 171:8 172:19 173:9 179:5 180:2 181:2, 4,10,12,16,19,21 182:19 183:1,8 185:3 186:8,24 187:11,17,23 188:1,4,12,17,22,24,25

**Windows** 58:19

**wonderful** 6:20

**wondering** 65:18

**word** 19:18,20 45:15 58:24 124:19 174:24

**words** 8:6 14:8

**work** 18:14,17 20:5 32:9,13,22 36:25 37:4,25 55:3,23 56:9,18 59:7 66:4 67:18,20 71:12 114:25 115:2 119:2 120:25 157:3 158:25 164:16

**worked** 16:5 131:20

**workgroup** 143:17,18,24,25 144:1,10,15,17,20 146:7 148:10 152:10,20,24 153:15 155:18 156:20 157:6 158:6 159:14,19,23 161:1 168:19,21

**workgroups** 143:20,22 144:3, 21 145:1 148:8

**working** 12:13 24:18 33:3 34:14 36:8,21 37:16,20,23 66:5 94:9,12,13 121:7 144:8 147:10

**works** 17:23 18:7 33:5 58:1 64:8 164:22

**worry** 106:14

**writing** 27:3,4 29:5,6,7,22 85:5 117:20 126:19,24 127:1 133:20, 22

**written** 66:1 81:2 92:9 100:7 109:6 117:12 132:6,7,8,17

**wrong** 28:14 54:24

**WU** 113:7 114:15 129:22 146:14, 16 152:20 153:10 159:3,22 160:16

### Y

**Yale** 147:12

**YC** 145:11,13

**year** 12:4,25 15:25 47:15 63:23 64:3 100:2

**years** 12:23 13:3,5,16,17 16:6, 14 22:23 89:20,25 90:4 91:4,13, 19 92:9,15 93:4 94:1 95:7 114:6, 12 122:22 127:22 129:17,25 159:9 161:14 164:2,5,6,24 165:4, 6

**yesterday** 7:20,24 10:11 11:25 15:17 16:18,24 17:23 18:7 28:13 32:21 33:5 34:3 38:21 39:18 41:16 42:24 43:8 58:7 59:11 61:20 62:5 66:15 74:20 75:13 82:15 83:13 91:21 98:12 100:12 103:3 105:8 108:15 116:7 120:16 124:9,12 128:2 132:2 139:8,16, 25 142:23 148:1 161:8,19 164:7 170:14 171:16 186:20

**York** 22:7,18 23:4 92:4,14,18,

19,24 119:21 132:13,17 138:22
161:14 162:20,23 163:2,21
164:3,4 170:1 177:2 180:20