# EXHIBIT D

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------X

ROXANNE DAWSON, individually and on behalf

of all persons similarly situated,

PLAINTIFF,

-against-          Case No.:

23 Civ.9690

STUDENT LOAN SOLUTIONS, LLC and ROACH &

MURTHA ATTORNEYS AT LAW, P.C.,

DEFENDANTS.

-------------------------------------------X

DATE: August 9, 2024

TIME: 9:36 a.m.

DEPOSITION of the Plaintiff,

ROXANNE DAWSON, taken by the Defendant,

pursuant to a Notice and to the Federal

Rules of Civil Procedure, held at the

offices of Lippes Mathias, LLP., 420

Lexington Avenue, Suite 2005, New York, New

York 10170, before Rose Marie Iacobellis, a

Notary Public of the State of New York.

Page 2

A P P E A R A N C E S:

NEW YORK LEGAL ASSISTANCE GROUP
    Attorneys for the Plaintiff
    ROXANNE DAWSON, individually and on
    behalf of all persons similarly situated
    100 Pearl Street, 19th Floor
    New York, New York 10004
    BY: JESSICA RANUCCI, ESQ.
        DANIELLE TARANTOLO, ESQ.
    File #: N/A

LIPPES MATHIAS, LLP
    Attorneys for the Defendant
    STUDENT LOAN SOLUTIONS, LLC
    420 Lexington Avenue, Suite 2005
    New York, New York 10170
    BY: BRENDAN H. LITTLE, ESQ.
    File #: N/A

ALSO PRESENT:
        ANDREA ASHBUR, Fellow
        SARA BOBOK, Intern

                *       *       *

Page 3

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*     *     *     *

Page 4

R. DAWSON

R O X A N N E   D A W S O N, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY.

MR. LITTLE:

Q.    Please state your name for the record.

A.    Roxanne Dawson.

Q.    What is your address?

A.    1063 East 226th Street, apartment 2, Bronx, New York 10466.

Q.    Ms. Dawson, good morning.

A.    Good morning.

Q.    My name is Brendan Little, I'm with the Law Firm of Lippes Mathias and I represent of defendant Student Loan Solutions in an action you commenced against it.

I'm going to ask you a series of questions about that lawsuit today.

If at any time you don't understand my question, didn't hear my question or need my question repeated for

Page 5

R. DAWSON

any reason, please, I don't know if I should say this, kick me under the table and ask me to repeat the question and I will rephrase and I will try to accommodate you, okay?

A.   Okay.

Q.   I ask that you try to let me finish my question before you give your answer and likewise, I will try not to ask another question while you are giving an answer, so that way we won't talk over one another, but our court reporter takes down me talking so fast, so two of us going at the same time will be rather challenging, so we're just going to try to keep a clear transcript, okay?

A.   Okay.

Q.   Continue to give us verbal response, yes, no, I don't know, we're not video taping this deposition, we can't take that down, obviously, if you shake your head, I know you mean yes, but the court reporter can't take down head nods, so you have to -- I'll remind you if you say

Page 6

R. DAWSON

uh-uh, mmm, to give me a yes, no, I don't know, okay?

A. Okay.

Q. And finally, you're not a hostage here, you can take a break at any time, if you have to make a telephone call, you have to use the ladies room, for whatever reason, just let me know, I'll get to a point where I can accommodate you and most importantly I just ask of you finish answering the question before we take a break, okay?

A. Okay.

Q. What's area date of birth, ma'am?

A. May 4, 1988.

Q. That makes you how old today?

A. 36.

Q. And I didn't take down the address that the reporter was reading, where do you currently side?

A. 1063 East 226th Street, apartment 2, Bronx, New York 10466.

Q. And how long have you resided

Page 7

R. DAWSON

there?

A.    Recently about a year and a half.

Q.    And who do you reside there with?

A.    My parents.

Q.    And you said a year and a half, so that takes us back to about January of 2023?

A.    March/April.

Q.    2023?

A.    2023, yes.

Q.    And where were you residing before then?

A.    Atlanta, Georgia.

Q.    And what was the address there?

A.    522 Pinhurst, P-I-N-H-U-R-S-T, Drive Atlanta, Georgia.

Q.    And who did you reside there with?

A.    Myself.

Q.    And how long were you in Atlanta?

A.    Maybe about a year.

Page 8

R. DAWSON

Q.   So that would have been March/April 2022?

A.   Yes, around that time.

Q.   And before this Pinhurst Drive address in Atlanta, where were you residing?

A.   1063 East 226th Street.

Q.   And that's the same address that you reside at today?

A.   Yes.

Q.   Were you residing at that point, I guess, prior to 2022 with your parents?

A.   For a period, not the whole time.

Q.   Your parents names are?

A.   Andrea, A-D-N-D-R-E-A, Dawson, Isaiah, my father, I-S-A-I-A-H, Dawson.

Q.   And how long were you residing at the 226th Street apartment?

A.   Prior to 2022?

Q.   Correct.

A.   About two years, two, three years, I think end of 2019.

Page 9

R. DAWSON

Q.    Okay.

So from approximately end of 2019 through March/April of 2023 you were residing at the 226th Street address?

A.    Correct.

Q.    And when you say you came back there, where were you coming from?

A.    Riverside, California.

Q.    Okay.

And how long were you in Riverside?

A.    I want to say like two years two years.

Q.    So that would have been end of 2017 to approximately end of 2019?

A.    '19, correct.

Q.    Have you ever gone by any other name other than Roxanne Dawson?

A.    No.

Q.    Have you ever given deposition testimony before?

A.    No.

Q.    Have you ever testified in a court proceeding or a trial?

R. DAWSON

A.    No.

Q.    Have you ever been convicted of a felony or misdemeanor?

A.    A misdemeanor.

Q.    What was the misdemeanor conviction?

A.    The actual conviction, I'm not sure what it was.

Q.    Okay.

What were you charged with?

A.    It was a drug possession.

Q.    Here in New York?

A.    No.

Q.    In --

A.    Atlanta, Georgia.

Q.    And was that case disposed of?

A.    What do you mean disposed?

Q.    Was it dismissed or did you enter a plea to so some charge?

A.    It was a plea.

Q.    And what was the sentence?

A.    Probation.

Q.    And are you still on probation or --

R. DAWSON

A.    No.

Q.    Have you completed that process?

A.    Completed.

Q.    What was the drug that you were charged with possessing?

A.    Marijuana.

Q.    Do you remember the approximate year of that arrest and conviction?

A.    I'm not sure off the top of my head, honestly.

Q.    It had to be some time in 2022 or '23?

A.    No, it was prior to that.

Q.    Prior to that?

A.    Yeah.

Q.    Was that in Fulton County?

A.    Douglas.

Q.    That's the only conviction?

A.    Yes.

Q.    Other than this lawsuit we're here to talk about today, have you ever been a party to another lawsuit whether you were the plaintiff who commenced the

R. DAWSON

lawsuit or the defendant who was actually sued?

A.    No.

Q.    Have you filed for bankruptcy protection?

A.    No.

Q.    What's your highest level of education?

A.    College degree, Bachelor 's.

Q.    And a Bachelor's in what?

A.    Healthcare administration.

Q.    Is that a BA?

A.    Yes -- no BS.

Q.    And where did you obtain that from?

A.    Stony Brook University.

Q.    And what year did you obtain that?

A.    2019.

Q.    Where did you graduate high school?

A.    DeWitt Clinton High School in the Bronx.

Q.    Can you spell that.

R. DAWSON

A.   D-E-W-I-T-T.

Q.   What year was that?

A.   2006.

Q.   Any other formal education after your BS?

A.   Nursing degree.

Q.   And where did you obtain that that from?

A.   Lincoln Technical Institute.

Q.   Where is that?

A.   Paramus, New Jersey.

Q.   When did you get your nursing degree?

A.   I want to say end of 2011, early 2012.

Q.   Are you currently a registered nurse?

A.   LPN, licenses practical nurse.

Q.   Have you ever been married?

A.   No.

Q.   Do you have any children?

A.   No.

Q.   Do you have a license to drive a car?

Page 14

R. DAWSON

A.    Yes.

Q.    In New York?

A.    Yes.

Q.    Have you ever maintained a license in any other States besides New York?

A.    Yes.

Q.    Which own ones?

A.    Georgia and California.

Q.    Other than your driver's license, do you have -- and your LPN license, do you have any other licenses?

A.    No.

Q.    Where are you currently employed?

A.    Morningside Nursing and Rehab.

Q.    And where is that?

A.    Bronx, New York.

Q.    And as an LPN?

A.    Yes.

Q.    Do you work a specific shift?

A.    Yeah, 7:00 a.m. to 7:00 p.m.

Q.    How long have you been employed there?

Page 15

R. DAWSON

A.    About a year.

Q.    Would that take us back to August 2023?

A.    July 2023.

Q.    Where were you employed before that?

A.    TFC Services Bureau.

Q.    What is TFC Bureau?

A.    It's home healthcare agency.

Q.    What did you do for them?

A.    LPN as well.

Q.    I assume you went into the patient's homes?

A.    Yes.

Q.    Where was that located?

A.    Atlanta, Georgia.

Q.    And what were your dates of employment at TFC Bureau?

A.    The one in Atlanta February 2022 to --

Q.    If you don't know, you can tell me you don't know, that's fine.  You can tell me an estimate.

A.    Yeah, the dates I was in

Page 16

R. DAWSON

Atlanta --

Q.    Was that your only employer in Atlanta?

A.    Yes.

Q.    And prior to working at TFC in Atlanta, where were you employed?

A.    I was working at TFC, New York.

Q.    Was that located in the Bronx as well?

A.    White Plains, New York.

Q.    And did you perform similar functions to that of your job in Atlanta?

A.    Yes.

Q.    How long were you employed in at TFC New York?

A.    Almost ten years.

Q.    Is that the first job you had after you obtained your LPN degree?

A.    One of them.

Q.    Isaiah Dawson you said is your father?

A.    Yes.

MS. RANUCCI:  Brendan, can you slow down a little bit to give her a

R. DAWSON

chance.

MR. LITTLE:  Meaning I'm talking to quickly?

MS. RANUCCI:  Yeah, just give a pause a little bit.

MR. LITTLE:  Okay.

MS. RANUCCI:  Thanks.

Q.    Have you communicated with your father about this lawsuit?

A.    Yes.

Q.    What have you told him?

MS. RANUCCI:  Objection.

A.    About this lawsuit that I'm filing?

Q.    Yes.

A.    No.

Q.    So just to make sure the record is clear, you have not spoken to him about the current lawsuit we're here to talk about today?

A.    No.

Q.    Have you talked about -- was there another lawsuit that you spoke to him about?

R. DAWSON

A.    The one that was filed in the Bronx court against me, yes.

Q.    Is that -- can I refer to that as the collection action, is that fair -- if I refer to that case as the collection action, is that okay?

A.    I guess.

Q.    Well, let me ask you this, what was that -- the lawsuit that was filed against you in the Bronx, what was it related to?

A.    Bank of America student loan.

Q.    And they were attempting to collect money from you as a result of the student loan?

A.    Yes.

Q.    So can we refer to that as the collection action?

A.    Yes.

Q.    And so you spoke to him about the collection action?

A.    Yes.

Q.    And what did you discuss with him about that?

Page 19

R. DAWSON

A.    He was the one that received the lawsuit, so we just had a discussion about what it was about.

Q.    When did you have that discussion with him, if you can remember?

A.    December 2023 -- 2022, I'm sorry.

Q.    Was he a party to that lawsuit?

A.    Not that I'm aware of.

Q.    Did he cosign the loan that was at issue in that collection action?

A.    Yes, he did.

Q.    Did your mother cosign too or it was just your dad?

A.    Just my father.

Q.    Have you reviewed any documents or other materials in preparation for your testimony today?

A.    Yes.

Q.    What did you review?

MS. RANUCCI:   Objection.

Q.    You can answer.

MS. TARANTOLO:   Could we take a moment.

Page 20

R. DAWSON

Off the record.

(Whereupon, an off-the-record discussion was held.)

Q.    Ms. Dawson, we had a conversation with the lawyers off the record, let me be clear, I don't want to know anything that you and your lawyers discussed about this case, that's protected communication and I'm not asking you any of the -- I don't want to know the answers to that stuff.

So if you feel that my question is going to cause you to reveal conversations you had with your lawyers, please let me know so, okay?

A.    Okay.

Q.    What documents did you review in anticipation of your testimony today?

MS. RANUCCI:  Objection.

MR. LITTLE:  What's the objection.

MS. RANUCCI:  Privilege.

Off the record.

(Whereupon, an off-the-record

Page 21

R. DAWSON

discussion was held.)

Q.    Ms. Dawson --

A.    Yes.

Q.    -- what documents did you review in anticipation for your testimony today?

A.    I don't remember specifically, but I know mostly documents that I provided to support the case, like plane tickets, cab fares, whatever bills or documents they asked for that I made payment towards, I provided mostly those and I think the Complaint that we're filing, yeah.

Q.    Okay.

So you reviewed receipts and supporting documentation to support your expenses?

A.    Correct.

Q.    And that's information that you gathered and provided to your lawyers?

A.    Yes.

Q.    Okay.

And you reviewed, you think, you said the Complaint?

Page 22

R. DAWSON

A.    Yes.

Q.    Okay.

Any other documents?

A.    There might have been, but do I remember exactly what everything was right now, no.

Q.    Okay.

Did you listen to any audio recordings in anticipation for your testimony today?

A.    No.

Q.    Did you watch any videos in anticipation for your testimony today?

A.    No.

Q.    Now, again, I'm not asking for the content of your communication, my question is did you speak with anyone in preparation for your testimony today, I don't want to know the substance of the communications, but I want to know who you spoke with?

A.    Yes.

Q.    Who did you speak with?

A.    My lawyers.

Page 23

                    R. DAWSON

Q.    Who are your lawyers?

A.    Jessica Ranucci and --

Q.    And you pointed to Danielle?

A.    Yes, Danielle.

Q.    And anyone else?

A.    These two young ladies were present as well.

Q.    Did you speak with any non-lawyers, I guess, is my question?

A.    Oh, no.

Q.    And when did you speak with Danielle and Jessica?

A.    Last Thursday, I'm not sure what the exact date -- Wednesday, I'm sorry, last Wednesday.

Q.    July 31st, does that sound right?

A.    Yes.

Q.    Was that in person or on the phone?

A.    In person.

Q.    How long was that meeting?

MS. RANUCCI:   Objection.

Q.    You can answer.

Page 24

R. DAWSON

A.    About three hours, I would say.

Q.    How many times have you met with your lawyers in person?

A.    Once.

Q.    Approximately how many times have you spoken to your lawyers on the telephone?

MS. RANUCCI:  Objection. Privilege.

MR. LITTLE:  It's not privilege.

MS. RANUCCI:  Off the record.

(Whereupon, an off-the-record discussion was held.)

A.    I don't remember the exact number of times we spoke.

Q.    Can you estimate for me.

A.    Maybe -- about this specific lawsuit -- correct.

Q.    Correct.

A.    Maybe four.

Q.    Okay.

Did you speak with anyone else besides your lawyers in anticipation of

Page 25

R. DAWSON

your testimony today?

A.    No.

Q.    Why did you file the subject lawsuit against Student Loan Solutions?

A.    Well, I thought that the previous lawsuit that was filed against me was wrong based on new information that I Googled myself and spoke to my lawyers about, so --

Q.    When you say the prior lawsuit, meaning the collection action?

A.    Yes.

Q.    I want to make sure I understand your answer, you said you commenced the subject lawsuit against Student Loan Solutions because you believe the prior collection action was wrong?

A.    Yes.

Q.    Okay.

What was wrong about the prior collection action?

A.    The timeframe in which that lawsuit should have been file, from my understanding, has passed.

Page 26

R. DAWSON

Q.   Okay.

Is there any other basis as to why you believe the collection action is wrong?

A.   No, just based on the timeframe.

Q.   And how did you obtain that information?

A.   Initially, Google.

Q.   So you initially --

MR. LITTLE:  Strike that.

Q.   When did you conduct your Google search to determine or gain your understanding that the collection action was untimely?

A.   December 2022.

Q.   And why did you start to do your Google search in December of 2022?

A.   After I found out that there was a lawsuit being filed against me.

Q.   And how did you learn there was a lawsuit that was being filed against you?

A.   My father called me and told me.

Page 27

R. DAWSON

Q. And did your dad explain how he had that understanding or he learned there was a lawsuit against you?

A. Yes.

Q. And what did he say to you?

A. He sent me a picture of actual papers that were left in the mailbox at the house.

Q. At the --

A. 1063 East 226, yes.

Q. And he said Roxanne, I'm going to send you a picture of this lawsuit that was left in the mailbox or something similar to that fashion?

MS. RANUCCI: Objection.

Q. Go ahead, you can answer.

A. He just sent a picture.

Q. So this communication was via text message?

A. Yes.

Q. Did you talk to him on the telephone at all about it?

A. Prior to the picture, yes.

Q. So was the first time you found

                        R. DAWSON

out about it in a telephone call or via
text message?

        A.      Telephone call.

        Q.      Prior to the text message
exchange, and we'll look at that later
today, because I have it, you're dad called
you and informed you that someone left a
lawsuit in the mailbox?

                MS. RANUCCI:   Objection.

        A.      He told me somebody attempted
to leave paperwork for me for a lawsuit,
but he told that person I don't live there
anymore, so they left.

        Q.      So he called to tell you that
someone attempted to serve you at the 1063
East 226 East address, but your dad
informed that person you no longer resided
there?

                MS. RANUCCI:   Objection.

        A.      Correct.

        Q.      When did you have that
telephone call with your dad about the
attempted service?

        A.      Early December 2022.

Page 29

R. DAWSON

Q.   Okay.

And about how much time passed before then your dad sent you a text message with the image of the lawsuit that was left in the mailbox at 1063 226 East 26th Street?

A.   I think approximately two to three weeks.

Q.   Did you communicate with your father at all in between that two- to three-week period about the lawsuit or the potential lawsuit?

A.   No.

Q.   Did you speak with anyone in between that two- to three-week time period when you first learned that someone was attempting to serve you versus actually receiving a copy of it via the text message about the lawsuit?

MS. RANUCCI:  Objection.

Q.   You can answer.

A.   My therapist.

Q.   Anyone else?

A.   No.

R. DAWSON

MR. LITTLE:  Is she going to claim conversations with her therapist as part of her damages in this in case or not?

MS. RANUCCI:  We're not going to put that at issue.

MR. LITTLE:  If it ever becomes an issue, I reserve the right to come back, but because it's not -- you're certifying that it isn't, then I will move on.

Q.    Did you start your Google searching when your dad called to tell you that someone was attempting to serve you or did you start your Google searching after you actually got a copy or the picture of the lawsuit?

MS. RANUCCI:  Objection.

A.    After I got the picture.

Q.    And what did Google tell you --

MR. LITTLE:  Well, strike that.

Q.    What question did you ask Google?

A.    The exact question, I'm not

R. DAWSON

sure, but -- I'm not sure.

Q.    What was the subject matter?

A.    Getting -- what to do when you get sued.

Q.    Okay.

And what did Google tell you?

MS. RANUCCI:  Objection.

A.    Google said a lot of things. Every detail that Google said I don't remember.

Q.    Did there come a point after your Google searching that you came up with the idea or the process that the lawsuit was untimely?

MS. RANUCCI:  Objection.

A.    I'm sorry, can you repeat the question.

Q.    Sure.

Did there come a point in time after your -- well, let's take a step back.

MR. LITTLE:  Strike that.

Q.    You indicated that you believe that the collection action was wrongfully commenced because it was untimely, correct?

R. DAWSON

A.   Yes.

Q.   And you indicated to me that you gained that position from Google searches, correct?

A.   Correct.

Q.   So, there came a point in time that after your Google searching you came up with the idea or the concept that the collection action was untimely?

MS. RANUCCI:  Objection.

A.   Correct.

Q.   And what was the factual basis as to why you believe that the collection action was untimely?

MS. RANUCCI:  Objection.

A.   Google said that the timeframe for being sued for a debt is like -- it was between three and six years and I know that timeframe has passed.

Q.   Okay.

And three to six years from what date?

MS. RANUCCI:  Objection.

A.   I'm not sure.

R. DAWSON

Q.    Do you know what State law applies to your loan with Bank of America?

MS. RANUCCI:  Objection.

A.    Not sure.

Q.    Other than --

MR. LITTLE:  Strike that.

Q.    Other than the lawsuit being commenced untimely, are you contending any -- that SLS did anything else incorrectly or wrong?

MS. RANUCCI:  Objection.

A.    I don't think I can answer that.

Q.    Okay.

Well, let me rephrase it.

I asked you why you filed the subject lawsuit we're here to talk about today, correct?

A.    Yes.  Correct.

Q.    And you indicated that because you believe that the collection action by Student Loan Solutions was untimely?

A.    Yes.

Q.    Are there any other basises for

R. DAWSON

the lawsuit today in addition to that that

you believe SLS commenced this action

untimely?

MS. RANUCCI:  Objection.

A.   Against me, that's my position.

Q.   Okay.

That's the sole reason as to

why you believe SLS's collection action was

wrongful?

MS. RANUCCI:  Objection.

A.   Against me, yes.

Q.   Did review the Complaint before

it was filed?

MS. RANUCCI:  Objection.

A.   What Complaint?

Q.   The Complaint that initiated

this lawsuit?

A.   I'm not sure.

Q.   Did you have any input in the

Complaint that was filed in this action?

MS. RANUCCI:  Objection.

Q.   You can answer, ma'am?

A.   What do you mean input?

Q.   Did you make any revisions, did

R. DAWSON

you say, you know, delete this word, add that word, that type of stuff?

MS. RANUCCI:  Objection.

Don't answer that.

MR. LITTLE:  She's a Class representative, she has a duty to the Class, I'm entitled to know what involvement she had in the litigation.

MS. RANUCCI:  But how can she answer that question in the way that -- you asked her what she told us --

MR. LITTLE:  I said did you have any involvement in drafting of the Complaint.

I didn't ask what she said -- what communication you guys had have or didn't have.

MS. RANUCCI:  That would obviously be a communication with us --

MR. LITTLE:  It's a yes --

Q.   Did you make any revisions to the Complaint, I'm not asking you what

Page 36

R. DAWSON

revisions you made, I'm asking you did --

MS. RANUCCI:  Objection.

Don't answer that.

Q.    Did you make any revisions to the Complaint before it was filed?

MR. LITTLE:  There's an objection from counsel based on attorney/client privilege.

You're directing the witness not to answer?

MS. RANUCCI:  Correct.

Q.    Do you know what date your Complaint was filed?

MS. RANUCCI:  Objection.

A.    The exact date, no.

Q.    Do you know what court the lawsuit was filed in?

A.    Not sure.

Q.    Do you know if there's been any motion practice in your case?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Do you know if an Amended Complaint was filed in your case?

Page 37

R. DAWSON

A.    I'm not sure.

Q.    Did anyone approach you about being a Class representative?

MS. RANUCCI:  Objection.

Don't answer that.

MR. LITTLE:  You're directing the witness not to answer if anyone asked her to be a Class representative?

MS. RANUCCI:  I don't understand how she can answer that without disclosing privileged communications.

MS. TARANTOLO:  Ms. Dawson, you can answer the yes-no-question if anyone talked to you about being a Class representative.

We'll take it from there.

Q.    Did anyone ask you to be a Class representative?

A.    Yes.

Q.    Who was that?

MS. RANUCCI:  You can answer that one.

R. DAWSON

A.    My lawyer.

Q.    And that would be Danielle and Jessica?

A.    Jessica.

Q.    And when was that?

A.    I don't remember the exact date.

Q.    What is your understanding of the Class representative?

MS. RANUCCI:  Objection.

You can answer.

A.    That there are other people that are filing on their behalf as well, but I'm the one that is essentially taking the lead.

Q.    Okay.

And what group of people do you purportedly want to represent?

MS. RANUCCI:  Objection.

A.    Other people that were sued by Student Loan Solutions.

Q.    Okay.

What are the duties and responsibilities of a Class representative?

R. DAWSON

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Are you willing to be the Class representative?

MS. RANUCCI:  Objection.

A.    I'm here, yeah.

Q.    Okay.

Well, without knowing the duties and responsibilities, you still want to be the Class representative?

MS. RANUCCI:  Objection.

A.    Yes.

Q.    Have you reviewed any of the Discovery documents produced by Student Loan Solutions in this case?

MS. RANUCCI:  Objection.

A.    Can you repeat the question.

Q.    Have you reviewed any of the documents produced by Student Loan Solutions in this case?

A.    I'm not sure.

Q.    Okay.

Have you reviewed any of the documents produced by Roach and Murtha in

R. DAWSON

this case?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Why did you sue Roach and Murtha in your action?

MS. RANUCCI:  Objection.

A.    In this lawsuit?

Q.    Yes.

A.    They were the law firm that I believe filed the suit against me.

Q.    The collection lawsuit?

A.    Yes.

Q.    So why did you sue them in this Federal lawsuit?

MS. RANUCCI:  Objection.

A.    Because they're part of the whole thing.

Q.    Okay.

What are you claiming that Roach and Murtha did incorrectly?

A.    They filed --

MS. RANUCCI:  Objection.

A.    -- they filed the lawsuit that I believe to be out of the time limit.

Page 41

R. DAWSON

Q.    Okay.

And that's the sole reason why you sued Roach and Murtha?

A.    Yes.

MS. RANUCCI:  Objection.

A.    Yes.

Q.    Have you paid any attorneys' fees in this case yet to date?

A.    No.

Q.    Who paid the filing fee to commence this lawsuit?

A.    I'm not sure.

Q.    Do you know how much the filing fee was?

A.    No, I do not.

Q.    Have you paid any expenses related to this litigation?

A.    To my attorneys?

Q.    Yes.

A.    No.

Q.    Do you have the ability to pay the expenses moving forward?

A.    I don't know how much they would be, so I can't answer that question.

Page 42

R. DAWSON

Q.    Okay.  Fair enough.

MS. RANUCCI:  Off the record.

(Whereupon, an off-the-record discussion was held.)

Q.    We're back from a brief break and just a couple of follow-up questions from my earlier line of questioning.

Did you review Student Loan Solutions Interrogatory Responses in this case?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Do you know what the Interrogatory Responses are?

MS. RANUCCI:  Objection.

A.    No.

Q.    Do you know if you responded to Interrogatories in your case?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Did anyone ever ask you to provide input in to the Interrogatory Responses?

MS. RANUCCI:  Objection.

R. DAWSON

Q.   You can answer.

A.   I'm not sure.

Q.   Did you ever sign a verification to Interrogatory Responses?

MS. RANUCCI:  Objection.

A.   I'm sorry.

Q.   Did you ever sign a verification to Interrogatory Responses?

A.   I'm not sure.

Q.   Do you know what a verification to Interrogatory Responses?

MS. RANUCCI:  Objection.

A.   I'm not sure.

Q.   The collection action in The Bronx concerned a loan, correct?

A.   Correct.

Q.   And that was a loan that was originated through Bank of America?

A.   Correct.

Q.   And as you sit here today, do you admit or deny that you took out the loan from Bank of America?

MS. RANUCCI:  Objection.

A.   I admit.

**Page 44**

R. DAWSON

Q.    Okay.

And why did you take out the loan from Bank of America?

A.    To pay for school.

Q.    Okay.

For the LPN schooling or the Stony Brook School?

A.    Stony Brook.

Q.    Okay.

So it was a student loan?

A.    Yes.

Q.    And I believe you indicated your dad cosigned that loan, correct?

A.    Correct.

Q.    Okay.

And did you ever make any payments on the Bank of America loan?

A.    Me personally?

Q.    Yes.

A.    No.

Q.    Okay.

Did anyone on your behalf ever make any payments on the Bank of America student loan?

Page 45

R. DAWSON

A.    I'm not sure.

Q.    Did Bank of America reach out at some point to say Ms. Dawson, your loan payments start commencing, they're starting X-Y-Z date?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Okay.

When you graduated from Stony Brook, did you have -- was anything in your head that hey, now I'm going to have to pay back my loan at some point?

MS. RANUCCI:  Objection.

A.    That particular loan?

Q.    Yes.

A.    No.

Q.    Did you forget about that you took out this Bank of America loan when you were at Stony Brook?

MS. RANUCCI:  Objection.

A.    No, I did not.

Q.    Okay.

Remind me, what years did you attend Stony Brook?

Page 46

R. DAWSON

A.      2006 to 2010.

Q.      Okay.

When you took out the loan --

MR. LITTLE:  Strike that.

Q.      I'm assuming you took out the loan in and around 2006.

MS. RANUCCI:  Objection.

A.      Some time between that, 2006 and 2010.

Q.      Okay.

When you took out the loan, did you have an understanding as to when you were obligated to start paying the loan back?

MS. RANUCCI:  Objection.

A.      When the re-start -- when the repayment started?

Q.      Correct.

A.      I'm not sure of the exact date.

Q.      Okay.

At the time you signed it, did you have an understanding that -- when the payments were going to start to become?

A.      I'm not sure what that date

Page 47

R. DAWSON

would have been.

Q.    Okay.

Did anyone articulate to you saying hey, you don't have to pay the student loan while your actively enrolled in school, but when you graduate or when you stop schooling the loan payments start to become due on X-Y-Z, date?

MS. RANUCCI:  Objection.

A.    Did somebody verbally tell me that?

Q.    Correct.

A.    No.

Q.    Did the documents that you signed indicate that at all?

MS. RANUCCI:  Objection.

A.    I don't remember exactly what the document said.

Q.    Okay.  Fair enough.

While you were in New York before you moved to Atlanta, did anyone from Bank of America attempt to contact you to say hey, Ms. Dawson, you need to start making loan apartments?

Page 48

R. DAWSON

MS. RANUCCI: Objection.

A. Can you specify what time period.

Q. Sure.

Let me ask it this way.

When is the first time that someone from Bank of America reached out to you to ask if you were going to start making payments on your loan?

MS. RANUCCI: Objection.

A. I'm -- I don't remember. I'm not sure.

Q. Did someone from Bank of America ever reach out to you and say hey, Ms. Dawson, you need to start making payments on your loan?

MS. RANUCCI: Objection.

A. I'm not sure.

Q. Okay.

MR. LITTLE: Please mark this is as Defendants' Exhibit A, Credit Agreement, Defendants' Exhibit B is a is Note Disclosure Statement.

(Whereupon, the aforementioned

Page 49

R. DAWSON

Credit Agreement and Note Disclosure Statement were marked as Defendants' Exhibit A-B for identification as of this date by the Reporter.)

Q.    Ms. Dawson, you get the official copy, I'm going to show you what's been marked as Defendants' Exhibit A, it's a multi-page document, you can page through it as you see fit.

If you want to look at it now, I'm just going to ask you a couple of questions about it or you can look at it after I ask you the questions, it's up to you.

A.    Okay.

Q.    Have you seen this document before?

A.    Yes.

Q.    When is the first time that you saw it?

A.    The first time ever?

Q.    Yes.

A.    I'm not sure of the exact date.

Q.    And it's got some information

Page 50

R. DAWSON

towards the top, it says lender Bank of America, is that correct?

A.    Okay.  Yes.

Q.    Okay.

And it indicates school SUNY Stony Brook, right?

A.    Correct.

Q.    And then up in the little corner to the right there is says academic period 9/2007 to 12/2007, does that correctly?

A.    Yes.

Q.    Seeing that, does that refresh your recollection that you took out this loan for the academic period September 2007 through December of 2007?

MS. RANUCCI:  Objection.

A.    Can you repeat your question.

Q.    Seeing the academic period listed on the this document, does that refresh your recollection that this loan was taken out for the academic period of September 2007 through December of 2007?

MS. RANUCCI:  Objection.

Page 51

R. DAWSON

A.    It was taken out during that academic period, but I'm not sure if it was for that academic period.

Q.    Understood.

And the loan amount requested was $30,000, am I reading that correctly?

A.    Yes.

Q.    And it says a -- there's a box there that says, borrower, student/borrower information, correct?

A.    Yes.

Q.    And your Social Security number is redacted, but it's got your 1063 East 226th Street address?

A.    Yes.

Q.    Okay.

And that's you date of birth, right,        ?

A.    Yes.

Q.    That home telephone number ending in 8165, is that still a good telephone number for you?

A.    For me personally, no.

Q.    Is that a landline associated

Page 52

R. DAWSON

with the 1063 226 East Street address?

A.    Yes.

Q.    Is that still active today?

A.    Yes.

Q.    And then it's got the cosigner information on the bottom, Isaiah Dawson, that would be your father, correct?

A.    Yes.

Q.    And if you flip over to page of two of Exhibit A, there's two signatures there, do you recognize that as your signature?

A.    It looks familiar.

Q.    So the answer is yes, it is your signature?

A.    Yes.

Q.    Do you remember signing this document?

A.    Not particularly, but my signature is there, so --

Q.    Okay.  Understood.

And it's dated 11/29/2007?

A.    Correct.

Q.    And there's a signature

Page 53

R. DAWSON

underneath for the cosigner, it appears to be Isaiah Dawson, would you agree with me?

A.    Yes.

Q.    Do you recognize that as your father's signature?

A.    It looks familiar.

Q.    And it's also dated 11/29/07?

A.    Yes.

Q.    I'm going to show you what's been marked as Defendant's Exhibit B, do you recognize that document?

A.    What do you mean by recognize?

Q.    Have you seen it before?

A.    Yes.

Q.    When is the most recent time you've seen it?

A.    When I met with my lawyers.

Q.    Okay.

Last week, the 31st?

A.    Correct.

Q.    Okay.

When is the first time that you remember seeing this document?

A.    Not sure.

Page 54

R. DAWSON

Q.    Do you know if this was provided to you on or about November 29th, 2007 when you signed Defendants' Exhibit A?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    You don't remember one way or the other?

A.    Correct.

Q.    Okay.

And it's got your and your father's name up in top right-hand corner, borrower?

A.    Yes.

Q.    And your middle initial is A as in Adam?

A.    Yes.

Q.    And you have an understanding of what this document is?

A.    Yes, I have a brief understanding.

Q.    And would you agree with me that about middle through the page it indicates that you were going to make 240 payments at $519.61 starting on the 9th day

Page 55

R. DAWSON

each month beginning December of 2010?

A.    That's what it says.

Q.    Okay.

And do you remember making a

any -- do you know if you made a payment on

12/9/2010?

MS. RANUCCI:  Objection.

A.    Me, Roxanne?

Q.    Yes.

A.    I don't remember.

Q.    Okay.

And do you know if anyone on

your behalf made a payment on 12/9/2010?

A.    I'm not sure.

Q.    Okay.

MR. LITTLE:  Please mark that

Defendants' Exhibit C, Amended

Complaint.

(Whereupon, the aforementioned

Amended Complaint was marked as

Defendants' Exhibit C for

identification as of this date by the

Reporter.)

Q.    Ms. Dawson, I'm showing you

Page 56

R. DAWSON

what's been marked Exhibit C as in Charlie, have you seen this document before?

A.    Yes.

Q.    And just so the record is clear, Ms. Dawson, at any point if I show you a document that you need to look at say hold on Little, let me look at page search so I understand what you're saying, okay?

A.    Okay.

Q.    So my question originally was have you seen the document before and I believe your answer was yes?

A.    Yes.

Q.    When was the first time you saw that document?

A.    When I met with my attorneys.

Q.    Okay.

And that was July 31st?

A.    Correct.

Q.    Do you know what an Amend Complaint is?

MS. RANUCCI:  Objection.

A.    I'm not sure of the legal term.

Q.    And that's fair.

Page 57

R. DAWSON

You don't get scored as a grade, either you know or you don't know.

I believe your answer is you don't know?

A.    Correct.

Q.    Why don't you flip to page 6, paragraph 35 and the first sentence of paragraph 35 says upon information and belief, Bank of America accelerated Ms. Dawson's loan at some point on or about the charge-off date July 23, 2012 and, in any event, prior to the sale of the loan to Student Loan Solutions in 2017, did I read that correctly?

A.    Yes, you did.

Q.    Okay.

Let me ask you this first, are you aware that Bank of America sold your loan to someone?

A.    Yes.

Q.    And what is your understanding of who that loan was sold to?

A.    Student Loan Solutions.

Q.    Okay.

Page 58

R. DAWSON

And when did you learn first that Bank of America had sold your loan?

A.    I believe -- I'm not sure.

Q.    But as you sit here today, August 9, 2024, it's your understanding that Student Loan Solutions owns your loan?

MS. RANUCCI:  Objection.

A.    Correct.

Q.    So back to what I originally read, first sentence of paragraph 35 of the Amended Complaint, Exhibit C, you allege or your lawsuit alleges that your loan at some point on or about the charge-off date of July 23, 2012 and prior to the sale of the loan to Student Loan Solutions in 2017, Bank of America accelerated your loan?

A.    That's what it says.

Q.    What date did Bank of America accelerate your loan?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Your lawsuit claims that it was accelerated some time on July 23rd, 2012 and before Student Loan Solutions purchased

Page 59

R. DAWSON

it in 2017, correct?

MS. RANUCCI:  Objection.

A.    It says that the charge-off date, I'm not sure if that's the acceleration date.

Q.    So if you look at the first line it says upon information and belief, Bank of America accelerated Ms. Dawson's loan at some point on or about the charge-off date July 23, 2012, and in any event, prior to the sale of the loan to Student Loan Solutions in 2017.

So my question to you is is it your position that Bank of America accelerated the loan some time between July 23, 2012 and 2017 when Student Loan Solutions acquired it?

MS. RANUCCI:  Objection.

A.    Can you repeat the question.

Q.    Sure.

It's your position in this case that Bank of America accelerated your loan, correct?

A.    Correct.

Page 60

R. DAWSON

Q.    So I'm trying to find out what date you believe Bank of America accelerated your loan?

A.    So you're allegation in paragraph 35 says some time between --

MR. LITTLE:  Well, strike that.

Q.    I will represent to you that Student Loan Solutions purchased your loan on October 31, 2017, okay?

A.    Okay.

Q.    So your allegation in paragraph 35 claims that some time between July 23, 2012 and 10/31/2017, Bank of America accelerated your loan.

I'm asking you what is the date during that five-year period, give or take, did Bank of America accelerate your loan?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Okay.

Did you ever know -- did you ever have a date in your head as to when Bank of America accelerated your loan?

MS. RANUCCI:  Objection.

Page 61

R. DAWSON

A.    No.

Q.    Okay.

Why do you believe that Bank of America accelerated your loan some time between July 23, 2012 and October 31 of 2017?

MS. RANUCCI:  Objection.

A.    I never said I believe that.

Q.    Well, your allegation says that in paragraph 35, does it not?

MS. RANUCCI:  Objection.

A.    There is some wordage in here that says the date of July 23, 2012, but I'm not quite sure if that's what it's saying.

Q.    Okay.

Did you review this document before it was filed?

A.    I don't believe so.

Q.    Did you receive any written communication from Bank of America at any point that told you that Bank of America was accelerating your loan?

A.    I'm not sure.

Page 62

R. DAWSON

Q.    Did you receive any communication from Williams and Fudge indicating that Bank of America was accelerating your loan?

A.    I'm not sure.

Q.    Did you receive communication from anyone indicating that Bank of America was accelerating your loan?

A.    I'm not sure.

Q.    Did someone tell you that Bank of America accelerated your loan at some point --

MS. RANUCCI:  Objection.

Q.    -- other than your lawyers?

A.    I don't think so.

Q.    Have you spoken to anyone at Bank of America regarding this loan?

A.    Have I spoken on the phone, me personally?

Q.    Yeah.

A.    I don't believe so.

Q.    Okay.

Have you ever spoken -- do you know who Williams and Fudge is?

Page 63

R. DAWSON

A.    I don't think so.

Q.    So would it be fair to say that you've never spoken to anyone at Williams and Fudge regarding this loan?

MS. RANUCCI:  Objection.

A.    I don't think so.

Q.    Have you spoken to anyone at Student Loan Solutions regarding this loan?

A.    I don't think so.

Q.    So what is your factual basis that Bank of America accelerated your loan?

MS. RANUCCI:  Objection.

A.    What do you mean factual --

Q.    Meaning what facts are you relying on to state that Bank of America accelerated your loan?

MS. RANUCCI:  Objection.

A.    I don't think I would have that information.

Q.    Okay.

So before I ask -- or let me ask it this way.

Who would have that information?

Page 64

R. DAWSON

MS. RANUCCI:  Objection.

A.    I think my lawyers would.

Q.    Okay.

And so did you provide your lawyers with any information that shows that Bank of America accelerated your loan?

MS. RANUCCI:  Objection.

Q.    You can answer.

A.    I provided a lot of documents, what they took from those documents, I'm not sure.

Q.    Okay.

So it's possible that you provided your lawyers with a document that showed Bank of America accelerated your loan, but you don't know one way or the another?

MS. RANUCCI:  Objection.

A.    Correct.

Q.    Okay.

MS. RANUCCI:  Okay.

Q.    Why do you believe that Bank of America accelerated your loan before it sold it to Student Loan Solutions?

Page 65

R. DAWSON

MS. RANUCCI:  Objection.

A.    You're asking me why Bank of America --

Q.    My question is why do you believe that Bank of America accelerated your loan before it sold it to Student Loan Solutions?

MS. RANUCCI:  Objection.

A.    What do you mean by believe?

Q.    Well, you're alleging in your lawsuit that Bank of America accelerated your loan prior to selling it to Student Loan Solutions, so I'm asking you why do you believe that?

MS. RANUCCI:  Objection.

A.    I believe that whatever information that lawyers gathered that was the conclusion that was came to.

Q.    Okay.

So you don't have an independent basis to believe that Bank of America accelerated your loan prior to selling it to Student Loan Solutions?

MS. RANUCCI:  Objection.

Page 66

R. DAWSON

A.    Outside of my attorneys?

Q.    Correct.

A.    I don't even know what that term means to even say I knew that before.

Q.    Fair enough.

Are you in possession of a document that shows Bank of America accelerated your loan before selling it to Student Loan Solutions?

MS. RANUCCI:   Objection.

A.    Like right now?

Q.    In your possession meaning it could be at your apartment, it could be in your car, if could be in your e-mail, it could be in your text messages, are you aware of any written documentation or communication that shows Bank of America accelerated your loan before it sold to Student Loan Solutions?

A.    I'm not sure.

Q.    Okay.

Did you ever receive any written communication from Bank of America on this loan?

Page 67

R. DAWSON

A.    I'm not sure.

Q.    Did you ever receive any written communication from Williams and Fudge regarding this loan?

A.    I'm not sure.

Q.    Do you know if you ever received any written communication from Student Loan Solutions regarding this loan?

A.    I'm not sure.

Q.    What telephone number, if you remember, were you using back in November of 2007?

A.    I don't remember.

Q.    Okay.

What's your current telephone number?

A.    332-214-8727.

Q.    And how long have you had that number?

A.    Approximately three to four years.

Q.    Okay.

It's a cell phone?

A.    Yes.

Page 68

R. DAWSON

Q.    Who is the carrier?

A.    T-Mobile.

Q.    Has anyone from Bank of America tried to call you at that 8727 number?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Has anyone from Williams and Fudge attempted to call you at the 8727 number?

A.    I'm not sure.

Q.    Has anyone from Student Loan Solutions attempted to call you at the 8727 number?

A.    I'm not sure.

Q.    And I guess, let me ask it this way, have you ever received a voicemail from either Bank of America, Williams and Fudge or Student Loan Solutions at that 8727 number?

MS. RANUCCI:  Objection.

A.    My voicemail is not activated.

Q.    And did you ever receive any kind of text message from Williams and Fudge, Student Loan Solutions or Bank of

Page 69

R. DAWSON

America at that 8727 number?

A. I'm not sure.

Q. Do you know if you ever received any e-mails from Bank of America regarding this loan?

A. I'm not sure.

Q. The e-mail address that you were using in 2007 is the same e-mail address that you use today?

A. Doubt it.

Q. Have you ever received any e-mails from Williams and Fudge regarding this loan?

A. I'm not sure.

Q. Have you ever received any e-mails from Student Loan Solutions regarding this loan?

A. I'm not sure.

MS. RANUCCI: Off the record.

(Whereupon, an off-the-record discussion was held.)

MR. LITTLE: Please mark this Defendants' Exhibit D, Williams and Fudge letter.

Page 70

R. DAWSON

(Whereupon, the aforementioned Williams and Fudge letter was marked as Defendants' Exhibit D for identification as of this date by the Reporter.)

MR. LITTLE: Please mark this Defendants' Exhibit E, Affidavit of Service.

(Whereupon, the aforementioned Affidavit of Service was marked as Defendant's Exhibit E for identification as of this date by the Reporter.)

MR. LITTLE: Please mark this Defendants' Exhibit F, Answer.

(Whereupon, the aforementioned Answer was marked as Defendants' Exhibit F for identification as of this date by the Reporter.)

Q.   Ms. Dawson, I'm showing you what's been marked as Defendants' Exhibit D, have you seen that document before?

A.   Yes.

Q.   When is the last time you saw

Page 71

R. DAWSON

it?

A.    With my attorney.

Q.    On the 31st of July?

A.    Yes.

Q.    When is the first time you saw it?

A.    I don't recall.

Q.    Other than the July 31st, viewing with your lawyers, do you remember how many times you saw it prior to that date?

A.    No, I don't.

Q.    Would you agree with me it's a letter to you from Williams and Fudge?

A.    Correct.

Q.    Dated December 1, 2021?

A.    Correct.

Q.    And I believe you testified earlier, just so the record is clear, you don't know who Williams and Fudge is, correct?

A.    Correct.

Q.    And if you look page 3, this is, for the record, it's a four-page

Page 72

R. DAWSON

document, if you look at pages 3 and 4, it's a letter also dated December 1, 2021 to your father, Isaiah Dawson, correct?

A.    Correct.

Q.    Did your dad ever reach out to you after he got this letter at all?

MS. RANUCCI:  Objection.

A.    Not that I recall.

Q.    Okay.

So if you go back to the first page of Exhibit D, the second paragraph under to Roxanne A. Dawson, it says pursuant to the agreement, SLS hereby accelerates the loan and demands all payments, consequently, $19,692.06 is now immediately due and owing to SLS, do you see that there?

A.    Yes, I do.

Q.    Did I read that correctly?

A.    Yes, you did.

Q.    Did you ever receive a letter from Bank of America that had similar language where Bank of America indicated it was accelerating the loan demanding all

Page 73

R. DAWSON

payments being due?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Did you receive any other letter from Williams and Fudge prior to December 1, 2021 that had similar language indicating that the loan was being accelerating and all payments were due?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    And it was mailed to you at the, if you turn to page 2, at the 1063 East 226th Street address, correct?

MS. RANUCCI:  Objection.

A.    That's what it says on the paper.

Q.    Where were you residing on December 1 --  on or about December 1, 2021?

A.    Give me a second.  I have to think back.

Q.    Take your time.

A.    Either I was at the 1063 or in Atlanta, I'm not sure.

Page 74

R. DAWSON

Q.    I'm looking at my notes and it could be correct, but they suggest that you were in Atlanta from March/April 2022 to March/ April 20223, does that help refresh your recollection as to where you were residing in -- on or about December 1 of 2021?

A.    Okay.  Yes, it does.

Q.    And hearing that, does that -- do you believe that you were residing at the 1063 East 226 Street address on or about December 1, of 2012?

A.    I believe so.

Q.    Okay.

Back to Exhibit C as in Charlie, the Amended Complaint, paragraph 72, page 11, paragraph 72 says indeed, upon information and belief, the 2021 acceleration notice was misleading, as it was sent out with your review or projection of the documentation from Bank of America that would allow determination of the actual acceleration date.

Upon information and belief,

Page 75

R. DAWSON

that notice was also false, as the loan was accelerated substantially before that time. This false and misleading notice was designed to deal with fraudulent nature by omitting that Student Loan Solutions had not reviewed the documentation that would have shown whether and when the loan was previously accelerated by Bank of America.

Did I read that correctly?

A.    Yes, you did.

Q.    Okay.

So this indicates or your lawsuit alleges that Exhibit D was sent falsely because the loan was accelerated substantially before December 1st, 2021?

MS. RANUCCI:   Objection.

Q.    What is your basis that the loan was accelerated prior to this December 1, 2021 letter marked at Exhibit D?

MS. RANUCCI:   Objection.

A.    My basis?

Q.    Yes.

A.    I don't think I have that information.

R. DAWSON

Q.    Okay.

Who has that information?

A.    I believe my attorneys would have that information.

Q.    Okay.

And is that information you did have at one point but then you gave to your attorneys?

MS. RANUCCI:   Objection.

A.    I'm not sure.

Q.    Okay.

So you don't know whether you provided them with information to show that the loan accelerated prior to December 1, 2021?

MS. RANUCCI:   Objection.

A.    I don't remember all the documents that I provided to them.

Q.    Do you know what -- who accelerated your loan prior to December 1, 2021?

MS. RANUCCI:   Objection.

A.    No, I'm not sure.

Q.    Was it Bank of America?

Page 77

R. DAWSON

A.    I'm not sure.

Q.    Do you know if it was Williams and Fudge?

A.    I'm not sure.

Q.    And do you know the date that it was accelerated prior December 1, 2021?

A.    I'm not sure.

Q.    And so who would know that information?

A.    My attorneys would.

Q.    Okay.

Based on information that you gave to your attorney?

MS. RANUCCI:  Objection.

A.    Based on whatever information they selected and information I've given to them.

Q.    Okay.

Flip to page 16, paragraph 99, let me first ask you, I believe your testimony was, and correct me if I'm wrong, that you were purporting to represent a group of Class members that were also sued by Student Loan Solutions, correct?

Page 78

R. DAWSON

MS. RANUCCI:  Objection.

A.    Correct.

Q.    So paragraph 99 reads upon information and belief, Student Loan Solutions representations that Class members loans were accelerated after Student Loan Solutions acquired the loan from Bank of America are either false or misleading, did I read that correctly?

A.    Yes.

Q.    What basis do you have to make the statement that the other Class members' loans were accelerated prior to Student loans acquisitions of the loans from Bank of America?

MS. RANUCCI:  Objection.

A.    I don't think I have that information.

Q.    Okay.

What is your basis for that statement then?

A.    I believe that my attorney's basis is whatever information they have.

Q.    Did you review this document

R. DAWSON

before it was filed?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    So any information to support the allegation that the loan of the Class members were accelerated prior to Student Loans acquisition of the loans would be in possession of your attorney?

MS. RANUCCI:  Objection.

A.    That is my understanding.

Q.    Okay.

Going on to paragraph 100, it says first, upon information and belief, Student Loan Solutions representations about loans acceleration dates were false as the loans were in fact accelerated before they were acquired by a whereby Student Loans Solution, did I read that correctly?

A.    Yes, you did.

Q.    What date were the loans accelerated?

MS. RANUCCI:  Objection.

A.    I don't think I have that

R. DAWSON

information.

Q.    Okay.

And what is your basis for the statement that the loans were -- loans of Class members were accelerated prior to Student Loan Solutions acquiring them?

MS. RANUCCI:  Objection.

A.    I believe that my attorneys would that have information.

Q.    Okay.

So you don't have any information to then identify the date that these loans were accelerated?

MS. RANUCCI:  Objection.

A.    No.

Q.    Any information that you would have to support the date would have been provided to your attorneys?

MS. RANUCCI:  Objection.

A.    Correct.

Q.    Do you know what company accelerated the loans of the Class members prior to Student Loan Solutions acquiring them?

Page 81

R. DAWSON

MS. RANUCCI: Objection.

A. I'm not sure.

Q. You don't know if was Bank of America?

A. I'm not sure.

Q. You don't know if it was Williams and Fudge?

MS. RANUCCI: Objection.

A. I'm not sure.

Q. Okay.

That information would be in the possession of your lawyers?

A. I believe so, yes.

Q. You can put Exhibit C and aside for now.

A. (Complying with request.)

Q. Ms. Dawson, you indicated, I believe, earlier that you first learned of the collection action when your dad called you in early in December 2022 and said someone was here to try and serve you with paperwork, correct?

MS. RANUCCI: Objection.

A. Correct.

Page 82

R. DAWSON

Q.    And then you said he later sent you a photograph of the lawsuit in some time in December of '22 and you actually saw the paperwork, I guess, for the first time, would that be fair to say?

A.    Yes, I saw the first page of the paper work.

Q.    Okay.  Fair.

And I'm going to show you what's been marked as Exhibit E, have you seen that document before?

A.    Yes.

Q.    When is the last time you saw it?

A.    With my attorney.

Q.    On July 31st?

A.    Correct.

Q.    When was the first time you saw it?

A.    I don't recall.

Q.    Did you provide this document to your lawyers or did they provide you a copy with it?

A.    This specific document, I

                         R. DAWSON

believe it was a part of the Discovery that was sent to me.

Q.    Okay.

In the collection action?

A.    No, that was later sent.

Q.    I'm not following you.

Let's clear the record up.

You believe the Exhibit E was sent to you at some point during Discovery?

A.    Yes.

Q.    And my question to you is the Discovery in the collection action or Discovery in the lawsuit we're here to talk about today?

A.    Collection action.

Q.    Okay.  Fair enough.

Now we're on the same page.

A.    Okay.

Q.    And so is it fair to say, then, you provided this document to your attorneys?

A.    I believe so.

Q.    Okay.

And do you know what this

Page 84

R. DAWSON

document is?

A.    It says it's a -- basically a service paper, meaning somebody served this paper, these papers to me.

Q.    I will represent to you that it's a -- well, you see at the top is says Student Loan Solutions versus Roxanne A. Dawson, correct?

A.    Correct.

Q.    And it's got Civil Court, City of New York, County of Bronx, correct?

A.    Correct.

Q.    And underneath the Index date of 11/7/22 it says Affidavit of Service of -- do you see that there on the top right-hand corner?

A.    Okay.  Yes.

Q.    So would you agree with me that this purports to be an Affidavit of Service?

A.    Correct.

Q.    Okay.

And it indicates that, if you go about a quarter of the way down the

Page 85

R. DAWSON

page, on the 6th day of December 2022 at 12:05 p.m., at the address of 1063 East 226 Street, floor two, Bronx, New York 10466, this Affiant served upon Roxanne A. Dawson in the matter described below, did I read that correctly?

A.    Correct.

Q.    And it indicates that a Jane Doe was served and do you know what -- when people use the word Jane/John Doe, do you know what that means?

MS. RANUCCI:  Objection.

A.    I have a vague understanding.

Q.    What's your understanding?

A.    That they're not sure of the person's correct name, so the Jane Doe represents a female and the John Doe represents a male.

Q.    Fair.  We have the same understanding.

A.    Okay.

Q.    So it indicates that the documents were served on a female, but we don't know who the female was by name?

Page 86

R. DAWSON

MS. RANUCCI:  Objection.

Q.    Would you agree with that statement?

A.    It says -- there's a description of a female that attempted to serve --

Q.    We'll get there in a second, but, I guess, the substitute service paragraph indicates that a Jane Does was served and then -- is that the answer to that question, yes, you would agree with that statement?

MS. RANUCCI:  Objection.

A.    I agree that that's what the paper says.

Q.    And then the description below about half way down the page says Jane Doe, I delivered the documents to an individual who refused to give their name who indicated they were the coresident and it says coresident twice, the individual accepted service with direct delivery.

They individual appeared to be the black-haired female, contact 55 to 65

R. DAWSON

years of ages, five foot six, approximately, tall, weighing 200 to 240 pounds --

MS. RANUCCI:  I think it says black-haired black female.

MR. LITTLE:  I'm sorry.

Thank you.

Q.   Did I read that correctly?

A.   For the most part, yes.

Q.   Other than Jessica corrected me.  Thank you.

A.   Yes.

Q.   Does that description accurately describe your mother?

MS. RANUCCI:  Objection.

A.   Not to -- no.

Q.   Okay.

In December of 2022, how old was you're mom, approximately?

A.   I don't have a calculator to do the math.

Q.   Was she older than 60?

A.   No.

Q.   Was she older than 50?

Page 88

R. DAWSON

A.    Yeah.

Q.    Let me ask you this way.

Do you know how old your mom is today?

A.    No.

Q.    Okay.

Do you have an estimate as to how old your mom is today?

A.    I know here birthday, we can --

Q.    What year was she born?

A.    '64.

Q.    So that makes her, approximately, 60 years old today depending on the month of her birthday?

A.    Yes.

Q.    So is it fair to say that she was in her late 50s in 2022?

A.    Correct.

Q.    Okay.

Is your mother black?

A.    Yes, she is.

Q.    Does your mother have black hair?

A.    For the most part, yes.

Page 89

R. DAWSON

Q.    Okay.

Is she about five foot six to five foot eight?

A.    No.

Q.    How tall is she, approximately?

A.    She's about five feet to five feet two.

Q.    Okay.

And this description regarding the weight 200 to 240 pounds, is that close, inaccurate?

MS. RANUCCI:   Objection.

A.    I think it's close.

Q.    Okay.

Was your mom residing at the 1063 East 226 Street address?

A.    Yes.

Q.    But is it your position that you don't believe that your mom is the Jane Doe described in this Affidavit of Service?

A.    No, I don't believe that she is.

Q.    Why is that?

A.    For one, based on my

R. DAWSON

understanding of how the papers were served, she was not a part of this, like, she wasn't even aware of this happening.

Q.    So she wasn't at home the time that these papers were purportedly served?

A.    She wasn't aware that these papers were ever served.

Q.    Was she at the apartment at the time that the process server came to attempt --

A.    I'm not sure.

Q.    Okay.

Was anyone else residing at that address in December of '22 besides your mom and your dad?

A.    Yes.

Q.    Who else?

A.    There's tenants on the first floor and tenants on the third floor.

Q.    Was anyone residing in apartment number 2 besides your mom and your dad?

A.    No.

Q.    And so you said it's your

R. DAWSON

understanding that you mom was not even around when these papers were attempted to be served, how did you gain that understanding?

A.   Not around, aware.

Q.   Fair.  I apologize.

Your mom wasn't aware, how did you gain that understanding?

A.   I believe from my father.

Q.   He said to you that your mother doesn't know about this or your mother doesn't -- what did your dad say specifically?

A.   He told me that she found the papers in the mailbox, so if they were in the mailbox and she saw them, she would have taken them.

Q.   Okay.  Fair.

Let me ask you a different question.

This is an Affidavit of Service about someone physically attempting to try to serve those papers on someone and not leaving them in the mailbox, per se, so I

Page 92

R. DAWSON

believe your testimony earlier was you first found out about this lawsuit when someone attempted to serve you at the apartment until your father told them you no longer resided there --

MS. RANUCCI:  Objection.

Q.    -- is that testimony correct?

A.    Correct.

Q.    Okay.

And so my question to you is at the time that someone tried to serve these papers and your dad told them Roxanne doesn't live here anymore, was your mom home at that time?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Did your father indicate to you one way or the other whether your mom was home at the time the person tried to serve the papers?

MS. RANUCCI:  Objection.

A.    No, not that specific day, no.

Q.    Okay.

So you don't know whether she

Page 93

R. DAWSON

was there or not there?

A.    At home, I'm not sure.

Q.    Okay.

Is it your position that the collection lawsuit was served improperly?

MS. RANUCCI:  Objection.

A.    You said is it my position?

Q.    Yes.

A.    From information I received, I believe so.

Q.    And why is it -- what's the basis for your position that the collection lawsuit was served improperly?

MS. RANUCCI:  Objection.

A.    Because I was told it was found in the mailbox, not that it was actually delivered to somebody's hand.

Q.    Okay.

So your -- make sure I understand what you're telling me, the basis for your position is the collection action was served improperly was because it was only put in the mailbox and it wasn't specifically handed to someone?

Page 94

R. DAWSON

A.    Correct.

MR. LITTLE:  Please mark this Defendants' Exhibit G, text message chain.

(Whereupon, the aforementioned text message chain was marked as Defendants' Exhibit G for identification as of this date by the Reporter.)

Q.    Ms. Dawson, I'm going to show you what we marked as Exhibit G as in George, and for the record, it's Plaintiff's Bates 745.

Have you seen this -- well, what is this?

A.    This is a text message exchange between me and my father.

Q.    Okay.

And it says pops up at the top, I'm assuming that's what you call your father?

A.    Yes.

Q.    And it appears that the date at the top, it says December 15, 2022?

Page 95

R. DAWSON

A.    Correct.

Q.    Is this a screen shot of the text message exchange between you and your father?

A.    Yes, it is.

Q.    Okay.

Are you the one that physically took the screen shot of this text message?

A.    Yes.

Q.    And you sent it to your attorney?

A.    Yes.

Q.    And we talked a little bit today about the photograph that your dad sent you of the lawsuit that you found in the mailbox.

The first photograph is a picture of a collection action, is it not?

MS. RANUCCI:  Objection.

A.    It's a picture of the lawsuit, I guess the first page of the lawsuit.

Q.    Okay.

Of the collection action?

A.    Correct.

Page 96

R. DAWSON

Q.   Okay.

And then he writes underneath, I'm assuming that's a picture that he sent to you, correct?

A.   Correct.

Q.   And then underneath it it says the same woman left this in the mailbox, did I read that correctly?

A.   Yes.

Q.   When -- was there a prior text message chain above the photograph regarding this lawsuit?

A.   Was there a prior text message exchange about the lawsuit?

Q.   Correct.

A.   No, there was not.

Q.   Okay.

So when he says the same woman left this in the mailbox, do you have any idea what he means when he said the same woman?

A.   Yes, I do.

Q.   Okay.

What was your understanding of

Page 97

R. DAWSON

the same woman?

A.    The previous phone calls that we had.

Q.    So you believe him to say this typed message telling you that the same woman who attempted to serve you at the apartment also left this copy of the lawsuit in the mailbox?

A.    Correct.

Q.    Okay.

When you say left in the mailbox, you mean that she physically put it in the mailbox herself or she stuck it in the mail with a stamp and the post office delivered it to the apartment?

MS. RANUCCI:  Objection.

A.    Based on the appearance of this, it was just put in the mailbox.

Q.    So did -- I understand your appearance by the photograph, did someone tell you, your mother, your father or otherwise that the document was actually placed in the mailbox versus, you know, put mail with a visual stamp, sticking it in

Page 98

R. DAWSON

the mailbox?

MS. RANUCCI:  Objection.

A.    He didn't differentiate the difference, however, if it was mailed, he would not open my mail.

Q.    Okay.

So if you go back to Exhibit E, under substitute service it says on the date of and then it's handwritten in 12/07, do you see that there?

A.    Yes.

Q.    Affiant then deposited in the United States mail in the county where the property is situated the above described document in a envelope bearing the legend, quote, personal and confidential, end quote, and not indicating on the outside thereof by return address or otherwise, says that the communication is from an attorney for an action against the person who was served, this was mailed with proper postage to Roxanne A. Dawson, 1063 East 226the Street, floor 2, Bronx, New York 10466, do you see that there?

Page 99

R. DAWSON

A.    Yes.

Q.    So is it fair to say that the Affidavit of Service reflects that Ms. Martha Falls (phonetic) who signed this affidavit, mailed a copy of the Summons and Complaint to your address 1063 East 226the Street?

MS. RANUCCI:  Objection.

A.    That's what it says.

Q.    Do you have any reason to not believe that Ms. Falls did not stick a copy of the Summons and Complaint in the mail?

MS. RANUCCI:  Objection.

A.    Can you repeat that, please.

Q.    Do you have a reason to believe that Ms. Falls did not actually mail a copy of the Summons and Complaint if she swore under oath that she did.

A.    Yes.

Q.    What is your basis for that?

A.    Because this is what my father told me he found in the mailbox.

Q.    Okay.

So when your dad told you he

Page 100

R. DAWSON

found this in the mailbox, he didn't say it came in an envelope with a stamp on it or he just said hey, I found this in the mailbox?

MS. RANUCCI:  Objection.

A.    Well, it says here what he says, the date and left this in the mailbox.

Q.    Okay.

So based on that text statement you believe and understand -- it's your understanding that Ms. Falls just stuck a copy of this in the mailbox as opposed to putting it in the mail?

A.    That's my belief and understanding.

Q.    Okay.

Did you ever ask your dad hey, did I ever -- did I receive a document in the mail versus someone sticking it in the mailbox?

MS. RANUCCI:  Objection.

A.    No, I did not ask him.

Q.    Did you ask your dad if he

R. DAWSON

actually physically saw the woman sticking the Summons and Complaint in the mailbox?

MS. RANUCCI:  Objection.

A.    I didn't ask him that.

Q.    Do you know if -- did your father articulate to you why he believes it was the same woman who attempted to serve you with the paperwork that also stuck the Summons and Complaint in the mailbox?

A.    Did he ever tell me why he felt that way?

Q.    Yes.

A.    No, I never asked him.

Q.    Did you -- as you sit here today, did anyone ever tell you that the same person who attempted to serve you was also the same person who stuck these papers in the mailbox?

MS. RANUCCI:  Objection.

A.    Just based on this text message, I just --

Q.    You didn't have any conversation outside of the text message that's in front of us in Exhibit G?

Page 102

R. DAWSON

A.    After the Service?

Q.    Yes.

A.    No.

Q.    Now let's go to Exhibit F.

I will show it to you in a second, Ms. Dawson.

Ultimately did you file an Answer in the collection lawsuit?

A.    Yes, I did.

Q.    Do you know what an Answer is?

A.    A response to a lawsuit.

Q.    And did you do that on your own or did someone assist you with filing that answer?

A.    Just the clerk in the courthouse.

Q.    Was that a person, a lawyer or you don't know?

A.    I don't know.

Q.    Was it a man or a woman?

A.    It was a man.

Q.    And you showed up to the courthouse and said hey, there's a lawsuit pending against me and I nee assistance?

Page 103

R. DAWSON

MS. RANUCCI:  Objection.

A.    I went to the courthouse and asked for direction of how to -- where to go to enter a lawsuit and they directed me and I went downstairs and I spoke to the clerk.

Q.    Okay.

And that person said Ms. Dawson, I'm happy to help you and did that person give you a form of some sort to assist you to file an Answer?

MS. RANUCCI:  Objection.

A.    Yes.

Q.    And so now I'm going to show you what's been marked as Exhibit F as in Frank and do you recognize that document?

A.    Yes, I do.

Q.    And is that the Answer that you filed in the collection action.

A.    Yes, it is.

Q.    Okay.

And it's got a file stamp on the lower right-hand corner showing that it was filed on January 17 of 2023?

Page 104

R. DAWSON

A.    Yes, it does.

Q.    And for the record, it's Plaintiff's H and it says up at the top, defendant Roxanne A. Dawson at 1063 East 226th Street, floor 2, Bronx, New York answered the Complaints as follows, we'll get there in a second.

Who typed that defendant Roxane A. Dawson at 1063 East 226th Street, is that something that you physically typed or did the clerk type that for you?

MS. RANUCCI:  Objection.

A.    I didn't physically type it. I'm guessing the clerk typed it.

Q.    So in order to generate this Answer, you didn't actually put fingers to keys to generate this Answer?

A.    No, I did not.

Q.    Is it fair to say this is a form that the clerk provided to you?

A.    Correct.

Q.    Okay.

A.    Something similar.

Q.    Okay.

R. DAWSON

And so you don't know how your name and address got on the top of the Answer?

A. No.

Q. And you checked box 11, Statute of Limitations, (the time has past -- correct?

A. Correct.

Q. And then you also checked latches (plaintiff has accepted legal aid to bring this lawsuit to my disadvantage); is that correct?

A. Correct.

Q. Who -- did you decide to check those boxes on your own or did the clerk assist you with checking these boxes?

MS. RANUCCI: Objection.

A. The clerk didn't assist me.

Q. Okay.

Did you actually -- did you tell the clerk, hey, check box 11 and check box 17, how did the X get on those -- line 11 and line 17?

MS. RANUCCI: Objection.

Page 106

R. DAWSON

A.    I was handed a piece of paper, I remember it was blank -- there was no Xs next to these and I checked those two things and handed that paper back to the clerk.

Q.    So you physically with a pen checked line 11 and checked line 17 and then you returned the document to the clerk?

A.    Yes.

Q.    Do you know how your checkmark with a pen turned into what appears to be a computer generated X on 11 and 17?

A.    I have no idea.

Q.    Okay.

Where it says your name up at the top with an address, did you physically write your name and address with the pen as well?

A.    I don't recall.

Q.    Do you know how the clerk would have gotten your name and address if you didn't put it in there with a pen yourself?

MS. RANUCCI:  Objection.

Page 107

R. DAWSON

A.   He has the copy of the paper that was served, we had a copy of that, so it could have been, I'm not sure.

Q.   Do you recall if you told him hi, I'm Roxanne Dawson, this is my address and he put that in there?

MS. RANUCCI:  Objection.

A.   I don't recall.

Q.   So as you sit here today, you don't know whether the clerk on his own put your name and address in there, whether you hand wrote it in there or you verbally told him there, but somehow your name and address got in that space?

MS. RANUCCI:  Objection.

A.   I'm not sure which of the three.

Q.   Okay.

A.   I don't know.

Q.   Okay.

And so we talked a little bit earlier about why you believed the collection lawsuit is improper because you said it was untimely, which would be --

Page 108

R. DAWSON

communications, why do you believe that the lawsuit was improper due to latches?

MS. RANUCCI:  Objection.

A.    At the time, I just read the paper and it seemed to go along with the Statute of Limitations thing and that's how I felt it wasn't to my advantage so --

Q.    Okay.  Fair.

Do you see a quarter of the way down the page where it says Service in capital letter and bold and underlined, box lines two and three?

A.    Yes.

Q.    And line two says I did not receive a copy of this Summons and Complaint and line three says I received this Summons and Complaint, but Service was not correct as required by law, do you see that?

A.    Yes.

Q.    If you believe that you were not properly served, why did you not check box two or three?

MS. RANUCCI:  Objection.

Page 109

R. DAWSON

A.    Maybe I didn't understand what those meant at the time.

Q.    Okay.

A.    Because technically I didn't get the document because I had the copy of the paperwork, but --

Q.    Sure.

But so it's some time after the date of this document, which is January 17th, 2023, you gained the understanding or gained the belief that you were not properly served with the collection action?

MS. RANUCCI:  Objection.

A.    I would say, yes.

Q.    Okay.

Do you know seeing that you filed this on January 17th, 2023 and did not check those boxes, do you have any recollection as to when after January 17th of 2023 you formed the basis that you were not properly served with collection action?

MS. RANUCCI:  Objection.

A.    I don't remember when that came.

Page 110

R. DAWSON

Q.    I'm giving you back Exhibit C
and take away Exhibit F.

A.    Okay.

Q.    And if you can flip to page 21,
paragraph 125 of Exhibit C, which is the
Amendment Complaint.

A.    (Complying with request.)

Q.    Are you there, Ms. Dawson?

A.    Yes, I am.

Q.    Paragraph 125 says Defendants'
violated the FECPA Section 1692E, 1692F,
1692G by making calls deceptive and
misleading representation, engaging in
unfair and unconscionable practices and
failing to send required Notices.

Defendants' violations included
but were not limited to calling and we'll
go through each of the -- enumerated A
through G.

I'm going to talk about letter
F, I guess, first.

It says the defendants failed
to send a Validation Notice and because you
plead defendants plural, are you contending

R. DAWSON

that Student Loan Solutions failed to send you a Validation Notice or defendant Roach and Murtha Attorneys at Law, PC failed to send you a Validation Notice?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Or both, I guess it could be.

A.    Could be.  I don't know.

Q.    You don't know?

A.    I'm not sure.

Q.    Why do you believe that Student Loan Solutions was required to send you a Validation Notice?

A.    That information, I don't have. I believe my attorneys have that information.

Q.    Have you ever spoken to Student Loan Solutions on the telephone?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    And I believe you indicated you don't remember receiving any written communication from Student Loan Solutions, correct?

Page 112

R. DAWSON

A.    I wasn't sure.

Q.    But you don't remember, right?

MS. RANUCCI:  Objection.

A.    I'm not sure if they did or didn't.

Q.    Okay.

But you don't know the basis for a violation of failing to send a Validation Notice is in the exclusive possession of your lawyers, you don't know the basis for that statement?

A.    Correct.

Q.    The letter A says -- well, let's step back to put it in to context.

It says defendants' violations included but were not to limited:  A, filing a lawsuit without review and possession of the promissory note under the loan, did I read that correctly?

A.    Yes, you did.

Q.    What is your basis that Student Loan Solutions did not review the promissory note before the collection action was filed?

Page 113

R. DAWSON

MS. RANUCCI:  Objection.

A.    I don't have that information.

Q.    Okay.

Who would have that information?

A.    My lawyers.

Q.    Is that something that you would have provided to your lawyers?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Okay.

Then it also says they filed the lawsuit because they did it without possessing the note.

What is your basis that SLS did not posses the promissory note at the time of the lawsuit?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    And who would have that information?

A.    My lawyers.

Q.    Is that information you would have provided to your lawyers?

Page 114

R. DAWSON

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Okay.

Then it says filing a lawsuit without review and possession of any necessary documentation, what documentation do you think SLS should have reviewed and possessed before commencing the collection action?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Who would have that information?

A.    My lawyers.

Q.    Is that information you would have provided to your lawyers?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Okay.

And then it say filing the lawsuit after the Statute of Limitations expired.

When did the Statute of Limitations expire on your loan?

Page 115

R. DAWSON

MS. RANUCCI:  Objection.

A.    I'm not sure of the exact date.

Q.    Do you know the year?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Was it before Student Loan Solutions acquired the loan on October 31st of 2017?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Who would have that information?

A.    My attorneys.

Q.    Is that information that you would have provided to your attorneys?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    It says filing a lawsuit without lawful service of process, I think we've been through that already, but just to confirm, you believe that the collection action wasn't improperly served is because someone just stuck the copy of the Summons and Complaint into your mailbox?

Page 116

R. DAWSON

MS. RANUCCI:  Objection.

A.    That's my belief, yes.

Q.    Is says filing a lawsuit without undertaking a meaningful attorney review of the case, is that directed at Student Loan Solutions or is that directed at Roach and Murtha?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Okay.

Do you have any information to show that Student Loan Solutions didn't have a meaningful review of your loan?

MS. RANUCCI:  Objection.

A.    My attorneys have that information.

Q.    Is that information you would have provided to your attorney?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Okay.

And we talked about Validation Notice already and then letter J it says sending false or misleading Acceleration

R. DAWSON

Notice and that was referencing Exhibit D as in David, the letter from Williams and Fudge dated December 1st of 2021, I'm reshowing that to you.

What is false and misleading about that Notice, ma'am?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    And who would know what is false and misleading about that Notice?

MS. RANUCCI:  Objection.

A.    I believe my attorney would.

Q.    And that's the information you would have provided to your attorneys?

MS. RANUCCI:  Objection.

A.    I'm not sure.

MS. RANUCCI:  Off the record.

(Whereupon, an off-the-record discussion was held.)

MR. LITTLE:  Please mark this Defendants' Exhibit H, Supplemental to Plaintiff's initial disclosures and mark Defendants' Exhibit I, text message chain.

Page 118

R. DAWSON

(Whereupon, the aforementioned Supplemental to Plaintiff's initial disclosures and text message chain were marked as Defendants' Exhibit H and I for identification as of this date by the Reporter.)

Q.    Just quickly back to Exhibit C, paragraph 125G, Ms. Dawson, before we took our short break, G indicates that the Defendants violations included but were not limited to sending a false or misleading Acceleration Notice, does that statement mean that Exhibit D, Acceleration Notice that we marked from Williams and Fudge dated December 1st, 2021 is a fake Acceleration Notice?

MS. RANUCCI:  Objection.

A.    I'm not sure what it means.

Q.    Okay.

Is there a different Acceleration Notice that you're aware of out there that makes this one false?

MS. RANUCCI:  Objection.

A.    I'm not sure.

R. DAWSON

Q.    And if this in fact, Exhibit D in fact a false Acceleration Notice, what is the date of the real Acceleration Notice?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    And do you know who the author of that letter would have been?

MS. RANUCCI:  Objection.

A.    Of what letter?

Q.    Of the real Acceleration Notice?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    Okay.

Tell me about the harm or damages that you received, that you incurred as a result of Student Loan Solutions' actions?

MS. RANUCCI:  Objection.

A.    Can you be more specific.

Q.    Sure.

Are you alleging that you incurred actual damages or actual harm as a

R. DAWSON

result of Student Loan Solutions' conduct?

MS. RANUCCI:  Objection.

A.    Yes.

Q.    What are you alleging are your damages?

MS. RANUCCI:  Objection.

A.    Financial.

Q.    Okay.

A.    Emotional.

Q.    Okay.

A.    Time.

Q.    We'll talk about those specifically.

Any other categories besides financial, emotional and time?

A.    Not off the top of my head.

Q.    Let's talk about financial first.

What are your financial damages as a result of Student Loan Solutions' conduct?

MS. RANUCCI:  Objection.

A.    I've had to take flights, take Ubers, if eventually started to move,

Page 121

R. DAWSON

decided to move.

Q.    Anything else?

A.    Wasted therapy.

Q.    Meaning time with your therapist?

A.    Yes.

Q.    To discuss the lawsuit?

A.    Yes.

Q.    And, again, we're not going there, you're not claiming that?

MS. RANUCCI:  Correct.

Q.    So tell me about the flights, what flight did you need to take as a result of Student Loan Solutions' conduct?

A.    Flight to enter the lawsuit.

Q.    So you flew from Atlanta to New York in order to go to the courthouse in The Bronx and file the Answer that was marked as Exhibit F on January 17, 2023?

MS. RANUCCI:  Objection.

A.    Yes, I took a flight to come to New York to answer the lawsuit.

Q.    So that is you're saying that you want to recover for whatever the flight

Page 122

R. DAWSON

cost was to fly from Atlanta to New York in order to file this Answer?

A.    One of them, yes.

Q.    Okay.

That's one flight?

A.    That's one flight.

Q.    What's the other flights?

A.    Flight back home to Atlanta.

Q.    After you filed this Answer?

A.    Correct.

Q.    So that would have been some time around January 17th of 2023?

A.    Around that time.

Q.    So that's two flights?

A.    Yes.

Q.    That's it for the flights?

A.    I believe another flight back to New York.

Q.    When was that?

A.    I'm not sure of the exact date.

Q.    What was the purpose of that flight?

A.    That was my flight to move back.

Page 123

R. DAWSON

Q.    To move from Atlanta to New York?

A.    Correct.

Q.    When you moved from Atlanta back to the apartment at 1063 226 East 26th Street?

A.    Correct.

Q.    And so why is Student Loan Solutions responsible for paying for a flight to move back from Atlanta to New York?

MS. RANUCCI:  Objection.

A.    Because if I didn't have this pending lawsuit, I wouldn't need to come back to New York.

Q.    Pending lawsuit meaning the collection action?

A.    Correct.

Q.    So it's your position that you needed to move back from Atlanta to The Bronx in order to deal with the collection lawsuit?

MS. RANUCCI:  Objection.

A.    That's what I believe, yes.

Page 124

R. DAWSON

Q.   Okay.

Why didn't you hire a lawyer in The Bronx to handle this on your behalf?

MS. RANUCCI:   Objection.

A.   I didn't know what to expect at the time.

Q.   Okay.

A.   So I didn't know what the next steps would be, so I just decided to full-fledge face it.

Q.   Understood.

So is the flight from New York -- or from Atlanta to New York and back in January of 2023 and then a flight from Atlanta to New York to return back to move to The Bronx to deal with the collection action?

MS. RANUCCI:   Objection.

A.   To deal with the case, yes.

Q.   The case meaning the collection action?

A.   Correct.

Q.   And -- but you don't remember when specifically you made that flight to

Page 125

R. DAWSON

return to New York?

MS. RANUCCI:  Objection.

A.    Not the exact date, no.

Q.    Do you know the month, year, approximately?

A.    Approximately March/April 2023.

Q.    And then you said Ubers, tell me about the Ubers.

A.    Ubers from my apartment in Atlanta, the airport in Atlanta, then Ubers from the Airport in New York to 1063.

Q.    Okay.

A.    Then Ubers from the airport in New York to 1063.

Q.    Okay.

A.    Then Ubers from 1063 to the courthouse or a cab, cab/Uber.

Q.    Transportation?

A.    Transportation, yeah, to the courthouse, from the courthouse back to 1063, 1063 back to the airport, then Airport in Atlanta back to the apartment in Atlanta, so for those flight times.

Q.    Okay.

Page 126

R. DAWSON

So you're seeking financial damages for Ubers or cabs, whatever you took, from your apartment in Atlanta to the airport in Atlanta, then you flew on the ground, got to New York, it doesn't matter whether you flew to JFK or La Guardia, but you flew to New York airport and then transportation to go from New York airport to the The Bronx Street address, Bronx Street address to the courthouse, courthouse back to the apartment, apartment to the New York airport and then after you got to Atlanta, from the Atlanta airport to your apartment in Atlanta?

A.    Sounds correct.

Q.    Okay.

And I think I have some documentation we will go through.

Any other Ubers/cabs expenses that you're claiming Student Loan Solutions is responsible for?

A.    I can't remember off the top of my head, but that's what I can think of right now.

R. DAWSON

Q.    Sure.

And then you said moving expenses?

A.    Correct.

Q.    And so that would have been the expenses in April, approximately April of '23 when you decided that you needed to move from Atlanta back to New York to deal with this head-on, I think were your words?

MS. RANUCCI:  Objection.

A.    Correct.

Q.    And so the moving expenses, was that to pay a moving company to move all of your personal belongings?

A.    The moving expenses I'm referring to are broken-lease expenses.

Q.    Okay.

So it's not for physically someone moving your personal belongings from Atlanta to New York, it's whatever charges you incurred by your landlord in Atlanta for breaking your lease early?

A.    Correct.

Q.    Any other what you categorize

Page 128

R. DAWSON

as moving expenses?

A.    Not that I can think of.

Q.    And then you say wasted time, what are the actual damages for --

MR. LITTLE:  Strike that.

Q.    What do you mean by wasted time?

A.    Time that I took to take these flights and come here and do all these things that was incurred, but I don't think there's monetary for that.

Q.    So you want to be compensated for your time for flying from Atlanta to New York to go to the courthouse, return to your parent's apartment, back to Atlanta and then your time to move from Atlanta to New York?

A.    Yeah.

Q.    But you -- as you sit here today, you can't monetize that saying it's $1,000 a day, a million dollars a day, whatever the number is?

MS. RANUCCI:  Objection.

A.    Not in minutes -- not in

Page 129

R. DAWSON

dollars, no.

Q.    Any others -- so we talked about flights, Ubers, cabs, moving expenses and time for your economic damages or financial damages.

Are there any financial damages that you're claiming to make that Student Loan Solutions is responsible for?

A.    I believe missed work.

Q.    Okay.

And what days did you miss work?

A.    I don't have the exact breakdown for you off the top of my head, it should be in the paperwork.

Q.    I don't know if it's there or not, we'll go through it, but is it for the time that you were away from Atlanta and flew to New York to deal with the issues in New York in January of 2023?

A.    Not the whole time, but some days I would have missed.

Q.    Okay.

And is there any other days of

Page 130

R. DAWSON

work missed or is it just that January 2023 time period?

A.   The December/January, December 2022, January 2023 and I believe the July of 2023 actual court date.

Q.   When you actually showed up in The Bronx?

A.   Yeah.

Q.   Okay.

A.   The actual court date after I answered and I had to go back to court.

Q.   So you missed a day of work there?

A.   Yes.

Q.   Okay.

So how many days of work did you miss in December 2022 to January 2023?

A.   I don't remember the exact calculations that we came up, but it's there, it's in the paperwork.

Q.   Are we talking like three days, are we talking like three weeks or is it --

A.   Definitely not three weeks, more like, I believe -- I'm not sure of the

Page 131

R. DAWSON

exact number.

Q.    Is it more or less than a week?

A.    I believe it's less than seven days.

Q.    And when you say missed work, did you take vacation time and get paid for that or is it you totally missed work and you didn't get paid at all?

MS. RANUCCI:  Objection.

A.    I didn't get paid at all.

Q.    And did you have any sick time or vacation time to use at your job during that time period or no?

A.    No.

Q.    How much -- when you were working in Atlanta at TFC Bureau, were you getting paid hourly or were you on a salary, how were you compensated?

MS. RANUCCI:  Objection.

A.    Hourly.

Q.    What were you getting paid per hour?

A.    It was around $35 an hour.

Q.    And so were you working 40

                    R. DAWSON

hours a week during that time period?

        A.      More like 48.

        Q.      So you belief you missed 48

hours of work at approximately $35 an hour?

                MS. RANUCCI:   Objection.

        A.      I'm not sure if that's the

actual number.

        Q.      Sure, but assuming that -- you

were getting paid by the hour, so it's 48

hours times your hourly rate that you were

making?

                MS. RANUCCI:   Objection.

        A.      I'm not sure of the exact

amount of hours that was calculated that I

missed, but that is the rate.

        Q.      Well, who would be able to

calculate that for us if you don't know the

exact numbers of hours you missed, we have

to go back to TFC Bureau or how would we

get documentation to show how many hours

that you actually missed?

                MS. RANUCCI:   Objection.

        A.      I believe I had this

conversation with my attorneys and we

Page 133

R. DAWSON

checked my schedule and we --

Q.    So it could be in the documents --

A.    Yeah, it might be there.

Q.    But if we do need documentation, we'd have to go to TFC Bureau because you don't remember off the top of your head?

MS. RANUCCI:  Objection.

A.    I don't remember what?

Q.    The number of hours you missed?

A.    Correct, not off the top of my head.

Q.    So we would have to go to TFC Bureau to get dose document?

MS. RANUCCI:  Objection.

A.    Maybe or ADP is the payroll rep.

Q.    ADP is the payroll vendor for TFC?

A.    Yes.

Q.    So any other economic damages besides taking flights, Ubers, cabs, moving expenses, waste of time and missed work?

Page 134

R. DAWSON

A.    Not that I can think of at the moment.

Q.    Tell me about your emotional damages, what are your emotional damages?

A.    What's the number or just describe --

Q.    Describe to me your emotional damages.

A.    This has been a very depressing time for me.

Q.    Okay.

A.    I've been stressed out, always having nightmares, can't sleep.  I'm an emotional eater, so I've gained like 40 pounds, spent time in therapy, but we're not -- but I've spent time in therapy just trying to cope with this and even to this day it's like -- it's still like nerve wreaking and I haven't been able to really focus on anything else for the past two years.

Q.    Okay.

A.    Or year and a half.

Q.    So you're having trouble

Page 135

R. DAWSON

sleeping, you're very depressed, I think was your words --

A.    Yes.

Q.    And difficulty sleeping and you've gained weight as a result of the stress that you're under?

A.    Yes.

Q.    Okay.

And you're seeing a therapist, but you're not claiming those damages in this case?

A.    Correct.

Q.    And is that because of the claim that you owe the loan, is it because you were improperly served, like what -- why -- what is the trigger for your emotional damages?

MS. RANUCCI:  Objection.

A.    Just the whole procedure of having to come to court, you don't know what is going to happen, you don't know, you know, Google will scare you into thinking that you're going to get your paycheck garnished, your car is going to

Page 136

R. DAWSON

get the lien on it, you bank account is going to get screened (phonetic), you know, it's just so much to worry about.

Q.    Understood.

Just so the record is clear, Student Loan Solutions has never threatened to garnish your wages or put a lien on your car or anything like that, right?

MS. RANUCCI:  Objection.

A.    Not to my knowledge.

Q.    And you said that the stress of this whole process, is it -- are you referring to the collection action specifically or are you talking about the subject lawsuit, both lawsuits, what process is stressful to you?

MS. RANUCCI:  Objection.

A.    I believe the collection action was the trigger.

Q.    Okay.

And that collection action was dismissed, right?

A.    Was it?

Q.    I'm asking, if you know.

Page 137

R. DAWSON

A.   I'm not sure.

Q.   No one has ever told you that the collection action was dismissed?

MS. RANUCCI:  Objection.

A.   Maybe, but --

Q.   Would it be helpful for your situation or your stressful situation if you learned that the collection action was dismissed?

A.   I think so.

Q.   Okay.

And the other category was time, but I assume we kind of merged time in to the economics portion of it?

A.   Correct.

Q.   Any other emotional damages that you want to tell me about?

A.   I think I covered most of it.

Q.   Okay.

I'm going to show you Exhibit H as in Henry.

A.   Okay.

Q.   Have you seen this document before?

Page 138

R. DAWSON

A. Yes.

Q. When was the last time you saw it?

A. With my attorneys.

Q. On July 31st?

A. Correct.

Q. When is the first time you saw it?

A. I'm not sure.

Q. Well, did you see it prior to July 31st?

A. I'm not sure.

Q. If you flip to page two, if the document is dated July 11th, 2024, do you remember -- seeing that the document is dated July 11th, 2024, does that help refresh your recollection as to what date you first saw this document?

A. Not necessarily.

Q. Okay.

And at the middle of page one it says computation of damages, do you see that?

A. Yes.

R. DAWSON

Q.    And then it articulates that you have actual damages of approximately $13,773.75 and that includes approximately $2,100 in lost wages for missed work, does that number sound accurate to you?

MS. RANUCCI:  Objection.

A.    It's the number on the paper what it says.

Q.    Well, I'm asking you is that an accurate number?

MS. RANUCCI:  Objection.

A.    I think so.

Q.    And that number was calculated based on the number of hours that you believe you missed versus your hourly rate of approximately $35 an hour?

A.    Yes.

Q.    Okay.

And just so the record is clear, did you -- when you moved from TFC Atlanta to TFC New York --

MR. LITTLE:  Strike that.

Q.    When you moved from TFC New York to TFC Atlanta, were you making the

Page 140

R. DAWSON

hourly rate of pay the same?

MS. RANUCCI:  Objection.

A.    I don't remember if it was exactly the same, but it was around that ballpark.

Q.    And when you started -- your current employer is again, remind me?

A.    Morningside Nursing and Rehab.

Q.    Is your current pay at Morningside more or less than what you were making at TFC in Atlanta?

A.    More.

Q.    How much -- are you paid hourly there as well?

A.    Yes.

Q.    What is your hourly rate there?

A.    38.

Q.    So approximately $3 more an hour?

A.    Correct.

Q.    Okay.

Travel expenses of 757.97, would that be your plane fare as well as your Ubers/taxi cabs?

R. DAWSON

A.    I believe that's it.

Q.    And then $5,915.78 is your moving expenses and I think you testified that was the cost to break your lease in Atlanta?

A.    Yes, the lease.

Q.    And did you actually write a check to the landlord for $5,915.78?

A.    No.

Q.    Is that a number that remains outstanding?

A.    Some of it, I'm paying monthly.

Q.    About how much of the fifty-nine hundred dollars have you paid to date?

A.    I would have to check, I don't remember the exact --

Q.    But you agreed to some kind of monthly payment plan?

A.    Yes.

Q.    And it says your garden variety of emotional stress damages approximately $5,000 and are you quantifying your emotional damages that you described to me

Page 142

R. DAWSON

earlier as being worth approximately $5,000?

MS. RANUCCI: Objection.

A.    I don't think that's quantifiable, but we came up with a number.

Q.    Okay.

That's your number, though, that $5,000?

A.    Correct.

Q.    Let's look at Exhibit I.

A.    (Complying with request.)

Q.    It is I Plaintiff's 746 through 754, for the record, on page one shows a -- appears to be an Uber or Lyft trip on December 19, 2022 from your address on Pinhurst Drive to American terminal in Atlanta, correct?

A.    Correct.

Q.    And that's $29.87?

A.    Correct.

Q.    And then your -- next page, Plaintiff's 747 appears to be a receipt for a trip from Atlanta to La Guardia in the amount of$109.57, correct?

Page 143

R. DAWSON

A.    Correct.

Q.    And that looks like it was purchased on December 9th, but looks like you traveled on Monday, December 19th, 2022, does that sound accurate?

A.    Yes.

Q.    I believe Plaintiff's 748 is further confirmation regarding your Atlanta to La Guardia trip on December 19th?

A.    Correct.

MS. RANUCCI:  Off the record.

(Whereupon, an off-the-record discussion was held.)

Q.    So just so the record is clear, again, page three of Exhibit I, Plaintiff's 748 refers to documentation regarding the trip from Atlanta to La Guardia?

A.    Correct.  Yes.

Q.    And then in the middle of page three it says -- there's an e-mail address there, Rdawson845aol.com, it that your current e-mail address?

A.    No, it's not.

Q.    When did stop using that e-mail

Page 144

R. DAWSON

address?

A.    I'm not sure.

Q.    How long were you using that e-mail address prior to December 19th of 2022?

A.    I don't know.  I'm not sure.

Q.    Is that still an active e-mail address for you?

A.    I don't use it, so, it's not something that I go check mail.

Q.    In theory if I e-mailed you at that address, you would have the username and password to gain access to that e-mail?

A.    I recently recovered it.

Q.    Did you receive any communication regarding the Bank of America loan at that Rdawsson845aol.com address?

A.    I'm not sure.

Q.    And then page four of Exhibit I, Plaintiff's 749 appears to be an Uber from La Guardia to 1063 226 East 26th Street?

A.    Correct.

Q.    And you took a Black Car, it

Page 145

R. DAWSON

says Black Car funds surcharge?

A.   I don't think I took a Black Car, but that's whatever charges, their fares.

Q.   Page five of Exhibit I, Plaintiff's 750 is an Uber X Ride with Evan and it looks like it was $43.46?

A.   Correct.

Q.   And that was the return -- from the apartment to La Guardia?

A.   Correct.

Q.   And so it looks like you were in New York for a month, approximately, December 19th to January 18th?

A.   Approximately, yes.

Q.   So how many of that month time period that you were here in New York did you -- are you calculating as missed work?

MS.  RANUCCI:  Objection.

A.   Calculating for this case?

Q.   Yes.

A.   The days that I had traveled and the days that I went to the courthouse.

Q.   So that would be one day to fly

Page 146

R. DAWSON

from Atlanta to La Guardia?

A.    Correct.

Q.    And then one day to return from La Guardia to Atlanta?

A.    Correct.

Q.    And the one day that you went to the courthouse?

A.    Correct.

Q.    So three days?

A.    For that period, correct.

Q.    And then you missed a fourth workday when you actually went to the courthouse in July of 2023?

A.    Correct.

Q.    So is it fair to say that you're claiming damages for four missed workdays?

MS. RANUCCI:  Objection.

A.    I'm not sure what the exact -- because the schedule that I would have worked when I came here, I think that's how we calculated it.

So if I came on a Monday and I had to work Tuesday, Wednesday, then I

R. DAWSON

would have missed those days.

Q.    So I think you said the days were calculated based off of the time that you took to travel and go to the courthouse?

A.    Part of it, yes.

Q.    So we agreed that either the travel day to New York and travel day returning to Atlanta, a court day for going to file the Answer in January of 2023 and a court day in July of 2023 you had to show up to court?

A.    Yes.

Q.    Are there any other dates that you're claiming damages for for lost work?

A.    I believe, from my understanding, the week that I came, whatever day I would have worked had I not came here, those days were claimed.

So if I came on a Monday and I had to work Tuesday, Wednesday, I missed those days, I would have -- that would be travel day plus those two days that I missed of work, yeah.

Page 148

R. DAWSON

Q.    Obviously you couldn't work in Atlanta if you were here in New York?

A.    Correct.

Q.    So what about the following week?

A.    I don't believe I claimed damages for that.

Q.    You're not claiming damages for that week?

A.    No, I am not.

Q.    Just the time that you -- that week of December 19th that you flew up here, whatever work that you missed in Atlanta --

A.    That week plus the day that I would take to travel back to Atlanta plus whatever court date in July.

Q.    Okay.

And then the next page, looks like Plaintiff's 751, is the flight from La Guardia to Atlanta to return?

A.    Yes.

Q.    And I don't know if I necessarily see a cost on that, but we can

R. DAWSON

follow up with your lawyers on that.

And then 752 is the Uber ride from the airport back to the Pinhurst address?

A.    Correct.

Q.    And 753 is the e-mail communication regarding the breaking of your lease in Atlanta?

A.    Correct.

Q.    And that' where you got the $5,915.78 number?

A.    Correct.

Q.    And the last page 754, what is that?

A.    That is a pay stub.

Q.    What is We Staff LLC?

A.    That's the employees to work at Morningside Nursing and Rehab.

Q.    And so you're showing your hourly rate of $38 an hour?

A.    Correct.

Q.    Is that anything specific about this pay stub or you're just showing this document was provided to show what your

Page 150

R. DAWSON

hourly rate is?

A.    I believe that's what --

Q.    And it looks like pay period 1/14/24 to 1/20/24 --

A.    Yes.

Q.    So 754 is to show your hourly rate at Morningside?

A.    Yes.

MR. LITTLE:  Off the record.

(Whereupon, an off-the-record discussion was held.)

Q.    Ms. Dawson, we were just off the record for a short break and you indicated that you want to clarify one of your answers.

A.    Yes.  I just wanted to clarify that when I went to court in January and July, I also took cabs, but they weren't Uber or Lyft, they were like the base taxis where you call and pay cash, so I don't have receipts for those.

Q.    Old school taxis?

A.    Yes.

Q.    Understood.

R. DAWSON

Are you claiming damages for those as well?

A.    Yes.

Q.    Do you have any recollection as to an estimate of what those -- what that would have cost you?

A.    Approximately $20 per direction each trip.

Q.    So it would have been there and back and there and back?

A.    Correct.

Q.    So $40 for each appearance?

A.    Correct.

Q.    What is your position as to when the date of your Bank of America loan was accelerated?

MS. RANUCCI:  Objection.

A.    I'm not sure of the date.

Q.    Do you know the party that accelerated your loan?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    And when I say party, just so the record is clear, was that Bank of

Page 152

R. DAWSON

America, was that Student Loan Solutions or some other party that we haven't talked about today?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    When do you believe the Statute of Limitations started to run on your loan with Bank of America?

MS. RANUCCI:  Objection.

A.    I'm not sure of the date.

Q.    Do you know the year?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    And when do you believe the Statute of Limitations actually ran on your loan with Bank of America?

MS. RANUCCI:  Objection.

A.    I'm not sure.

Q.    And you can't give me a year either?

A.    No, I'm not sure.

Q.    And all the information regarding the date of acceleration and who accelerated would be in the possession of

R. DAWSON

your lawyers?

MS. RANUCCI:  Objection.

A.    That's my belief.

Q.    You don't have any documents or e-mails or text messages that you unintentionally or intentionally withheld from your lawyers to support the dates for acceleration --

MS. RANUCCI:  Objection.

A.    Did I intentionally withhold records?

Q.    That's a poor question.

Let me ask it again.

You're not withholding any information that you're aware of that would support the dates for acceleration or who the party accelerated it was or when the Statute of Limitations begins or how long it ran?

MS. RANUCCI:  Objection.

A.    No, I'm not intentionally withholding that information.

Q.    To the best of your knowledge, anything that you have or you think is

**Page 154**

R. DAWSON

pertinent information you turned over to

your lawyers?

MS. RANUCCI:  Objection.

A.     That is my belief.

MR. LITTLE:  That's all the

questions I have.

Thank you, everyone.

MS. RANUCCI:  Thank you very

much.

We would like a copy of the

transcript and we will read and sign.

(Whereupon, at 12:45 p.m., the

Examination of this witness was

concluded.)

°          °          °          °

Page 155

R. DAWSON

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

_____
ROXANNE DAWSON

Subscribed and sworn to before me this _____ day of _____ 20____.

_____
NOTARY PUBLIC

Page 156

R. DAWSON

E X H I B I T S

DEFENDANTS' EXHIBITS

| EXHIBIT LETTER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Credit Agreement | 49 |
| Exhibit B | Note Disclosure Statement | 49 |
| Exhibit C | Amended Complaint | 56 |
| Exhibit D | Williams and Fudge Letter | 70 |
| Exhibit E | Affidavit of Service | 70 |
| Exhibit F | Answer | 70 |

(Continued on next page)

Page 157

R. DAWSON

DEFENDANTS' EXHIBITS

| EXHIBIT LETTER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit G | Text message Chain | 94 |
| Exhibit H | Supplemental to Plaintiff's initial Disclosures | 118 |
| Exhibit I | Text message chain | 118 |

(Exhibits retained by Court Reporter.)

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MR. LITTLE | 4 |

Page 158

R. DAWSON

INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION AND/OR DOCUMENTS          PAGE

(None)


QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

Page 159

R. DAWSON

C E R T I F I C A T E

STATE OF NEW YORK         )

                          :   SS.:

COUNTY OF KINGS           )


I, ROSE MARIE IACOBELLIS, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of August 2024.


ROSE MARIE IACOBELLIS

Page 160

JESSICA RANUCCI, ESQ.

jranucci@nylag.org

August 30, 2024

RE:  Roxanne Dawson v. Student Loan Solutions, Llc, Et Al.

8/9/2024, Roxanne Dawson (#6807719)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at CS-NY@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

**Page 161**

Roxanne Dawson v. Student Loan Solutions, Llc, Et Al.

Roxanne Dawson (#6807719)

E R R A T A   S H E E T

PAGE 12___ LINE 20___ CHANGE "2019" to "2010"_____

_____

REASON Typographical_____

PAGE 25___ LINE 8___ CHANGE "on new information," remove "new"

_____

REASON Transcription_____

PAGE 60___ LINE 5___ CHANGE "A." to "Q."_____

_____

REASON Typographical_____

PAGE 103___ LINE 5___ CHANGE "enter" to "answer"_____

_____

REASON Transcription_____

PAGE 120___ LINE 25___ CHANGE "if" to "I"_____

_____

REASON Typographical_____

PAGE 136___ LINE 3___ CHANGE "screened" to "freezed"_____

_____

REASON Transcription_____

_Roxanne Dawson_____     9/30/24___

Roxanne Dawson                                    Date

**Page 162** ~~Page 161~~

Roxanne Dawson v. Student Loan Solutions, Llc, Et Al.

Roxanne Dawson (#6807719)

# E R R A T A   S H E E T

PAGE 74   LINE 5   CHANGE "20223" to "2023"

_____

REASON Typographical

PAGE 74   LINE 13   CHANGE "2012" to "2021"

_____

REASON Typographical

PAGE 115   LINE 23   CHANGE "improperly" to "properly"

_____

REASON Transcription

PAGE 123   LINE 6   CHANGE "1063 226 East 26th" to "1063 East 226th"

_____

REASON Transcription

PAGE 13   LINE 19   CHANGE "licenses" to "licensed"

_____

REASON Typographical

PAGE 25   LINE 24   CHANGE "file" to "filed"

_____

REASON Typographical

_____   9/30/24

Roxanne Dawson                    Date

Page 163 ~~Page 162~~

Roxanne Dawson v. Student Loan Solutions, Llc, Et Al.

Roxanne Dawson (#6807719)

ACKNOWLEDGEMENT OF DEPONENT

I, Roxanne Dawson, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____          9/30/24
Roxanne Dawson                       Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.


_____

NOTARY PUBLIC

[& - 226th]                                                    Page 1

### &

**&**  1:8 3:17

### 1

**1**  3:17 71:17 72:3 73:7,19 73:19 74:7,13 75:20 76:15,21 77:7
**1,000**  128:22
**1/14/24**  150:5
**1/20/24**  150:5
**10/31/2017**  60:14
**100**  2:6 79:13
**10004**  2:6
**10170**  1:22 2:12
**10466**  4:13 6:24 85:4 98:25
**1063**  4:12 6:23 8:8 27:11 28:16 29:6 51:14 52:2 73:13,24 74:12 85:3 89:17 98:23 99:7 104:5,10 123:6 125:12,15,17 125:22,22 144:22
**109.57**  142:25
**11**  74:18 105:6 105:22,24 106:8,14

**11/29/07**  53:8
**11/29/2007**  52:23
**11/7/22**  84:15
**118**  157:9,13
**11th**  138:15,17
**12/07**  98:10
**12/2007**  50:11
**12/9/2010**  55:7 55:14
**125**  110:6,11
**125g**  118:9
**12:05**  85:3
**12:45**  154:13
**13,773.75**  139:4
**15**  94:25
**16**  77:20
**1692e**  110:12
**1692f**  110:12
**1692g**  110:13
**17**  103:25 105:23,24 106:8,14 121:20
**17th**  109:11,18 109:20 122:13
**18th**  145:15
**19**  9:17 142:16
**19,692.06**  72:16
**1988**  6:17
**19th**  2:6 143:5 143:10 144:5 145:15 148:13
**1st**  75:16 117:4 118:16

### 2

**2**  4:13 6:24 73:13 90:22 98:24 104:6
**2,100**  139:5
**20**  151:8 155:19 162:15
**200**  87:3 89:11
**2005**  1:21 2:11
**2006**  13:4 46:2 46:7,9
**2007**  50:16,17 50:24,24 54:4 67:13 69:9
**2010**  46:2,10 55:2
**2011**  13:15
**2012**  13:16 57:12 58:15,24 59:11,17 60:14 61:6,14 74:13
**2017**  9:16 57:14 58:16 59:2,13,17 60:10 61:7 115:9
**2019**  8:25 9:4 9:16 12:20
**2021**  71:17 72:3 73:7,20 74:8,19 75:16 75:20 76:16,22 77:7 117:4 118:16

**2022**  8:3,13,22 11:13 15:21 19:7 26:17,19 28:25 74:4 81:21 85:2 87:19 88:18 94:25 130:5,18 142:16 143:6 144:6
**20223**  74:5
**2023**  7:10,12,13 9:4 15:4,5 19:7 103:25 109:11 109:18,21 121:20 122:13 124:15 125:7 129:21 130:2,5 130:6,18 146:14 147:11 147:12
**2024**  1:12 58:6 138:15,17 159:20 160:3
**21**  110:5
**22**  82:4 90:15
**226**  27:11 28:17 29:6 52:2 74:12 85:3 89:17 123:6 144:22
**226th**  4:12 6:23 8:8,21 9:5 51:15 73:14 104:6,10

**[226the - accommodate]** Page 2

**226the** 98:24 99:7
**23** 1:7 11:14 57:12 58:15 59:11,17 60:13 61:6,14 127:8
**23rd** 58:24
**240** 54:24 87:3 89:11
**24531** 159:23
**26th** 29:7 123:6 144:22
**29.87** 142:20
**29th** 54:3 159:20

**3**

**3** 71:24 72:2 140:19
**30** 3:16 160:3 160:16
**30,000** 51:7
**31** 60:10 61:6
**31st** 23:17 53:20 56:19 71:4,9 82:17 115:8 138:6,12
**332-214-8727** 67:18
**35** 57:8,9 58:11 60:6,13 61:11 131:24 132:5 139:17
**36** 6:19
**38** 140:18 149:21

**4**

**4** 6:17 72:2 157:21
**40** 131:25 134:15 151:13
**420** 1:20 2:11
**43.46** 145:8
**48** 132:3,4,10
**49** 156:8,10

**5**

**5,000** 141:24 142:3,9
**5,915.78** 141:3 141:9 149:12
**50** 87:25
**50s** 88:18
**519.61** 54:25
**522** 7:18
**55** 86:25
**56** 156:13

**6**

**6** 57:7
**60** 87:23 88:14
**64** 88:12
**65** 86:25
**6807719** 160:5 161:2 162:2
**6th** 85:2

**7**

**70** 156:15,18,20
**72** 74:18,18
**745** 94:14
**746** 142:13

**747** 142:23
**748** 143:8,17
**749** 144:21
**750** 145:7
**751** 148:21
**752** 149:3
**753** 149:7
**754** 142:14 149:14 150:7
**757.97** 140:23
**7:00** 14:23,23

**8**

**8/9/2024** 160:5
**8165** 51:22
**8727** 68:5,9,13 68:20 69:2

**9**

**9** 1:12 58:6
**9/2007** 50:11
**94** 157:6
**99** 77:20 78:4
**9:36** 1:13
**9th** 54:25 143:4

**a**

**a.m.** 1:13 14:23
**ability** 41:22
**able** 132:17 134:20
**above** 96:12 98:15 155:6 160:6 162:7
**academic** 50:10 50:16,20,23 51:3,4

**accelerate** 58:20 60:18
**accelerated** 57:10 58:17,24 59:9,16,23 60:4,15,24 61:5 62:12 63:12,17 64:7 64:16,24 65:6 65:12,23 66:9 66:19 75:3,9 75:15,19 76:15 76:21 77:7 78:7,14 79:7 79:17,23 80:6 80:14,23 151:17,21 152:25 153:18
**accelerates** 72:15
**accelerating** 61:24 62:5,9 72:25 73:9
**acceleration** 59:6 74:20,24 79:16 116:25 118:13,14,17 118:22 119:3,4 119:12 152:24 153:9,17
**accepted** 86:23 105:11
**access** 144:14
**accommodate** 5:5 6:10

**[account - america]** Page 3

account 136:2
accuracy 160:9
accurate 139:6
 139:11 143:6
accurately
 87:15
acknowledge...
 162:3
acknowledg...
 160:12
acquired 59:18
 78:8 79:18
 115:8
acquiring 80:7
 80:24
acquisition
 79:8
acquisitions
 78:15
action 4:19
 18:5,7,19,22
 19:12 25:12,18
 25:22 26:4,15
 31:24 32:10,15
 33:22 34:3,9
 34:21 40:6
 43:15 81:20
 83:5,13,16
 93:23 95:19,24
 98:21 103:20
 109:13,22
 112:25 114:10
 115:23 123:18
 124:18,22
 136:14,19,22

137:4,9 159:16
actions 119:20
activated 68:22
active 52:4
 144:8
actively 47:6
actual 10:8
 27:7 74:24
 119:25,25
 128:5 130:6,11
 132:8 139:3
actually 12:2
 29:18 30:17
 82:4 93:17
 97:23 99:17
 101:2 104:17
 105:21 130:7
 132:22 141:8
 146:13 152:16
adam 54:16
add 35:2
addition 34:2
additions 162:6
address 4:11
 6:21 7:17 8:6,9
 9:5 28:17
 51:15 52:2
 69:8,10 73:14
 74:12 85:3
 89:17 90:15
 98:19 99:7
 105:3 106:18
 106:19,23
 107:6,12,15
 126:10,11

142:16 143:21
 143:23 144:2,5
 144:9,13,18
 149:5
administer
 3:11
administration
 12:12
admit 43:22,25
adp 133:18,20
advantage
 108:8
affiant 85:5
 98:13
affidavit 70:8
 70:11 84:15,20
 89:21 91:22
 99:4,6 156:18
aforemention...
 48:25 55:20
 70:2,10,17
 94:6 118:2
agency 15:10
ages 87:2
agree 53:3
 54:22 71:14
 84:19 86:3,12
 86:15
agreed 3:5,20
 141:19 147:8
agreement
 48:23 49:2
 72:14 156:8
ahead 27:17

aid 105:11
airport 125:11
 125:12,14,22
 125:23 126:5,8
 126:9,13,14
 149:4
al 160:4 161:1
 162:1
allegation 60:5
 60:12 61:10
 79:6
allege 58:12
alleges 58:13
 75:14
alleging 65:11
 119:24 120:5
allotted 160:19
allow 74:23
amend 56:21
amended 36:24
 55:18,21 58:12
 74:17 156:13
amendment
 110:7
america 18:13
 33:3 43:19,23
 44:4,18,24
 45:3,19 47:23
 48:8,15 50:3
 57:10,19 58:3
 58:17,19 59:9
 59:15,23 60:3
 60:14,18,24
 61:5,22,23
 62:4,8,12,18

**[america - attached]**

63:12,16 64:7
64:16,24 65:4
65:6,12,23
66:8,18,24
68:4,18 69:2,5
72:23,24 74:22
75:9 76:25
78:9,16 81:5
144:17 151:16
152:2,9,17
**american**
142:17
**amount**  51:6
132:15 142:25
**andrea**  2:16
8:18
**answer**  5:10,12
19:23 23:25
25:15 27:17
29:22 33:13
34:23 35:5,12
36:4,11 37:6,8
37:12,16,24
38:12 41:25
43:2 52:15
56:13 57:4
64:9 70:16,18
86:11 102:9,11
102:15 103:12
103:19 104:17
104:18 105:4
121:19,23
122:3,10
147:11 156:20

**answered**
104:7 130:12
**answering**  6:12
**answers**  20:11
150:16
**anticipation**
20:19 21:6
22:10,14 24:25
**anymore**  28:14
92:14
**apartment**  4:13
6:24 8:21
66:14 90:9,22
92:5 97:8,16
123:6 125:10
125:23 126:4
126:12,12,15
128:16 145:11
**apartments**
47:25
**apologize**  91:7
**appearance**
97:18,21
151:13
**appeared**  86:24
**appears**  53:2
94:24 106:13
142:15,23
144:21
**appended**
162:7
**applicable**
160:8
**applies**  33:3

**approach**  37:3
**approximate**
11:9
**approximately**
9:3,16 24:6
29:8 67:21
87:3,20 88:14
89:6 125:6,7
127:7 132:5
139:3,4,17
140:19 141:23
142:2 145:14
145:16 151:8
**april**  7:11 8:3
9:4 74:4,5
125:7 127:7,7
**area**  6:15
**arrest**  11:10
**articulate**  47:4
101:7
**articulates**
139:2
**ashbur**  2:16
**aside**  81:15
**asked**  21:12
33:17 35:13
37:9 101:14
103:4
**asking**  20:10
22:16 35:25
36:2 60:16
65:3,14 136:25
139:10
**assist**  102:14
103:12 105:17

105:19
**assistance**  2:4
102:25
**associated**
51:25
**assume**  15:13
137:14
**assuming**  46:6
94:21 96:4
132:9
**atlanta**  7:16,19
7:24 8:6 10:16
15:17,20 16:2
16:4,7,13
47:22 73:25
74:4 121:17
122:2,9 123:2
123:5,11,21
124:14,16
125:11,11,23
125:24 126:4,5
126:14,14,15
127:9,21,23
128:14,16,17
129:19 131:17
139:22,25
140:12 141:6
142:18,24
143:9,18 146:2
146:5 147:10
148:3,15,17,22
149:9
**attached**
160:11

**[attempt - believe]** Page 5

**attempt** 47:23
90:11
**attempted**
28:11,16,24
68:9,13 86:6
91:3 92:4 97:7
101:8,17
**attempting**
18:14 29:18
30:15 91:23
**attend** 45:25
**attorney** 36:9
71:3 77:14
79:9 82:16
95:12 98:21
116:5,19
117:13 160:13
**attorney's**
78:23
**attorneys** 1:9
2:4,10 41:8,19
56:17 66:2
76:4,9 77:11
80:9,19 83:22
111:4,16
115:14,16
116:16 117:15
132:25 138:5
**audio** 22:9
**august** 1:12
15:4 58:6
159:20 160:3
**author** 119:8
**authorized**
3:11

**available** 160:6
**avenue** 1:21
2:11
**aware** 19:10
57:19 66:17
90:4,7 91:6,8
118:22 153:16

**b**

**b** 48:23 49:4
53:11 156:2,10
**ba** 12:13
**bachelor** 12:10
**bachelor's**
12:11
**back** 7:9 9:7
15:3 30:10
31:21 42:6
45:13 46:15
58:10 67:12
72:11 73:22
74:16 98:8
106:5 110:2
112:15 118:8
122:9,18,25
123:6,11,16,21
124:14,16
125:21,22,23
126:12 127:9
128:16 130:12
132:20 148:17
149:4 151:11
151:11
**ballpark** 140:6
**bank** 18:13
33:3 43:19,23

44:4,18,24
45:3,19 47:23
48:8,14 50:2
57:10,19 58:3
58:17,19 59:9
59:15,23 60:3
60:14,18,24
61:4,22,23
62:4,8,11,18
63:12,16 64:7
64:16,23 65:3
65:6,12,22
66:8,18,24
68:4,18,25
69:5 72:23,24
74:22 75:9
76:25 78:9,15
81:4 136:2
144:17 151:16
151:25 152:9
152:17
**bankruptcy**
12:5
**base** 150:20
**based** 25:8 26:6
36:8 77:13,16
89:25 97:18
100:11 101:21
139:15 147:4
**basically** 84:3
**basis** 26:3
32:13 63:11
65:22 75:18,22
78:12,21,24
80:4 93:13,22

99:21 109:21
112:8,12,22
113:16
**basises** 33:25
**bates** 94:14
**bearing** 98:16
**beginning** 55:2
**begins** 153:19
**behalf** 1:3 2:5
38:14 44:23
55:14 124:4
**belief** 57:10
59:8 74:19,25
78:5 79:14
100:16 109:12
116:3 132:4
153:4 154:5
**believe** 25:17
26:4 31:23
32:14 33:22
34:3,9 40:11
40:25 44:13
56:13 57:4
58:4 60:3 61:4
61:9,20 62:22
64:23 65:6,10
65:15,17,22
71:19 74:11,14
76:4 77:21
78:23 80:9
81:14,19 83:2
83:9,23 89:20
89:22 91:10
92:2 93:11
97:5 99:12,16

100:12 108:2
108:22 111:12
111:16,22
115:22 117:13
122:18 123:25
129:10 130:5
130:25 131:4
132:24 136:19
139:16 141:2
143:8 147:17
148:7 150:3
152:7,15
**believed** 107:23
**believes** 101:7
**belongings**
127:15,20
**best** 153:24
**bills** 21:11
**birth** 6:15
51:18
**birthday** 88:10
88:15
**bit** 16:25 17:6
95:14 107:22
**black** 86:25
87:6,6 88:21
88:23 144:25
145:2,3
**blank** 106:3
**blood** 159:16
**bobok** 2:17
**bold** 108:12
**born** 88:11
**borrower**
51:10,10 54:13

**bottom** 52:7
**box** 51:9 105:6
105:22,23
108:12,24
**boxes** 105:16
105:17 109:19
**break** 6:6,13
42:6 118:10
141:5 150:14
**breakdown**
129:15
**breaking**
127:23 149:8
**brendan** 2:12
4:16 16:24
**brief** 42:6
54:20
**bring** 105:12
**broken** 127:17
**bronx** 4:13
6:24 12:24
14:19 16:9
18:3,11 43:16
84:12 85:4
98:24 104:6
121:19 123:22
124:4,17
126:10,10
130:8
**brook** 12:17
44:8,9 45:11
45:20,25 50:7
**bs** 12:14 13:6
**bureau** 15:8,9
15:19 131:17

132:20 133:8
133:16

**c**

**c** 2:2 55:18,22
56:2 58:12
74:16 81:15
110:2,6 118:8
155:2 156:13
159:2,2
**cab** 21:11
125:18,18
**cabs** 126:3,20
129:4 133:24
140:25 150:19
**calculate**
132:18
**calculated**
132:15 139:14
146:23 147:4
**calculating**
145:19,21
**calculations**
130:20
**calculator**
87:21
**california** 9:9
14:10
**call** 6:7 28:2,4
28:23 68:5,9
68:13 94:21
150:21
**called** 4:2 26:24
28:7,15 30:14
81:20

**calling** 110:18
**calls** 97:3
110:13
**capital** 108:12
**car** 13:25 66:15
135:25 136:9
144:25 145:2,4
**carrier** 68:2
**case** 1:6 10:17
18:6 20:9
21:10 30:5
36:21,25 39:16
39:21 40:2
41:9 42:11,19
59:22 116:6
124:20,21
135:12 145:21
**cash** 150:21
**categories**
120:15
**categorize**
127:25
**category**
137:13
**cause** 20:14
**cell** 67:24
**certification**
3:8
**certify** 155:4,8
159:9,14
**certifying**
30:11
**chain** 94:5,7
96:12 117:25
118:4 157:7,13

**[challenging - complying]**

| | | | |
|---|---|---|---|
| **challenging** 5:15 | **claimed** 147:20 148:7 | 19:12 25:12,18 25:22 26:4,15 | **communication** 20:10 22:17 |
| **chance** 17:2 | **claiming** 40:20 | 31:24 32:10,14 | 27:19 35:18,21 |
| **change** 161:4,7 | 121:11 126:21 | 33:22 34:9 | 61:22 62:3,7 |
| 161:10,13,16 | 129:8 135:11 | 40:12 43:15 | 66:18,24 67:4 |
| 161:19 | 146:17 147:16 | 81:20 83:5,13 | 67:8 98:20 |
| **changes** 160:10 | 148:9 151:2 | 83:16 93:6,13 | 111:24 144:17 |
| 162:6 | **claims** 58:23 | 93:22 95:19,24 | 149:8 |
| **charge** 10:20 | 60:13 | 102:9 103:20 | **communicati...** |
| 57:12 58:14 | **clarify** 150:15 | 107:24 109:13 | 22:21 37:14 |
| 59:4,11 | 150:17 | 109:22 112:24 | 108:2 |
| **charged** 10:11 | **class** 35:6,8 | 114:9 115:22 | **company** 80:22 |
| 11:7 | 37:4,9,18,21 | 123:18,22 | 127:14 |
| **charges** 127:22 | 38:10,25 39:4 | 124:17,21 | **compensated** |
| 145:4 | 39:11 77:24 | 136:14,19,22 | 128:13 131:19 |
| **charlie** 56:2 | 78:6,13 79:6 | 137:4,9 | **complaint** |
| 74:17 | 80:6,23 | **college** 12:10 | 21:14,25 34:13 |
| **check** 105:15 | **clear** 5:16 | **come** 30:9 | 34:16,17,21 |
| 105:22,22 | 17:19 20:7 | 31:12,20 | 35:16,25 36:6 |
| 108:23 109:19 | 56:6 71:20 | 121:22 123:15 | 36:14,25 55:19 |
| 141:9,17 | 83:8 136:6 | 128:10 135:21 | 55:21 56:22 |
| 144:11 | 139:21 143:15 | **coming** 9:8 | 58:12 74:17 |
| **checked** 105:6 | 151:25 | **commence** | 99:7,13,18 |
| 105:10 106:4,8 | **clerk** 102:16 | 41:12 | 101:3,10 |
| 106:8 133:2 | 103:7 104:12 | **commenced** | 108:17,18 |
| **checking** | 104:15,21 | 4:19 11:25 | 110:7 115:25 |
| 105:17 | 105:16,19,22 | 25:16 31:25 | 156:13 |
| **checkmark** | 106:6,10,22 | 33:9 34:3 | **complaints** |
| 106:12 | 107:11 | **commencing** | 104:7 |
| **children** 13:22 | **client** 36:9 | 45:5 114:9 | **complete** 162:8 |
| **city** 84:11 | **clinton** 12:23 | **communicate** | **completed** 11:3 |
| **civ.9690** 1:7 | **close** 89:12,14 | 29:10 | 11:5 160:16 |
| **civil** 1:19 84:11 | **collect** 18:15 | **communicated** | **complying** |
| **claim** 30:3 | **collection** 18:5 | 17:9 | 81:17 110:8 |
| 135:15 | 18:6,19,22 | | 142:12 |

| | | | |
|---|---|---|---|
| **computation** 138:23 | **convicted** 10:3 | 78:3 80:21 | 85:7 87:9 96:9 |
| **computer** 106:14 | **conviction** 10:7 10:8 11:10,20 | 81:23,25 82:18 | 112:20 |
| **concept** 32:9 | **cope** 134:18 | 84:9,10,12,13 | **cosign** 19:11,14 |
| **concerned** 43:16 | **copies** 160:14 | 84:22 85:8,17 | **cosigned** 44:14 |
| **concluded** 154:15 | **copy** 3:14,17 29:19 30:17 | 88:19 92:8,9 | **cosigner** 52:6 53:2 |
| **conclusion** 65:19 | 49:7 82:24 | 94:2 95:2,25 96:5,6,16 | **cost** 122:2 |
| **conduct** 26:13 120:2,22 | 97:8 99:6,12 99:17 100:14 | 97:10 104:22 | 141:5 148:25 151:7 |
| 121:15 | 107:2,3 108:16 | 105:8,9,13,14 | **counsel** 3:6,17 |
| **confidential** 98:17 | 109:6 115:24 154:11 | 108:19 111:25 112:13 121:12 | 36:8 160:14 |
| **confirm** 115:22 | **coresident** 86:21,22 | 122:11 123:4,8 | **county** 11:18 84:12 98:14 |
| **confirmation** 143:9 | **corner** 50:10 | 123:19 124:23 126:16 127:5 | 159:5 |
| **consequently** 72:16 | 54:12 84:17 103:24 | 127:12,24 | **couple** 42:7 49:12 |
| **contact** 47:23 86:25 | **correct** 8:23 | 133:13 135:13 137:16 138:7 | **court** 1:2 3:13 5:13,23 9:25 |
| **contending** 33:9 110:25 | 9:6,17 21:19 24:20,21 28:21 | 140:21 142:10 142:18,19,21 | 18:3 36:17 84:11 130:6,11 |
| **content** 22:17 | 31:25 32:5,6 32:12 33:19,20 | 142:25 143:2 143:11,19 | 130:12 135:21 147:10,12,13 |
| **context** 112:15 | 36:12 43:16,17 43:20 44:14,15 | 144:24 145:9 145:12 146:3,6 | 148:18 150:18 157:15 |
| **continue** 5:19 | 46:19 47:13 50:3,8 51:11 | 146:9,11,15 148:4 149:6,10 | **courthouse** 102:17,24 |
| **continued** 156:23 | 52:8,24 53:21 54:9 56:20 | 149:13,22 151:12,14 | 103:3 121:18 125:18,21,21 |
| **conversation** 20:6 101:24 | 57:6 58:9 59:2 59:24,25 64:20 | 155:9 162:8 | 126:11,12 128:15 145:24 |
| 132:25 | 66:3 71:16,18 71:22,23 72:4 | **corrected** 87:11 **corrections** | 146:8,14 147:6 |
| **conversations** 20:15 30:3 | 72:5 73:14 74:3 77:22,25 | 162:6 **correctly** 50:12 51:7 57:15 | **covered** 137:19 **credit** 48:22 49:2 156:8 |
| | | 72:20 75:10 78:10 79:20 | |

**cs** 160:15
**current** 17:20
67:16 140:8,10
143:23
**currently** 6:22
13:17 14:15

**d**

**d** 3:2 4:2 8:18
8:18 13:2
69:24 70:4,23
72:12 75:14,20
117:2 118:14
119:2 155:2
156:15 157:18
**dad** 19:15 27:2
28:7,17,23
29:4 30:14
44:14 72:6
81:20 90:16,23
91:13 92:13
95:15 99:25
100:19,25
**damages** 30:4
119:18,25
120:6,20 126:3
128:5 129:5,6
129:7 133:23
134:5,5,9
135:11,18
137:17 138:23
139:3 141:23
141:25 146:17
147:16 148:8,9
151:2

**danielle** 2:7
23:4,5,13 38:3
**date** 1:12 6:15
23:15 32:23
36:13,16 38:8
41:9 45:6
46:20,25 47:9
49:5,24 51:18
55:23 57:12
58:14,19 59:5
59:6,11 60:3
60:16,23 61:14
70:5,13,20
71:12 74:24
77:6 79:22
80:13,18 84:14
94:9,24 98:10
100:8 109:10
115:3 118:7
119:4 122:21
125:4 130:6,11
138:18 141:16
148:18 151:16
151:19 152:11
152:24 161:24
162:12
**dated** 52:23
53:8 71:17
72:3 117:4
118:16 138:15
138:17
**dates** 15:18,25
79:16 147:15
153:8,17

**david** 117:3
**dawson** 1:3,17
2:5 4:1,10,14
5:1 6:1 7:1 8:1
8:18,19 9:1,19
10:1 11:1 12:1
13:1 14:1 15:1
16:1,21 17:1
18:1 19:1 20:1
20:5 21:1,3
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1,15 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1,4 46:1
47:1,24 48:1
48:16 49:1,6
50:1 51:1 52:1
52:7 53:1,3
54:1 55:1,25
56:1,6 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1,21 71:1
72:1,4,13 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1,18
82:1 83:1 84:1

84:9 85:1,5
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
94:11 95:1
96:1 97:1 98:1
98:23 99:1
100:1 101:1
102:1,7 103:1
103:10 104:1,5
104:10 105:1
106:1 107:1,6
108:1 109:1
110:1,9 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1,9 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1,13 151:1
152:1 153:1

**[dawson - discuss]**

154:1 155:1,15 156:1 157:1 158:1 159:1 160:4,5 161:1 161:2,24 162:1 162:2,4,12

**dawson's** 57:11 59:9

**day** 54:25 85:2 92:23 128:22 128:22 130:13 134:19 145:25 146:4,7 147:9 147:9,10,12,19 147:24 148:16 155:19 159:20 162:15

**days** 3:16 129:12,23,25 130:17,22 131:5 145:23 145:24 146:10 147:2,3,20,23 147:24 160:16

**deal** 75:5 123:22 124:17 124:20 127:9 129:20

**debt** 32:18

**december** 19:7 26:17,19 28:25 50:17,24 55:2 71:17 72:3 73:7,19,19 74:7,13 75:16

75:19 76:15,21 77:7 81:21 82:4 85:2 87:19 90:15 94:25 117:4 118:16 130:4,4 130:18 142:16 143:4,5,10 144:5 145:15 148:13

**deceptive** 110:13

**decide** 105:15

**decided** 121:2 124:10 127:8

**declare** 162:4

**deemed** 162:6

**defendant** 1:17 2:10 4:18 12:2 104:5,9 111:3

**defendant's** 53:11 70:12

**defendants** 1:10 48:22,23 49:3,8 54:4 55:18,22 69:24 70:4,8,16,18,22 94:4,8 110:11 110:17,23,25 112:16 117:22 117:24 118:5 118:11 156:4 157:2

**definitely** 130:24

**degree** 12:10 13:7,14 16:19

**delete** 35:2

**delivered** 86:19 93:18 97:16

**delivery** 86:23

**demanding** 72:25

**demands** 72:15

**deny** 43:22

**depending** 88:14

**deponent** 160:13 162:3

**deposing** 160:13

**deposited** 98:13

**deposition** 1:16 3:8,9,14 5:21 9:21

**depressed** 135:2

**depressing** 134:10

**describe** 87:15 134:7,8

**described** 85:6 89:21 98:15 141:25

**description** 86:6,17 87:14 89:10 156:7 157:5

**designed** 75:5

**detail** 31:10

**determination** 74:23

**determine** 26:14

**dewitt** 12:23

**difference** 98:5

**different** 91:20 118:21

**differentiate** 98:4

**difficulty** 135:5

**direct** 86:23

**directed** 103:5 116:6,7

**directing** 36:10 37:7

**direction** 103:4 151:8

**disadvantage** 105:12

**disclosing** 37:13

**disclosure** 48:24 49:2 156:10

**disclosures** 117:23 118:4 157:11

**discovery** 39:15 83:2,10 83:13,14

**discuss** 18:24 121:8

**[discussed - essentially]**                                     Page 11

**discussed**  20:9
**discussion**  19:3
  19:6 20:4 21:2
  24:15 42:5
  69:22 117:20
  143:14 150:12
**dismissed**
  10:19 136:23
  137:4,10
**disposed**  10:17
  10:18
**district**  1:2,2
**document**
  47:19 49:9,17
  50:21 52:19
  53:12,24 54:19
  56:3,7,12,16
  61:18 64:15
  66:8 70:23
  72:2 78:25
  82:12,22,25
  83:21 84:2
  97:23 98:16
  100:20 103:17
  106:9 109:6,10
  133:16 137:24
  138:15,16,19
  149:25
**documentation**
  21:17 66:17
  74:22 75:7
  114:7,7 126:19
  132:21 133:7
  143:17

**documents**
  19:17 20:18
  21:5,9,11 22:4
  39:15,20,25
  47:15 64:10,11
  76:19 85:24
  86:19 133:3
  153:5 158:2,3
**doe**  85:10,11,17
  85:18 86:18
  89:21
**dollars**  128:22
  129:2 141:15
**dose**  133:16
**doubt**  69:11
**douglas**  11:19
**downstairs**
  103:6
**drafting**  35:15
**drive**  7:19 8:5
  13:24 142:17
**driver's**  14:11
**drug**  10:12
  11:6
**due**  47:9 72:17
  73:2,9 108:3
**duly**  4:3 155:5
  159:11
**duties**  38:24
  39:10
**duty**  35:7

**e**

**e**  2:2,2 3:2,2 4:2
  8:18 13:2
  66:15 69:5,8,9

  69:13,17 70:8
  70:12 82:11
  83:9 98:8
  143:21,23,25
  144:5,8,12,14
  149:7 153:6
  155:2 156:2,18
  157:18 159:2,2
  161:3,3,3
**earlier**  42:8
  71:20 81:19
  92:2 107:23
  142:2
**early**  13:16
  28:25 81:21
  127:23
**east**  4:12 6:23
  8:8 27:11
  28:17,17 29:6
  51:14 52:2
  73:14 74:12
  85:3 89:17
  98:23 99:7
  104:5,10 123:6
  144:22
**eater**  134:15
**economic**  129:5
  133:23
**economics**
  137:15
**education**  12:9
  13:5
**effect**  3:12,15
**eight**  89:4

**either**  57:3
  68:18 73:24
  78:9 147:8
  152:21
**emotional**
  120:10,16
  134:4,5,8,15
  135:18 137:17
  141:23,25
**employed**
  14:16,24 15:6
  16:7,15
**employees**
  149:18
**employer**  16:3
  140:8
**employment**
  15:19
**engaging**
  110:14
**enrolled**  47:6
**enter**  10:20
  103:5 121:16
**entitled**  35:8
**enumerated**
  110:19
**envelope**  98:16
  100:3
**errata**  160:11
  160:13,16
**esq**  2:7,7,12
  160:1
**essentially**
  38:15

**[estimate - fifty]**

**estimate** 15:24 24:18 88:8 151:6
**et** 160:4 161:1 162:1
**evan** 145:7
**event** 57:13 59:12
**eventually** 120:25
**exact** 23:15 24:16 30:25 36:16 38:7 46:20 49:24 115:3 122:21 125:4 129:14 130:19 131:2 132:14,19 141:18 146:20
**exactly** 22:6 47:18 140:5
**examination** 4:6 154:14 157:20 159:10 159:12
**examined** 4:5
**except** 3:21
**exchange** 28:6 94:17 95:4 96:15
**exclusive** 112:10
**exhibit** 48:22 48:23 49:4,8 52:11 53:11

54:4 55:18,22 56:2 58:12 69:24 70:4,8 70:12,16,19,22 72:12 74:16 75:14,20 81:15 82:11 83:9 94:4,8,12 98:8 101:25 102:5 103:16 110:2,3 110:6 117:2,22 117:24 118:5,8 118:14 119:2 121:20 137:21 142:11 143:16 144:20 145:6 156:6,6,8,10,13 156:15,18,20 157:4,4,6,9,13
**exhibits** 156:4 157:2,15
**expect** 124:6
**expenses** 21:18 41:17,23 126:20 127:4,7 127:13,16,17 128:2 129:4 133:25 140:23 141:4
**expire** 114:25
**expired** 114:23
**explain** 27:2

**f**

**f** 3:2 70:16,19 102:5 103:16 110:3,22 121:20 156:20 159:2
**face** 124:11
**fact** 79:17 119:2,3
**facts** 63:15
**factual** 32:13 63:11,14
**failed** 110:23 111:2,4
**failing** 110:16 112:9
**fails** 160:18
**fair** 18:5 42:2 47:20 56:25 63:3 66:6 82:6 82:9 83:17,20 85:20 88:17 91:7,19 99:3 104:20 108:9 146:16
**fake** 118:16
**falls** 99:5,12,17 100:13
**false** 75:2,4 78:9 79:16 116:25 117:6 117:11 118:12 118:23 119:3
**falsely** 75:15

**familiar** 52:14 53:7
**fare** 140:24
**fares** 21:11 145:5
**fashion** 27:15
**fast** 5:14
**father** 8:19 16:22 17:10 19:16 26:24 29:11 52:8 72:4 91:10 92:5,18 94:18 94:22 95:5 97:22 99:22 101:7
**father's** 53:6 54:12
**february** 15:20
**fecpa** 110:12
**federal** 1:18 40:15
**fee** 41:11,15
**feel** 20:13
**fees** 41:9
**feet** 89:7,8
**fellow** 2:16
**felony** 10:4
**felt** 101:11 108:8
**female** 85:18 85:24,25 86:6 86:25 87:6
**fifty** 141:15

**[file - georgia]**

**file** 2:8,13 25:4 25:24 102:8 103:12,23 121:19 122:3 147:11

**filed** 12:5 18:2 18:10 25:7 26:21,23 33:17 34:14,21 36:6 36:14,18,25 40:11,22,24 61:19 79:2 103:20,25 109:18 112:25 113:13 122:10

**filing** 3:7 17:15 21:14 38:14 41:11,14 102:14 112:18 114:5,21 115:19 116:4

**finally** 6:5

**financial** 120:8 120:16,18,20 126:2 129:6,7

**find** 60:2

**fine** 15:23

**fingers** 104:17

**finish** 5:9 6:11

**firm** 4:17 40:10

**first** 4:3 16:18 27:25 29:17 48:7 49:20,22 53:23 56:15 57:8,18 58:2

58:11 59:7 71:6 72:11 77:21 79:14 81:19 82:5,7 82:19 90:19 92:3 95:18,22 110:22 120:19 138:8,19 155:5

**fit** 49:10

**five** 60:17 87:2 89:3,4,7,7 145:6

**fledge** 124:11

**flew** 121:17 126:5,7,8 129:20 148:13

**flight** 121:14 121:16,22,25 122:6,7,9,18,23 122:24 123:11 124:13,15,25 125:24 148:21

**flights** 120:24 121:13 122:8 122:15,17 128:10 129:4 133:24

**flip** 52:10 57:7 77:20 110:5 138:14

**floor** 2:6 85:4 90:20,20 98:24 104:6

**fly** 122:2 145:25

**flying** 128:14

**focus** 134:21

**follow** 42:7 149:2

**following** 83:7 148:5

**follows** 4:5 104:7

**foot** 87:2 89:3,4

**force** 3:15

**foregoing** 155:8 162:5

**forget** 45:18

**form** 3:21 103:11 104:21

**formal** 13:5

**formed** 109:21

**forth** 159:11

**forward** 41:23

**found** 26:20 27:25 91:15 92:3 93:16 95:16 99:23 100:2,4

**four** 24:22 67:21 71:25 144:20 146:17

**fourth** 146:12

**frank** 103:17

**fraudulent** 75:5

**front** 101:25

**fudge** 62:3,25 63:5 67:5 68:9 68:19,25 69:13

69:25 70:3 71:15,21 73:6 77:4 81:8 117:4 118:15 156:15

**full** 124:11

**fulton** 11:18

**functions** 16:13

**funds** 145:2

**further** 3:20 143:9 155:8 159:14

**g**

**g** 94:4,8,12 101:25 110:20 118:10 157:6

**gain** 26:14 91:4 91:9 144:14

**gained** 32:4 109:11,12 134:15 135:6

**garden** 141:22

**garnish** 136:8

**garnished** 135:25

**gathered** 21:21 65:18

**generate** 104:16,18

**generated** 106:14

**george** 94:13

**georgia** 7:16,19 10:16 14:10 15:17

**[getting - hourly]**

**getting** 31:4 131:18,22 132:10

**give** 5:9,19 6:2 16:25 17:5 60:17 73:21 86:20 103:11 152:20

**given** 9:21 77:17 155:10 159:13 162:9

**giving** 5:11 110:2

**go** 27:17 72:11 84:25 98:8 102:5 103:5 108:6 110:19 121:18 126:9 126:19 128:15 129:18 130:12 132:20 133:7 133:15 144:11 147:5

**going** 4:21 5:14 5:16 20:14 27:12 30:2,6 45:12 46:24 48:9 49:7,12 53:10 54:24 79:13 82:10 94:11 103:15 110:21 121:10 135:22,24,25 136:3 137:21 147:10

**good** 4:14,15 51:22

**google** 26:10,14 26:19 30:13,16 30:21,24 31:7 31:9,10,13 32:4,8,17 135:23

**googled** 25:9

**gotten** 106:23

**grade** 57:3

**graduate** 12:21 47:7

**graduated** 45:10

**ground** 126:6

**group** 2:4 38:18 77:24

**guardia** 126:7 142:24 143:10 143:18 144:22 145:11 146:2,5 148:22

**guess** 8:13 18:8 23:10 68:16 82:5 86:9 95:22 110:22 111:8

**guessing** 104:15

**guys** 35:18

**h**

**h** 2:12 7:18 8:19 104:4 117:22 118:5

137:21 156:2 157:9 161:3

**hair** 88:24

**haired** 86:25 87:6

**half** 7:4,8 86:18 134:24

**hand** 54:12 84:17 93:18 103:24 107:13 159:20

**handed** 93:25 106:2,5

**handle** 124:4

**handwritten** 98:10

**happen** 135:22

**happening** 90:4

**happy** 103:10

**harm** 119:17 119:25

**head** 5:23,24 11:12 45:12 60:23 120:17 126:24 127:10 129:15 133:9 133:14

**healthcare** 12:12 15:10

**hear** 4:24

**hearing** 74:10

**held** 1:19 20:4 21:2 24:15 42:5 69:22 117:20 143:14

150:12

**help** 74:5 103:10 138:17

**helpful** 137:7

**henry** 137:22

**hereinbefore** 155:11 159:11

**hereto** 162:7

**hereunto** 159:19

**hey** 45:12 47:5 47:24 48:15 100:4,19 102:24 105:22

**hi** 107:6

**high** 12:21,23

**highest** 12:8

**hire** 124:3

**hold** 56:8

**home** 15:10 51:21 90:5 92:15,20 93:3 122:9

**homes** 15:14

**honestly** 11:12

**hostage** 6:6

**hour** 131:23,24 132:5,10 139:17 140:20 149:21

**hourly** 131:18 131:21 132:11 139:16 140:2 140:14,17 149:21 150:2,7

**[hours - july]**                                                    Page 15

**hours** 24:2
  132:2,5,11,15
  132:19,21
  133:12 139:15
**house** 27:9
**hundred**
  141:15

**i**

**iacobellis** 1:22
  159:7,23
**idea** 31:14 32:9
  96:21 106:15
**identification**
  49:4 55:23
  70:5,13,19
  94:9 118:6
**identify** 80:13
**image** 29:5
**immediately**
  72:17
**importantly**
  6:11
**improper**
  107:24 108:3
**improperly**
  93:6,14,23
  115:23 135:16
**inaccurate**
  89:12
**included**
  110:17 112:17
  118:11
**includes** 139:4
**incorrectly**
  33:10 40:21

**incurred**
  119:19,25
  127:22 128:11
**independent**
  65:22
**index** 84:14
**indicate** 47:16
  92:18
**indicated** 31:23
  32:3 33:21
  44:13 72:24
  81:18 86:21
  111:22 150:15
**indicates** 50:6
  54:24 75:13
  84:24 85:9,23
  86:10 118:10
**indicating** 62:4
  62:8 73:8
  98:18
**individual**
  86:19,22,24
**individually**
  1:3 2:5
**information**
  21:20 25:8
  26:9 49:25
  51:11 52:7
  57:9 59:8
  63:20,25 64:6
  65:18 74:19,25
  75:25 76:3,5,7
  76:14 77:10,13
  77:16,17 78:5
  78:19,24 79:5

  79:14 80:2,10
  80:13,17 81:12
  93:10 111:15
  111:17 113:3,6
  113:22,24
  114:14,16
  115:13,15
  116:12,17,18
  117:14 152:23
  153:16,23
  154:2 158:2,3
**informed** 28:8
  28:18
**initial** 54:15
  117:23 118:3
  157:10
**initially** 26:10
  26:11
**initiated** 34:17
**input** 34:20,24
  42:23
**institute** 13:10
**intentionally**
  153:7,11,22
**interested**
  159:17
**intern** 2:17
**interrogatories**
  42:19
**interrogatory**
  42:10,15,23
  43:5,9,12
**involvement**
  35:9,15

**isaiah** 8:19
  16:21 52:7
  53:3 72:4
**issue** 19:12
  30:7,9
**issues** 129:20

**j**

**j** 116:24
**jane** 85:9,11,17
  86:10,18 89:20
**january** 7:9
  103:25 109:10
  109:18,20
  121:20 122:13
  124:15 129:21
  130:2,4,5,18
  145:15 147:11
  150:18
**jersey** 13:12
**jessica** 2:7 23:3
  23:13 38:4,5
  87:11 160:1
**jfk** 126:7
**job** 16:13,18
  131:13
**john** 85:11,18
**jranucci** 160:2
**judge** 3:13
**july** 15:5 23:17
  56:19 57:12
  58:15,24 59:11
  59:16 60:13
  61:6,14 71:4,9
  82:17 130:5
  138:6,12,15,17

**[july - lexington]**

146:14 147:12 148:18 150:19

**k**

**keep** 5:16
**keys** 104:18
**kick** 5:3
**kind** 68:24 137:14 141:19
**kings** 159:5
**knew** 66:5
**know** 5:2,20,23 6:3,9 15:22,23 20:8,11,16 21:9 22:20,21 32:19 33:2 35:2,8 36:13 36:17,20,24 41:14,24 42:14 42:18 43:11 54:2 55:6,13 56:21 57:3,3,5 60:22 62:25 64:17 66:4 67:7 69:4 71:21 76:13,20 77:3,6,9 80:22 81:4,7 83:25 85:10,12,25 88:4,10 91:12 92:25 97:24 101:6 102:11 102:19,20 105:2 106:12 106:22 107:11 107:20 109:17

111:9,10 112:8 112:11 115:4 117:10 119:8 124:6,9 125:5 129:17 132:18 135:21,22,23 136:3,25 144:7 148:24 151:20 152:12
**knowing** 39:9
**knowledge** 136:11 153:24

**l**

**l** 3:2,2 155:2
**la** 126:7 142:24 143:10,18 144:22 145:11 146:2,5 148:21
**ladies** 6:8 23:7
**landline** 51:25
**landlord** 127:22 141:9
**language** 72:24 73:7
**latches** 105:11 108:3
**late** 88:18
**law** 1:9 4:17 33:2 40:10 108:19 111:4
**lawful** 115:20
**lawsuit** 4:22 11:22,24 12:2 17:10,14,20,24 18:10 19:3,9

24:20 25:5,7 25:11,16,24 26:21,23 27:4 27:13 28:9,12 29:5,12,13,20 30:18 31:14 33:8,18 34:2 34:18 36:18 40:8,12,15,24 41:12 58:13,23 65:12 75:14 82:3 83:14 92:3 93:6,14 95:16,21,22 96:13,15 97:9 102:9,12,24 103:5 105:12 107:24 108:3 112:18 113:14 113:18 114:5 114:22 115:19 116:4 121:8,16 121:23 123:15 123:17,23 136:16
**lawsuits** 136:16
**lawyer** 38:2 102:18 124:3
**lawyers** 20:6,8 20:15 21:21 22:25 23:2,10 24:4,7,25 25:9 53:18 62:15 64:3,6,15 65:18 71:10

81:13 82:23 112:11 113:7,9 113:23,25 114:15,17 149:2 153:2,8 154:3
**lead** 38:16
**learn** 26:22 58:2
**learned** 27:3 29:17 81:19 137:9
**lease** 127:17,23 141:5,7 149:9
**leave** 28:12
**leaving** 91:25
**left** 27:8,14 28:8,14 29:6 96:8,20 97:8 97:12 100:8
**legal** 2:4 56:24 105:11 160:23
**legend** 98:16
**lender** 50:2
**letter** 69:25 70:3 71:15 72:3,7,22 73:6 75:20 108:12 110:21 112:14 116:24 117:3 119:9,11 156:7 156:16 157:5
**level** 12:8
**lexington** 1:21 2:11

**license** 13:24 14:6,12,13
**licenses** 13:19 14:13
**lien** 136:2,8
**likewise** 5:10
**limit** 40:25
**limitations** 105:7 108:7 114:22,25 152:8,16 153:19
**limited** 110:18 112:17 118:12
**lincoln** 13:10
**line** 42:8 59:8 105:23,24 106:8,8 108:15 108:17 158:8 161:4,7,10,13 161:16,19
**lines** 108:13
**lippes** 1:20 2:10 4:17
**listed** 50:21
**listen** 22:9
**litigation** 35:10 41:18
**little** 2:12 4:7 4:16 16:25 17:3,6,7 20:21 24:11 26:12 30:2,8,22 31:22 33:7 35:6,14,23

36:7 37:7 46:5 48:21 50:9 55:17 56:8 60:7 69:23 70:7,15 87:7 94:3 95:14 107:22 117:21 128:6 139:23 150:10 154:6 157:21
**live** 28:13 92:14
**llc** 1:8 2:11 149:17 160:4 161:1 162:1
**llp** 1:20 2:10
**loan** 1:8 2:11 4:18 18:13,16 19:11 25:5,17 33:3,23 38:22 39:16,20 42:9 43:16,18,23 44:4,11,14,18 44:25 45:4,13 45:15,19 46:4 46:7,12,14 47:6,8,25 48:10,17 50:16 50:22 51:6 57:11,13,14,20 57:23,24 58:3 58:7,7,13,16,16 58:17,20,25 59:10,12,13,16 59:17,23 60:4

60:9,9,15,18,24 61:5,24 62:5,9 62:12,18 63:5 63:9,9,12,17 64:7,17,24,25 65:7,7,13,14,23 65:24 66:9,10 66:19,20,25 67:5,9,9 68:12 68:19,25 69:6 69:14,17,18 72:15,25 73:8 75:2,6,8,15,19 76:15,21 77:25 78:5,8,8 79:6 79:15 80:7,24 84:8 111:2,13 111:19,24 112:20,23 114:25 115:7,8 116:7,13,14 119:19 120:2 120:21 121:15 123:9 126:21 129:9 135:15 136:7 144:18 151:16,21 152:2,8,17 160:4 161:1 162:1
**loans** 78:7,14 78:15,15 79:8 79:8,16,17,19 79:22 80:5,5 80:14,23

**located** 15:16 16:9
**long** 6:25 7:23 8:20 9:11 14:24 16:15 23:23 67:19 144:4 153:19
**longer** 28:18 92:6
**look** 28:6 49:11 49:13 56:7,8 59:7 71:24 72:2 142:11
**looking** 74:2
**looks** 52:14 53:7 143:3,4 145:8,13 148:20 150:4
**lost** 139:5 147:16
**lot** 31:9 64:10
**lower** 103:24
**lpn** 13:19 14:12 14:20 15:12 16:19 44:7
**lyft** 142:15 150:20

## m

**ma'am** 6:16 34:23 117:7
**made** 21:12 36:2 55:6,14 124:25 162:5
**mail** 66:15 69:8 69:9 97:15,25

**[mail - money]**                                      Page 18

98:6,14 99:13 99:17 100:15 100:21 143:21 143:23,25 144:5,8,11,14 149:7
**mailbox** 27:8 27:14 28:9 29:6 91:16,17 91:25 93:17,24 95:17 96:8,20 97:9,13,14,19 97:24 98:2 99:23 100:2,5 100:9,14,22 101:3,10,19 115:25
**mailed** 73:12 98:5,22 99:6 144:12
**mails** 69:5,13 69:17 153:6
**maintained** 14:5
**make** 6:7 17:18 25:14 34:25 35:24 36:5 44:17,24 54:24 78:12 93:20 129:8
**makes** 6:18 88:13 118:23
**making** 47:25 48:10,16 55:5 110:13 132:12

139:25 140:12
**male** 85:19
**man** 102:21,22
**march** 7:11 8:2 9:4 74:4,5 125:7
**marie** 1:22 159:7,23
**marijuana** 11:8
**mark** 48:21 55:17 69:23 70:7,15 94:3 117:21,24
**marked** 49:3,8 53:11 55:21 56:2 70:3,11 70:18,22 75:20 82:11 94:7,12 103:16 118:5 118:15 121:20 158:7
**marriage** 159:16
**married** 13:20
**martha** 99:5
**materials** 19:18
**math** 87:22
**mathias** 1:20 2:10 4:17
**matter** 31:3 85:6 126:6 159:18
**mean** 5:23 10:18 34:24 53:13 63:14

65:10 97:13 118:14 128:7
**meaning** 17:3 25:12 63:15 66:13 84:4 121:5 123:17 124:21
**meaningful** 116:5,14
**means** 66:5 85:12 96:21 118:19
**meant** 109:3
**meeting** 23:23
**members** 77:24 78:7,13 79:7 80:6,23
**merged** 137:14
**message** 27:20 28:3,5 29:5,19 68:24 94:4,7 94:17 95:4,9 96:12,14 97:6 101:22,24 117:25 118:4 157:6,13
**messages** 66:16 153:6
**met** 24:3 53:18 56:17
**middle** 54:15 54:23 138:22 143:20
**million** 128:22

**minutes** 128:25
**misdemeanor** 10:4,5,6
**misleading** 74:20 75:4 78:10 110:14 116:25 117:6 117:11 118:12
**missed** 129:10 129:23 130:2 130:13 131:6,8 132:4,16,19,22 133:12,25 139:5,16 145:19 146:12 146:17 147:2 147:22,25 148:14
**mmm** 6:2
**mobile** 68:3
**mom** 87:20 88:4,9 89:16 89:20 90:16,22 91:2,8 92:14 92:19
**moment** 19:25 134:3
**monday** 143:5 146:24 147:21
**monetary** 128:12
**monetize** 128:21
**money** 18:15

**[month - objection]**                                      Page 19

**month** 55:2 88:15 125:5 145:14,17
**monthly** 141:13,20
**morning** 4:14 4:15
**morningside** 14:17 140:9,11 149:19 150:8
**mother** 19:14 87:15 88:21,23 91:11,12 97:22
**motion** 36:21
**move** 30:12 120:25 121:2 122:24 123:2 123:11,21 124:16 127:9 127:14 128:17
**moved** 47:22 123:5 139:21 139:24
**moving** 41:23 127:3,13,14,16 127:20 128:2 129:4 133:24 141:4
**multi** 49:9
**murtha** 1:9 39:25 40:6,21 41:4 111:4 116:8

**n**

**n** 2:2,8,13 3:2 4:2,2,2 7:18 8:18 155:2 157:18
**name** 4:8,16 9:19 54:12 85:17,25 86:20 105:3 106:17 106:19,23 107:12,14
**names** 8:17
**nature** 75:5
**necessarily** 138:20 148:25
**necessary** 114:7 162:6
**nee** 102:25
**need** 4:25 47:24 48:16 56:7 121:14 123:15 133:6
**needed** 123:21 127:8
**nerve** 134:19
**never** 61:9 63:4 101:14 136:7
**new** 1:2,21,21 1:23 2:4,6,6,12 2:12 4:4,13 6:24 10:13 13:12 14:3,6 14:19 16:8,11 16:16 25:8 47:21 84:12

85:4 98:24 104:6 121:17 121:23 122:2 122:19 123:2 123:11,16 124:13,14,16 125:2,12,15 126:6,8,9,13 127:9,21 128:15,18 129:20,21 139:22,24 145:14,18 147:9 148:3 159:4,8
**nightmares** 134:14
**nine** 141:15
**nods** 5:24
**non** 23:10
**notary** 1:23 4:4 155:22 159:7 162:13,19
**note** 48:24 49:2 112:19,24 113:15,17 156:10 160:10
**noted** 162:7
**notes** 74:2
**notice** 1:18 74:20 75:2,4 110:24 111:3,5 111:14 112:10 116:24 117:2,7 117:11 118:13

118:14,17,22 119:3,5,13
**notices** 110:16
**november** 54:3 67:12
**number** 24:17 51:13,21,23 67:11,17,20 68:5,10,14,20 69:2 90:22 128:23 131:2 132:8 133:12 134:6 139:6,8 139:11,14,15 141:11 142:6,8 149:12
**numbers** 132:19
**nurse** 13:18,19
**nursing** 13:7 13:13 14:17 140:9 149:19
**ny** 160:15
**nylag.org** 160:2

**o**

**o** 3:2 4:2,2 155:2
**oath** 3:12 99:19
**objection** 17:13 19:22 20:20,22 23:24 24:9 27:16 28:10,20 29:21 30:19 31:8,16 32:11

**[objection - okay]**

| | | | |
|---|---|---|---|
| 32:16,24 33:4 | 100:23 101:4 | **obligated** 46:14 | 60:11,21 61:3 |
| 33:12 34:5,11 | 101:20 103:2 | **obtain** 12:15,18 | 61:17 62:23 |
| 34:15,22 35:4 | 103:13 104:13 | 13:8 26:8 | 63:21 64:4,13 |
| 36:3,8,15,22 | 105:18,25 | **obtained** 16:19 | 64:21,22 65:20 |
| 37:5 38:11,20 | 106:25 107:8 | **obviously** 5:22 | 66:22 67:15,23 |
| 39:2,6,12,17 | 107:16 108:4 | 35:21 148:2 | 72:10 74:9,15 |
| 40:3,7,16,23 | 108:25 109:14 | **october** 60:10 | 75:12 76:2,6 |
| 41:6 42:12,16 | 109:23 111:6 | 61:6 115:8 | 76:12 77:12,19 |
| 42:20,25 43:6 | 111:20 112:4 | **office** 97:16 | 78:20 79:12 |
| 43:13,24 45:7 | 113:2,10,19 | **offices** 1:20 | 80:3,11 81:11 |
| 45:14,21 46:8 | 114:2,11,18 | **official** 49:7 | 82:9 83:4,17 |
| 46:16 47:10,17 | 115:2,5,10,17 | **oh** 23:11 | 83:19,24 84:18 |
| 48:2,11,18 | 116:2,9,15,20 | **okay** 5:6,7,17 | 84:23 85:22 |
| 50:18,25 54:5 | 117:8,12,16 | 5:18 6:3,4,13 | 87:18 88:7,20 |
| 55:8 56:23 | 118:18,24 | 6:14 9:2,10 | 89:2,9,15 |
| 58:8,21 59:3 | 119:6,10,14,21 | 10:10 17:7 | 90:13 91:19 |
| 59:19 60:19,25 | 120:3,7,23 | 18:7 20:16,17 | 92:10,24 93:4 |
| 61:8,12 62:14 | 121:21 123:13 | 21:15,23 22:3 | 93:19 94:19 |
| 63:6,13,18 | 123:24 124:5 | 22:8 24:23 | 95:7,23 96:2 |
| 64:2,8,19 65:2 | 124:19 125:3 | 25:20 26:2 | 96:18,24 97:11 |
| 65:9,16,25 | 127:11 128:24 | 29:2 31:6 | 98:7 99:24 |
| 66:11 68:6,21 | 131:10,20 | 32:21 33:15 | 100:10,18 |
| 72:8 73:3,10 | 132:6,13,23 | 34:7 38:17,23 | 103:8,22 |
| 73:15 75:17,21 | 133:10,17 | 39:8,23 40:19 | 104:23,25 |
| 76:10,17,23 | 135:19 136:10 | 41:2 42:2 44:2 | 105:20 106:16 |
| 77:15 78:2,17 | 136:18 137:5 | 44:6,10,16,22 | 107:19,21 |
| 79:3,10,24 | 139:7,12 140:3 | 45:9,23 46:3 | 108:9 109:4,16 |
| 80:8,15,20 | 142:4 145:20 | 46:11,21 47:3 | 110:4 112:7 |
| 81:2,9,24 | 146:19 151:18 | 47:20 48:20 | 113:4,12 114:4 |
| 85:13 86:2,14 | 151:22 152:5 | 49:16 50:4,5 | 114:20 116:11 |
| 87:16 89:13 | 152:10,13,18 | 51:17 52:22 | 116:22 118:20 |
| 92:7,16,22 | 153:3,10,21 | 53:19,22 54:10 | 119:16 120:9 |
| 93:7,15 95:20 | 154:4 | 55:4,12,16 | 120:11 122:5 |
| 97:17 98:3 | **objections** 3:21 | 56:9,10,18 | 124:2,8 125:13 |
| 99:9,14 100:6 | | 57:17,25 60:10 | 125:16,25 |

**[okay - pending]**                                                        Page 21

126:17 127:18
129:11,24
130:10,16
134:12,23
135:9 136:21
137:12,20,23
138:21 139:19
140:22 142:7
148:19
**old**  6:18 87:19
88:4,9,14
150:23
**older**  87:23,25
**omitting**  75:6
**once**  24:5
**ones**  14:9
**open**  98:6
**opposed**  100:14
**order**  104:16
121:18 122:3
123:22
**original**  3:9,17
**originally**
56:11 58:10
**originated**
43:19
**outcome**
159:17
**outside**  66:2
98:18 101:24
**outstanding**
141:12
**owe**  135:15
**owing**  72:17

**own**  14:9
102:13 105:16
107:11
**owns**  58:7

**p**

**p**  2:2,2 3:2 7:18
**p.c.**  1:9
**p.m.**  14:23 85:3
154:13
**page**  49:9,9
52:10 54:23
56:8 57:7
71:24,25 72:12
73:13 74:18
77:20 82:7
83:18 85:2
86:18 95:22
108:11 110:5
138:14,22
142:14,22
143:16,20
144:20 145:6
148:20 149:14
156:6,23 157:4
157:20 158:3,8
161:4,7,10,13
161:16,19
**pages**  72:2
**paid**  41:8,11,17
131:7,9,11,18
131:22 132:10
140:14 141:15
**paper**  73:17
82:8 84:4,5
86:16 106:2,5

107:2 108:6
139:8
**papers**  27:8
84:5 90:2,6,8
91:3,16,24
92:13,21
101:18
**paperwork**
28:12 81:23
82:5 101:9
109:7 129:16
130:21
**paragraph**
57:8,9 58:11
60:6,12 61:11
72:12 74:17,18
77:20 78:4
79:13 86:10
110:6,11 118:9
**paramus**  13:12
**parent's**  128:16
**parents**  7:7
8:14,17
**part**  30:4 40:17
83:2 87:10
88:25 90:3
147:7
**particular**
45:15
**particularly**
52:20
**parties**  3:7
159:15
**party**  11:24
19:9 151:20,24

152:3 153:18
**passed**  25:25
29:3 32:20
**password**
144:14
**past**  105:7
134:21
**patient's**  15:14
**pause**  17:6
**pay**  41:22 44:5
45:12 47:5
127:14 140:2
140:10 149:16
149:24 150:4
150:21
**paycheck**
135:25
**paying**  46:14
123:10 141:13
**payment**  21:12
55:6,14 141:20
**payments**
44:18,24 45:5
46:24 47:8
48:10,17 54:25
72:16 73:2,9
**payroll**  133:18
133:20
**pc**  111:4
**pearl**  2:6
**pen**  106:7,13
106:19,24
**pending**  102:25
123:15,17

[people - process]                                                    Page 22

**people** 38:13,18 38:21 85:11
**perform** 16:12
**period** 8:15 29:12,16 48:4 50:11,16,20,23 51:3,4 60:17 130:3 131:14 132:2 145:18 146:11 150:4
**person** 23:20 23:22 24:4 28:13,18 92:20 98:21 101:17 101:18 102:18 103:9,11
**person's** 85:17
**personal** 98:17 127:15,20
**personally** 44:19 51:24 62:20
**persons** 1:4 2:5
**pertinent** 154:2
**phone** 23:21 62:19 67:24 97:3
**phonetic** 99:5 136:3
**photograph** 82:3 95:15,18 96:12 97:21
**physically** 91:23 95:8 97:13 101:2

104:11,14 106:7,18 127:19
**picture** 27:7,13 27:18,24 30:17 30:20 95:19,21 96:4
**piece** 106:2
**pinhurst** 7:18 8:5 142:17 149:4
**place** 155:11
**placed** 97:24
**plains** 16:11
**plaintiff** 1:5,16 2:4 11:25 105:11
**plaintiff's** 94:14 104:4 117:23 118:3 142:13,23 143:8,16 144:21 145:7 148:21 157:10
**plan** 141:20
**plane** 21:10 140:24
**plea** 10:20,21
**plead** 110:25
**please** 4:8 5:2 20:16 48:21 55:17 69:23 70:7,15 94:3 99:15 117:21

**plural** 110:25
**plus** 147:24 148:16,17
**point** 6:10 8:13 31:12,20 32:7 45:4,13 56:6 57:11 58:14 59:10 61:23 62:13 76:8 83:10
**pointed** 23:4
**poor** 153:13
**pops** 94:20
**portion** 137:15
**position** 32:4 34:6 59:15,22 89:19 93:5,8 93:13,22 123:20 151:15
**posses** 113:17
**possessed** 114:9
**possessing** 11:7 113:15
**possession** 10:12 66:7,13 79:9 81:13 112:11,19 114:6 152:25
**possible** 64:14
**post** 97:15
**postage** 98:23
**potential** 29:13
**pounds** 87:4 89:11 134:16

**practical** 13:19
**practice** 36:21
**practices** 110:15
**preparation** 19:18 22:19
**present** 2:15 23:8
**previous** 25:7 97:3
**previously** 75:9
**prior** 8:13,22 11:15,16 16:6 25:11,18,21 27:24 28:5 57:13 58:15 59:12 65:13,23 71:11 73:6 75:19 76:15,21 77:7 78:14 79:7 80:6,24 96:11,14 138:11 144:5
**privilege** 20:23 24:10,12 36:9
**privileged** 37:13
**probation** 10:23,24
**procedure** 1:19 135:20
**proceeding** 9:25
**process** 11:4 31:14 90:10

**[process - r]** Page 23

115:20 136:13 136:17

**produced** 39:15,20,25

**projection** 74:21

**promissory** 112:19,24 113:17

**proper** 98:22

**properly** 108:23 109:13 109:22

**property** 98:15

**protected** 20:9

**protection** 12:6

**provide** 42:23 64:5 82:22,23

**provided** 21:9 21:13,21 54:3 64:10,15 76:14 76:19 80:19 83:21 104:21 113:9,25 114:17 115:16 116:19 117:15 149:25

**public** 1:23 4:4 155:22 159:8 162:19

**purchased** 58:25 60:9 143:4

**purportedly** 38:19 90:6

**purporting** 77:23

**purports** 84:20

**purpose** 122:22

**pursuant** 1:18 72:14

**put** 30:7 81:15 93:24 97:13,19 97:24 104:17 106:24 107:7 107:11 112:15 136:8

**putting** 100:15

**q**

**quantifiable** 142:6

**quantifying** 141:24

**quarter** 84:25 108:10

**question** 4:24 4:25,25 5:4,9 5:11 6:12 20:13 22:18 23:10 30:23,25 31:18 35:12 37:16 39:18 41:25 50:19 56:11 59:14,20 65:5 83:12 86:12 91:21 92:11 153:13 158:8

**questioning** 42:8

**questions** 4:22 42:7 49:13,14 154:7 158:7

**quickly** 17:4 118:8

**quite** 61:15

**quote** 98:17,18

**r**

**r** 2:2 3:2 4:1,2 5:1 6:1 7:1,18 8:1,18 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1

83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1,2 156:1 157:1

**[r - recently]** Page 24

158:1 159:1,2
161:3,3
**ran** 152:16
153:20
**ranucci** 2:7
16:24 17:5,8
17:13 19:22
20:20,23 23:3
23:24 24:9,13
27:16 28:10,20
29:21 30:6,19
31:8,16 32:11
32:16,24 33:4
33:12 34:5,11
34:15,22 35:4
35:11,20 36:3
36:12,15,22
37:5,11,24
38:11,20 39:2
39:6,12,17
40:3,7,16,23
41:6 42:3,12
42:16,20,25
43:6,13,24
45:7,14,21
46:8,16 47:10
47:17 48:2,11
48:18 50:18,25
54:5 55:8
56:23 58:8,21
59:3,19 60:19
60:25 61:8,12
62:14 63:6,13
63:18 64:2,8
64:19,22 65:2

65:9,16,25
66:11 68:6,21
69:20 72:8
73:3,10,15
75:17,21 76:10
76:17,23 77:15
78:2,17 79:3
79:10,24 80:8
80:15,20 81:2
81:9,24 85:13
86:2,14 87:5
87:16 89:13
92:7,16,22
93:7,15 95:20
97:17 98:3
99:9,14 100:6
100:23 101:4
101:20 103:2
103:13 104:13
105:18,25
106:25 107:8
107:16 108:4
108:25 109:14
109:23 111:6
111:20 112:4
113:2,10,19
114:2,11,18
115:2,5,10,17
116:2,9,15,20
117:8,12,16,18
118:18,24
119:6,10,14,21
120:3,7,23
121:12,21
123:13,24

124:5,19 125:3
127:11 128:24
131:10,20
132:6,13,23
133:10,17
135:19 136:10
136:18 137:5
139:7,12 140:3
142:4 143:12
145:20 146:19
151:18,22
152:5,10,13,18
153:3,10,21
154:4,9 160:1
**rate** 132:11,16
139:16 140:2
140:17 149:21
150:2,8
**rather** 5:15
**rdawson845a...**
143:22
**rdawsson845...**
144:18
**reach** 45:3
48:15 72:6
**reached** 48:8
**read** 57:14
58:11 72:20
75:10 78:10
79:19 85:6
87:9 96:9
108:5 112:20
154:12 160:9
162:5

**reading** 6:21
51:7
**reads** 78:4
**real** 119:4,12
**really** 134:20
**reason** 5:2 6:9
34:8 41:3
99:11,16
160:11 161:6,9
161:12,15,18
161:21
**recall** 71:8 72:9
82:21 106:21
107:5,9
**receipt** 142:23
160:17
**receipts** 21:16
150:22
**receive** 61:21
62:2,7 66:23
67:3 68:23
72:22 73:5
100:20 108:16
144:16
**received** 19:2
67:8 68:17
69:5,12,16
93:10 108:17
119:18
**receiving** 29:19
111:23
**recent** 53:16
**recently** 7:3
144:15

**recognize**
52:12 53:5,12
53:13 103:17
**recollection**
50:15,22 74:6
109:20 138:18
151:5
**record** 4:9
17:18 20:2,3,7
20:24,25 24:13
24:14 42:3,4
56:5 69:20,21
71:20,25 83:8
94:13 104:3
117:18,19
136:6 139:20
142:14 143:12
143:13,15
150:10,11,14
151:25 159:12
**recordings**
22:10
**records** 153:12
**recover** 121:25
**recovered**
144:15
**redacted** 51:14
**refer** 18:4,6,18
**referenced**
160:6
**referencing**
117:2
**referring**
127:17 136:14

**refers** 143:17
**reflects** 99:4
**refresh** 50:14
50:22 74:5
138:18
**refused** 86:20
**regarding**
62:18 63:5,9
67:5,9 69:6,13
69:18 89:10
96:13 143:9,17
144:17 149:8
152:24
**registered**
13:17
**rehab** 14:17
140:9 149:19
**related** 18:12
41:18 159:15
**relying** 63:16
**remains** 141:11
**remember** 11:9
19:6 21:8 22:6
24:16 31:11
38:7 47:18
48:12 52:18
53:24 54:7
55:5,11 67:12
67:14 71:10
76:18 106:3
109:24 111:23
112:3 124:24
126:23 130:19
133:8,11
138:16 140:4

141:18
**remind** 5:25
45:24 140:8
**rep** 133:19
**repayment**
46:18
**repeat** 5:4
31:17 39:18
50:19 59:20
99:15
**repeated** 4:25
**rephrase** 5:5
33:16
**reporter** 5:13
5:24 6:21 49:5
55:24 70:6,14
70:20 94:10
118:7 157:15
**represent** 4:18
38:19 60:8
77:23 84:6
**representation**
110:14
**representations**
78:6 79:15
**representative**
35:7 37:4,10
37:18,21 38:10
38:25 39:5,11
**represents**
85:18,19
**request** 81:17
110:8 142:12
**requested** 51:6
158:2

**required**
108:19 110:16
111:13 162:13
**reserve** 30:9
**reserved** 3:22
**reshowing**
117:5
**reside** 7:5,20
8:10
**resided** 6:25
28:18 92:6
**residing** 7:14
8:7,12,20 9:5
73:18 74:7,11
89:16 90:14,21
**respective** 3:6
**responded**
42:18
**response** 5:20
102:12
**responses**
42:10,15,24
43:5,9,12
**responsibilities**
38:25 39:10
**responsible**
123:10 126:22
129:9
**result** 18:15
119:19 120:2
120:21 121:15
135:6
**retained**
157:15

**return** 98:19 124:16 125:2 128:15 145:10 146:4 148:22 160:13,16
**returned** 106:9
**returning** 147:10
**reveal** 20:14
**review** 19:21 20:18 21:6 34:13 42:9 61:18 74:21 78:25 112:18 112:23 114:6 116:6,14 160:7
**reviewed** 19:17 21:16,24 39:14 39:19,24 75:7 114:8
**revisions** 34:25 35:24 36:2,5
**ride** 145:7 149:3
**right** 22:6 23:18 30:9 50:7,10 51:19 54:12 66:12 84:17 103:24 112:3 126:25 136:9,23
**riverside** 9:9,12
**roach** 1:8 39:25 40:5,21 41:4 111:3 116:8

**room** 6:8
**rose** 1:22 159:7 159:23
**roxane** 104:9
**roxanne** 1:3,17 2:5 4:10 9:19 27:12 55:9 72:13 84:8 85:5 92:13 98:23 104:5 107:6 155:15 160:4,5 161:1 161:2,24 162:1 162:2,4,12
**rules** 1:19
**rulings** 158:7
**run** 152:8

**s**

**s** 2:2 3:2,2 4:2 7:18 8:19 12:10 156:2 161:3
**salary** 131:19
**sale** 57:13 58:15 59:12
**sara** 2:17
**saw** 49:21 56:15 70:25 71:6,11 82:5,7 82:14,19 91:17 101:2 138:3,8 138:19
**saying** 47:5 56:9 61:16 121:24 128:21

**says** 50:2,10 51:9,10 55:3 57:9 58:18 59:4,8 60:6 61:10,14 72:13 73:16 74:18 79:14 84:3,7 84:15 86:5,16 86:18,22 87:5 94:20,25 96:7 96:19 98:9,20 99:10 100:7,8 104:4 106:17 108:11,15,17 110:11,23 112:14,16 113:13 114:5 115:19 116:4 116:24 138:23 139:9 141:22 143:21 145:2
**scare** 135:23
**schedule** 133:2 146:21
**school** 12:22,23 44:5,8 47:7 50:6 150:23
**schooling** 44:7 47:8
**scored** 57:2
**screen** 95:3,9
**screened** 136:3
**se** 91:25
**sealing** 3:7

**search** 26:14,19 56:8
**searches** 32:5
**searching** 30:14,16 31:13 32:8
**second** 72:12 73:21 86:8 102:7 104:8
**section** 110:12
**security** 51:13
**see** 49:10 72:18 84:7,16 98:11 98:25 108:10 108:19 138:11 138:23 148:25
**seeing** 50:14,20 53:24 109:17 135:10 138:16
**seeking** 126:2
**seemed** 108:6
**seen** 49:17 53:14,17 56:3 56:12 70:23 82:12 94:15 137:24
**selected** 77:17
**selling** 65:13,24 66:9
**send** 27:13 110:16,24 111:2,5,13 112:9
**sending** 116:25 118:12

**[sent - sounds]**

**sent** 27:7,18 29:4 74:21 75:14 82:2 83:3,6,10 95:11,16 96:4 160:14
**sentence** 10:22 57:8 58:11
**september** 50:16,24
**series** 4:21
**serve** 28:16 29:18 30:15 81:22 86:7 91:24 92:4,12 92:20 97:7 101:8,17
**served** 84:4 85:5,10,24 86:11 90:3,6,8 91:4 93:6,14 93:23 98:22 107:3 108:23 109:13,22 115:23 135:16
**server** 90:10
**service** 3:16 28:24 70:9,11 84:4,15,21 86:9,23 89:21 91:22 98:9 99:4 102:2 108:11,18 115:20 156:18

**services** 15:8
**set** 159:11,20
**seven** 131:4
**shake** 5:22
**sheet** 160:11
**shift** 14:22
**short** 118:10 150:14
**shot** 95:3,9
**show** 49:7 53:10 56:6 76:14 82:10 94:11 102:6 103:15 116:13 132:21 137:21 147:12 149:25 150:7
**showed** 64:16 102:23 130:7
**showing** 55:25 70:21 103:24 149:20,24
**shown** 75:8
**shows** 64:6 66:8,18 142:14
**sick** 131:12
**side** 6:22
**sign** 43:4,8 154:12 160:12
**signature** 52:13 52:16,21,25 53:6 159:23
**signatures** 52:11

**signed** 3:10,12 3:15 46:22 47:16 54:4 99:5 160:19
**signing** 52:18
**similar** 16:12 27:15 72:23 73:7 104:24
**similarly** 1:4 2:5
**sit** 43:21 58:5 101:15 107:10 128:20
**situated** 1:4 2:5 98:15
**situation** 137:8 137:8
**six** 32:19,22 87:2 89:3
**sleep** 134:14
**sleeping** 135:2 135:5
**slow** 16:25
**sls** 33:10 34:3 72:14,17 113:16 114:8
**sls's** 34:9
**social** 51:13
**sold** 57:19,23 58:3 64:25 65:7 66:19
**sole** 34:8 41:3
**solution** 79:19
**solutions** 1:8 2:11 4:19 25:5

25:17 33:23 38:22 39:16,21 42:10 57:14,24 58:7,16,25 59:13,18 60:9 63:9 64:25 65:8,14,24 66:10,20 67:9 68:13,19,25 69:17 75:6 77:25 78:6,8 79:15 80:7,24 84:8 111:2,13 111:19,24 112:23 115:8 116:7,13 119:20 120:2 120:21 121:15 123:10 126:21 129:9 136:7 152:2 160:4,23 161:1 162:1
**somebody** 28:11 47:11 84:4
**somebody's** 93:18
**sorry** 19:8 23:16 31:17 43:7 87:7
**sort** 103:11
**sound** 23:17 139:6 143:6
**sounds** 126:16

**[southern - suite]** Page 28

**southern** 1:2
**space** 107:15
**speak** 22:18,24
  23:9,12 24:24
  29:15
**specific** 14:22
  24:19 82:25
  92:23 119:22
  149:23
**specifically**
  21:8 91:14
  93:25 120:14
  124:25 136:15
**specified**
  155:11
**specify** 48:3
**spell** 12:25
**spent** 134:16
  134:17
**spoke** 17:24
  18:21 22:22
  24:17 25:9
  103:6
**spoken** 17:19
  24:7 62:17,19
  62:24 63:4,8
  111:18
**ss** 159:4
**staff** 149:17
**stamp** 97:15,25
  100:3 103:23
**start** 26:18
  30:13,16 45:5
  46:14,17,24
  47:8,24 48:9

48:16
**started** 46:18
  120:25 140:7
  152:8
**starting** 45:5
  54:25
**state** 1:23 4:4,8
  33:2 63:16
  159:4,8
**statement**
  48:24 49:3
  78:13,22 80:5
  86:4,13 100:11
  112:12 118:13
  156:11
**states** 1:2 14:6
  98:14
**statute** 105:6
  108:7 114:22
  114:24 152:7
  152:16 153:19
**step** 31:21
  112:15
**steps** 124:10
**stick** 99:12
**sticking** 97:25
  100:21 101:2
**stipulated** 3:5
  3:20
**stony** 12:17
  44:8,9 45:10
  45:20,25 50:7
**stop** 47:8
  143:25

**street** 2:6 4:12
  6:23 8:8,21 9:5
  29:7 51:15
  52:2 73:14
  74:12 85:4
  89:17 98:24
  99:8 104:6,10
  123:7 126:10
  126:11 144:23
**stress** 135:7
  136:12 141:23
**stressed** 134:13
**stressful**
  136:17 137:8
**strike** 26:12
  30:22 31:22
  33:7 46:5 60:7
  128:6 139:23
**stub** 149:16,24
**stuck** 97:14
  100:13 101:9
  101:18 115:24
**student** 1:8
  2:11 4:18
  18:13,16 25:5
  25:17 33:23
  38:22 39:15,20
  42:9 44:11,25
  47:6 51:10
  57:14,24 58:7
  58:16,25 59:13
  59:17 60:9
  63:9 64:25
  65:7,13,24
  66:10,20 67:9

68:12,19,25
  69:17 75:6
  77:25 78:5,8
  78:14 79:7,15
  79:19 80:7,24
  84:8 111:2,12
  111:18,24
  112:22 115:7
  116:7,13
  119:19 120:2
  120:21 121:15
  123:9 126:21
  129:8 136:7
  152:2 160:4
  161:1 162:1
**stuff** 20:12 35:3
**subject** 25:4,16
  31:3 33:18
  136:16
**subscribed**
  155:18 162:14
**substance**
  22:20
**substantially**
  75:3,16
**substitute** 86:9
  98:9
**sue** 40:5,14
**sued** 12:3 31:5
  32:18 38:21
  41:4 77:24
**suggest** 74:3
**suit** 40:11
**suite** 1:21 2:11

**[summons - testimony]**                                    Page 29

**summons** 99:6
99:13,18 101:3
101:10 108:16
108:18 115:24
**suny** 50:6
**supplemental**
117:22 118:3
157:9
**support** 21:10
21:17 79:5
80:18 153:8,17
**supporting**
21:17
**surcharge**
145:2
**sure** 10:9 11:11
17:18 23:14
25:14 31:2,2
31:19 32:25
33:5 34:19
36:19,23 37:2
39:3,22 40:4
41:13 42:13,21
43:3,10,14
45:2,8 46:20
46:25 48:5,13
48:19 49:24
51:3 53:25
54:6 55:15
56:24 58:4,22
59:5,21 60:20
61:15,25 62:6
62:10 64:12
66:21 67:2,6
67:10 68:7,11

68:15 69:3,7
69:15,19 73:4
73:11,25 76:11
76:24 77:2,5,8
79:4 81:3,6,10
85:16 90:12
92:17 93:3,20
107:4,17 109:8
111:7,11,21
112:2,5 113:11
113:20 114:3
114:12,19
115:3,6,11,18
116:10,21
117:9,17
118:19,25
119:7,15,23
122:21 127:2
130:25 132:7,9
132:14 137:2
138:10,13
144:3,7,19
146:20 151:19
151:23 152:6
152:11,14,19
152:22
**swore** 99:18
**sworn** 3:10 4:3
155:5,18
159:11 162:14

**t**

**t** 3:2,2 7:18
13:2,2 68:3
155:2 156:2
159:2,2 161:3

161:3
**table** 5:3
**take** 5:21,24
6:6,12,20 15:3
19:24 31:21
37:19 44:3
60:17 73:23
110:3 120:24
120:24 121:14
128:9 131:7
148:17
**taken** 1:17
50:23 51:2
91:18
**takes** 5:13 7:9
**talk** 5:12 11:23
17:20 27:22
33:18 83:14
110:21 120:13
120:18
**talked** 17:23
37:17 95:14
107:22 116:23
129:3 152:3
**talking** 5:14
17:4 130:22,23
136:15
**tall** 87:3 89:6
**taping** 5:21
**tarantolo** 2:7
19:24 37:15
**taxi** 140:25
**taxis** 150:20,23
**technical** 13:10

**technically**
109:5
**telephone** 6:7
24:8 27:23
28:2,4,23
51:21,23 67:11
67:16 111:19
**tell** 15:22,24
28:15 30:14,21
31:7 47:11
62:11 97:22
101:11,16
105:22 119:17
121:13 125:8
134:4 137:18
**telling** 93:21
97:6
**ten** 16:17
**tenants** 90:19
90:20
**term** 56:24
66:5
**terminal**
142:17
**testified** 4:5
9:24 71:19
141:4
**testify** 155:5
**testimony** 9:22
19:19 20:19
21:6 22:11,14
22:19 25:2
77:22 92:2,8
155:6,10
159:13 160:9

160:17 162:8
**text** 27:20 28:3
28:5 29:4,19
66:16 68:24
94:4,7,17 95:4
95:9 96:11,14
100:11 101:21
101:24 117:24
118:4 153:6
157:6,13
**tfc** 15:8,9,19
16:6,8,16
131:17 132:20
133:7,15,21
139:21,22,24
139:25 140:12
**thank** 87:8,12
154:8,9
**thanks** 17:8
**theory** 144:12
**therapist** 29:23
30:4 121:6
135:10
**therapy** 121:4
134:16,17
**thereof** 98:19
**thing** 40:18
108:7
**things** 31:9
106:5 128:11
**think** 8:25
21:13,24 29:8
33:13 62:16
63:2,7,10,19
64:3 73:22

75:24 78:18
79:25 87:5
89:14 114:8
115:20 126:18
126:24 127:10
128:3,11 134:2
135:2 137:11
137:19 139:13
141:4 142:5
145:3 146:22
147:3 153:25
**thinking**
135:24
**third** 90:20
**thought** 25:6
**threatened**
136:7
**three** 8:24 24:2
29:9,12,16
32:19,22 67:21
107:18 108:13
108:17,24
130:22,23,24
143:16,21
146:10
**thursday** 23:14
**tickets** 21:10
**time** 1:13 3:22
4:23 5:15 6:7
8:4,16 11:13
27:25 29:3,16
31:20 32:7
40:25 46:9,22
48:3,7 49:20
49:22 53:16,23

56:15 58:24
59:16 60:6,13
61:5 70:25
71:6 73:23
75:3 82:4,6,14
82:19 90:5,10
92:12,15,20
105:7 108:5
109:3,9 113:17
120:12,16
121:5 122:13
122:14 124:7
128:4,8,9,14,17
129:5,19,22
130:3 131:7,12
131:13,14
132:2 133:25
134:11,16,17
137:14,14
138:3,8 145:17
147:4 148:12
155:10 160:18
**timeframe**
25:23 26:7
32:17,20 160:8
**times** 24:3,6,17
71:11 125:24
132:11
**today** 4:22 6:18
8:10 11:23
17:21 19:19
20:19 21:7
22:11,14,19
25:2 28:7
33:19 34:2

43:21 52:4
58:5 69:10
83:15 88:5,9
88:14 95:15
101:16 107:10
128:21 152:4
**told** 17:12
26:24 28:11,13
35:13 61:23
91:15 92:5,13
93:16 99:23,25
107:5,13 137:3
**took** 43:22
45:19 46:4,6
46:12 50:15
64:11 95:9
118:9 121:22
126:4 128:9
144:25 145:3
147:5 150:19
**top** 11:11 50:2
54:12 84:7,16
94:20,25 104:4
105:3 106:18
120:17 126:23
129:15 133:9
133:13
**totally** 131:8
**towards** 21:12
50:2
**transcript** 5:17
154:12 155:9,9
160:6,19 162:5
162:8

**transportation** 125:19,20 126:9
**travel** 140:23 147:5,9,9,24 148:17
**traveled** 143:5 145:23
**trial** 3:22 9:25
**tried** 68:5 92:12,20
**trigger** 135:17 136:20
**trip** 142:15,24 143:10,18 151:9
**trouble** 134:25
**true** 155:9 159:12 162:8
**truth** 155:5
**try** 5:5,8,10,16 81:22 91:23
**trying** 60:2 134:18
**tuesday** 146:25 147:22
**turn** 73:13
**turned** 106:13 154:2
**twice** 86:22
**two** 5:14 8:24 8:24 9:13,14 23:7 29:8,11 29:16 52:11,11 85:4 89:8

106:4 108:13 108:15,24 122:15 134:21 138:14 147:24
**type** 35:3 104:12,14
**typed** 97:6 104:9,11,15

**u**

**u** 3:2 7:18
**uber** 125:18 142:15 144:21 145:7 149:3 150:20
**ubers** 120:25 125:8,9,10,11 125:14,17 126:3,20 129:4 133:24 140:25
**uh** 6:2,2
**ultimately** 102:8
**unconsciona...** 110:15
**under** 5:3 72:13 98:9 99:19 112:19 135:7
**underlined** 108:12
**underneath** 53:2 84:14 96:3,7
**understand** 4:24 25:15

37:12 56:9 93:21 97:20 100:12 109:2
**understanding** 25:25 26:15 27:3 38:9 46:13,23 54:18 54:21 57:22 58:6 79:11 85:14,15,21 90:2 91:2,5,9 96:25 100:13 100:17 109:11 147:18
**understood** 51:5 52:22 124:12 136:5 150:25
**undertaking** 116:5
**unfair** 110:15
**unintentionally** 153:7
**united** 1:2 98:14
**university** 12:17
**unsigned** 3:14
**untimely** 26:16 31:15,25 32:10 32:15 33:9,23 34:4 107:25
**use** 6:8 69:10 85:11 131:13 144:10

**used** 3:14 160:19
**username** 144:13
**using** 67:12 69:9 143:25 144:4

**v**

**v** 160:4 161:1 162:1
**vacation** 131:7 131:13
**vague** 85:14
**validation** 110:24 111:3,5 111:14 112:10 116:23
**variety** 141:22
**vendor** 133:20
**verbal** 5:19
**verbally** 47:11 107:13
**verification** 43:5,9,11
**verify** 160:9
**veritext** 160:14 160:23
**veritext.com** 160:15
**versus** 29:18 84:8 97:24 100:21 139:16
**video** 5:21
**videos** 22:13

**[viewing - year]**                                                    Page 32

**viewing**  71:10
**violated**  110:12
**violation**  112:9
**violations**
  110:17 112:16
  118:11
**visual**  97:25
**voicemail**
  68:17,22

**w**

**w**  4:2 13:2
**wages**  136:8
  139:5
**waived**  3:9
**want**  9:13
  13:15 20:7,11
  22:20,21 25:14
  38:19 39:10
  49:11 121:25
  128:13 137:18
  150:15
**wanted**  150:17
**waste**  133:25
**wasted**  121:4
  128:4,7
**watch**  22:13
**way**  5:12 35:12
  48:6 54:7
  63:23 64:17
  68:17 84:25
  86:18 88:3
  92:19 101:12
  108:10 159:17
**we've**  115:21

**wednesday**
  23:15,16
  146:25 147:22
**week**  29:12,16
  53:20 131:3
  132:2 147:18
  148:6,10,13,16
**weeks**  29:9
  130:23,24
**weighing**  87:3
**weight**  89:11
  135:6
**went**  15:13
  103:3,6 145:24
  146:7,13
  150:18
**whereof**  159:19
**white**  16:11
**williams**  62:3
  62:25 63:4
  67:4 68:8,18
  68:24 69:13,24
  70:3 71:15,21
  73:6 77:3 81:8
  117:3 118:15
  156:15
**willing**  39:4
**withheld**  153:7
**withhold**
  153:11
**withholding**
  153:15,23
**witness**  3:10,16
  3:18 4:3 36:10
  37:8 154:14

159:10,13,19
  160:8,10,12,18
**woman**  96:8,19
  96:22 97:2,7
  101:2,8 102:21
**word**  35:2,3
  85:11
**wordage**  61:13
**words**  127:10
  135:3
**work**  14:22
  82:8 129:10,13
  130:2,13,17
  131:6,8 132:5
  133:25 139:5
  145:19 146:25
  147:16,22,25
  148:2,14
  149:18
**workday**
  146:13
**workdays**
  146:18
**worked**  146:22
  147:19
**working**  16:6,8
  131:17,25
**worry**  136:4
**worth**  142:2
**wreaking**
  134:20
**write**  106:19
  141:8
**writes**  96:3

**written**  61:21
  66:17,24 67:4
  67:8 111:23
**wrong**  25:8,18
  25:21 26:5
  33:11 77:22
**wrongful**  34:10
**wrongfully**
  31:24
**wrote**  107:13

**x**

**x**  1:3,10 4:2
  45:6 47:9
  105:23 106:14
  145:7 156:2
  157:18
**xs**  106:3

**y**

**y**  45:6 47:9
**yeah**  11:17
  14:23 15:25
  17:5 21:14
  39:7 62:21
  88:2 125:20
  128:19 130:9
  133:5 147:25
**year**  7:3,8,25
  11:10 12:18
  13:3 15:2
  60:17 88:11
  115:4 125:5
  134:24 152:12
  152:20

**[years - z]**                                                   Page 33

**years** 8:24,25
9:13,14 16:17
32:19,22 45:24
67:22 87:2
88:14 134:22
**york** 1:2,21,22
1:23 2:4,6,6,12
2:12 4:4,13
6:24 10:13
14:3,7,19 16:8
16:11,16 47:21
84:12 85:4
98:24 104:6
121:18,23
122:2,19 123:3
123:12,16
124:13,14,16
125:2,12,15
126:6,8,9,13
127:9,21
128:15,18
129:20,21
139:22,25
145:14,18
147:9 148:3
159:4,9
**young** 23:7

**z**

**z** 45:6 47:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.